1  Steven M. Kroll, Bar No. 216196
   FORD & HARRISON LLP
2  350 South Grand Avenue, Suite 2300
   Los Angeles, California 90071
3  Telephone: (213) 237-2400
   Facsimile: (213) 237-2401
4  skroll@fordharrison.com

5  Jeffrey D. Mokotoff, GA Bar No. 515472
   FORD & HARRISON LLP
6  *Admitted Pro Hac Vice*
   1275 Peachtree Street, NE, Suite 600
7  Atlanta, Georgia 30309
   Telephone: (404) 888-3800
8  Facsimile: (404) 888-3863
   jmokotoff@fordharrison.com
9
   Attorneys for Defendant
10 KNOWLEDGESTORM, INC.

11              UNITED STATES DISTRICT COURT

12     NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

13

14 JASBIR GILL, MAHMOUD          Case No. C 07-04112 PVT
   KEDKAD,
15                               **DEFENDANT**
              Plaintiffs,        **KNOWLEDGESTORM, INC.'S**
16                               **NOTICE OF MOTION AND**
        v.                       **MOTION FOR SUMMARY**
17                               **JUDGMENT OR, IN THE**
   KNOWLEDGESTORM, INC., a       **ALTERNATIVE, PARTIAL**
18 corporation, DOES 1through 50, **SUMMARY JUDGMENT, AGAINST**
                                 **PLAINTIFF MAHMOUD KEDKAD;**
19            Defendants.        **MEMORANDUM OF POINTS AND**
                                 **AUTHORITIES**
20
                                 Date:    June 3, 2008
21                               Time     10:00 a.m.
                                 Crtrm:   5, 4th floor
22
                                 Action filed: July 13, 2007
23                               Trial date: August 4, 2008

24

25

26

27

28

Ford & Harrison
LLP
Attorneys At Law
Los Angeles

LA:66304.1

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD

1    TO PLAINTIFF MAHMOUD KEDKAD AND HIS ATTORNEYS OF

2    RECORD:

3    PLEASE TAKE NOTICE that on June 3, 2008, at 10:00 a.m., or as soon

4    thereafter as the matter may be heard in Courtroom 5, 4th floor of the United States

5    District Court, Northern District of California, San Jose Division, located at 280

6    South 1st Street, San Jose, California 95113, defendant KnowledgeStorm, Inc.

7    ("Defendant") will and does hereby apply to this court for an order granting

8    summary judgment in its favor and against plaintiff Mahmoud Kedkad ("Plaintiff").

9    This motion is made on the grounds that Plaintiff's claim for racial

10    harassment against Defendant has no merit, that there is no triable issue of material

11    fact as to the legal issues raised therein, and that Defendant is entitled to judgment

12    on Plaintiff's claim for racial harassment as a matter of law.

13    In the alternative, Defendant will move, and by this motion hereby does

14    move, this court for an order granting partial summary judgment in its favor and

15    against Plaintiff with respect to the following issues:

16    Issue One:   Defendant is entitled to partial summary judgment in its favor

17    and against Plaintiff on his cause of action for racial harassment because Plaintiff

18    cannot establish a prima facie case as a matter of law.  (Facts 1-75.)

19    Issue Two:   Defendant is entitled to partial summary judgment in its favor

20    and against Plaintiff on his cause of action for racial harassment because Plaintiff

21    could have avoided any alleged harassment if he had complied with Defendant's

22    No-Harassment Policy as a matter of law.  (Facts 1-75.)

23    This motion is based upon this notice of motion and motion, the

24    memorandum of points and authorities, the separate statement of uncontroverted

25    facts, the evidence submitted in support of the this motion, all papers and pleadings

26    filed by the parties herein, and upon any other oral or documentary evidence that

27    may be timely presented prior to or at the hearing of this motion.

28

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                                  - 2 -                    DEFENDANT'S MOTION FOR SUMMARY
                                                                    JUDGMENT AGAINST PLAINTIFF KEDKAD

1

2

Dated:  April 29, 2008                    FORD & HARRISON LLP

3

4                                         By: /s/ Steven M. Kroll

5                                             Jeffrey D. Mokotoff
                                              Steven M. Kroll
                                              Attorneys for Defendant
6                                             KNOWLEDGESTORM, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                    - 3 -                    DEFENDANT'S MOTION FOR SUMMARY
                                                      JUDGMENT AGAINST PLAINITFF KEDKAD

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF FACTS .....................................................................2

    A.    The Parties and Witnesses.............................................................2

    B.    Kedkad's Employment with KnowledgeStorm................................2

    C.    KnowledgeStorm's No-Harassment Policy ....................................3

    D.    Alleged Harassment by Joe Brown ...............................................3

        1.    Alleged statements witnessed by Kedkad..................................3

        2.    Alleged statements never witnessed by Kedkad.........................5

    E.    Kedkad's Alleged Report of Harassment to Hoback ......................5

    F.    Miller's Harassment Complaint Against Kedkad ...........................6

    G.    Kedkad's Report of Brown to Gay................................................6

III.  SUMMARY JUDGMENT STANDARD ..................................................6

IV.   ARGUMENT ......................................................................................7

    A.    Plaintiff's Racial Harassment Claim Is Without Merit Because He Cannot Establish a Prima Facie Case of Racial Harassment...........7

        1.    The conduct complained of by Plaintiff was not "because of" his race ...........................................................................7

        2.    The conduct complained of by Plaintiff was not "sufficiently severe or pervasive" to alter his conditions of employment and create an abusive working environment....... 10

