1   Steven M. Kroll, Bar No. 216196
    FORD & HARRISON LLP
2   350 South Grand Avenue, Suite 2300
    Los Angeles, California 90071
3   Telephone:   (213) 237-2400
    Facsimile:   (213) 237-2401
4   skroll@fordharrison.com

5   Jeffrey D. Mokotoff, GA Bar No. 515472
    FORD & HARRISON LLP
6   *Admitted Pro Hac Vice*
    1275 Peachtree Street, NE, Suite 600
7   Atlanta, Georgia 30309
    Telephone: (404) 888-3800
8   Facsimile:   (404) 888-3863
    jmokotoff@fordharrison.com
9
    Attorneys for Defendant
10  KNOWLEDGESTORM, INC.

11              UNITED STATES DISTRICT COURT

12      NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

13

14  JASBIR GILL, MAHMOUD              Case No. C 07-04112 PVT
    KEDKAD,
15                                    **EVIDENCE SUBMITTED IN
                    Plaintiffs,       SUPPORT OF DEFENDANT
16                                    KNOWLEDGESTORM, INC.'S
        v.                            MOTION FOR SUMMARY
17                                    JUDGMENT, OR IN THE
    KNOWLEDGESTORM, INC., a           ALTERNATIVE, PARTIAL
18  corporation, DOES 1through 50,    SUMMARY JUDGMENT AGAINST
                                      PLAINTIFF MAHMOUD KEDKAD**
19                  Defendants.
                                      **(Pages 1 through 85)**
20
                                      Date:      June 3, 2008
21                                    Time       10:00 a.m.
                                      Crtrm:   5, 4th floor
22

23                                    Action filed:  July 13, 2007
                                      Trial date:  August 4, 2008
24

25          Defendant KnowledgeStorm, Inc., respectfully submits the following

26  evidence in support of its Motion for Summary Judgment or, in the alternative,

27  Partial Summary Judgment against Plaintiff Mahmoud Kedkad.

28  / / /

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

EVIDENCE SUBMITTED IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD

# INDEX OF EVIDENCE

## DECLARATIONS                                                    PAGE(S)

Declaration of Kelly Gay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Declaration of Michael Ewers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Declaration of Joseph Brown. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Declaration of Lisa McGuire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Declaration of Elysse Miller. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Declaration of Jeffrey Mokotoff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Declaration of Steven Kroll. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## EXHIBITS

Exhibit 3:   Offer letter to Plaintiff

             dated 10/30/06. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Exhibit 6:   Email from Brown to Kedkad

             dated 4/3/07. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Exhibit A:   Letter from B. Kreger to J. Mokotoff

             dated 4/18/08 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

Exhibit B:   Defendant's Request for Admissions

             to Plaintiff Kedkad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

Exhibit C:   Plaintiff Kedkad's Responses to Defendant's

             Request for Admission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Exhibit D:   KnowledgeStorm Employee

             Handbook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57

Exhibit E:   Defendant's Request for Admissions

             to Plaintiff Gill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .86

Exhibit F:   Plaintiff Gill's Responses to

             Defendant's Request for Admission . . . . . . . . . . . . . . . . . 90

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66271.1                          - 2 -                  EVIDENCE SUBMITTED IN SUPPORT OF
                                                           DEFENDANT'S MOTION FOR SUMMARY
                                                           JUDGMENT AGAINST PLAINTIFF KEDKAD

1

**DEPOSITION TRANSCRIPTS**

2     <u>Deposition of Plaintiff Kedkad</u>:  Excerpts from

3     Transcript dated January 15, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

4     <u>Deposition of Plaintiff Gill</u>:  Excerpts from

5     Transcript dated January 14, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

6

7   Dated:  April 29, 2008            FORD & HARRISON LLP

8

9               By: /s/ Steven M. Kroll

                   Jeffrey D. Mokotoff

10                Steven M. Kroll

                   Attorneys for Defendant

11                KNOWLEDGESTORM, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORD & HARRISON LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66271.1       - 3 -      EVIDENCE SUBMITTED IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD

**DEPOSITION TRANSCRIPTS**

Deposition of Plaintiff Kedkad:  Excerpts from

Transcript dated January 15, 2008

Deposition of Plaintiff Gill:  Excerpts from

Transcript dated January 14, 2008

Dated:  April 29, 2008                    FORD & HARRISON LLP


By: /s/ Steven M. Kroll
    Jeffrey D. Mokotoff
    Steven M. Kroll
    Attorneys for Defendant
    KNOWLEDGESTORM, INC.

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66271.1                    - 3 -                    EVIDENCE SUBMITTED IN SUPPORT OF
                                                      DEFENDANT'S MOTION FOR SUMMARY
                                                      JUDGMENT AGAINST PLAINTIFF KEDKAD

Declaration of Kelly Gay

Steven M. Kroll, Bar No. 216196
FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone:  (213) 237-2400
Facsimile:  (213) 237-2401
skroll@fordharrison.com

Jeffrey D. Mokotoff, GA Bar No. 515472
FORD & HARRISON LLP
*Admitted Pro Hac Vice*
1275 Peachtree Street, NE, Suite 600
Atlanta, Georgia 30309
Telephone:  (404) 888-3800
Facsimile:  (404) 888-3863
jmokotoff@fordharrison.com

Attorneys for Defendant
KNOWLEDGESTORM, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **JASBIR GILL, MAHMOUD KEDKAD,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**KNOWLEDGESTORM, INC., a corporation, DOES 1through 50,**<br><br>**Defendants.** | Case No. C 07-04112 PVT<br><br><br>**DECLARATION OF KELLY GAY** |

The following declaration is made pursuant to 28 U.S.C. § 1746:

1.     I, Kelly Gay, was employed by KnowledgeStorm, Inc. from approximately February 2000 until December 2007.  I held the positions of Executive Vice President, and then President and Chief Executive Officer (CEO), based out of KnowledgeStorm's headquarter office in Alpharetta, Georgia.  I have personal knowledge of the matters described in this declaration, knowledge that I acquired in the course of my duties.  This declaration is made for use in the above-entitled lawsuit.

2.     In November 2007, KnowledgeStorm was sold to a competitor. Effective December 2007, the competitor terminated my employment, along with the majority of KnowledgeStorm's employees, including Mr. Kedkad.

3.     KnowledgeStorm was a company that provided search resources for technology solutions and information.  It gave technology vendors opportunities to reach business and technology professionals as they conducted research online and gave contact information that converted them into web leads.

4.     During my tenure as President and CEO of KnowledgeStorm, I was very involved with KnowledgeStorm's employees.   I am unaware that KnowledgeStorm ever continued to employ (i.e., elected not to terminate) an employee who it believed used company time and equipment to print out his or her resume.  Had I known that any employee, without my permission or the permission of upper management, used company time and equipment to print out his or her

**005**

resume, KnowledgeStorm would have terminated that employee.

5.      On or about April 25, 2007, I interviewed Elysse Miller concerning a complaint of harassment she lodged against Mr. Kedkad.  As part of KnowledgeStorm's investigation of Ms. Miller's complaint, I, along with Chris Gleason, interviewed Mr. Kedkad the following day, April 26, 2007.  During the interview, Mr. Kedkad stated, for the very first time, that he believed there was discrimination ongoing in the South San Francisco office.

6.      Immediately after completing our interview of Mr. Kedkad regarding Ms. Miller's complaint, we commenced an investigation into Mr. Kedkad's complaint.  During the evening of April 26, 2007, we spoke with Mr. Kedkad regarding his complaint.  As part of our investigation, KnowledgeStorm also interviewed Joe Brown, Jason Hoback, Kevin Cummings, Rachel Gordon, Rick Neigher, Tracy Mikolajewski, Matt Hart, and Emily Crume.  KnowledgeStorm concluded that Mr. Brown did not engage in any discriminatory behavior.  To minimize any further interaction between Mr. Brown and Mr. Kedkad, KnowledgeStorm began having Mr. Kedkad report to Mr. Jim Canfield, VP of Sales.

7.      Since this litigation commenced, I have become aware that Ms. Gill and Mr. Kedkad created a company called Content Maximizers using Company time and Company equipment.  If I had become aware of these actions while either

Ms. Gill or Mr. Kedkad was employed, KnowledgeStorm would have terminated immediately their employment.

I declare under penalty of perjury that the foregoing declaration is true and correct. Executed in Atlanta, Georgia, on April 29, 2008.

*Kelly Gay*

KELLY GAY

Atlanta:449379.1

**007**

Declaration of Michael Ewers

Steven M. Kroll, Bar No. 216196
FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone:  (213) 237-2400
Facsimile:  (213) 237-2401
skroll@fordharrison.com

Jeffrey D. Mokotoff, GA Bar No. 515472
FORD & HARRISON LLP
*Admitted Pro Hac Vice*
1275 Peachtree Street, NE, Suite 600
Atlanta, Georgia 30309
Telephone:  (404) 888-3800
Facsimile:  (404) 888-3863
jmokotoff@fordharrison.com

Attorneys for Defendant
KNOWLEDGESTORM, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **JASBIR GILL, MAHMOUD KEDKAD,** | **Case No. C 07-04112 PVT** |
| **Plaintiffs,** | |
| **v.** | **DECLARATION OF MICHAEL EWERS** |
| **KNOWLEDGESTORM, INC., a corporation, DOES 1 through 50,** | |
| **Defendants.** | |

The following declaration is made pursuant to 28 U.S.C. § 1746:

1.    I, Michael Ewers, was employed by KnowledgeStorm, Inc. from approximately January 2000 until February 2008, based out of KnowledgeStorm's headquarters office in Alpharetta, Georgia. I have personal knowledge of the matters described in this declaration, knowledge that I acquired in the course of my duties. This declaration is made for use in the above-entitled lawsuit.

2.    My last position with KnowledgeStorm was as V.P. of Finance and Human Resources. In that capacity, I oversaw the training of KnowledgeStorm's employees, including its sales executives. At the beginning of their employment, both Mr. Kedkad and Ms. Gill attended a week-long training session in KnowledgeStorm's Alpharetta, Georgia office. During the training, KnowledgeStorm held a presentation on its employment policies and procedures, including its No-Harassment policy. At the training, both Mr. Kedkad and Ms. Gill received a copy of KnowledgeStorm's employee handbook ("Handbook"). The Handbook included a No-Harassment policy that required an employee who "is being harassed . . . or believes his/her employment is being adversely affected by such conduct" to "immediately report their concerns to" either "Mike Ewers, Vice-President" or "Kelly Gay, CEO." A true and correct of the Handbook is attached hereto as Exhibit "D".

**009**

I declare under penalty of perjury that the foregoing declaration is true and correct. Executed in Atlanta, Georgia, on April 29, 2008.

                                         _____

                                         MICHAEL EWERS

LA:66324.1

**010**

Declaration of Joseph Brown

Steven M. Kroll, Bar No. 216196
FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone:  (213) 237-2400
Facsimile:  (213) 237-2401
skroll@fordharrison.com

Jeffrey D. Mokotoff, GA Bar No. 515472
FORD & HARRISON LLP
*Admitted Pro Hac Vice*
1275 Peachtree Street, NE, Suite 600
Atlanta, Georgia 30309
Telephone:  (404) 888-3800
Facsimile:  (404) 888-3863
jmokotoff@fordharrison.com

Attorneys for Defendant
KNOWLEDGESTORM, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **JASBIR GILL, MAHMOUD KEDKAD,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**KNOWLEDGESTORM, INC., a corporation, DOES 1through 50,**<br><br>**Defendants.** | Case No. C 07-04112 PVT<br><br><br>**DECLARATION OF JOSEPH WELLS BROWN** |

The following declaration is made pursuant to 28 U.S.C. § 1746:

1.     I, Joseph Wells Brown, was employed by KnowledgeStorm, Inc. from approximately August 2003 until December 2007, based out of KnowledgeStorm's headquarter office in Alpharetta, Georgia. I have personal knowledge of the matters described in this declaration, knowledge that I acquired in the course of my duties. This declaration is made for use in the above-entitled lawsuit.

2.     From approximately October 2006 until the summer of 2007, I held the position of Western Region Sales Manager. In that capacity, I supervised Mr. Kekdad and Ms. Gill.   I was involved in the decision to hire both Mr. Kedkad and Ms. Gill. I recommended that they be hired.

3.     In or about April 2007, I discovered three (3) printed copies of Ms. Gill's resume on KnowledgeStorm's printer located in Alpharetta, Georgia. I took these resumes to my supervisor, Jason Hoback. At that point, I discussed with Mr. Hoback the fact that this was a violation of company policy. In late March 2007, I had a face-to-face conversation with Ms. Gill wherein, as a follow-up to a discussion about honesty, Ms. Gill asked me if we would still be friends if we ever left KnowledgeStorm (at that point we understood that KnowledgeStorm was going to be acquired). I responded that we would as long as she was honest with me. Ms. Gill responded that she wanted me to know that she felt like she worked for me, i.e., she was expressing her loyalty to me.

4.     Later in the same day that I found the resumes, Jason Hoback and I

012

called Ms. Gill on her cell phone. Mr. Hoback informed her that he had found

three (3) of her resumes on our printer and asked her whether she wanted to

explain that. She responded that she was printing the resumes to share them with a

friend. I informed Ms. Gill that it was a violation of Company policy to use

Company equipment for personal use and on Company time. Mr. Hoback

informed her that she was terminated.

    4.    I am unaware that KnowledgeStorm ever continued to employ (i.e.,

elected not to terminate) an employee who it believed used company time and

equipment to print out his or her resume.

    5.    KnowledgeStorm interviewed me on two (2) separate occasions

concerning allegations that had been brought to their attention. Attached as

Exhibits "A" and "B" to my declaration are the transcriptions of these interviews

that I signed and dated.

    6.    I have never in my life used the term "sand nigger" or "camel jockey"

and I have never in my life ever made any of the statements attributed to me by

Mr. Kedkad and Ms. Gill. In short, they are lying through their teeth.

    I declare under penalty of perjury that the foregoing declaration is true and

correct. Executed in Atlanta, Georgia, on April 29, 2008.

JOSEPH WELLS BROWN

**013**

- 3 -

### MEMORANDUM

TO:        Joe Brown

FROM:    Chris Gleason

DATE:    Discussed with Joe on May 17th

A current employee, Mike Kedkad, recently alleged that you engaged in discriminatory behavior by excluding him from a company dinner and a sales promotion. Upon learning of these allegations, the Company immediately conducted a thorough investigation into the matter.

As you are aware, the Company has a No-Harassment Policy prohibiting all forms of illegal harassment and discrimination in the workplace. The No-Harassment Policy also prohibits any adverse treatment of an employee because they report inappropriate activity. A copy of the No-Harassment Policy is attached, to ensure, once again, that you read and understand the Company's policy. We expect and demand that all employees comply with this Policy and that they conduct themselves professionally at all times. We take all reports concerning this Policy very seriously and whenever an employee alleges that the Policy has been violated, we thoroughly investigate those concerns.

We have completed our investigation of the two instances of alleged discrimination. The facts do not support discriminatory behavior. Those facts are: The dinner was not company-sponsored or company-planned. It was an informal meeting initiated by a sales rep that evening (Matt Hart) who called Joe Brown to invite him to come have dinner. Matt was in town for business and Joe was not aware that many other local employees were there and only realized it when he arrived. Several weeks later, there was a company-sponsored dinner and Joe invited all West coast employees. With respect to the sales promotion, it was one of many promotions routinely implemented to drive specific business goals. In this case, in order to participate, only reps that were on a full quota were considered. At the time, Mike Kedkad was not eligible as he was not yet at full quota.