    B.    Plaintiff Could Have Avoided Any Alleged Harassment if He Had Complied with KnowledgeStorm's Complaint Procedures under its No-Harassment Policy.......................................................... 14

V.    CONCLUSION............................................................................... 16

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

- i -

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)..................................................................................7

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)............................................................................. 6, 7

*Harper v. Wallingford,*
  877 F.2d 728 (9th Cir. 1989) .................................................................7

*Manatt v. Bank of America,*
  339 F.3d 792 (9th Cir. 2003) ............................................................... 13

*Martinez v. Marin Sanitary Service,*
  349 F. Supp. 2d 1234 (N.D. Cal. 2004).................................... 9, 11, 12, 13

*Vasquez v. County of Los Angeles,*
  349 F.3d 634 (9th Cir. 2001) ........................................................ 11, 12, 13

## STATE CASES

*Aguilar v. Avis Rent A Car System, Inc.,*
  21 Cal. 4th 121 (1999) ................................................................. 7, 10, 11

*Beyda v. City of Los Angeles,*
  65 Cal. App. 4th 511 (1998) ......................................................... 9, 10, 12

*Etter v. Veriflo Corp.,*
  67 Cal. App. 4th 457 (1998) ................................................................. 11

*Fisher v. San Pedro Peninsula Hospital,*
  214 Cal. App. 3d 590 (1989) ............................................................ 7, 11

*Guthrey v. State of California,*
  63 Cal. App. 4th 1108 (1998) ...............................................................7

*Horn v. Cushman & Wakefield Western, Inc.,*
  72 Cal. App. 4th 798 (1999) ............................................................. 9, 10

*Jones v. Department of Corrections and Rehabilitation,*
  152 Cal. App. 4th 1367 (2007) ............................................................. 10

*Lyle v. Warner Brothers Television Products,* 38 Cal. 4th 264 (2006) .............. 7, 11

*State Department of Health Services v. Superior Court,*
  31 Cal. 4th 1026 (2003) ................................................................. 14, 15

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

- ii -

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINITFF KEDKAD

# TABLE OF AUTHORITIES
## (continued)

**Page**

*West v. Bechtel Corp.,*
   96 Cal. App. 4th 966 (2002) ..................................................................... 9, 10

## STATE STATUTES

Cal. Code Regs., tit. 2, § 7287.6(b)(1)(A) ............................................................. 8, 9

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINITFF KEDKAD

**MEMORANDUM OF POINTS AND AUTHORITIES**

1       **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.    INTRODUCTION**

3           Plaintiff Mahmoud Kedkad ("Kedkad"), who is Middle Eastern, asserts his

4   remaining claim of racial harassment in violation of the California Fair

5   Employment and Housing Act (FEHA) against defendant KnowledgeStorm, Inc.

6   ("KnowledgeStorm").[1]  Kedkad worked as a sales executive out of the company's

7   South San Francisco office for approximately a year from November 2006 to

8   December 2007.  During the first five months of his employment, Kedkad alleges

9   his supervisor, Joe Brown, who worked out of the company's Atlanta office,

10  verbally harassed him during his periodic sales visits.  However, the conduct of

11  which Kedkad complains does not rise to the level of unlawful harassment under

12  the FEHA.  Particularly, Brown's alleged remarks were neither "because of"

13  Kedkad's race, nor "sufficiently severe or pervasive" to alter the conditions of

14  Kedkad's employment and create an abusive working environment.

15          Moreover, Kedkad never properly reported the alleged harassment pursuant

16  to the company's No-Harassment policy until months later when *he* was the subject

17  of a harassment complaint by a coworker.  Although KnowledgeStorm contends

18  Kedkad fabricated these allegations in response to the investigation of harassment

19  against him, he could have avoided any alleged harassment during the first part of

20  his employment by complying with the company's formal complaint procedures for

21  reporting harassment.  Nevertheless, even taking his allegations in the light most

22  favorable to him, Kedkad's racial harassment claim fails as a matter of law.

23

24  _____

25  [1]     Kedkad's attorney of record advised KnowledgeStorm that Kedkad is no longer pursuing a retaliation claim against KnowledgeStorm. (Kedkad Depo., p.

26  92:17-94:6; Ex. A - Kreger letter.)  Kedkad is not pursuing a wrongful termination claim against KnowledgeStorm. (Complaint, ¶¶ 33-37; Ex. B & C - Kedkad's

27  Response to Request for Admission, No. 20).  Accordingly, Kedkad's sole claim

28  against KnowledgeStorm is one for racial harassment.

## II.    STATEMENT OF FACTS

### A.    The Parties and Witnesses

Kedkad is a Middle Eastern male who was born in Libya. (Fact 1.)

KnowledgeStorm was a company that provided search resources for technology solutions and information. It gave technology vendors opportunities to reach business and technology professionals as they conducted research online and gave contact information that converted them into web leads. (Fact 2.)

Kelly Gay was the chief executive office and president of KnowledgeStorm. (Fact 3.) Mike Ewers was its vice president of finance and human resources. (Fact 4.) Jim Canfield was its vice president of sales. (Fact 5.) Jason Hoback was its director of sales, reporting to Canfield. (Fact 6.) Joe Brown was its western regional sales manager, reporting to Hoback. (Fact 7.)

Joseph Niederberger, Lisa McGuire, Katie Kimball, Rachel Gordon, and co-plaintiff Jasbir Gill were sales executives of KnowledgeStorm and coworkers of Kedkad. (Fact 8.)