KnowledgeStorm is taking the following actions to ensure communications are clear and company events and sales promotions are not perceived as discriminating against anyone.

1) Continue to communicate all company-sponsored events to all team members. Communication must include an email to all team members.
2) Ensure that all sales reps are aware that sales promotions are routinely implemented to drive specific business objectives, and as such, they may not include all employees in the sales organization. At times sales reps will be specifically included to participate based upon criteria such as; status of being on a full quota, attainment to quota, experience, geography, types of accounts handled, knowledge of certain services, etc. At no time is the exclusion of a sales rep ever based upon discrimination of a protected class and if a sales rep ever has questions about being excluded, they will be directed to an email to their manager and copy the VP of Sales to get clarification on the sales promotion criteria.

- 1 -

In addition, before implementation, a written description of the sales promotion goals and criteria must be approved by both the VP of Sales and the VP of Human Resources. To ensure sales reps understand that this is the operating norm, a written policy will be communicated to the sales team and will be included in sales training.

Please be advised that the No-Harassment Policy prohibits any retaliation against Mr. Kedkad. If we learn of any retaliatory actions on your part, you will be subject to disciplinary action, up to and including the immediate termination of your employment

KnowledgeStorm is committed to providing an amicable and professional working environment for all of its employees. Accordingly, pursuant to the No-Harassment Policy, please promptly report to Kelly Gay or to Mike Ewers any incidents of inappropriate conduct or behavior of which you are aware.

If you have any questions, please discuss them with me or Mike Ewers. Please also keep in mind that this matter is confidential and you should not discuss this matter with anyone at the Company. Please acknowledge your receipt of this memorandum and the No-Harassment Policy by signing below.

_____    June 4, 2007
Joe Brown                              Date

_____    6/4/07
Chris Gleason                          Date

- 2 -

KSI 0138                              015

Interview with Joe Brown
June 5, 2007

Present in Chris' office: Chris Gleason and Mike Ewers
On the phone: Joe Brown
Meeting time: approximately 10 am – 11 am

Chris prefaced the call by saying that as she and Joe had previously discussed, this call was to conduct an investigation of the most recent claims alleged by Mike Kedkad and Jasbir Gill in a letter from their attorney. Chris said that we would be asking specific questions about those allegations and that she would be taking notes. Mike reiterated that only Kelly, Chris, and he knew the specifics of these allegations and Joe was not to share them with anyone.

Mike said that we would specifically be referencing allegations stated in the recent letter from Mike's and Jasbir's attorney.

Mike: "Have you ever said that *All Muslims are terrorists?*"
Joe: "Never in my life."
Mike: Have you ever used anything like that in a joke?"
Joe: "No"
Mike: "Have you ever called or referred to Jasbir Gill or Mike Kedkad as a *sand nigger?*"
Joe: "Never"
Chris: "Have you ever used those words or words like that in the workplace?"
Joe: "No, never."
Mike: "Have you ever used the term *camel jockey?*"
Joe: "No, never."
Mike: "Have you ever heard that term or a similar term used in a joking way?"
Joe: "No"
Mike: "Have you ever said that *you hated Indians because they were taking all of the jobs.*"
Joe: "My God, no".
Joe: "The only time where there was any reference to Indians in any comments was a conversation that Jasbir Gill and I entered into. The conversation was about the different classes of Indians between the Southern Indians and the Northern Indians. Jasbir was explaining to me the interclass warfare between the North and the South. She was explaining that the persecution of one group was magnified as anything in history, but did not get the coverage. She was talking about where she was from. I don't remember which, the North or the South. I was interested in learning history that I knew nothing about. I was speaking to her about her perceptions and she was explaining it to me. I found it fascinating that she was sharing all of this and it was fascinating as a historical conversation."
Mike: "How did the conversation start?"

KSI 0151

016

**Joe:** "It was in the office. The door was open, but no one else was involved. Jasbir was the only one. I don't remember who else was in the office."

**Mike:** "Was it argumentative?"

**Joe:** "Not at all, no, no. It was interesting the fact that she was telling me all about this. It was a casual conversation about Indian culture."

**Chris:** "Was there any other conversation about Indian culture?"

**Joe:** "The only other thing I remember talking to Jasbir about was when she was going to visit her mother, who she was going to see in 3 weeks."

**Mike:** "When was that conversation?"

**Joe:** "I don't remember the exact dates. It was probably in January, early on after she started. I can look to see when I was in San Francisco. She hadn't seen her mother in 3 years and she was really excited about it."

**Mike:** "Can you go into details about any events where Jasbir Gill or Mike Kedkad were not included or invited to events?"

**Joe:** "I have no idea what they might be referring to. There is only one instance that I am aware of where Mike perceived that. It was a casual dinner that was organized by sales reps. It was a non-company function that I was invited to long after the event started. I was completely unaware that Mike thought that it was a company function that he was not invited to attend until my conversation with Chris.

**Mike:** "When was that dinner?"

**Joe:** "It was around the end of February. I think Jasbir was on vacation."

**Mike:** "Who was there" (at the dinner)?

**Joe:** "Matt, Rachel, Rick Neigher, Emily Crume, Lisa, Katie. I don't remember if Kevin Cummings was there. I was working late, after 6; I got a call from Matt Hart. When I got there, I found out the most of the team was there."

**Mike:** "Who wasn't there?"

**Joe:** "Joe Kaniewski, Joe Niederberger, Mike Kedkad, David Boyd, Jonathan Brown, Tracy Mikolajewski"

Joe said his recollection was that Mike Kedkad had been back to work for about a month after his 2nd child was born. He didn't remember what patterns Mike had, i.e., if he was working at home, going home early.

**Chris:** Did you hear anyone talking about getting together earlier that day? ~~unusual~~ *unusual* JB

**Joe:** "I think I heard Matt and Rachel talking about going out to eat. That was not usual. Most of time when someone is in town, they will buddy up and go out to dinner. I didn't think anything of it. When there are company events, everyone is always included. There was a dinner after that and I sent an outlook invite, which I still have. There was 100% participation. The only decliner was Joe Niederberger-he said he had a prior commitment.

**Chris:** "Did you ever hear anything from any employee about anyone being treated unfairly or discriminated against….about themselves or anyone else?"

**Joe:** Mike Kedkad had continually asked me to have accounts transitioned to him when reps left. It was never based upon discrimination. Mike was always eager to have accounts. I explained that the policy, practice, was when a rep makes a 1st sale on their own merit, then they were entitled to have accounts transitioned to them. That has been

our 4 year history, up to that point, both from my experience as a sales rep myself and as a manager. No one referenced or ever brought any concerns about discrimination against anyone. Jasbir Gill did say, and the details are fuzzy, something like "I hope you don't associate me with Mike Kedkad. He's a complainer and I hope you don't group us together. They had the same start date, so in that sense they were in the same group."
Mike: "Did you ever refuse to include anyone, including Jasbir Gill and Mike Kedkad, because they were scouting for terrorist targets?"
Joe: "No, never."
Mike: "Did you ever treat Jasbir Gill or Mike Kedkad differently than Caucasian employees or not provide them the tools and information necessary to be successful in their work?"
Joe: "No, I never treated either of them differently than anyone else."
Chris: "Were there any issues of any kind brought to you by Jasbir Gill or Mike Kedkad?"
Joe: "Jasbir raised the issue that while she was on vacation, she needed an email with pricing. She submitted it to Brian Stewart and Dan O'Shaughnessy. She sent an email and asked me to follow up. Then she asked for the status again. I finally got the proposal and pricing to her. I don't recall anything other than that. We had a 2 and ½ hour conversation on 3/27 right before the team dinner. In her words, "we cleared the air about that situation." She said she had chosen to wait to talk face to face. She said she was upset that it took more than 1 request to get what she needed. We talked about what she liked in terms of how to manage her. It was a very productive discussion.

The only other thing that she brought up was that Jason and I were always behind closed doors and mentioned that the last time we were in CA we spent the whole time interviewing.

It was a good relationship building discussion. Joe said Jasbir said it meant a lot to her that he was there and said something like, "I really feel like I am working for you, not KnowledgeStorm." Joe said that that was "meaningful to hear."
Chris: "Have you every yelled or raised your voice at Mike Kedkad or Jasbir Gill or at anyone in the office?"
Joe: "No I have not. I have not ever heard screaming or yelling while I was in the office."
Mike: "Do you have anything to add to what was covered or anything related to this?"
Joe: "I am shocked, disappointed, surprised. Shocked at what is here. I have nothing to add. I volunteered everything that I felt was appropriate about what discussions took place. I felt like I have a bond with people. I felt like Jasbir Gill felt like I was a genuine person when she was talking about the history."
Chris: "Rachel mentioned that Katie yelled in the office. Did you hear any complaints about that or anything else from anyone?"
Joe: "Both Lisa and Rachel mentioned Katie's childish behavior. I specifically talked to Katie about it. I didn't know until afterwards, but people in general didn't like Joe Niederberger. I do recall hearing from Jason that he and David Boyd had a heated discussion one time."
Chris: "Did you hear about that from anyone else?"

KSI 0153

Joe: "I just heard it from Jason and then I think David mentioned it. No one else said anything about it. "

Joe: "I'd also heard Mike Kedkad suggested to Jason Hoback that Joe Kaniewski was trying to play KnowledgeStorm by saying he had another offer and asked for a salary increase."

Mike: "Regarding the employment guarantees for Mike Kedkad and Jasbir Gill, were you involved in those discussions with either of them?"

Joe: "No, that was mainly Jason.

Mike: "Did you ever say anything or communicate anything about falsifying start dates or inflating proposals?"

Joe: "No, in fact, my comments to sales reps, emails, and phone conversations, too, that whenever there is a promotion to close business or something else we are being asked to do, I always clearly state as long as there is no negative impact to the customer and won't damage the relationship, then go ahead. I have always coached to be respectful of the customer first. It is my personal belief and I manage people to do so."

**Concluding Comments**

Chris and Mike reiterated that this was not to be discussed with anyone and that Joe should focus on business. In addition, we discussed that there could be no retaliation. We discussed that there should be very limited need to talk to Mike Kedkad, since he was now reporting to Jim Canfield. Joe asked if he should continue to keep Mike on his team emails. Chris said that he should just so that Mike didn't miss anything, but that we would ask Mike to direct any related questions to Jim. Joe asked if he should approve a deal. Mike said yes if Jim wasn't around, to go ahead and do that.

Chris and Mike told Joe if he had any questions or needed to talk further about this situation, that he should call either of us.

*[signature]* 06/11/07

Declaration of Lisa McGuire

Steven M. Kroll, Bar No. 216196
FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone:  (213) 237-2400
Facsimile:  (213) 237-2401
skroll@fordharrison.com

Jeffrey D. Mokotoff, GA Bar No. 515472
FORD & HARRISON LLP
*Admitted Pro Hac Vice*
1275 Peachtree Street, NE, Suite 600
Atlanta, Georgia 30309
Telephone:  (404) 888-3800
Facsimile:  (404) 888-3863
jmokotoff@fordharrison.com

Attorneys for Defendant
KNOWLEDGESTORM, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **JASBIR GILL, MAHMOUD KEDKAD,** | **Case No. C 07-04112 PVT** |
| **Plaintiffs,** | |
| **v.** | **DECLARATION OF LISA McGUIRE** |
| **KNOWLEDGESTORM, INC., a corporation, DOES 1through 50,** | |
| **Defendants.** | |

The following declaration is made pursuant to 28 U.S.C. § 1746:

1.    I, Lisa McGuire, was employed as a sales executive for KnowledgeStorm, Inc., from approximately April 2006 until I resigned in March 2007. I have personal knowledge of the matters described in this declaration, knowledge that I acquired in the course of my duties. This declaration is made for use in the above-entitled lawsuit.

2.    As a sales executive, I worked directly and closely with Plaintiffs Mahmoud "Mike" Kedkad and Jasbir Gill, who were also sales executives, out of KnowledgeStorm's South San Francisco office. The office was a very small office, with approximately 9 employees working out of the office in early 2007. We had no manager on-site at that time. Rather, Joe Brown was manager of our sales force, and he was located out of KnowledgeStorm's headquarters office in Atlanta, Georgia.

3.    Of all of the sales executives, I believe that I had the closest working and social relationship with both Mr. Kedkad and Ms. Gill. I probably spoke more with Mr. Kedkad and Ms. Gill than any of the other sales executives. All of the sales executives, with the exception of a sales executive by the name of Joe Niederberger, got along very well. I considered our South San Francisco sales force as a close-knit family.

4.    Beginning in or about January 2007 through approximately March 2007, Mr. Kedkad and Ms. Gill began working, while on company time, on

- 2 -

021

creating their own business. The name of the business was Content Maximizers (www.contentmaximizers.com). Both Mr. Kedkad and Ms. Gill approached me to ask whether I would like to help them with their new business. In fact, while working at KnowledgeStorm, I went on an appointment with Mike Kedkad to a potential client of Content Maximizers. Ms. Gill and Mr. Kedkad worked often on this new company and spent time during and after work on developing this company.

5.    At no time did I witness or hear Joe Brown make any statements as alleged by Mr. Kedkad or Ms. Gill in their lawsuit. In fact, at no time did I hear Joe Brown make *any* racist, discriminatory or derogatory comments toward or about *anyone*, including Mr. Kedkad and Ms. Gill. Mr. Kedkad's and Ms. Gill's allegations are unbelievable. Joe Brown always tried to do the right thing by everyone. Joe Brown came out to the office approximately one time per month and he approached everybody in the same manner. More specifically, he always asked, "Is there anything I can do for you?" and "Is there anything you need to speak about?" I would go so far as to say that he never, to my knowledge, said one bad thing about anybody. I would describe Joe Brown as kind, sensitive, and always trying to do right by everyone.

6.    If Joe Brown had made any one of the statements attributed to him by Mr. Kedkad or Ms. Gill, I simply cannot believe that they, or anyone else in the

office, would not have told me about the alleged comments. Indeed, because of my close relationship with Mr. Kedkad and Ms. Gill, I find their allegations to be incredible and unbelievable.

7.    I am unaware whether Mr. Kedkad or Ms. Gill ever reported to Jason Hoback any of the allegations as identified in their Complaint. However, I knew Jason Hoback very well. This is because, before I was a sales executive for KnowledgeStorm, I was a KnowledgeStorm client for approximately three years. In that capacity, I knew both Jason and Kelly Gay, KnoweldgeStorm's CEO, well. If Jason or Kelly Gay ever discovered that any of their employees had made statements like those alleged in Mr. Kedkad and Ms. Gill's lawsuit, they would have taken immediate action against the employee making those statements and indeed, I believe they would have fired that person.