### B.    Kedkad's Employment with KnowledgeStorm

On or about October 20, 2006, Kedkad interviewed with several employees of KnowledgeStorm at its headquarters in Atlanta, Georgia. (Fact 9.) On October 30, 2006, Brown offered Kedkad a sales executive position with the company. (Fact 10.) Kedkad accepted the offer. (Fact 11.) He began working for KnowledgeStorm on or about November 20, 2006. (Fact 12.)

Kedkad worked out of KnowledgeStorm's South San Francisco office. (Fact 13.) There were approximately eight employees working in cubicles in this office. (Fact 14.) Kedkad had a good working relationship with most of his coworkers and, as time went on, he believed he had a "better working relationship" with coworkers McGuire, Kimball, Gordon, and co-Plaintiff Gill. (Fact 15.)

Kedkad reported directly to Brown. (Fact 16.) However, Brown did not work out of the South Francisco office. (Fact 17.) He worked out of the Atlanta

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                              - 2 -                              DEFENDANT'S MOTION FOR SUMMARY
                                                                          JUDGMENT AGAINST PLAINTIFF KEDKAD

1  office. (Fact 18.) Brown traveled to the South San Francisco office once every two

2  or three weeks. (Fact 19.)

3        Kedkad thought "[he] was a good salesman" at KnowledgeStorm. (Fact 20.)

4  Brown openly praised Kedkad for his sales efforts at the company. (Fact 21.)

5  Kedkad was an above quota sales performer for the first quarter of 2007. (Fact 22.)

6  Kedkad readily described himself as being "hard-working" and "very successful,"

7  during this quarter. (Fact 23.) Kedkad does not "live [his] life based on what other

8  people think." (Fact 24.)

9        **C.**   **KnowledgeStorm's No-Harassment Policy**

10        After his hire, Kedkad attended a training from on or about December 4 to 8,

11  2006, in the Atlanta office. (Fact 25.) During the training, KnowledgeStorm held a

12  presentation on its employment policies and procedures, including its No-

13  Harassment policy. (Fact 26.) At the training or at some other time in 2006,

14  Kedkad received a copy of KnowledgeStorm's employee handbook ("Handbook").[2]

15  (Fact 27.) The Handbook included a No-Harassment policy that required an

16  employee who "is being harassed . . . or believes his/her employment is being

17  adversely affected by such conduct" to "immediately report their concerns to"

18  either "Mike Ewers, Vice-President" or "Kelly Gay, CEO." (Fact 28.)

19        **D.**   **Alleged Harassment by Joe Brown**

20          **1.**   *Alleged statements witnessed by Kedkad*

21        Kedkad claims Brown harassed him because of his race. (Complaint, ¶¶ 5-

22  22). During the second or third week in December 2006, Kedkad allegedly

23  overheard Brown say to Niederberger, "What do you think of the camel jockey

24

25  _____

   [2]   Only when Kedkad's attorney of record improperly coached Kedkad, by
interrupting Kedkad's cross-examination to ask KnowledgeStorm's counsel, "Do

26  you have a signed acknowledgment," did Kedkad subsequently change his

27  testimony and state that he now did "not recall receiving" the Handbook. (Kedkad
Depo., p. 60:4-12)

28

LA:66304.1               - 3 -              DEFENDANT'S MOTION FOR SUMMARY
                                                             JUDGMENT AGAINST PLAINTIFF KEDKAD

1    we've hired? Why don't you take the swat on him so he can start making some

2    calls?" (Fact 29.) Brown was allegedly speaking with Niederberger at

3    Niederberger's cubicle. (Fact 30.) Kedkad was walking by when he heard Brown's

4    alleged remark. (Fact 31.) Kedkad did not know the context of the remark; he was

5    not a part of the conversation. (Fact 32.) Kedkad thought the statement was about

6    him because he was "self-conscious about making phone calls." (Fact 33.) Kedkad

7    never heard Brown use the term "camel jockey" on any other occasion. (Fact 34.)

8    However, Kedkad has heard that term "all the time" outside of his employment.

9    (Fact 35.)

10        In the middle of January 2007, Brown allegedly made comments about

11   Kedkad's clothes. On one day, Brown allegedly asked Kedkad, "Why are you

12   dressed like this? You think you're in the Middle East?" (Fact 36.) Kedkad was

13   not wearing anything distinctive to the Middle East. (Fact 37.) He was wearing "a

14   long shirt and pants, a heavy shirt." (Fact 38.) Kedkad did not say anything in

15   response. (Fact 39.)

16        One or two days later, Kedkad arrived at work wearing a light jacket that was

17   long. (Fact 40.) Brown allegedly asked Kedkad, "What is this funny weird clothes

18   you're wearing?" (Fact 41.) There was nothing distinctive about Kedkad's jacket

19   that would suggest it was Middle Eastern. (Fact 42.) Kedkad told Brown "that this

20   is a style here." (Fact 43.)

21        During the third week of February 2007, Brown and Kedkad were having a

22   conversation on different topics including about foreigners living in the bay area.

23   (Fact 44.) In this conversation, Brown allegedly told Kedkad that he thought there

24   were many Indians and how they were taking all the jobs to the point were he hates

25   them. (Fact 45.) Kedkad did not say anything in response. (Fact 46.)