8.    As I mentioned above, I believe that the South San Francisco office got along very well, except for Joe Niederberger. Both Ms. Gill and Mr. Kedkad expressed to me their dislike for Joe Niederberger. I would describe Mr. Niederberger as someone who was less than forthright. For example, approximately two days after Mr. Niederberger began working for KnowledgeStorm (he began working at approximately the same time Jasbir Gill began working for KnowledgeStorm), I learned that Mr. Niederberger was contacting one of my accounts with which I was in the middle of contract

- 4 -

negotiations. I then explained the "45-day rule" to Joe Niederberger. A short

while after, I discovered that he had literally removed my name from

approximately fifteen (15) strategic accounts and put his name in my place. This

would have occurred in or about December 2006. Beginning sometime in early

2007, Joe Niederberger worked almost exclusively from home and rarely, if at all,

was at the office. I recall Joe Niederberger telling me: "All you have to do is raise

your voice to Joe Brown or any of the other execs, and they will back down.

That's what I do and that's why I get what I want."

9.      I am unaware of any fraudulent acts in which KnowledgeStorm

allegedly engaged, as asserted by Mr. Kedkad and/or Ms. Gill in their lawsuit. I

specifically am unaware that KnowledgeStorm, through any of its management,

directed or suggested that any of the sales representatives falsify start dates or

inflate proposals in an effort to defraud potential buyers of KnowledgeStorm.

10.      I am unaware that KnowledgeStorm or Joe Brown discriminated

against Mr. Kedkad or Ms. Gill on the basis of race, national origin or any other

criteria, or retaliated against them, including by allegedly supporting other sales

executives in a more favorable fashion. Just before I left my employment at

KnowledgeStorm, I gave exclusively to Mr. Kedkad and Ms. Gill my list of

hundreds of prospects. Accordingly, if anything, Ms. Gill and Mr. Kedkad had

greater opportunities for sales than their co-workers. More specifically, every sales

024

Jan 22 08 01:34p    E STORM INTERNATIONAL                14153521254                        p.6

executive had to cold call and no sales executive was given leads. All sales representatives were trained extensively on calling.

11.    Jasbir Gill told me she was terminated from KnowledgeStorm because they caught her printing out her resumes at work. She never told me, during or after she was terminated, that Joe Brown discriminated against her or harassed her because of her race, national origin, religion, or any other criteria, and she never told me that he made any derogatory remarks to or about her or Mr. Kedkad.

12.    Mr. Kedkad's and/or Ms. Gill's assertion, that Joe Brown did not invite them to a "business dinner" on February 21, 2007, is untrue. On or about February 21, 2007, after work, I, along with Katie Sefton, initiated an informal get together. We went to Xebec for drinks. I recall that, that morning, Mr. Kedkad was not in the office when we discussed going out for drinks. I also recall that, later that day, he and Joe Brown spoke for several hours in Joe Brown's office about business issues. I do not believe that Jasbir Gill was in the office that day because she was in India. I recall that Emily Crume was in the office that day as was Matt Hart, and that Rick Neighor was in from Los Angeles. We all had drinks at Xebec and then Joe Brown showed up later that afternoon/early evening at Xebec. I recall that the next day, Mr. Kedkad came into the office and was angry that he had not been invited. I told him that we had invited everyone and assumed he knew about it. This was not a "business dinner" initiated by Joe Brown and/or a

- 6 -

dinner for which Joe Brown would have invited attendees.  I have just learned that

Mr. Kedkad stated that I told him after this get-together that Joe Brown told me or

made some reference to Mr. Kedkad or Ms. Gill not being invited to this gathering

because they would "scope out terrorist targets."  Mr. Brown never made any such

comment, or any remark even vaguely like that, and I never told Mr. Kedkad that

Mr. Brown made any such comment, or any remark even vaguely like that.  In

short, Mr. Kedkad is lying.  As stated above, at no time did Mr. Brown make any

racist or derogatory remark to or about Mr. Kedkad or Ms. Gill.

   I declare under penalty of perjury that the foregoing declaration is true and

correct.  Executed in _San Francisco_ California on January _22_, 2008.

                                          Lisa McGuire

Atlanta:440102.1

Declaration of Elysse Miller

The following declaration is made pursuant to 28 U.S.C. § 1746:

1.     I, Elysse Miller, was employed by KnowledgeStorm, Inc. from approximately March 2007 until December 2007.  I held the position of Business Development Representative ("BDR").  I have personal knowledge of the matters described in this declaration, knowledge that I acquired in the course of my duties.  This declaration is made for use in the above-entitled lawsuit.

2.     As a BDR, I worked out of KnowledgeStorm's Alpharetta, Georgia office.  In that capacity, I worked directly with Plaintiff Mahmoud "Mike" Kedkad, who was located out of KnowledgeStorm's South San Francisco office, to assist him in making sales.

3.     At no time did I hear Joe Brown make *any* racist, discriminatory or derogatory comments toward or about *anyone*, including Mr. Kedkad and Ms. Jasbir Gill.

4.     On the morning of April 25, 2007, I had a telephone conversation with Mr. Kedkad.  During this conversation, Mr. Kedkad yelled and screamed at me and told me, among other things, "I wish I didn't have a woman as a BDR," or words to that effect.  I immediately reported the conversation to Nick Roberts.  That same afternoon, Chris Gleason and Kelly Gay interviewed me concerning my report.  The content of my interview with Chris Gleason and Kelly Gay is attached

- 2 -

to my declaration as Exhibit A. Exhibit A accurately reflects what I told Chris Gleason about the events that took place on April 25, 2007.

5.    Subsequently, I signed an "outcome" Memorandum from Chris Gleason, explaining the outcome of KnowledgeStorm's investigation into my complaint concerning Mr. Kedkad. Exhibit B is an accurate copy of the outcome Memorandum that I signed and dated.

6.    No employee of KnowledgeStorm suggested, requested, or demanded me to make a complaint of harassment against Mr. Kedkad. I made the complaint against Mr. Kedkad on my own free will and accord.

I declare under penalty of perjury that the foregoing declaration is true and correct. Executed in Georgia on April 9, 2008.

Elysse Miller

LA:65609.1

- 3 -

028

**Conversation with Elysse Miller during Investigations:**
Present in room: Kelly Gay, Chris Gleason, and Elysse Miller
Interview Date: Wednesday, April 25, 2007

Kelly and Chris explained that the purpose of the meeting was to investigate the facts regarding the call that happened earlier in the day between her and Mike Kedkad. Since this was a formal investigation per our Harassment Policy, as stated in the KnowledgeStorm Employee Handbook, Kelly would be taking notes. Elysse would be asked to sign the notes and ensure that they were an accurate reflection of her statements. Kelly and Chris asked Elysse to talk about the call and her interactions with Mike Kedkad. They stated that they needed just the facts as she knew them and that it was not appropriate to talk about this investigation with other employees as that would not be fair to any of the parties involved.

When Elysse started here, she asked Mike Kedkad for the materials to do her job. After several conversations, she was still not getting that. Elysse decided to take it into her own hands and do the research on every one of Mike Kedkad's accounts herself. It took way too much time, and Joe Brown and Nick Roberts noticed. Nick and Joe both asked that Elysse send a detailed email to Mike Kedkad, cc'ing them, to outline exactly what she needed with regard to the list from him so that she could do her job. Mike called Elysse the next day (today – the call) very upset, yelling at Elysse. He said she had no reason to be bringing Nick and Joe into this. She stated that they (she and Mike) have had multiple conversations about the list and they weren't getting anywhere. She commented that they (Nick and Joe) both had noticed that she was not being productive. Mike Kedkad commented Joe? Joe who? Joe doesn't even know who my BDR is. Mike Kedkad just went off and started repeating things, started talking down to Elysse, like she worked for him. He kept saying, "You're new, you don't know anything. You're supposed to be calling me and doing what I say." He said instead of looking at lists she should be looking at her own competency. He said that she has been here three weeks and has not set many appointments. "I wish I didn't have woman as a BDR. I'll get you your accounts, but if I have to do all this work, then what's the point of having a BDR?"

Lisa Lewis had previously brought to Elysse that Mike Kedkad had stolen Borland from their territory. Lisa brought it to Elysse. Elysse sent a quick email stating what Lisa had brought to her attention, and why did he want this account. "Lisa would have called directly, but I told her I would email you."

Mike brought Borland up again today and said "If you would stop spending all of your time relaying messages for Shawn, you could get me appointments." He said, "You are new and shouldn't get involved." In all previous phone conversations, he was very nice.

Elysse commented that she has not been able to get through to him on the workable accounts, and could not figure out why he was having trouble getting the concept.

The conversation was going in circles, and Mike kept yelling and yelling.  We've had these conversations.  No we haven't.  Yes we have.  The further the conversation got, the more he was talking down to Elysse, both his tone of voice and his attitude.  Chris asked Elysse to define yelling.  Elysse's description was beyond a raised voice.

Mike mentioned quite a number of times references to incompetence, like "it's not my list, – it's you."  Mike Kedkad did say once outright that she was incompetent.  The two points of feeling harassed specifically were the comment about being incompetent and the statement, "I wish I didn't have a woman as a BDR."

Mike Kedkad had previously asked who the other reps Elysse called on were, and she said they were David and Tracy.  Elysse said they had previously had conversations where Mike Kedkad said that David was fine, and don't worry about calling on his accounts.

_____                    _____

Elysse Miller                                                                          Date

# MEMORANDUM

TO:        Elysse Miller

FROM:      Kelly Gay

DATE:      April 27, 2007

---

    This memorandum explains the outcome of the Company's investigation into your April 25th complaint of inappropriate and unprofessional behavior by Mike Kedkad. As I trust you realized from our efforts to immediately investigate your complaints, Knowledgestorm is strongly committed to providing a workplace that is free from all forms of harassment and offensive conduct. We do not tolerate it.

    Immediately upon your initial report to me on April 25th, we commenced a thorough investigation of your allegations. Our investigation was inconclusive. We have documented both accounts of the call, reiterated our harassment policy to Mike Kedkad, and in order to minimize any future interaction you may have with Mr. Kedkad, we are reassigning you to a different teammate.

    Knowledgestorm is committed to ensuring that all of our employees are comfortable working for it and that no retaliatory actions are taken against those bringing such matters to management's attention. Please continue to follow the Company's No-Harassment Policy against harassment, discrimination, retaliation and other inappropriate behavior and promptly report to me or to Mike Ewers any further incidents of inappropriate conduct of which you are aware.

    Please acknowledge your receipt of this memorandum by signing below.

_____  4/30/07
Elysse Miller          Date

Declaration of Jeffrey Mokotoff

Steven M. Kroll, Bar No. 216196
FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone:   (213) 237-2400
Facsimile:   (213) 237-2401
skroll@fordharrison.com

Jeffrey D. Mokotoff, GA Bar No. 515472
FORD & HARRISON LLP
*Admitted Pro Hac Vice*
1275 Peachtree Street, NE, Suite 600
Atlanta, Georgia 30309
Telephone:  (404) 888-3800
Facsimile:   (404) 888-3863
jmokotoff@fordharrison.com

Attorneys for Defendant
KNOWLEDGESTORM, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **JASBIR GILL, MAHMOUD KEDKAD,** | **Case No. C 07-04112 PVT** |
| **Plaintiffs,** | |
| **v.** | **DECLARATION OF JEFFREY MOKOTOFF** |
| **KNOWLEDGESTORM, INC., a corporation, DOES 1through 50,** | |
| **Defendants.** | |

    I, Jeffrey D. Mokotoff, am one of the attorneys of record for Defendant KnowledgeStorm, Inc., in the above-entitled case. This declaration is made in support of Defendant's summary judgment motion. This declaration is based on personal knowledge of the facts set forth below.

1.

I received the letter attached hereto as Exhibit "A" from Plaintiff's counsel.
In the letter, Plaintiffs' counsel states that "there is no longer any claim for
retaliation due to the release [Kedkad] signed when he left KnowledgeStorm."

2.

Based in part on the letter, I had a telephone conversation with Plaintiffs'
counsel, Brian Kreger, on April 22, 2008.  In that conversation, I asked Mr. Kreger
to confirm that Mr. Kedkad was no longer asserting any cause of action for
retaliation against KnowledgeStorm.  In response, Mr. Kreger stated that Mr.
Kedkad was not asserting any cause of action for retaliation against
KnowledgeStorm.

I declare under penalty of perjury that the foregoing declaration is true and
correct.  Executed in Atlanta, Georgia, on April 28, 2008.

JEFFREY D. MOKOTOFF

Declaration of Steven Kroll

1   Steven M. Kroll, Bar No. 216196
    FORD & HARRISON LLP
2   350 South Grand Avenue, Suite 2300
    Los Angeles, California 90071
3   Telephone:  (213) 237-2400
    Facsimile:   (213) 237-2401
4   skroll@fordharrison.com

5   Jeffrey D. Mokotoff, GA Bar No. 515472
    FORD & HARRISON LLP
6   *Admitted Pro Hac Vice*
    1275 Peachtree Street, NE, Suite 600
7   Atlanta, Georgia 30309
    Telephone:  (404) 888-3800
8   Facsimile:   (404) 888-3863
    jmokotoff@fordharrison.com
9
    Attorneys for Defendant
10  KNOWLEDGESTORM, INC.

11              UNITED STATES DISTRICT COURT

12      NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

13

14  JASBIR GILL, MAHMOUD          | Case No. C 07-04112 PVT
    KEDKAD,                       |
15                                | **DECLARATION OF STEVEN
                  Plaintiffs,     | KROLL IN SUPPORT OF
16                                | DEFENDANT'S MOTION FOR
        v.                        | SUMMARY JUDGMENT, OR IN
17                                | THE ALTERNATIVE, PARTIAL
    KNOWLEDGESTORM, INC., a       | SUMMARY JUDGMENT**
18  corporation, DOES 1through 50,|
19                                |
                  Defendants.     |

20

21

22

23

24

25

26

27

28

Ford & Harrison
LLP
Attorneys At Law
Los Angeles

LA:66328.1                          - 1 -                    DECLARATION OF STEVEN KROLL

034

1

<u>**DECLARATION OF STEVEN KROLL**</u>

2

I, Steven M. Kroll, declare as follows:

3

1.    I am an attorney at law licensed to practice in the State of California

4

and the United States District Court, Northern District of California.

5

2.    I am an associate with the law firm of Ford & Harrison LLP, attorneys

6

of record for defendant KnowledgeStorm, Inc. ("Defendant") in this action.

7

3.    I have personal knowledge of each of the matters set forth below and,

8

if called as a witness, could and would testify competently to each of them under

9

oath.

10

4.    I am making this declaration in support of Defendant's motion for

11

summary judgment or, in the alternative, partial summary judgment against plaintiff

12

Mahmoud Kedkad ("Plaintiff") and its separate statement of uncontroverted

13

material facts.

14

5.    Attached hereto under a tab are true and correct copies of excerpts

15

from the deposition transcript of plaintiff Jasbir Gill dated January 14, 2007.

16

6.    Attached hereto under a tab are true and correct copies of excerpts

17

from the deposition transcript of Plaintiff dated January 15, 2007.

18

7.    Attached hereto as Exhibit "B" is a true and correct copy of

19

Defendant's Request for Admissions to Plaintiff, Set One.

20

8.    Attached hereto as Exhibit "C" is a true and correct copy of Plaintiff's

21

Responses to Defendant's Request for Admissions, Set One.

22

9.    Attached hereto as Exhibit "E" is a true and correct copy of

23

Defendant's Request for Admissions to Plaintiff Jasbir Gill, Set One.