26        At the end of March 2007, Kedkad and Brown met with a prospective client.

27   (Fact 47.) After the meeting, while walking outside of the client's office building,

28   Kedkad asked Brown what he thought of the meeting. (Fact 48.) Brown allegedly

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                - 4 -              DEFENDANT'S MOTION FOR SUMMARY
                                              JUDGMENT AGAINST PLAINTIFF KEDKAD

1   stated, "You know, I think you should go back to school, learn some English, read
2   and write so you can speak normal like us. You'll really be successful. You need
3   it." (Fact 49.) Kedkad allegedly asked Brown, "Why do you think that?" (Fact
4   50.) Brown allegedly said that Hoback told him Kedkad made too many mistakes
5   in his proposals. (Fact 51.) Kedkad allegedly told Brown that he "made one
6   mistake in a company's name, one line in a company's name, and [Hoback] pointed
7   it out to [him] and it was corrected." (Fact 52.)

8                    **2.    *Alleged statements never witnessed by Kedkad***

9        On February 21, 2007, the employees in the South San Francisco office
10   attended a party after work. (Fact 53.) Kedkad did not attend the party. (Fact 54.)
11   His coworkers allegedly told him about the party the next day. (Fact 55.) McGuire
12   allegedly told Kedkad that Brown told her at the party that Kedkad was not invited
13   because he would be "scoping out terrorist targets." (Fact 56.)

14        At some time after the week of March 26, 2007, co-plaintiff Gill allegedly
15   told Kedkad that Brown told her that "all Muslims are terrorists." (Fact 57.)
16   However, Kedkad did not witness Brown making this comment. (Fact 58.) There
17   is no testimony that Kedkad is Muslim, or that Joe Brown understood Kedkad was
18   or was not Muslim.

19        At some time toward the end of April or beginning of May 2007, co-plaintiff
20   Gill allegedly told Kedkad that she heard from Niederberger that Brown referred to
21   Kedkad as a "sand nigger." (Fact 59.) However, Kedkad never heard Brown use
22   the term "sand nigger." (Fact 60.) Gill also never heard Brown use the term "sand
23   nigger." (Fact 61.)

24            **E.    Kedkad's Alleged Report of Harassment to Hoback**

25        Kedkad allegedly told Hoback of the "camel jockey" and "dress" comments
26   at the end of January 2007. (Fact 62.) He allegedly told Hoback about the
27   "scoping out terrorist targets" comment at the end of March 2007. (Fact 63.)
28   Kedkad allegedly told Hoback about the "Indians in the area" remark in late March

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                                 - 5 -                    DEFENDANT'S MOTION FOR SUMMARY
                                                                   JUDGMENT AGAINST PLAINTIFF KEDKAD

1    2007. (Fact 64.) He allegedly told Hoback of the March 2007 "learn some

2    English" comment in the beginning of *February* 2007. (Fact 65.)

3    **F.    Miller's Harassment Complaint Against Kedkad**

4    On the morning of April 25, 2007, Elysse Miller, the new business

5    development representative ("BDR") assigned to help Kedkad with his sales, had a

6    telephone conversation with Kedkad. (Fact 66.) After this conversation, Miller

7    reported to KnowledgeStorm that Kedkad told her, among other things, "I wish I

8    didn't have a woman as a BDR," or words to that effect. (Fact 67.) That same

9    afternoon, Gay interviewed Miller concerning her report. (Fact 68.)

10    Gay interviewed Kedkad the following day on April 26, 2007. (Fact 69.)

11    During the interview, Kedkad advised Gay, for the first time, that he believed there

12    was discrimination ongoing in the South San Francisco office. (Fact 70.)

13    **G.    Kedkad's Report of Brown to Gay**

14    71.    Immediately after completing her interview of Kedkad regarding

15    Miller's complaint, Gay commenced an investigation into Kedkad's complaint of

16    discrimination. (Fact 71.) During the evening of April 26, 2007, Gay spoke with

17    Kedkad regarding his complaint. (Fact 72.) KnowledgeStorm also interviewed Joe

18    Brown, Jason Hoback, Kevin Cummings, Rachel Gordon, Rick Neigher, Tracy

19    Mikolajewski, Matt Hart, and Emily Crume. (Fact 73.) KnowledgeStorm

20    concluded that Brown did not engage in any discriminatory behavior. (Fact 74.) To

21    minimize any further interaction between Brown and Kedkad, KnowledgeStorm

22    began having Kedkad report to Canfield, beginning May 2007. (Fact 75.)

23    **III.    SUMMARY JUDGMENT STANDARD**

24    The moving party must demonstrate that no genuine issue of material fact

25    exists for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, the

26    moving party is not required to *negate* those portions of the nonmoving party's

27    claim on which the nonmoving party bears the burden of proof. Id. Once the

28    moving party demonstrates that there is no genuine issue of material fact, the

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                    - 6 -                    DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD

1    nonmoving party must designate "specific facts showing that there is a genuine

2    issue for trial." <u>Id</u>. at 324. The nonmoving party must "make a showing sufficient to

3    establish the existence of an element essential to that party's case, and on which that

4    party will bear the burden of proof at trial." <u>Id</u>. at 322.

5        Plaintiff's bald assertion that a genuine issue of material fact exists does not

6    preclude summary judgment.  <u>Harper v. Wallingford</u>, 877 F.2d 728 (9th Cir. 1989).

7    The mere existence of alleged factual disputes cannot defeat an otherwise properly

8    supported motion.  Rather, the factual dispute or disputes must be material.

9    <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986).

10    **IV.    ARGUMENT**

11        **A.    Plaintiff's Racial Harassment Claim Is Without Merit Because He**

12            **Cannot Establish a Prima Facie Case of Racial Harassment**

13        Under the FEHA, it is an unlawful employment practice "[f]or an

14    employer…or any other person, because of race…to harass an employee…" Cal.