24

/ / /

25

/ / /

26

/ / /

27

/ / /

**035**

28

/ / /

1    10.    Attached hereto as Exhibit "F" is a true and correct copy of Plaintiff

2  Jasbir Gill's Responses to Defendant's Request for Admissions, Set One.

3

4    I declare under penalty of perjury under the laws of the State of California

5  and the United States of America that the foregoing is true and correct.

6    Executed this 29th day of April 2008, at Los Angeles, California.

7

8    *St— M. Kroll*

9    Steven M. Kroll

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**036**

Exhibit 3

 KNOWLEDGESTORM

October 30, 2006

Mr. Mahmoud Kedkad
8 Avocet Drive
Redwood City, CA 94065

Dear Mike:

On behalf of the entire KnowledgeStorm team, we are pleased to offer you the position of Sales Executive. It is personally gratifying to know that a person of your caliber is ready to join our team. We certainly look forward to working with you!

| | |
|---|---|
| Reports to: | Joseph Brown, Sales Manager for the West Coast |
| Base Salary: | $75,000, paid in semi-monthly installments |
| Variable Comp: | Commissions (plan to be disseminated separately) |
| Benefits: | Position qualifies for all employee benefit programs including: health and dental (after 30 day wait period), life insurance, disability, 401(k) plan, flexible spending plan, vacation, sick pay, and holidays. Visit our benefits website at www.benefitspassport.com, for more information. The log in information is: User ID: knowledgestorm, Password: benefits. |
| Vacation: | Two (2) weeks of vacation |

We believe that every member of our team should contribute toward and participate in its financial success. To that end, after thirty (30) days of consecutive, active employment you will be granted Incentive Stock Options to purchase 2,000 shares of KnowledgeStorm, Inc. common stock, subject to terms and conditions of the KnowledgeStorm, Inc. Stock Incentive Plan. The stock options will be delivered thirty (30) days thereafter. The options will vest at a rate of no less than 25% per year over a four (4) year period.

This offer is contingent upon your successful completion of a background investigation and reference checks. If the background investigation reveals any felony and/or misdemeanor crimes involving moral turpitude, such as embezzlement, theft, assault or a pattern of violating federal or state laws, or reveals any falsehoods, false statements or misrepresentations, this offer will be immediately rescinded. In addition, it is also contingent upon your submitting to us the required documentation of your eligibility to work in the United States, such as a valid driver's license, social security card, military identification, passport or other acceptable documentation as determined by the US Department of Immigration and Naturalization.

*The above offer is a summary of our mutual understanding surrounding the terms of employment offered to you, and does not constitute an employment contract. Your employment with KnowledgeStorm is on an "at will" basis.*



DEFENDANT'S
EXHIBIT
3
1-15-08

037

Oct 30 06 02:52p     Mike Kedkad                        718-821-6825           p.3

October 27, 2006
Page 2 of 2

We are excited about your future with KnowledgeStorm. Please confirm your acceptance of this offer by signing below and returning to me within twenty-four hours. Should you have any questions, concerns, find this offer unacceptable or not as it was verbally communicated to you, please contact me directly at (770) 290-8837.

Please do not make any changes to this letter. Should it be altered in any way, this offer will be considered null and void.

Again, we look forward to working with you and receiving your acceptance of this letter.


Regards,


Joseph Brown
Sales Manager


I, Mike Kedkad, accept the position and conditions as described above:


Signature _____    10/30/06 _____    11/20/06 _____
                                        Acceptance Date      Start Date


**Please fax back to 770-290-8841**

Exhibit 6



**From:** Brown, Joe
**Sent:** Tuesday, April 03, 2007 6:58 AM
**To:** Boyd, David; Brown, Jonathan; Costa, Tom; Cummings, Kevin; Gilbreth, Rich; Gill, Jasbir; Hart, Matt; Kedkad, Mike; Mikolajewski, Tracy; Neigher, Rick; Niederberger, Joe; Norman, Deidre
**Cc:** tcosta@lnsurancefusion.com; deidre norman
**Subject:** Monday West Region call follow up

On our call yesterday, we congratulated the following reps for their March performance above quota:

Jon Brown

David Boyd

Mike Kedkad

Jasbir Gill

Joe Niederberger

Thanks for a tremendous effort in March!!!

We also congratulated the following for being at their Year to Date plan through Q1:

Jon Brown

Mike Kedkad

Joe Niederberger

Your hard work and effort paid off, resulting in your great performance through the first quarter.  Thank you again for the results.

Some other items:

- We announced the addition of Rich Gilbreth, Tom Costa and Diedre Norman to the Western Region Sales team!  Please welcome them at your earliest convenience.

- **Monday Sales Update Trainings** announced by Heather Foster are MANDATORY unless you have client calls previously scheduled or personal emergency.  It is widely known which people show up and which don't.  I won't police this activity, but expect to have full participation from the region

- For **Western Region calls**, if you accept and cannot make it, I will send a recap email.  If you can't get

00 004

039

Exhibit A



**LAMBERTO**
**& KREGER**

160 West Santa Clara
Suite 1050
San Jose, CA 95113
phone: 408.999.0300
fax: 408.999.0301

Brian S. Kreger
Attorney at Law

April 18, 2008

Jeff Mokotoff
Ford and Harrison
1275 Peachtree St., Suite 600
Atlanta, GA 30309

      Re:    Jasbir Gill and Mahmoud Kedkad v. KnowledgeStorm Inc.

Dear Mr. Mokotoff:

      In follow up to your meet and confer letter, I am not sure why you are claiming that the information is relevant. You were present at plaintiff's deposition when we put on the record that there is no longer any claim for retaliation due to the release he signed when he left Knowledgestorm. ( See page 93). Additionally, as you can see from the responses, he is not making a claim for economic loss. The "after acquired evidence" affirmative defense is not a defense to a claim for racial harassment. Please give me a call to discuss this when you get a chance.

                       Very truly yours,

                       BRIAN S. KREGER

Exhibit B

1  Steven M. Kroll, Bar No. 216196
   FORD & HARRISON LLP
2  350 South Grand Avenue, Suite 2300
   Los Angeles, California 90071
3  Telephone:  (213) 237-2400
   Facsimile:   (213) 237-2401
4  skroll@fordharrison.com

5  Jeffrey D. Mokotoff, GA Bar No. 515472
   FORD & HARRISON LLP
6  *Admitted Pro Hac Vice*
   1275 Peachtree Street, NE, Suite 600
7  Atlanta, Georgia 30309
   Telephone:  (404) 888-3800
8  Facsimile:  (404) 888-3863
   jmokotoff@fordharrison.com

9
   Attorneys for Defendant
10 KNOWLEDGESTORM, INC.

11            UNITED STATES DISTRICT COURT

12     NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

13

14 JASBIR GILL, MAHMOUD              Case No. C 07-04112 PVT
   KEDKAD,
15                                   **DEFENDANT
              Plaintiffs,            KNOWLEDGESTORM, INC.'S
16                                   REQUEST FOR ADMISSIONS TO
        v.                           PLAINTIFF MAHMOUD KEDKAD,
17                                   SET ONE**
   KNOWLEDGESTORM, INC., a
18 corporation, DOES 1 through 50,

19            Defendants.

20

21 PROPOUNDING PARTY:        DEFENDANT KNOWLEDGESTORM, INC.

22 RESPONDING PARTY:         PLAINTIFF MAHMOUD KEDKAD

23 SET NUMBER:               SET ONE (1)

24        Defendant KnowledgeStorm, Inc. hereby requests that plaintiff Mahmoud

25 Kedkad answer the following request for admissions in writing and under oath,

26 within thirty (30) days after service, pursuant to Federal Rules of Civil Procedure,

27 Rule 36.

28                                                        **041**

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:64683.1                          DEFENDANT'S REQUEST FOR ADMISSIONS TO
                                    PLAINTIFF MAHMOUD KEDKAD, SET ONE

**REQUEST FOR ADMISSION NO. 1**

Admit attached hereto to as Exhibit "A" is a genuine copy of a resume of PLAINTIFF.

(As used herein, "PLAINTIFF" refers to plaintiff Mahmoud Kedkad.)

(As used herein, "DEFENDANT" refers to defendant KnowledgeStorm, Inc.)

**REQUEST FOR ADMISSION NO. 2**

Admit PLAINTIFF prepared the RESUME.

(As used herein, "RESUME" refers to the resume of PLAINTIFF attached hereto as Exhibit "A.")

**REQUEST FOR ADMISSION NO. 3**

Admit PLAINTIFF provided false information in the RESUME.

**REQUEST FOR ADMISSION NO. 4**

Admit all information in the RESUME is true.

**REQUEST FOR ADMISSION NO. 5**

Admit PLAINTIFF sent the RESUME to Naviga Business Services, LLC.

**REQUEST FOR ADMISSION NO. 6**

Admit PLAINTIFF did not work for SunGard Systems from April 2003 to July 2006.

**REQUEST FOR ADMISSION NO. 7**

Admit PLAINTIFF did not work for SunGuard Systems as its Director of Business Development/National Sales Manager.

**REQUEST FOR ADMISSION NO. 8**

Admit PLAINTIFF did not work for Xtiva Financial Systems from July 2001 to April 2003.

**REQUEST FOR ADMISSION NO. 9**

Admit PLAINTIFF did not work for Xtiva Financial Systems as its National Sales Manager.

**042**

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:64683.1                - 2 -                DEFENDANT'S REQUEST FOR ADMISSIONS TO
PLAINTIFF MAHMOUD KEDKAD, SET ONE

**REQUEST FOR ADMISSION NO. 10**

Admit PLAINTIFF did not work for Vicinity Corporation/Mapblast from December 1996 to July 2001.

**REQUEST FOR ADMISSION NO. 11**

Admit PLAINTIFF did not work for Vicinity Corporation/Mapblast as its Senior Sales Executive.

**REQUEST FOR ADMISSION NO. 12**

Admit PLAINTIFF did not work for Hewlett Packard Company from March 1988 to September 1996.

**REQUEST FOR ADMISSION NO. 13**

Admit PLAINTIFF did not work for Hewlett Packard Company as its National Account Manager.

**REQUEST FOR ADMISSION NO. 14**

Admit PLAINTIFF was terminated from his employment with Hewlett Packard Company for misconduct.

**REQUEST FOR ADMISSION NO. 15**

Admit PLAINTIFF did not work for International Purchasing Consultants from July 1981 to February 1988.

**REQUEST FOR ADMISSION NO. 16**

Admit PLAINTIFF did not work for International Purchasing Consultants as its Worldwide Sales Manager.

**REQUEST FOR ADMISSION NO. 17**

Admit PLAINTIFF cannot establish a claim of racial harassment against DEFENDANT.

**REQUEST FOR ADMISSION NO. 18**

Admit PLAINTIFF cannot establish a claim of retaliation against DEFENDANT.

**043**

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:64683.1                     - 3 -                     DEFENDANT'S REQUEST FOR ADMISSIONS TO
PLAINTIFF MAHMOUD KEDKAD, SET ONE

**REQUEST FOR ADMISSION NO. 19**

Admit PLAINTIFF cannot establish a claim of wrongful termination in violation of public policy against DEFENDANT.

**REQUEST FOR ADMISSION NO. 20**

Admit PLAINTIFF does not allege a claim of wrongful termination in violation of public policy against DEFENDANT.

**REQUEST FOR ADMISSION NO. 21**

Admit Joseph Niederberger was never employed by DEFENDANT for 14 months.

**REQUEST FOR ADMISSION NO. 22**

Admit Joseph Niederberger was never employed by DEFENDANT as the Western Regional Director of Sales.

**REQUEST FOR ADMISSION NO. 23**

Admit PLAINTIFF never witnessed Joseph Brown use the term "sand nigger."

**REQUEST FOR ADMISSION NO. 24**

Admit PLAINTIFF never witnessed Joseph Brown use the term "sand niggers."

**REQUEST FOR ADMISSION NO. 25**

Admit Elysse Miller made a complaint of harassment against PLAINTIFF during his employment with DEFENDANT.

**REQUEST FOR ADMISSION NO. 26**

Admit Rachel Gordon made a complaint of harassment against PLAINTIFF during his employment with DEFENDANT.

**REQUEST FOR ADMISSION NO. 27**

Admit PLAINTIFF is not making a claim for any economic damages.

**044**

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:64683.1                                     - 4 -                        DEFENDANT'S REQUEST FOR ADMISSIONS TO
                                                                            PLAINTIFF MAHMOUD KEDKAD, SET ONE

1

## **REQUEST FOR ADMISSION NO. 28**

2      Admit PLAINTIFF has not consulted with any medical health professional

3   for his alleged emotional distress damages.

4

5   Dated: March 11, 2008                    FORD & HARRISON LLP

6

7                                       By: _St— M. Kroll_____

8                                            Jeffrey D. Mokotoff
                                             Steven M. Kroll
9                                            Attorneys for Defendant
                                             KNOWLEDGESTORM, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**045**

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:64683.1                    - 5 -        DEFENDANT'S REQUEST FOR ADMISSIONS TO
                                           PLAINTIFF MAHMOUD KEDKAD, SET ONE

Legal Tabs Co. 1-800-322-3022

Recycled  Stock # EXA-10-B

**Exhibit A**

**046**

**MIKE KEDKAD, MBA**
8 Avocet Dr, Redwood City, Ca. 94065
**(650) 592-2214**
*mkedkad@hotmail.com*

## Sr. Sales Executive | Sr. Sales Engineer | Sales Manager

### Skills/Competencies

- Sales veteran with over 20 years of a proven track record for consistently achieving and exceeding quota in technical sales, and sales management
- Well versed in the art of complex selling by utilizing proven solution/consultative selling methodologies and skill sets, in Vertical, Channel or Geographic accounts arena
- Proven skills in managing customer relations and expectations, time management, project management, account prioritization, forecasting, and resource utilization
- Results-oriented, self-motivated, skilled communicator, independent, persuasive, professional, and team player
- Strong in-depth technical knowledge, E-services, Portals, ASP hosted solution, licensing, and outsourced solutions.

### Work History

**SunGard Systems; New York, NY**                          April 03- July 06
*Director of Business Development/National Sales Manager*

*With annual revenue of $4 billion, SunGard is a global leader in software and processing solutions for financial services, higher education and the public sector.*

Responsible for penetrating and developing new markets for portfolio management, investment accounting, compliance, and reporting solutions to the leading financial institutions.   Identify market opportunities in a vertical that includes Asset Mangers, Banks, Custodian Banks, and Investment Managers.  Build partnerships through networking, personal contacts, trade shows, publications, existing SunGard relationships, and cold calling.  Independently plan and develop marketing campaigns, marketing strategies, and marketing material for this new market.  Deliver clear & effective value propositions to C-level executives plan and lead sales meetings, handle objections, document meetings and sales activity in CRM.  Prepare quarterly/annual accurate and thorough sales activity reports, forecast reports and present to upper management.  Effectively perform needs assessments, facilitate product demos, develops sales proposals, and answer RFP's. Work with operations, client services, finance, and legal to finalize the sale. Research the market and stay up to date with market changes, and competition.  Participate in civic and professional organizations, company wide meetings, workshops and seminars.  Also responsible for account management after the sale with focus on satisfaction/loyalty, sales support and up-selling.