15    Gov. Code, § 12940(j)(1).

16        To establish a prima facie case of racial harassment, an employee must show

17    that: (1) he belongs to a protected group; (2) he was subjected to unwelcome

18    harassment; (3) the harassment was based upon his race; (4) the harassment was

19    sufficiently severe or pervasive so as to alter the conditions of employment and

20    create an abusive working environment; and (5) respondeat superior. <u>Guthrey v.</u>

21    <u>State of California</u>, 63 Cal.App.4th 1108, 1122-1123 (1998); <u>Fisher v. San Pedro</u>

22    <u>Peninsula Hospital</u>, 214 Cal.App.3d 590, 608 (1989).

23        **1.    *The conduct complained of by Plaintiff was not "because of"***

24            ***his race***

25        The FEHA does not prohibit all harassment in the workplace; it is directed at

26    unlawful harassment "because of race." Cal. Gov. Code, § 12940(j)(1); <u>Aguilar v.</u>

27    <u>Avis Rent A Car System, Inc.</u>, 21 Cal.4th 121, 129-131 (1999). "[I]t is the

28    disparate treatment of an employee on the basis of [race] – not the mere discussion

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                     - 7 -                     DEFENDANT'S MOTION FOR SUMMARY
                                                        JUDGMENT AGAINST PLAINTIFF KEKDAD

1    of [race]... – that is the essence of a [racial] harassment claim." <u>Lyle v. Warner</u>

2    <u>Bros. Television Prods.</u>, 38 Cal.4th 264, 279-282 (2006) [harassment because of

3    sex].

4      Here, the conduct complained of by Kedkad was <u>not</u> *because of* his race.

5    With regard to the alleged "camel jockey" remark, there is no admissible evidence

6    that it was even in reference to Kedkad. He allegedly *overheard* the remark in a

7    private conversation between Brown and Niederberger while walking by them.

8    Kedkad was <u>not</u> a part of the conversation and did <u>not</u> even know the context of the

9    remark. He only assumed the alleged statement was about him because he was

10   purportedly "self-conscious about making phone calls."

11     With regard to the alleged "dress" remarks, there is no admissible evidence

12   that it was in reference to Kedkad's race. The remarks were about his *clothes*. On

13   the first occasion, Kedkad was wearing "a long shirt and pants, a heavy shirt." On

14   the second occasion, he was wearing a light jacket that was long. Brown's remarks

15   were <u>not</u> racial epithets, derogatory comments or slurs. Cal. Code Regs., tit. 2, §

16   7287.6(b)(1)(A).

17     With regard to the "Indians in the area" remark, there is no evidence

18   whatsoever that it was in reference to Kedkad's race. He is not Indian, but Middle

19   Eastern. Kedkad was even admittedly talking about foreigners in the bay area

20   openly with Brown when the alleged remark was made. Kedkad did not even say

21   anything in response. Brown's remark was <u>not</u> a racial epithet, derogatory

22   comment or slur. Cal. Code Regs., tit. 2, § 7287.6(b)(1)(A).

23     With regard to the "learn some English" remark, there is no admissible

24   evidence that it was in reference to Kedkad's race. The remark was about his

25   *communication skills*. After the prospective client meeting, Kedkad asked Brown

26   what he thought of the meeting. Brown allegedly stated Kedkad should learn some

27   more English because Hoback informed him that Kedkad made many mistakes in

28   his proposals. Again, Brown's remark was <u>not</u> a racial epithet, derogatory

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1  - 8 -  DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD

1   comment or slur.  Cal. Code Regs., tit. 2, § 7287.6(b)(1)(A).

2       With regard to the alleged "scoping out terrorist targets," "all Muslims are

3   terrorists," and "sand nigger" remarks, they are all inadmissible hearsay.  Kedkad

4   admittedly <u>never</u> witnessed Brown making any of them.  Indeed, they were all

5   communicated to Kedkad by or through his coworkers (e.g., double and triple

6   hearsay).  <u>See</u> Section II.C.2.  As Kedkad cannot rely upon inadmissible hearsay or

7   workplace gossip to establish an unlawful hostile work environment, these alleged

8   remarks are irrelevant to this analysis and cannot be considered by the court.

9   <u>Martinez v. Marin Sanitary Service</u>, 349 F. Supp.2d 1234, 1248 (N.D. Cal. 2004)

10  [holding "[i]ncidents of harassment predicated on inadmissible hearsay are not

11  proper for the court to consider in evaluating the hostility of [the plaintiff's]

12  workplace"]; <u>Beyda v. City of Los Angeles</u>, 65 Cal.App.4th 511, 521 (1998)

13  [holding "mere workplace gossip is not a substitute for proof. Evidence of

14  harassment of others, and of a plaintiff's awareness of that harassment, is subject to

15  the limitations of the hearsay rule"].