### Achievements:
- ✓ Developed a new market introducing  $5 Million in new revenues
- ✓ Led the territory to become the highest revenue producing
- ✓ Identified product improvements
- ✓ Awarded 100% club every single year

### Xtiva Financial Systems; New York, NY
*National Sales Manager*

July 01- April 03

*Xtiva Financial Systems is a leading provider of enterprise-wide business and technology solutions for the financials service industry. Xtiva offers an ASP model hosted suite of applications utilizing N-tiered architecture supporting data analytics (OLAP), decision support, and reporting.*

Leveraging financial, technical, and business skills in providing an overall solution for back-office commission management system. This position is responsible for sales and the acquisition of new accounts through cold calls, warm leads from strategic partners, response to RFP's, and personal networks. Responsible for delivering informative and consultive sales presentations tailored to clients needs, recommending solutions and solving complex issues. Demo of products on site, or online using Webex. Responsible for pipeline management, account penetration and timely follow up with C level executives and decision makers.  Develop and present proposals based on thorough understanding of business needs, customization, and data flow. Managed customer expectations, ensuring successful product implementation and delivery, product training and ongoing support.  Provide feedback to management to strategically assist in sales growth and improved product functionality, and features.

### *Achievements:*
✓  Surpassed quota helping the company achieve revenue goals
✓  Met aggressive sales targets to establish the company as a leader
✓  Excel under the pressure of quarterly quota objectives.

### Vicinity Corporation/Mapblast; Palo Alto, California
*Sr. Sales Executive*

December 96-July 01

*Vicinity Corporation/Mapblast is a leading provider of technology-based marketing solutions for businesses, and governments, using Web, wireless and speech platforms*

Responsible for selling a Portal providing Location-based technology in multiple vertical markets. Independently planed, developed, and led the formulation and implementation of sales strategies with focus on attaining sales objectives.  Identified new opportunities, and expanded sales through canvassing, cold calling, letter writing campaigns, cultivation of customer referrals, timely follow-up on sales leads, and personal networks. Prepared, presented and followed up on proposals, drafted and negotiated contracts. Assisted both the customer and Vicinity project managers as required to assure successful product delivery, product training and ongoing support. Managed post launch partner relationships to insure all contractual obligations were met from both parties.  Negotiated and closed contract renewals.  Participated in trade and professional societies, and attended local and regional trade shows.

### *Achievements:*
✓  Grew revenues to $5 million in 3 years
✓  Played a key role in client relationship contributing to the 95% customer retention ratio.
✓  Played a key role in Vicinity's successful Public Offering in 2000.

### Hewlett Packard Company; Denver, Colorado
*National Account Manager*

March 88-September 96

*Hewlett Packard T&M organization is the world's leading provider of Electronic Test and Measurement tools*

Responsible for selling network management trouble-shooting equipment, and network management software worldwide.  Applied consultive/solution approach to recommend products and solve customer issues. Designed, verified, presented, and demo solutions to clients.  Played a consultive role to the customer as go to person for advanced product concepts, and future directions.  Coordinated activities with product manager to attend trade shows, and demo of new products. Developed account plans and strategies

for relationships with key decision makers.  Strategically serviced accounts building HP product loyalty, and customer commitment. Responsible for developing  "winning strategies" to execute and win additional revenues from existing accounts.  Provided accurate quarterly sales forecasts and provided monthly updates.

*Achievements:*
- ✓ HP Club Award for 125% of quota two years running
- ✓ Three times winner sales person of the year award
- ✓ Princes Resort trip winner for exceeding set objectives

**International Purchasing Consultants; Denver, Colorado**          July 81- February 88
*Worldwide Sales Manager*

Established, staffed, and managed international sales division for this start up multi media Company. Established the international department as an expansion strategy.  Opened, and managed remote offices overseas. Effectively trained and managed a sales force of twelve account executives, a director, and over $10 million of sales.  Managed sales activity reporting and monthly funnel reporting.
Developed effective business strategies to increase revenues and profits through new export markets. Motivate, train and direct staff to stay focused on achieving key priorities on weekly, monthly, and annual basis as determined by executive management; track progress and provide reports to management as required.  Maximize the development of staff by directing the implementation of ongoing employee training and development programs in conjunction with senior management.  Resolve any issues with customers or staff in a timely and professional manner.

*Achievements:*
- ✓ Created and Directed the international sales department
- ✓ Opened multiple international offices
- ✓ Successfully grew sales to $10 million

## Education

**MBA** Business Administration and Management; University Of Phoenix
**B S**   Chemical Engineering; University of California Santa Barbara

## Certifications/ Accreditations

- • Miller Hieman Strategic Selling/Conceptual Selling
- • Communications Designs Inc; Ten Key to Powerful Presenting
- • Decker Communications Inc; Effective Communicating
- • Hewlett Packard; PAR Skills To Obtaining Valuable Business Results
- • Hewlett Packard; Test & Measurement Basics
- • Hasler Sales Education Program; Selling at the Next Level
- • Nextel; Technical Marketing
- • Brian Tracy; 24 Techniques for Closing the Sale
- • TechLink; Project Management For IT Professionals Certifications
- • Dearborn; General Securities Representative (Series 7)

**PROOF OF SERVICE**

I, Yolanda H. Dennison, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 350 South Grand Avenue, Suite 2300, Los Angeles, California 90071. On March 11, 2008, I served a copy of the within document(s):

**DEFENDANT KNOWLEDGESTORM, INC.'S REQUEST FOR ADMISSIONS TO PLAINTIFF JASBIR GILL, SET ONE**

☐ by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐ by placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

Brian S. Kreger, Esq.                    *Counsel For Plaintiffs*
Lamberto & Kreger
160 W. Santa Clara St., Suite 1050
San Jose, California 95113
Telephone: (408) 999-0300
Facsimile: (408) 999-0301

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on March 11, 2008, at Los Angeles, California.

_Yolanda H. Dennison_
Yolanda H. Dennison

**050**

FORD & HARRISON
LLP
ATTORNEYS AT LAW
ATLANTA

LA:64823.1

POS RE: DEFENDANT'S REQUEST
FOR ADMISSIONS TO PLAINTIFF
MAHMOUD KEDKAD, SET ONE

Exhibit C

1   BRIAN S. KREGER, State Bar No. 106707
    LAMBERTO & KREGER
2   160 W. Santa Clara St., Suite 1050
    San Jose, CA 95113
3   Telephone: (408) 999-0300
    Facsimile: (408) 999-0301
4
    Attorneys for Plaintiffs
5

6

7

8                   UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA-SAN JOSE DIVISION

10

11  JASBIR GILL, MAHMOUD KEDKAD,            **Case No. C 07-04112PVT**

12                  Plaintiffs,

13  vs.                                     **RESPONSE TO REQUEST FOR**
                                            **ADMISSION**
14  KNOWLEDGESTORM, INC. a corporation,
15  DOES 1 THROUGH 50,

16                  Defendants.
                                        /
17

18  PROPOUNDING PARTY: Defendant

19  RESPONDING PARTY: Plaintiff, Mahmoud Kedkad

20  SET NUMBER: One

21

22  RESPONSE TO REQUEST FOR ADMISSION NO. 1

23       This request is objected to on the grounds that it is not reasonably

24  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

25  and is propounded for the improper purpose of harassment.

26

27  RESPONSE TO REQUEST FOR ADMISSION NO. 2

28       This request is objected to on the grounds that it is not reasonably

1  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

2  and is propounded for the improper purpose of harassment.

3

4  RESPONSE TO REQUEST FOR ADMISSION NO. 3

5      This request is objected to on the grounds that it is not reasonably

6  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

7  and is propounded for the improper purpose of harassment.

8

9  RESPONSE TO REQUEST FOR ADMISSION NO. 4

10      This request is objected to on the grounds that it is not reasonably

11  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

12  and is propounded for the improper purpose of harassment.

13

14  RESPONSE TO REQUEST FOR ADMISSION NO. 5

15      This request is objected to on the grounds that it is not reasonably

16  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

17  and is propounded for the improper purpose of harassment.

18

19  RESPONSE TO REQUEST FOR ADMISSION NO. 6

20      This request is objected to on the grounds that it is not reasonably

21  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

22  and is propounded for the improper purpose of harassment.

23

24  RESPONSE TO REQUEST FOR ADMISSION NO. 7

25      This request is objected to on the grounds that it is not reasonably

26  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

27  and is propounded for the improper purpose of harassment.

28

**052**

1  RESPONSE TO REQUEST FOR ADMISSION NO. 8

2      This request is objected to on the grounds that it is not reasonably

3  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

4  and is propounded for the improper purpose of harassment.

5

6  RESPONSE TO REQUEST FOR ADMISSION NO. 9

7      This request is objected to on the grounds that it is not reasonably

8  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

9  and is propounded for the improper purpose of harassment.

10

11  RESPONSE TO REQUEST FOR ADMISSION NO. 10

12      This request is objected to on the grounds that it is not reasonably

13  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

14  and is propounded for the improper purpose of harassment.

15

16  RESPONSE TO REQUEST FOR ADMISSION NO. 11

17      This request is objected to on the grounds that it is not reasonably

18  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

19  and is propounded for the improper purpose of harassment.

20

21  RESPONSE TO REQUEST FOR ADMISSION NO. 12

22      This request is objected to on the grounds that it is not reasonably

23  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

24  and is propounded for the improper purpose of harassment.

25

26  RESPONSE TO REQUEST FOR ADMISSION NO. 13

27      This request is objected to on the grounds that it is not reasonably

28  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

- 3 -

1  and is propounded for the improper purpose of harassment.

2

3  RESPONSE TO REQUEST FOR ADMISSION NO. 14

4      This request is objected to on the grounds that it is not reasonably

5  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

6  and is propounded for the improper purpose of harassment.

7

8  RESPONSE TO REQUEST FOR ADMISSION NO. 15

9      This request is objected to on the grounds that it is not reasonably

10  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

11  and is propounded for the improper purpose of harassment.

12

13  RESPONSE TO REQUEST FOR ADMISSION NO. 16

14      This request is objected to on the grounds that it is not reasonably

15  calculated to lead to discoverable evidence, violates plaintiff's right to privacy

16  and is propounded for the improper purpose of harassment.

17

18  RESPONSE TO REQUEST FOR ADMISSION NO. 17

19      Denied.

20  RESPONSE TO REQUEST FOR ADMISSION NO. 18

21      Denied.

22  RESPONSE TO REQUEST FOR ADMISSION NO. 19

23      Denied.

24  RESPONSE TO REQUEST FOR ADMISSION NO. 20

25      Admit.

26  RESPONSE TO REQUEST FOR ADMISSION NO. 21

27      Plaintiff lacks sufficient knowledge to admit or deny and on that basis

28  denies the request.

- 4 -

054

1  RESPONSE TO REQUEST FOR ADMISSION NO. 22

2      Plaintiff lacks sufficient knowledge to admit or deny and on that basis

3  denies the request.

4  RESPONSE TO REQUEST FOR ADMISSION NO. 23

5      Admit.

6  RESPONSE TO REQUEST FOR ADMISSION NO. 24

7      Admit.

8  RESPONSE TO REQUEST FOR ADMISSION NO. 25

9      This request is objected to as vague ambiguous and unintelligible.

10  RESPONSE TO REQUEST FOR ADMISSION NO. 26

11      This request is objected to as vague ambiguous and unintelligible.

12  RESPONSE TO REQUEST FOR ADMISSION NO. 27

13      Admit.

14  RESPONSE TO REQUEST FOR ADMISSION NO. 28

15      Admit.

16

17  Dated: April 10, 2008                LAMBERTO & KREGER

18

19

20

21                          By: _____

22                              BRIAN S. KREGER

23                              Attorneys for Plaintiffs

24

25

26

27

28
                                                    **055**
                          - 5 -

DECLARATION OF SERVICE

I, the undersigned, declare:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, California, in which county the within-mentioned mailing occurred, and not a party to the subject cause. My business address is 160 West Santa Clara, Suite 1050, San Jose, California 95113. On April 10, 2008, I caused to be served the attached RESPONSE TO REQUEST FOR ADMISSIONS on the parties in said cause as follows:

Steven Kroll
Ford & Harrison
350 South Grand Ave., Suite 2300
Los Angeles, CA 90071


Jeffrey D. Mokotoff
Ford & Harrison
1275 Peachtree St., NE, Suite 600
Atlanta, GA 30309


[ X ]　(BY MAIL) I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at San Jose, California.

[　]　(BY PERSONAL SERVICE) I caused such envelope(s) to be delivered by hand this date to the offices of the addressee(s).

[　]　(BY OVERNIGHT DELIVERY) I caused such envelopes to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

[　]　(BY FACSIMILE) I served the parties listed on the attached service list by facsimile on the fax numbers listed below each of the parties.


[ X ]　(FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 10, 2008, at San Jose, California.

BRIAN S. KREGER

**056**

Exhibit D

# KNOWLEDGESTORM EMPLOYEE HANDBOOK
## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................ 1
   A. COMPANY HISTORY ....................................................... 2
   B. EMPLOYEE HANDBOOK ................................................ 2
II.  GENERAL COMPANY POLICIES ............................................. 2
   A. EQUAL EMPLOYMENT OPPORTUNITY POLICY ....................... 2
   B. NO-HARASSMENT POLICY .............................................. 3
III. HIRING ........................................................................................ 4
   A. EMPLOYMENT SCREENING ............................................ 4
   B. HIRE DATE .................................................................. 4
   C. INTRODUCTORY PERIOD ............................................... 4
   D. PROMOTIONS AND TRANSFERS ..................................... 5
   E. EMPLOYEE CLASSIFICATIONS ....................................... 6
IV.  CONDITIONS OF EMPLOYMENT ............................................ 6
   A. EMPLOYEE HONESTY .................................................... 6
   B. CONFIDENTIALITY ........................................................ 6
   C. TELEPHONE ................................................................. 7
   D. EMAIL ......................................................................... 7
   E. INTERNET .................................................................... 8
   F. WORKPLACE SEARCHES ............................................... 8
   G. CONTRACT/TEMPORARY WORKERS ............................... 9
   H. DRESS CODE/APPEARANCE .......................................... 9
   I. HOURS OF WORK AND FLEXTIME ................................... 9
   J. OVERTIME ................................................................... 10
   K. PERFORMANCE APPRAISALS ........................................ 10
   L. SMOKING POLICY ......................................................... 11
   M. ACCESS CARDS ........................................................... 11

KSI 0001

N. SECOND JOBS ...................................................................................11

O. RECORDING DEVICES......................................................................11

P. ACCURATE HOME ADDRESSES AND PHONE NUMBERS ..........12

V.   COMPENSATION AND BENEFITS.....................................................12

A. PAY PERIOD .......................................................................................12

B. PAYROLL DEDUCTIONS...................................................................12

C. GARNISHMENTS................................................................................12

D. VACATION ..........................................................................................13

E. EMPLOYEE BENEFITS .....................................................................13

F. WORKERS' COMPENSATION...........................................................14

G. INSURANCE CONTINUATION.........................................................14

VI.   ATTENDANCE, HOLIDAYS, AND LEAVES.......................................15

A. ATTENDANCE....................................................................................15

B. TARDINESS AND LEAVING EARLY ...............................................15

C. HOLIDAYS ..........................................................................................15

D. FAMILY AND MEDICAL LEAVE ACT ("FMLA") ..........................16

E. PERSONAL LEAVE ...........................................................................18

F. MILITARY LEAVE .............................................................................19

G. BEREAVEMENT LEAVE ...................................................................19

H. JURY DUTY.........................................................................................19

I. SCHOOL VISITATION LEAVE ..........................................................19

J. SICK LEAVE .......................................................................................20

K. VOTING LEAVE .................................................................................20

VII.   DISCIPLINE, DRUGS AND GRIEVANCES ........................................21

A. DISCLAIMER......................................................................................21

B. DISCIPLINARY PROCEDURE .........................................................21

C. ILLEGAL DRUGS ..............................................................................21

D. QUESTIONS, SUGGESTIONS, AND COMPLAINTS........................22

VIII.   TERMINATION ....................................................................................22

KSI 0002

    A. RESIGNATION ..................................................................22

    B. DISMISSAL FOR CAUSE ...............................................22

IX.   ACKNOWLEDGMENT ...........................................................25

X.  ACKNOWLEDGMENT ...........................................................26

KSI 0003

# I.     INTRODUCTION

Dear KnowledgeStorm Colleague,

I remember the day I joined KnowledgeStorm—brimming with ideas and enthusiasm about how I could make a difference and contribute to the company's success. Mine is just one of the many "KnowledgeStorm stories" shared among friends and co-workers. I was employee #21, and as I looked to my co-workers, I knew it was "up to us" to make KnowledgeStorm succeed. Each of us had to make the commitment that our individual effort would lead to the team's achievement. Whether KnowledgeStorm is 21 or 2100 employees, that commitment still holds true.