16      The same actor presumption, which is applied in employment discrimination

17  cases, lends further reasoning why the conduct complained of by Kedkad was not

18  *because of* his race.  In California, it is well established that "'[w]here the same

19  actor is responsible for both the hiring and the firing of a discrimination plaintiff,

20  and both actions occur within a short period of time,[3] a strong inference arises that

21  there was no discriminatory motive.'"  <u>Horn v. Cushman & Wakefield Western,</u>

22  <u>Inc.</u>, 72 Cal.App.4th 798, 809 (1999) (citations omitted); <u>West v. Bechtel Corp.</u>, 96

23  Cal.App.4th 966, 980-981 (2002).

24

25  [3]     While the passage of time eventually attenuates this same actor presumption,
    the California courts have held the presumption to last for years.  <u>Horn</u>, 72
26  Cal.App.4th at 809, fn. 7 [holding "five years is relatively short time and is not so
    long a time as to attenuate the presumption"]; <u>West</u>, 96 Cal.App.4th at 981
27  [applying the presumption with "particular force" where the employer fired the
28  employee just after a month of employment].

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                    - 9 -                    DEFENDANT'S MOTION FOR SUMMARY
                                                      JUDGMENT AGAINST PLAINTIFF KEDKAD

1    Under the instant facts, Brown is both the person who made the decision to

2    hire Kedkad and the person who allegedly harassed him over an approximate five-

3    month period of time immediately after his hiring. As such, if Brown had a

4    discriminatory animus against Middle Easterners, "'[i]t hardly makes sense to hire

5    workers from a group one dislikes (thereby incurring the psychological costs of

6    associating with them), only to fire [or harass] them once they are on the job.'"

7    Horn, 72 Cal.App.4th at 809 (emphasis added) (citations omitted); West, 96

8    Cal.App.4th at 980-81.

9    Thus, there is no evidence to satisfy this element of Kedkad's racial

10    harassment claim as a matter of law.

**2.    _The conduct complained of by Plaintiff was not "sufficiently
severe or pervasive" to alter his conditions of employment and
create an abusive working environment_**

14    Assuming _arguendo_ Brown's remarks were because of race, Kedkad cannot

15    establish that the complained of conduct was sufficiently severe or pervasive to

16    alter the conditions of employment and create an abusive working environment.

17    To show an unlawful hostile work environment exists, the employee must

18    show that he was subjected to comments which are sufficiently severe or pervasive

19    so as to alter the conditions of employment and create an abusive working

20    environment. Aguilar, 21 Cal.4th at 130-131. "The requirement that the conduct

21    be sufficiently severe or pervasive to create a working environment a reasonable

22    person would find hostile or abusive is a crucial limitation that prevents [racial]

23    harassment law from being expanded into a 'general civility code.'" Jones v.

24    Department of Corrections and Rehabilitation, 152 Cal.App.4th 1367, 1377 (2007)

25    (citation omitted).

26    The employee must meet both an objective and subjective standard,

27    including whether a "reasonable person" would find the conduct offensive. Beyda,

28    65 Cal.App.4th at 518. The "totality of the circumstances" must be analyzed. The

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                              - 10 -                    DEFENDANT'S MOTION FOR SUMMARY
                                                                 JUDGMENT AGAINST PLAINTIFF KEDKAD

1  factors include: (1) the frequency of the conduct; (2) the severity of the conduct; (3)

2  whether the conduct was physically threatening or humiliating or whether it was a

3  mere offensive utterance; and (4) whether the conduct unreasonably interfered with

4  plaintiff's work performance.  Etter v. Veriflo Corp., 67 Cal.App.4th 457, 466

5  (1998).

6      An employee *cannot* recover for harassment that is "occasional, isolated,

7  sporadic, or trivial; rather, the employee must show a concerted pattern of

8  harassment of a repeated, routine, or a generalized nature." Lyle, 38 Cal.4th at 283;

9  Aguilar, 21 Cal.4th at 131; Fisher, 214 Cal. App. 3d at 610.  That is, when the

10  harassing conduct is not severe in the extreme, more than a few isolated incidents

11  must have occurred to prove a claim based on working conditions.  Lyle, 38 Cal.4th

12  at 283; Martinez, 349 F. Supp.2d at 1252 [stating "evidence of only a few specific

13  racially-charged incidents is usually insufficient to support a claim for an

14  objectively unreasonable hostile work environment"]; Vasquez v. County of Los

15  Angeles, 349 F.3d 634, 642-643 (9th Cir. 2001) [holding that, although plaintiff

16  claimed that he was continually harassed, he provided specific factual allegations

17  regarding only a few discrete incidents, which were insufficient].

18      Moreover, when a plaintiff cannot point to a loss of tangible job benefits, he

19  must make a "'commensurately higher showing that the sexually harassing conduct

20  was pervasive and destructive of the working environment.'" Lyle, 38 Cal.4th at

21  284 (quoting Fisher, 214 Cal. App. 3d at 610).

22      Here, there is no evidence that a "concerted pattern of harassment of a

23  repeated, routine, or a generalized nature" existed in the South San Francisco office.

24  First, Brown's alleged remarks were infrequent.  Brown did not even work out of

25  that office.  He worked out of the Atlanta office, and traveled to the South San

26  Francisco office once every two or three weeks.  Kedkad only alleges that the

27  racially harassing conduct occurred when Brown visited the South San Francisco

28  office.

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                    - 11 -                    DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD

1     Over a year of employment, Kedkad witnessed Brown make only five

2     remarks that Kedkad attributes or connects to his race.[4]  Brown made the alleged

3     "camel jockey" remark to Niederberger during the second or third week in

4     December 2006.  Approximately 30 days later, Brown made the alleged "dress"

5     remarks in mid-January 2007, one or two days apart.  Next, approximately 30 days

6     later, Brown made the alleged "Indians in the area" remark at the end of February

7     2007.  Lastly, approximately 30 days later, Brown made the alleged "learn some

8     English" comments at the end of March 2007.  Thus, Brown's alleged remarks were

9     plainly occasional or sporadic and cannot support a hostile environment claim.