Based on the efforts of the original team and all the talent that have since joined, KnowledgeStorm has taken the lead as an indispensable resource for IT buyers and IT providers.

There are three fundamental values that have served as the foundation for KnowledgeStorm's success:

- Respect—KnowledgeStorm promotes a professional environment of cooperation and integrity.
- Contribution—KnowledgeStorm recognizes individual effort, which contributes to the team's overall success.
- Work Ethic—KnowledgeStorm achieves its greatest success when each colleague is laser focused and working in an environment of optimized performance.

KnowledgeStorm has established this Employee Handbook to clearly detail the expectations and privileges common to KnowledgeStorm. I encourage you to read this document carefully and to incorporate these practices into your daily professional routine.

KnowledgeStorm is an ambitious organization and doesn't rest easy on its laurels. The achievements are great and many more lay ahead. In our environment where expectations and values are clear, each one of us can walk in every morning with that same sense of enthusiasm and purpose we had on day one.

Welcome to the KnowledgeStorm team!

Sincerely,

*Kelly*

Kelly H. Gay
Chairman, President & CEO

**060**

KSI 0004

## A. COMPANY HISTORY

KnowledgeStorm, Inc. was conceived during the summer of 1998. The concept grew out of recognition that both prospective buyers and potential providers of software and high-tech products were using inefficient means to find each other. This realization, combined with new ideas on how to use the web to harvest, normalize, search and distribute information led to the KnowledgeStorm, Inc. business model and service.

## B. EMPLOYEE HANDBOOK

The strength of KnowledgeStorm is based in the quality of the KnowledgeStorm team. This handbook is designed to provide you with a full range of general information that will assist you during your career with KnowledgeStorm, help you grow as a part of our team, and improve your working relationships with your co-workers.

This handbook is not an employment contract, either express or implied. Your employment relationship is at-will, meaning that either you or KnowledgeStorm may terminate the employment relationship at any time, for any reason or no reason. These policies and procedures, may, and likely will be, changed from time to time with or without notice, as KnowledgeStorm, in its sole discretion, deems appropriate. Please refer to the Acknowledgment on the last page of the handbook, read it carefully, sign and return it to the Human Resources Department.

After reading the handbook, please keep it to review for general information about our Company. Please do not hesitate to ask your manager or contact Human Resources if you have any questions about this handbook.

## II.    GENERAL COMPANY POLICIES

## A. EQUAL EMPLOYMENT OPPORTUNITY POLICY

KnowledgeStorm will recruit, hire, promote, transfer, train, and make all other employment decisions without regard to race, color, religion, sex, age, national origin, ancestry, pregnancy, disability, veteran status, sexual orientation, marital status, medical condition, childbirth, or related medical condition, or any other protected status.

In compliance with all applicable state and federal civil rights laws, every effort will be made to employ the most qualified individuals without regard to the above factors. Additionally, it is, and will continue to be, our policy to provide information and advancement opportunities in a non-discriminatory fashion.

**061**

KSI 0005

## B.  NO-HARASSMENT POLICY

It is also KnowledgeStorm policy that employees and their work environment should be free from all forms of prohibited harassment and intimidation. KnowledgeStorm does not, and will not, permit employees to engage in prohibited sexual harassment (with or without sexual conduct) or harassment based on race, color, religion, sex, age, national origin, ancestry, pregnancy, disability, veteran status, sexual orientation, marital status, medical condition, childbirth or related medical condition, protected status (i.e., opposition to prohibited discrimination or participation in the statutory complaint process), or other status protected by state or federal law.  Prohibited harassment by any employee, manager, and any person doing business with KnowledgeStorm is strictly prohibited.

Prohibited harassment includes verbal or physical conduct that denigrates or shows hostility toward an individual because of his/her race, color, religion, sex, age, national origin, ancestry, pregnancy, disability, veteran status, sexual orientation, marital status, medical condition, childbirth or related medical condition, or other status protected by federal or state law and that creates an intimidating, hostile, or offensive working environment.  Prohibited harassment may include, but is not limited to, epithets, slurs, jokes, or other verbal or physical conduct relating to an individual's race, color, religion, sex, age, national origin, ancestry, pregnancy, disability, veteran status, sexual orientation, marital status, medical condition, childbirth or related medical condition, or other protected status.  Prohibited sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal, graphic, or physical conduct of a sexual nature that creates an offensive or hostile work atmosphere.  This policy also prohibits same-sex harassment.

Any employee who believes that he/she is being harassed by a co-worker, manager, or other individual, whether employed at KnowledgeStorm or not, or believes his/her employment is being adversely affected by such conduct, whether directed at that employee or another employee, should immediately report their concerns to:

> Mike Ewers
> Vice-President
> 2520 Northwinds Parkway
> Suite 600
> Alpharetta, GA 30004
>
> or
>
> Kelly Gay
> CEO
> 2520 Northwinds Parkway
> Suite 600
> Alpharetta, GA 30004

**062**

KSI 0006

A prompt and thorough investigation will occur and, if it is determined that prohibited harassment has occurred, KnowledgeStorm will take appropriate disciplinary action calculated to see that the harassment ends, up to and including discharge of the offending employee. KnowledgeStorm will protect the confidentiality of harassment allegations to the extent possible, and although KnowledgeStorm cannot guarantee complete confidentiality, information about the allegations of harassment will be shared only with those who need to know about it. KnowledgeStorm will not take action against the employee who makes a good faith report of inappropriate conduct. KnowledgeStorm will not tolerate adverse treatment of an employee because they report harassment or provide information related to such complaints.

All employees, including managers, have an obligation to stop discrimination and all forms of harassment from occurring and must report conduct which they observe that violates this policy to the most senior member of management at their facility or corporate headquarters.

## III.    HIRING

### A.  EMPLOYMENT SCREENING

We desire honest, law-abiding employees with the highest level of integrity. In furtherance of that goal, we reserve the right to conduct criminal background checks and Social Security Number verifications on all of the Company's applicants. A record of criminal conviction will not necessarily be a bar to employment, since we will consider factors such as the age of the offense, time of the offense, the nature, and seriousness of the violation, and evidence of rehabilitation in making any employment decision. We also reserve the right to conduct criminal checks on our current employees at twelve (12) to eighteen (18) month intervals.

### B.  HIRE DATE

An employee's initial hire date is to be used in establishing length of service. An employee needs to be on the company payroll as a regular employee before a hire date is established.

### C.  INTRODUCTORY PERIOD

We allow you to get to know fellow employees, managers and the tasks involved in your position through a 90 day Introductory Period. During this time, your performance will be evaluated for continuing employment. At any time during these first 90 days, you may resign, for any reason or no reason. Likewise, KnowledgeStorm may terminate your employment for any reason or no reason. Vacation and sick time are accrued during this period but are not available for use until the completion of the introductory period; however, personal floating holidays may be used.

**063**

KSI 0007

Please understand that completion of the Introductory Period does not guarantee continued employment for any specified period of time, nor does it require than an employee be discharged only for "cause."

After the Introductory Period, your employment will continue to be at-will, meaning you may resign at any time, for any reason or no reason. Likewise, KnowledgeStorm may terminate your employment at any time, for any reason or no reason.

## D. PROMOTIONS AND TRANSFERS

Transfers and promotions represent one of the most important elements of employee development and growth.

We are firmly committed to a policy of promotion from within on the basis of merit. This is possible because we hire people who are capable of handling increased or new responsibilities and because we offer opportunities for improvement and growth. Of course, internal promotion is in our interest as well, as it is a desirable and necessary means of attracting, retaining, motivating, and developing high-caliber personnel.

*Employee Initiative:* Each employee must take the initiative in deciding what his or her career goals are and in seeking counsel from his or her manager to develop career plans. In the final analysis, advancement at KnowledgeStorm depends on individual job performance, management's evaluation of capability to accept more responsibility, the availability of openings, and the relative qualifications of other candidates for advancement.

*Promotion from Within:* Whenever possible, new and vacant positions will be filled from within KnowledgeStorm by promoting a qualified internal candidate. Merit factors considered include performance in present and previous positions, other related experience skills, technical qualifications, aptitude, motivation, knowledge, education, and career interests. Generally, priority is given to candidates within the same work group or department where the opening exists. Length of continuous service will be considered only in the unusual event that two or more candidates are equally qualified.

*Transfers:* Among the reasons for company-initiated transfers are meeting work load needs, whether short-term or long-term; better matching of individual abilities to positions; staffing new functions; providing needed on-the-job training; opening channels for promotion of others; alleviating personality conflicts, etc.

In order to qualify as a candidate for promotion or transfer, an employee must generally have been in his or her current position for a minimum period of 6 months and have a performance rating of average or better. Should the manager declare the candidate unavailable due to urgent business needs, management will work together to assist in a

**064**

KSI 0008

resolution which is in the best interest of, first, KnowledgeStorm and second, the employee.

## E. EMPLOYEE CLASSIFICATIONS

*Regular Full-Time Employees:* A regular full-time employee is regularly scheduled to work at least forty (40) hours per week.

*Regular Part-Time Employees:* A regular part-time employee is regularly scheduled to work less than forty (40) hours per week.

*Temporary Employees:* A temporary employee is one who works full-time or part-time and who is employed for no definite term in a position that has a limited duration.

*Exempt and Non-Exempt Employees:* Non-exempt employees are paid on an hourly basis and are entitled to overtime pay at the rate of one and one-half times the regular rate of pay for all hours worked in excess of forty (40) in a workweek. Exempt employees are paid on a salary basis and are not eligible for overtime pay.

# IV.    CONDITIONS OF EMPLOYMENT

## A. EMPLOYEE HONESTY

We expect that our employees will always act with the utmost honesty and integrity. The following approach makes good business sense, but more importantly, it is the right thing to do. Failure to act honestly and with integrity towards our clients and co-workers could result in your immediate termination. The following are examples of conduct that will not be tolerated under any circumstances. This list below is a sample of activities that will not be tolerated. This list is not meant to be exclusive or complete:

1.    Taking leads from another sales representative.
2.    Lying to managers.
3.    Falsifying time-off records.

## B. CONFIDENTIALITY

At the time of hiring, all employees are required to sign an employee agreement. This agreement requires employees to keep confidential any company-related information they may acquire or become aware of through working at KnowledgeStorm. Confidential information includes, but is not limited to, trade secrets, processes, data, procedures, discoveries, developments, designs, improvements, techniques, marketing plans, strategies, forecasts, new products, unpublished financial statements, budgets, projects, licenses, prices, costs, customer and suppliers' lists, and customer information regarding sales. Such confidential information has been created, discovered, or

**065**

KSI 0009

developed by, or has otherwise become known to KnowledgeStorm, or is information in which property rights have been assigned or otherwise conveyed to KnowledgeStorm.

We value our reputation in the business community. The Company and our employees have worked hard to gain that reputation and believe that the KnowledgeStorm name itself is a business asset, or in other words, goodwill. This goodwill can be damaged or destroyed by negative comments regarding KnowledgeStorm by people currently or previously employed by the Company. Such comments have the potential to harm KnowledgeStorm financially and are therefore prohibited. Violation of this policy could result in KnowledgeStorm seeking to recover damages against you that it suffered as a result of such comments.

## C. TELEPHONE

We may employ electronic or mechanical devices to monitor employees' phone calls so that we may assess the productivity and performance of our employees.

We realize that personal calls are sometimes necessary. However, such calls must be kept to an absolute minimum. Long distance calls that do not pertain to Company business are discouraged and should be charged to your home telephone or personal charge card. Where this is not possible, you must reimburse the Company for the cost of the call.

You are prohibited from using the phone in a manner that is harassing, intimidating, offensive, or discriminatory. Such conduct may result in your immediate dismissal or other disciplinary measures.

## D. EMAIL

Each employee will be given a password to access e-mail. Your password is confidential and should not be shared with anyone else. You are prohibited from the unauthorized access of someone else's e-mail. However, we retain a copy of all passwords and have a right to access e-mail at any time for any reason without notice.

We realize that personal e-mails, like personal calls, are sometimes necessary. However, such e-mails should be kept to an absolute minimum.

You are prohibited from sending e-mails that are harassing, intimidating, offensive, discriminatory, or obscene. Similarly, you may not forward, arrange to receive or view such e-mails. Such conduct may result in your immediate dismissal or other disciplinary measures. We reserve the right to forward any evidence of illegal activity to the proper authorities.

**066**

KSI 0010

## E. INTERNET

Internet equipment, connections, and transmissions are the property of KnowledgeStorm. By using the Internet, you are acting as a representative of KnowledgeStorm and should conduct yourself accordingly. Use of the Internet to view, create or forward material that is harassing, intimidating, offensive, discriminatory or obscene, including pornographic, sexist or racist material, is strictly prohibited. Failure to comply with this policy will result in disciplinary action, up to and including possible termination. The company reserves the right to monitor all information transmitted over the Internet to ensure compliance with this policy.

Compliance with the following policies is expected:

1.      Internet access is provided for business use only. During non-business hours it is acceptable to access the Internet for personal reasons as long as is does not violate any of the rules set forth within this section. The duration of such personal use should be reasonable as defined by management.

2.      Electronic communications generally are confidential, however, users should not expect confidentiality with the Internet. Therefore, Internet users must act in accordance with established security procedures when sending confidential or non-confidential information across the Internet.

3.      The malicious tampering, or intentional introduction of viruses with any computer system is prohibited. Any such activity will result in your immediate dismissal or other disciplinary measures.

4.      Unless otherwise noted, all software on the Internet should be considered copyrighted work. Therefore, employees are prohibited from downloading software and/or modifying work without permission.

5.      Misuse of the Internet can result in your immediate dismissal or other disciplinary measures.

If you are unsure if your use of the Internet will violate the KnowledgeStorm policy, please consult your manager.