10    Martinez, 349 F. Supp.2d at 1252; Vasquez, 349 F.3d at 642-643.

11    Second, Brown's alleged racial remarks were not severe.  With regard to the

12    alleged "camel jockey" remark, which is arguably the most severe, Kedkad merely

13    *overheard* it in a private conversation between Brown and Niederberger while he

14    walking by them.  He was not a part of the conversation and did not even know the

15    context of the remark.  He only assumed the statement was about him.  Kedkad also

16    never heard Brown use the term on any other occasion.  Although the remark might

17    have engendered offensive feelings in Kedkad, he has admittedly heard that term

18    "all the time" outside of his employment and, notably, waited over 30 days

19    allegedly to report it to Hoback at the end of January 2007.

20    With regard to the alleged "dress" remarks, they were mere references to

21    Kedkad's *clothes*.  On the first occasion, Kedkad was wearing "a long shirt and

22    pants, a heavy shirt."  He did not even respond to Brown.  One or two days later, on

23    the second occasion, Kedkad was wearing a light jacket that was long.  He simply

24    told Brown "that is a style here" the second time.  Although these remarks might

25

26    [4]    As Kedkad never witnessed the alleged "scoping out terrorist targets," "all

27    Muslims are terrorists," and "sand nigger" remarks, these remarks are also
      irrelevant to this analysis. Martinez, 349 F. Supp.2d at 1248; Beyda, 65

28    Cal.App.4th at 521.

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                    - 12 -                    DEFENDANT'S MOTION FOR SUMMARY
                                                        JUDGMENT AGAINST PLAINITFF KEDKAD

1    have engendered offensive feelings in Kedkad, he admittedly waited a couple of

2    weeks before allegedly reporting them to Hoback.

3    　　　With regard to the "Indians in the area" remark, it was a reference to Indians,

4    not Middle Easterners.  At the time, Brown and Kedkad were even having an open

5    conversation on different topics, including about foreigners living in the area.

6    Kedkad might not have appreciated Brown's remark, but he certainly solicited it.

7    Although these remarks might have engendered offensive feelings in Kedkad, he

8    admittedly waited over 30 days before allegedly reporting it to Hoback.

9    　　　With regard to the "learn some English" comment, according to Kedkad, it

10    was a reference to his *communication skills.*  After the prospective client meeting,

11    Kedkad asked Brown what he thought of the meeting.  Kedkad might not have

12    appreciated Brown's remark, but he certainly solicited it.  Brown even based his

13    opinion on information from Hoback that Kedkad made many mistakes in his

14    proposals.  Kedkad allegedly told Hoback of this March 2007 "learn some English"

15    comment in the beginning of *February* 2007, which makes no logical sense.

16    　　　Overall, Brown's alleged remarks were plainly trivial or offhand comments

17    and are insufficient as a matter of law to support a hostile environment claim.  For

18    example, in Manatt v. Bank of America, 339 F.3d 792 (9th Cir. 2003), the plaintiff's

19    coworkers called her "China woman" several times and, on several occasions,

20    ridiculed her appearance and speech on the basis of her race. Id. at 795-796. The

21    Ninth Circuit found that such behavior, although troubling, generally fell into the

22    category of "simple teasing" and "offhand comments" and was not actionable. Id. at

23    799; Vasquez, 307 F.3d at 893 [no hostile work environment when plaintiff's

24    supervisor made racially offensive remarks to plaintiff on two occasions and yelled

25    at him in front of others]; Martinez, 349 F. Supp.2d at 1253 ["the casual utterance

26    of several offensive racial slurs is not likely to be severe enough to constitute

27    actionable hostile work environment harassment. If groping a woman's intimate

28    body parts is insufficiently severe to make a single event actionable, then a handful

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                                   - 13 -                      DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD

1  of racial epithets also seems insufficiently severe"].

2       Third, there is no evidence that the alleged racial remarks were in any way

3  physically threatening. At best, they were mere offensive utterances. However,

4  there is no evidence that the alleged remarks were made in the presence of or

5  overheard by any of Kedkad's coworkers. Apparently, Brown only uttered the

6  alleged remarks during one-on-one conversations with Kedkad.

7       Fourth, there is no admissible evidence that Brown's alleged racial remarks

8  unreasonably interfered with Kedkad's work performance. Rather, during the time

9  period in which Brown allegedly made these statements, Brown openly praised

10  Kedkad for his sales efforts at the company. Kedkad was an *above* quota sales

11  performer for the first quarter of 2007. He readily described himself as being

12  "hard-working" and "very successful," and someone who does not "live [his] life

13  based on what other people think."

14       Thus, there is also no evidence to satisfy this element of Kedkad's racial

15  harassment claim as a matter of law.

16      **B.**    **Plaintiff Could Have Avoided Any Alleged Harassment if He Had**

17            **Complied with KnowledgeStorm's Complaint Procedures under**

18            **its No-Harassment Policy**

19       Under the FEHA, an employer is strictly liable for all acts of unlawful

20  harassment by a supervisor. "But strict liability is not absolute liability in the sense

21  that it precludes all defenses. Even under a strict liability standard, a plaintiff's own

22  conduct may limit the amount of damages recoverable or bar recovery entirely."

23  State Dept. of Health Services v. Superior Court, 31 Cal.4th 1026, 1042 (2003)

24  [("McGinnis")].