## F. WORKPLACE SEARCHES

All company property, including, but not limited to, desks, file cabinets, computers, computer disks and electronically stored data, is subject to being searched and the contents held by the KnowledgeStorm personnel at any time.

If you store personal information on company computers, you do so at your own risk. Such information becomes the property of KnowledgeStorm and may be subject to

**067**

KSI 0011

review, copying or deletion. All information stored on company computers, as well as all software provided by the company, is the company's property. Transferring or copying information relating to company business or company software for non-company use is forbidden.

Introduction of personal property onto company premises is deemed consent to all searches. The company may, from time-to-time, search and/or require employees to allow searches of parcels, bags (including handbags and briefcases) and or/other personal items, and/or personal vehicles brought onto company property. In conducting searches, special care will be taken to preserve individual dignity to the fullest extent possible.

If you interfere with or refuse to cooperate in an investigation, including a search or a request to submit to a test for drugs, you are subject to discipline including immediate termination.

## G. CONTRACT/TEMPORARY WORKERS

Individuals may be hired from time-to-time on a temporary or contract basis. Such hires when utilizing KnowledgeStorm's facilities are expected to abide by company policies and work practices as a courtesy to others in the workplace. These individuals are not entitled to benefits, including vacation, sick, holiday pay, medical, or other benefits.

## H. DRESS CODE/APPEARANCE

We do not have a formal dress code or appearance code. However, your appearance should always reflect a standard of professionalism. You should always be well groomed and your attire should be appropriate and conducive to a good working environment. Let common sense and good taste be your guide. If you are unsure of what is acceptable, consult with your manager. A department manager can establish a department dress code if needed.

## I. HOURS OF WORK AND FLEXTIME

*Work Hours/Workweek:* Your manager will tell you your scheduled workdays and the hours you are expected to work each day. Generally, the regular workweek is Monday through Friday and averages forty (40) hours for nonexempt employees. Your workweek may vary from time-to-time as projects dictate. We reserve the right to assign duties and to change starting and stopping times according to need.

Customer service is essential to our success, so you are expected to be in attendance and on the job ready to work at your starting time. Likewise, you are expected to work until your regularly scheduled departure time unless your manager gives you permission to leave early.

**068**

KSI 0012

If you are unable to work or will report late, you must telephone your manager personally and no later than your regular starting time. It will not be acceptable to have another party call for you unless it is impossible for you to call personally.

*Flextime:* Flexible work arrangements are dependent on company requirements. A universal flexible work policy does not apply to every department or situation. Managers are encouraged to explore flexible work arrangements with their employees. A work plan that is beneficial to both employee and KnowledgeStorm can be developed jointly by you and your manager in cases where a flexible work arrangement is feasible. All flexible scheduling arrangements are subject to management approval and must not impair company operations.

A flextime work schedule allows you latitude in scheduling working hours within specified limits as long as your full complement of work hours is met. Individual departments may use a flexible work schedule provided there is adequate staff coverage to meet the operational requirements of the department.

## J. OVERTIME

From time-to-time, overtime may be required. In the event that overtime is necessary, non-exempt employees must receive prior approval from their manager. This permission must be renewed on a daily basis. Overtime will be computed on the basis of time-and-one-half for all time worked in excess of forty (40) hours per week for all nonexempt employees. Exempt employees are not eligible to receive overtime pay.

## K. PERFORMANCE APPRAISALS

The purpose of a performance appraisal is to give your manager a means of rating your work and to give you an accurate understanding of your performance as your manager evaluates it. The appraisal also gives you the opportunity to discuss your thoughts about your work, your manager and KnowledgeStorm. Employees who are not performing satisfactorily may be placed on a formal "performance improvement plan" at the time of the appraisal or at any time their performance needs improvement.

You will be asked to sign your appraisal to indicate you have reviewed it. A signature on the form does not necessarily indicate agreement with the appraisal. If you disagree with your appraisal, you may document the areas of disagreement either on the form or in a separate note, which will be attached to the appraisal before it is sent to the file.

Around each year's anniversary of employment with KnowledgeStorm, a formal performance appraisal will take place. In addition to a formal performance appraisal once a year, informal performance appraisals may take place from time to time at KnowledgeStorm's discretion. These performance appraisals will be carried out in an objective manner. These appraisal meetings may or may not be used for determination of salary increases and/or bonuses.

**069**

KSI 0013

We reserve the right to conduct interim reviews as deemed necessary by management.

### L.  SMOKING POLICY

Smoking is not permitted in any KnowledgeStorm owned or leased buildings. Employees who smoke must do so outside the building.  It is your responsibility to ensure that smoking does not in any way interfere with or detracts from your job performance or punctuality.  Employees who abuse smoking breaks will be subject to disciplinary action.

### M. ACCESS CARDS

Access cards may be issued to employees on their first day of employment. These cards are not only provided to allow entrance to the building, but to provide a safer working environment and prevent unauthorized people from wandering into the building. Since we are trying to provide for employees safety, allowing any outside person to use your card may result in disciplinary action.

If an access card is misplaced or lost, please notify management immediately.  A replacement card will be issued.  If an access card is misplaced a second time, a replacement fee may be required.

### N.  SECOND JOBS

There may be times when you want to work a second job in addition to the one you have here at KnowledgeStorm.  We will allow you to work a second job so long as you are not working for a company that competes with us either in whole or in part. Furthermore, we cannot allow your work at another company to impact your work at KnowledgeStorm.  If your performance and productivity falter, you could be asked to resign from your other position or face disciplinary action including discharge.  In addition, you are prohibited from engaging in work for another company while you are on KnowledgeStorm's time or premises.  Failure to comply with this rule could result in disciplinary action including discharge.

### O.  RECORDING DEVICES

Voice and video recording devices in the workplace are strictly prohibited, other than those used by KnowledgeStorm managers or managers in the usual and ordinary course of their jobs, or by employees at the direction of management.  No employee may bring a voice recorder or video recording device into the workplace without the express written approval of the Chief Executive Officer.  Violation of this policy will result in disciplinary action up to and including termination.

**070**

KSI 0014

### P.  ACCURATE HOME ADDRESSES AND PHONE NUMBERS

There will be times when we may need to contact you at home, either by phone or mail. You should update your address and phone number within fourteen (14) days of a change in such information.  Willful failure to provide this information could result in discipline up to and including discharge.

## V.    COMPENSATION AND BENEFITS

### A.  PAY PERIOD

You are paid on the basis of semimonthly pay periods.  Paychecks will be distributed on the working day on or before the 1st and 15th of each month.  Payday on the 1st and 15th of the month is for the previous pay period, not the current one.

### B.  PAYROLL DEDUCTIONS

We are required to make certain deductions from your salary.  These include federal withholding tax, state withholding tax, Social Security tax, etc.  Each employee is required to sign a "withholding certificate" (Form W-4).  This indicates the number of exemptions that you have for income tax purposes.  If the number of exemptions that you are entitled to changes, your manager should be notified immediately.  A new W-4 must be signed to reflect the change.

All deductions are itemized on your payroll check.  In accordance with the provisions of the law, after the end of the year, you will receive a statement (Form W-2), in duplicate, showing your earnings and the amount withheld for federal, state, and local taxes.

### C.  GARNISHMENTS

Your creditors may garnish your pay for an unpaid debt.  We are required by law to honor legal garnishments.  Responding to garnishments is time-consuming and costly to the Company because it involves preparing additional payroll records and submitting documents to court officials, and thus reduces the overall efficiency of the payroll department.  As such, we do not wish to become involved in the personal finances of its employees.  We expect employees to handle their personal financial affairs with a sense of responsibility that does not require Company involvement.  We do not favor garnishment of your wages and strongly encourage you to resolve debts and financial disputes in order to avoid unnecessary garnishment proceedings.

071

KSI 0015

## D.  VACATION

We believe that vacations from work are a healthy and desirable part of everyone's life; therefore, we provide paid vacations to both regular full-time and regular part-time employees.  All full-time employees are eligible to receive vacation at the regular rate of pay and based on eight (8) hour days.  Part-time employees are eligible to receive vacation with pay, prorated on the average number of hours worked per week at the regular rate of pay.  Vacation time must be used in accordance with the terms of this policy.

Standard vacation time is as follows:

| Years employed | Yearly vacation accrual rate |
|---|---|
| Less than 5 | 10 days |
| 5 to 10 | 15 days |
| 10 and over | 20 days |

You will begin accruing vacation at that rate from your first day on the job.  Any fractions of a day will be rounded up to the next whole day.  For example, if you are hired on March 1, you would be eligible to accrue 10/12 of 10 days vacation, or 8.3 days of vacation which would be rounded up to 9 days of vacation for the calendar year in which you were hired.

The company will allow for up to five (5) days to be rolled over into the following calendar year if approved by management in writing.  These days must be used within the first quarter of the following year.

Vacation requests should be put in writing to your manager as soon as possible to allow for adequate scheduling.  If there is a conflict surrounding the scheduling of vacation time, preference will be given to the employee with the greatest length of service, provided that adequate notice has been given.

No accrued vacation will be paid to employees at the termination of their employment relationship except as state law requires.

## E.  EMPLOYEE BENEFITS

We provide a broad range of benefits for regular full-time employees who have been employed for at least thirty (30) days.  Specific eligibility requirements and detailed information appear in the booklets we provide for each benefit plan.  Each employee is provided this information upon hire.  We reserve the right to adjust and modify the benefits package at any time.

**072**

KSI 0016

Company benefits currently available to all employees are:

1. Comprehensive Health and Dental Insurance for employees and/or family (spouse and/or children)

2. Long-Term Disability

3. Short-Term Disability

4. Life Insurance/Accidental Death and Dismemberment

## F. WORKERS' COMPENSATION

We provide Workers' Compensation insurance on all employees while working. Although you should use caution in your work and follow all safety requirements and procedures as set forth by your manager, should you receive any kind of injury while on the job, immediately bring it to the attention of your manager. A First Report of Injury must be filed within three days of injury even if you consider the injury or illness minor and do not seek medical attention. This report is to be signed by you and your manager and forwarded to:

> Michael Ewers
> Vice-President
> 2520 Northwinds Pkwy #600
> Alpharetta, GA 30004

## G. INSURANCE CONTINUATION

Termination of your employment may entitle you and any covered dependents to continued group medical insurance benefits for a period of eighteen (18) months from the date of your termination. Entitlement to continued group medical insurance benefits would not continue beyond:

1. The date KnowledgeStorm ceases to provide a group health plan to any employee.

2. Thirty (30) days after premiums for continuation of coverage are not paid.

3. The date you become entitled to Medicare.

4. The date you become covered under any other group health plan.

Your election of coverage must be made within sixty (60) days of either the date of your termination or the date you are first notified by the insurance carrier of your right to elect continuation coverage. If this election is made after either of these dates, you are

**073**

KSI 0017

responsible for payment of the premiums for coverage during the period before this election and must pay this premium within forty-five (45) days from the date of this election.

You or your beneficiaries must notify the insurance carrier of any change in marital status and/or change in number of dependents within sixty (60) days from the date this change occurs. You must notify KnowledgeStorm and the insurance carrier promptly of any address change or coverage by a new Company for you and/or your dependents.

## VI. ATTENDANCE, HOLIDAYS, AND LEAVES

### A. ATTENDANCE

Regular and prompt attendance is essential to your success and the success of KnowledgeStorm. Each employee has a critical role to play in our operation. Absences disrupt business and put an added burden on co-workers. As a result, regular attendance by each employee is mandatory. In addition, on days where you will be absent, you must call in to your manager by 9am (or start of business that day) to report your absence.

An employee absent from work for two consecutively scheduled workdays without notifying his/her manager or manager will be considered to have quit without notice.

### B. TARDINESS AND LEAVING EARLY

Tardiness and leaving early are defined as time lost during the actual workday due to late arrival or departure before the normally scheduled end of the workday. Tardiness and leaving early, like absences, disrupt our business and put an added burden on co-workers. We request that you do everything possible to limit the number of times you are tardy or leave early.

### C. HOLIDAYS

We observe the following eleven (11) holidays:

1. New Year's Day
2. Memorial Day
3. Independence Day
4. Labor Day
5. Thanksgiving Day
6. Day After Thanksgiving
7. Christmas Day
8. Two (2) Company-Chosen Floating Holidays

**074**

KSI 0018

9.    Two (2) Employee-Chosen Floating Holidays

When a holiday falls on a Saturday, the preceding Friday is observed as the holiday. If the holiday falls on a Sunday, the following Monday is observed as the holiday. Employees must work the day before and the day immediately following any regularly scheduled holiday in order to be eligible to receive holiday pay. This provision will be strictly enforced. If a holiday falls within an employee's vacation period, it will not be charged to the vacation. An employee who wishes to observe a religious holiday may charge such holiday against his or her personal or vacation time with prior managerial approval.

Only regular full-time and regular part-time employees are entitled to holiday pay at the regular rate of pay. Part-time employees who work less than a forty (40) hour workweek will be paid on a prorated basis as follows:

1.    35 hours a week will be paid 7 hours of holiday pay
2.    30 hours a week will be paid 6 hours of holiday pay
3.    25 hours a week will be paid 5 hours of holiday pay
4.    20 hours a week will be paid 4 hours of holiday pay, etc.

Each year the company will choose two floating holidays. Every effort will be made to place these floating holidays near another company observed holiday. Each year employees will be able to use two additional floating holidays of their choice with appropriate approval.

New employees, for the first year, will receive their floating holidays in the following manner:

1.    If hired between January 1st and June 30th, you will be given two floating holidays for that year.
2.    If hired between July 1st and December 31st, you will be given one floating holiday for that year.

Floating holidays cannot be rolled over into the following year with the exception of new employees hired during the last quarter of the year. In these cases, the one day can be rolled over and must be used within the first quarter of the following year.

## D.  FAMILY AND MEDICAL LEAVE ACT ("FMLA")

Eligible employees are permitted to take up to twelve (12) weeks of unpaid leave during any "rolling" twelve (12) month period (measured backward from the date the FMLA leave sought by the employee would begin) for the following reasons:  (1) the birth of a child or placement of a child with the employee for adoption or foster care; (2) the care of a spouse, child or parent with a serious health condition; or (3) a serious health condition of the employee that renders the employee unable to perform the functions of

075

KSI 0019

his or her job. Leave taken under this policy will be counted against the employee's annual Family and Medical Leave Act entitlement.

Eligibility - In order to be eligible for leave under this policy, employees must have been employed by the Company for at least one (1) year of cumulative service, must have worked at least 1,250 hours during the twelve (12) months immediately preceding the leave and must be employed at a worksite where fifty (50) or more employees are employed by the Company within seventy-five (75) miles of that worksite.

An employee desiring leave under this policy for foreseeable events (such as an expected birth or adoption of a child or for planned medical treatments) must provide us with at least thirty (30) days advance written notice explaining the reasons for such leave, the anticipated duration of the leave and the expected start of the leave. In cases where the need for leave cannot be anticipated thirty (30) days in advance, the employees must give notice of the need for leave as soon as practicable (ordinarily one or two business days) after the employee learns of the need for the leave. The employee must also make reasonable efforts to schedule the leave in a manner that does not unduly disrupt Company operations. Failure to comply with the notice requirements for foreseeable leave under this policy may result in denial of leave until thirty (30) days after the employee provides proper notice to the Company.

In cases where both a husband and wife work for the company, they will each be eligible for a total of twelve (12) weeks of unpaid leave during a twelve (12) month period for the birth, placement for adoption or foster care of a child, the care of a child after birth, placement for adoption or foster care, or the care of a parent with a serious health condition.

Benefits - During a leave under this policy, an employee's health insurance coverage will be continued at the same level of benefits and under the same terms and conditions as the coverage currently being provided by the company. If an employee is currently paying a portion of the health insurance premium, the employee must continue to make such payments to the company, at the time such payments would be due if made by payroll deduction, for the duration of the leave. Such payments should be made by check or money order in person or through the mail. Any questions concerning benefits should be directed to the Company Human Resource representative. Other employment benefits, such as vacation days, sick time, etc., shall not be accrued during the leave.

Reinstatement - Employees returning from leave under this policy (other than "key employees' as defined below) will be reinstated to their former position or an equivalent position with equivalent benefits, pay and other terms and conditions of employment. "Key employees" are those salaried Family and Medical Leave Act-eligible employees within the highest ten percent pay bracket of all employees employed by the company within seventy-five (75) miles of the employee's worksite. Reinstatement may be denied to key employees under this policy if it is necessary to prevent substantial and grievous economic injury to the company, the company notifies

**076**

KSI 0020

the employee of its intent to deny reinstatement, and the employee elects not to return to work within a reasonable period of time after receipt of such notice.

Pay During Leave - Employees who take leave because of personal medical illness must first exhaust any earned paid sick leave days. Employees who take leave for any reason under this policy must use earned but untaken vacation time. In all other circumstances, time spent on leave under this policy will be unpaid.

Verification Requirements - Employees who request leave under this policy for a period of time equal to or greater than one week for the serious health condition of the employee or a family member (spouse, child or parent), must provide KnowledgeStorm with a statement of medical certification from a health care provider which explains the condition necessitating the leave, the date the condition commenced, the probable duration of the condition and the anticipated regimen of treatment to be prescribed. Employees who request leave under this policy for more than one month must provide re-certification of the medical condition on the monthly anniversary of the first day such leave was taken. The state of medical certification should be provided to the company at the time the employee requests leave under this policy, or shortly thereafter. In the case of unforeseen leave (such as for a medical emergency) the statement of medical certification should be provided to the company soon after the leave commences. Failure to comply with the medical certification provisions of this policy may result in the denial of leave until after the employee provides a statement of medical certification to the company.

If the company has reason to request the validity of a medical certification provided by the employee's health care provider, the company might require the employee to obtain a second opinion, at the company's expense, from a health care provider designated by the company. In the event the second opinion differs from the first, the company may request the employee to obtain a third and final opinion, at the company's expense, from a health care provider jointly approved by the company and the employee.

The company also requires the employee to submit a report once every seven (7) days during the duration of the leave regarding the medical status of the employee or family member and the employee's intention of returning to work. An employee returning from leave under this policy due to his or her own serious health condition which kept the employee out of work for a period of time equal to or greater than one week must provide the company with a written medical release from a health care provider before initiating work. Failure to provide a release may result in a denial of restoration of employment until the employee provides a medical release to the company.

**E.  PERSONAL LEAVE**

Consideration will be given to the granting of a personal leave of absence for a brief period of time under certain extraordinary circumstances at the Company's discretion.

**077**

KSI 0021

## F.  MILITARY LEAVE

Members of the National Guard or any branch of the armed services will be granted military leave in accordance with applicable state and federal laws.

## G.  BEREAVEMENT LEAVE

In the event of a death in your or your spouse's immediate family (spouse, son, daughter, father, mother, brother, sister, grandfather, grandmother) you can receive time off, up to five (5) days, to attend the funeral services.  You will be paid for the days taken to attend the funeral at your regular base rate of pay.  Such leave must be approved by your manager.

In the event of a death in your or your spouse's extended family, you may receive one (1) day of paid bereavement leave.

If you have used the allotted number of days and additional days off are necessary, the employee may take additional time without pay or use vacation or floating holidays with your manager's approval.

## H.  JURY DUTY

Participation in our judicial system is an important civic responsibility.  An employee who serves on any duly constituted jury, or who is subpoenaed as a witness or serves as a voluntary witness at the request of the company, shall be paid for hours necessarily absent from work.  You must give a copy of the jury duty summons to your manager as soon as you are notified. Pay for time off for jury duty will be based on the straight-time earnings that the employee lost as a result of jury service up to a maximum of forty (40) hours(or prorated based upon employees whose normal workweek is less than forty hours).  You must return to your regularly scheduled work when you are relieved from jury duty.

## I.  SCHOOL VISITATION LEAVE

We allow both full-time and part-time employees who are not eligible for paid vacation or personal time or who have exhausted their paid vacation and personal time to receive up to eight hours of unpaid time per school year to attend school activities that cannot be scheduled during non-work hours.  Excess leave will be granted, as state law requires.

Full-time and part-time employees must have worked six consecutive months prior to requesting this time off.  Employees must make a written request for this time off at least seven days in advance and must first exhaust all accrued vacation and paid personal time.

**078**

KSI 0022

## J. SICK LEAVE

It is our policy to grant the equivalent of five (5) paid sick days per twelve months employment to regular full-time employees, based upon the limitations set below. You will begin accruing such sick days from the day you begin work. Any fractions of a day will be rounded up to the next whole day. For example, if you are hired on March 1, you would be eligible to accrue 10/12 of 5 days sick leave, or 4.16 days of paid sick leave which would be rounded up to 5 days of sick leave for the calendar year in which you hired.

Paid sick days are for use in connection with absences from work due to legitimate personal injuries, illnesses or pregnancy as determined by the company. Paid sick days may also be used to take care of an ill family member. The company may, at the company's discretion, require a doctor's statement describing the employee's condition or additional information regarding the employee's condition if the employee is absent three or more working days.

Pay for each paid sick day will be calculated on the same basis as holiday pay.

You must personally contact your manager before the scheduled start of your workday in order to receive sick pay for that day.

Employees who are ill and have exhausted their accrued sick leave will not be paid for those days absent. However, vacation days or employee-chosen floating holidays may be substituted for an unpaid absence due to illness.

Paid sick days cannot be carried forward into the following calendar year. Sick time may be used in four-hour increments if desired. Sick days have no cash value upon termination of employment and will not be paid upon termination of employment except as state law requires.

## K. VOTING LEAVE

We believe that all of our employees should exercise their right to vote. If you do not have enough time outside of your working hours to vote, you may take enough time so that, when it is added to the time available outside working hours, you will be able to vote. This time must be at the beginning or the end of the time you are scheduled to work unless you and your manager come to an alternate arrangement. We will pay you for this time off, up to a maximum of two hours. If you are aware that you need to take time off to vote, you must provide us with at least two working days notice that you will need this time off.

**079**

KSI 0023

## VII.   DISCIPLINE, DRUGS AND GRIEVANCES

### A. DISCLAIMER

This section does not alter the at-will employment relationship. These steps may not be followed at the sole discretion of KnowledgeStorm. The employee may still resign for any reason or no reason and KnowledgeStorm may terminate the employment relationship for any reason or no reason.

### B. DISCIPLINARY PROCEDURE

We utilize a progressive discipline policy to correct employee problems involving misconduct, excessive absenteeism, and poor job performance. When it becomes necessary to take corrective action, the company will make every effort to apply discipline in a fair and consistent manner. The company reserves the right to accelerate discipline up to and including termination in any individual case considering the employee's position and the frequency and/or seriousness of the matter.

If you have received a formal, written warning for violating any company rule and for a period of one year from the date of the warning you have no other rule infractions, that warning will be voided and will not be used to support future disciplinary action.

### C. ILLEGAL DRUGS

We make every effort to maintain a work environment that is safe and conducive to employee productivity. The use of illegal drugs may have a serious adverse effect on the workplace. Accordingly, this statement summarizes the company's illegal drug policy.

1.   We strongly oppose the use of illegal drugs and believe that illegal drug use, either on or off-duty, is inconsistent with the company's anti-drug commitment. For purposes of this policy, "illegal drugs" includes non-prescribed narcotics, hallucinogenic drugs, marijuana, or other non-prescribed controlled substances, including prescription drugs that have not been prescribed to the employee. The possession, use, purchase, sale, manufacture, or distribution of illegal drugs is prohibited. Employees are prohibited from reporting to work or being at work with any measurable quantity of illegal drugs in their blood or urine.

2.   If an employee has committed an unsafe working practice or is involved in an accident, that employee is subject to immediate drug testing. If the test reveals the presence of illegal drugs in the employee's blood, hair or urine, that employee is subject to immediate discharge.

**080**

KSI 0024

## D. QUESTIONS, SUGGESTIONS, AND COMPLAINTS

As an employee of KnowledgeStorm, you are a valued asset to the company. We encourage you to bring your questions, suggestions, and complaints to our attention. We will give them careful consideration in our continued efforts to improve our relationship and to ensure our continued success.

Differences of opinion are bound to occur in almost any company. When many people work together, situations may be viewed differently. While we cannot guarantee that we will always give you the answer that you may want, your complaints, problems, or suggestions will always be given fair consideration.

If you have a problem or a question, you should first discuss the situation with your manager. You and your manager work closely on a day-to-day basis, and our experience have shown that most problems can be settled at this level. We encourage you to speak honestly and openly with your manager.

If you still feel that your question or problem has not been resolved or if for some reason you do not wish to discuss it with your manager, you should speak directly with Mike Ewers, Vice-President. He will review your problem and will meet with you to discuss a possible resolution. In sum, we hope you understand that we will do everything to ensure that your complaints, problems, or questions are handled in a fair and confidential manner.

# VIII. TERMINATION

## A. RESIGNATION

We hope that your association with us will be a long one and that you will stay and grow with the Company. However, should circumstances require that you leave, please notify your manager in writing as soon as possible. You must give a minimum of two weeks written notice in order to be eligible for potential re-hire by KnowledgeStorm and to receive a favorable reference or recommendation from the Company.

## B. DISMISSAL FOR CAUSE

The following acts are examples of types of conduct that are prohibited while at work or on our premises. These types of conduct may be subject to discipline, including termination. This list is for illustrative purposes only and is not exclusive or complete:

1. Theft, misappropriation or removing from the company private or company property.
2. Falsification of personnel or other records or the employment application.
3. Fighting on company property, except in the case of an innocent victim of an unprovoked assault.

**081**

KSI 0025

4. Refusal to follow direction or orders of managers while performing your job or insubordination.

5. Abuse or deliberate destruction of company property, tools, equipment, or vending machines.

6. Use, sale, possession, distribution, purchase, transfer, offer to sell or buy, transportation, presence in the body of, or bringing onto company property illegal drugs or controlled substances, or hallucinogens; or possessing equipment related to illegal drugs or controlled substances.

7. Unauthorized consumption of illegal drugs, controlled substances, or hallucinogens on company property or reporting for work while impaired by illegal drugs, alcohol or controlled substances, or hallucinogens.

8. Use or possession of weapons or firearms on company property.

9. Using obscene language, engaging in obscene conduct or displaying indecent literature or pictures on Company property.

10. Defacing company property or posting unauthorized materials on company property.

11. Failure to report an on-the-job injury or failure to report for scheduled medical treatment relating to an on-the-job injury.

12. Conviction of a felony or other crime involving moral turpitude or crimes which can be construed to indicate that the continued presence of the employee would constitute a hazard to fellow employees, the company or its property.

13. Unauthorized work elsewhere while off work or failure to return to work at the end of an unauthorized leave of absence.

14. Excessive absenteeism, tardiness or irregular attendance.

15. Improper use or removal from the premises without proper authorization of company property, company records or confidential information.

16. Threatening, intimidating, coercing or interfering with employees or supervision at any time.

17. Smoking or use of tobacco products on company premises except in designated area.

18. Using threatening, profane, obscene or abusive language to managers or employees.

19. Engaging in disorderly conduct while on company property.

20. Receiving or making excessive personal phone calls during working hours except in case of an emergency due to an injury, illness, or a life-or-death situation.

21. Failure to perform any job as requested by the manager unless such work will endanger the health or safety of the employee(s).

22. For unexcused absences, failing to call in to the employee's manager for two consecutive workdays.

23. Excessive unavailability for work.

24. Revealing or disclosing confidential information about or concerning employees, or company business, without prior permission.

25. Failure to maintain positive working relationships with co-workers.

26. Falsification or unauthorized altering of records, employment applications, time sheets, time cards, client records, etc.

**082**

KSI 0026

27.    Deliberate or willful violation of KnowledgeStorm's equal employment opportunity policies.

28.    Failure to act with professional integrity and honesty towards coworkers.

**083**

KSI 0027

# IX.    ACKNOWLEDGMENT

## ACKNOWLEDGMENT FORM

This will acknowledge that I have received a copy of the KnowledgeStorm employee handbook.  I recognize my responsibility to abide by the policies contained in the handbook, as well as those included in updates or additions to the handbook.

**I UNDERSTAND THAT MY EMPLOYMENT IS AT-WILL AND THAT THIS HANDBOOK DOES NOT CREATE AN EMPLOYMENT CONTRACT, OR ANY OTHER CONTRACT, EXPRESS OR IMPLIED.  THAT MEANS THAT I MAY RESIGN AT ANY TIME, FOR ANY REASON OR NO REASON, AND THAT KNOWLEDGESTORM MAY TERMINATE MY EMPLOYMENT RELATIONSHIP AT ANY TIME, FOR ANY REASON OR NO REASON.**

I understand the rules, policies, and benefits contained in the handbook may be changed, modified or deleted at any time.  No manager may vary the terms of these policies either orally or in writing without the written authorization of the Company's HR representative.  I recognize that all members of management are dedicated to ensuring that discipline, including dismissal, is administered fairly and uniformly.

I further acknowledge that KnowledgeStorm has a right to monitor my use of the computer, e-mail, and phone.  I understand that if I violate the company's policies regarding the use of the Internet, e-mail, and phone as explained by this handbook that I am subject to discipline including termination.

I understand that this handbook is mine to keep, and I will be responsible for replacing or adding pages when they are provided to me.  I understand this version of the handbook supersedes all previous copies of the KnowledgeStorm employee handbook I may have in my possession.

_____Employee's Name (please print)

_____Employee's Signature

_____Date

_____Manager's Signature

**084**

KSI 0028

# X.    ACKNOWLEDGMENT

## ACKNOWLEDGMENT FORM

I hereby acknowledge that I have received a copy of KnowledgeStorm's Equal Employment Opportunity Policy and No-Harassment Policy. I have initialed a duplicate copy of the policy at the same time I signed this form. I further acknowledge that I have read and understand this policy. I agree to promptly report and conduct that I believe violates the policy to one of the individuals identified in the policy. I acknowledge that KnowledgeStorm wants to know if there is harassment at work and will not take any action against me for reporting such inappropriate conduct.

_____Employee's Name (please print)

_____Employee's Signature

_____Date

I hereby acknowledge that I have provided this employee with a copy of the company's Equal Opportunity Policy and No-Harassment Policy. The employee stated to me that he or she understood the policy, the reporting procedure, the obligation to report all violations of the policy, and the KnowledgeStorm will not take any action against the employee for reporting inappropriate conduct.

_____Manager's Signature

_____Date

**085**

KSI 0029