25       In an action under the FEHA against an employer for hostile environment

26  racial harassment by a supervisor, an employer may plead and prove a defense

27  based on the "avoidable consequences doctrine." McGinnis, 31 Cal.4th at 1044.

28  To establish a defense under this doctrine, an employer must show that: "(1) the

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1         - 14 -         DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD

1   employer took reasonable steps to prevent and correct workplace [racial]

2   harassment; (2) the employee unreasonably failed to use the preventive and

3   corrective measures that the employer provided; and (3) reasonable use of the

4   employer's procedures would have prevented at least some of the harm that the

5   employee suffered." Id.

6       "If the employer establishes that the employee, by taking reasonable steps to

7   utilize employer-provided complaint procedures, could have caused the harassing

8   conduct to cease, the employer will nonetheless remain liable for any compensable

9   harm the employee suffered before the time at which the harassment would have

10  ceased, and the employer avoids liability only for the harm the employee incurred

11  thereafter." McGinnis, 31 Cal.4th at 1045.

12      Here, Kedkad could have avoided any alleged harassment if he had complied

13  with KnowledgeStorm's No-Harassment policy.  First, KnowledgeStorm took

14  reasonable steps to prevent and correct all forms of workplace harassment.  In its

15  Handbook, the company had a No-Harassment policy that required an employee

16  who "is being harassed . . . or believes his/her employment is being adversely

17  affected by such conduct" to "immediately report their concerns to" either "Mike

18  Ewers, Vice-President" or "Kelly Gay, CEO."  After his hire, Kedkad received a

19  copy of the Handbook and even attended a training in the Atlanta office during

20  which the company held a presentation on its employment policies and procedures,

21  including its No-Harassment policy.

22      Second, Kedkad unreasonably failed to use the preventive and corrective

23  measures that KnowledgeStorm provided in its No-Harassment policy.  Kedkad

24  never properly reported any of Brown's alleged racial remarks to Gay (or Ewers),

25  until months later when he was the subject of a harassment complaint by Miller.

26  Rather, Kedkad allegedly reported the alleged harassment to Hoback and in a

27  dilatory fashion.  Kedkad waited over 30 days to report the alleged "camel jockey"

28  remark, which is arguably the most severe, to Hoback at the end of January 2007.

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1                           - 15 -                    DEFENDANT'S MOTION FOR SUMMARY
                                                              JUDGMENT AGAINST PLAINTIFF KEDKAD

1  Likewise, Kedkad waited *a couple of weeks* before allegedly reporting the alleged
2  "dress" remarks to Hoback.  Further, he waited *over 30 days* before reporting the
3  alleged "Indians in the area" remark to Hoback.  Lastly, Kedkad allegedly informed
4  Hoback of the March 2007 "learn some English" remark in the beginning of
5  February 2007, which chronologically precedes the time period Kedkad would have
6  known of the alleged remark.  Certainly, Kedkad should have immediately reported
7  these alleged racial remarks to Ewers or Gay when he believed Hoback was not
8  taking any corrective action.

9      Lastly, Kedkad's reasonable use of the KnowledgeStorm's No-Harassment
10  policy would have prevented all, or at the very least some, of the harm that Kedkad
11  allegedly suffered.  Kedkad advised Gay, *for the very first time*, that he believed
12  there was discrimination ongoing in the South San Francisco office during the
13  Miller investigation.  Immediately after completing her interview of Kedkad
14  regarding Miller's complaint, Gay commenced an investigation into Kedkad's
15  complaint of discrimination.  Notably, Kedkad does not allege any racial
16  harassment by Brown after he complained to Gay in April 2007.

17      Thus, KnowledgeStorm should not be liable for any of the harm that Kedkad
18  allegedly suffered prior to him making a complaint with Gay.

19  **V.    CONCLUSION**

20      Based on the foregoing, KnowledgeStorm respectfully requests this court to
21  grant its motion for summary judgment or, in the alternative, partial summary
22  judgment against Kedkad.

23  Dated:  April 29, 2008          FORD & HARRISON LLP

24

25                      By: /s/ Steven M. Kroll
26                          Jeffrey D. Mokotoff
                           Steven M. Kroll
27                          Attorneys for Defendant
                           KNOWLEDGESTORM, INC.

28

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1          - 16 -          DEFENDANT'S MOTION FOR SUMMARY
                                    JUDGMENT AGAINST PLAINITFF KEDKAD

# PROOF OF SERVICE

I, Yolanda H. Dennison, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 350 South Grand Avenue, Suite 2300, Los Angeles, California 90071. On April 29, 2008, I served a copy of the within document(s):

**DEFENDANT KNOWLEDGESTORM, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT, AGAINST PLAINTIFF MAHMOUD KEDKAD; MEMORANDUM OF POINTS AND AUTHORITIES**

☒ (E-Mail/Electronic Transmission) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed on the attached service list. I did not receive, within a reasonable time after the submission, any electronic message or other indication that the transmission was unsuccessful pursuant to the CM/ECF system of the United States District Court for the Northern District of California.

☐ by placing the document(s) listed above in a sealed Overnite Express envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Overnite Express agent for delivery.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

VIA E-MAIL
Brian S. Kreger, Esq.
Lamberto & Kreger
160 W. Santa Clara St., Suite 1050
San Jose, CA 95113

Attorneys for Plaintiffs
Tel: 408-999-0300
Fax: 408-999-0301
briank@lambertokreger.com

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 29th day of April, 2008, at Los Angeles, California.

Yolanda H. Dennison

FORD & HARRISON LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66304.1

- 1 -

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD