1     Steven M. Kroll, Bar No. 216196
      FORD & HARRISON LLP
2     350 South Grand Avenue, Suite 2300
      Los Angeles, California 90071
3     Telephone:  (213) 237-2400
      Facsimile:   (213) 237-2401
4     skroll@fordharrison.com

5     Jeffrey D. Mokotoff, GA Bar No. 515472
      FORD & HARRISON LLP
6     *Admitted Pro Hac Vice*
      1275 Peachtree Street, NE, Suite 600
7     Atlanta, Georgia 30309
      Telephone:  (404) 888-3800
8     Facsimile:   (404) 888-3863
      jmokotoff@fordharrison.com
9
      Attorneys for Defendant
10    KNOWLEDGESTORM, INC.

11               UNITED STATES DISTRICT COURT

12     NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

13

14    JASBIR GILL, MAHMOUD          Case No. C 07-04112 PVT
      KEDKAD,
15                        **EVIDENCE SUBMITTED IN**
              Plaintiffs,        **SUPPORT OF DEFENDANT**
16                        **KNOWLEDGESTORM, INC.'S**
      v.                            **MOTION FOR SUMMARY**
17                        **JUDGMENT, OR IN THE**
      KNOWLEDGESTORM, INC., a     **ALTERNATIVE, PARTIAL**
18    corporation, DOES 1through 50,    **SUMMARY JUDGMENT AGAINST**
                         **PLAINTIFF MAHMOUD KEDKAD**
19              Defendants.
                       **(Pages 86 through 171)**
20
                       Date:      June 3, 2008
21                      Time      10:00 a.m.
                       Crtrm:    5, 4th floor
22

23                      Action filed:  July 13, 2007
                       Trial date:  August 4, 2008
24

25         Defendant KnowledgeStorm, Inc., respectfully submits the following

26   evidence in support of its Motion for Summary Judgment or, in the alternative,

27   Partial Summary Judgment against Plaintiff Mahmoud Kedkad.

28   / / /

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES      LA:66271.1           - 1 -           EVIDENCE SUBMITTED IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF KEDKAD

Exhibit E

1  Steven M. Kroll, Bar No. 216196
   FORD & HARRISON LLP
2  350 South Grand Avenue, Suite 2300
   Los Angeles, California 90071
3  Telephone:  (213) 237-2400
   Facsimile:   (213) 237-2401
4  skroll@fordharrison.com

5  Jeffrey D. Mokotoff, GA Bar No. 515472
   FORD & HARRISON LLP
6  *Admitted Pro Hac Vice*
   1275 Peachtree Street, NE, Suite 600
7  Atlanta, Georgia 30309
   Telephone:  (404) 888-3800
8  Facsimile:  (404) 888-3863
   jmokotoff@fordharrison.com

9
   Attorneys for Defendant
10 KNOWLEDGESTORM, INC.

11              UNITED STATES DISTRICT COURT

12      NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

13

14 JASBIR GILL, MAHMOUD            Case No. C 07-04112 PVT
   KEDKAD,
15                                 **DEFENDANT
                                   KNOWLEDGESTORM, INC.'S
16              Plaintiffs,        REQUEST FOR ADMISSIONS TO
                                   PLAINTIFF JASBIR GILL, SET
17     v.                          ONE**

   KNOWLEDGESTORM, INC., a
18 corporation, DOES 1through 50,

19              Defendants.

20

21 PROPOUNDING PARTY:        DEFENDANT KNOWLEDGESTORM, INC.

22 RESPONDING PARTY:         PLAINTIFF JASBIR GILL

23 SET NUMBER:               SET ONE (1)

24      Defendant KnowledgeStorm, Inc. hereby requests that plaintiff Jasbir Gill

25 answer the following request for admissions in writing and under oath, within thirty

26 (30) days after service, pursuant to Federal Rules of Civil Procedure, Rule 36.

27

28                                                    **086**

FORD & HARRISON
      LLP
ATTORNEYS AT LAW      LA:64688.1              DEFENDANT'S REQUEST FOR ADMISSIONS TO
  LOS ANGELES                                    PLAINTIFF JASBIR GILL, SET ONE

**REQUEST FOR ADMISSION NO. 1**

Admit PLAINTIFF cannot establish a claim of racial harassment against DEFENDANT.

(As used herein, "PLAINTIFF" refers to plaintiff Jasbir Gill.)

(As used herein, "DEFENDANT" refers to defendant KnowledgeStorm, Inc.)

**REQUEST FOR ADMISSION NO. 2**

Admit PLAINTIFF cannot establish a claim of retaliation against DEFENDANT.

**REQUEST FOR ADMISSION NO. 3**

Admit PLAINTIFF cannot establish a claim of wrongful termination in violation of public policy against DEFENDANT.

**REQUEST FOR ADMISSION NO. 4**

Admit PLAINTIFF never witnessed Joseph Brown use the term "sand nigger."

**REQUEST FOR ADMISSION NO. 5**

Admit PLAINTIFF never witnessed Joseph Brown use the term "sand niggers."

**REQUEST FOR ADMISSION NO. 6**

Admit PLAINTIFF never witnessed Joseph Brown use the term "camel jockey."

**REQUEST FOR ADMISSION NO. 7**

Admit PLAINTIFF never witnessed Joseph Brown use the term "camel jockeys."

**REQUEST FOR ADMISSION NO. 8**

Admit PLAINTIFF never made a written complaint of harassment to management during her employment with DEFENDANT.

**087**

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:64688.1          - 2 -          DEFENDANT'S REQUEST FOR ADMISSIONS TO
PLAINTIFF JASBIR GILL, SET ONE

1   **REQUEST FOR ADMISSION NO. 9**

2        Admit PLAINTIFF never made any complaint of harassment to Kelly Gay

3   during her employment with DEFENDANT.

4   **REQUEST FOR ADMISSION NO. 10**

5        Admit PLAINTIFF never made any complaint of harassment to Mike Ewers

6   during her employment with DEFENDANT.

7   **REQUEST FOR ADMISSION NO. 11**

8        Admit Joseph Niederberger was never employed by DEFENDANT for 14

9   months.

10  **REQUEST FOR ADMISSION NO. 12**

11       Admit Joseph Niederberger was never employed by DEFENDANT as the

12  Western Regional Director of Sales.

13  **REQUEST FOR ADMISSION NO. 13**

14       Admit PLAINTIFF has not consulted with any medical health professional

15  for her alleged emotional distress damages.

16  **REQUEST FOR ADMISSION NO. 14**

17       Admit on April 11, 2007, PLAINTIFF printed her resume three times while

18  at work.

19

20  Dated: March 11, 2008                    FORD & HARRISON LLP

21

22                                           By: _St— M. Kroll_____

23                                           Jeffrey D. Mokotoff
                                             Steven M. Kroll
24                                           Attorneys for Defendant
                                             KNOWLEDGESTORM, INC.

25

26

27

28                                                        **088**

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:64688.1                    - 3 -              DEFENDANT'S REQUEST FOR ADMISSIONS TO
                                                 PLAINTIFF JASBIR GILL, SET ONE

## PROOF OF SERVICE

I, Yolanda H. Dennison, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 350 South Grand Avenue, Suite 2300, Los Angeles, California 90071. On March 11, 2008, I served a copy of the within document(s):

**DEFENDANT KNOWLEDGESTORM, INC.'S REQUEST FOR ADMISSIONS TO PLAINTIFF JASBIR GILL, SET ONE**

☐ by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐ by placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

Brian S. Kreger, Esq.            *Counsel For Plaintiffs*
Lamberto & Kreger
160 W. Santa Clara St., Suite 1050
San Jose, California 95113
Telephone: (408) 999-0300
Facsimile: (408) 999-0301

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on March 11, 2008, at Los Angeles, California.

Yolanda H. Dennison

**089**

FORD & HARRISON
LLP
ATTORNEYS AT LAW
ATLANTA

LA:64825.1

POS RE: DEFENDANT'S REQUEST
FOR ADMISSIONS TO PLAINTIFF
JASBIR GILL, SET ONE

Exhibit F

1  BRIAN S. KREGER, State Bar No. 106707
   LAMBERTO & KREGER
2  160 W. Santa Clara St., Suite 1050
   San Jose, CA 95113
3  Telephone: (408) 999-0300
   Facsimile: (408) 999-0301

4  Attorneys for Plaintiffs

5

6

7

8              UNITED STATES DISTRICT COURT

9      NORTHERN DISTRICT OF CALIFORNIA-SAN JOSE DIVISION

10

11  JASBIR GILL, MAHMOUD KEDKAD,              **Case No. C 07-04112PVT**

12                 Plaintiffs,

13  vs.                                       **RESPONSE TO REQUEST FOR
                                              ADMISSION**
14
    KNOWLEDGESTORM, INC. a corporation,
15  DOES 1 THROUGH 50,

16                 Defendants.
                                    /
17
    PROPOUNDING PARTY: Defendant
18
    RESPONDING PARTY: Plaintiff, Jasbir Gill
19

20  SET NUMBER: One

21

22  RESPONSE TO REQUEST FOR ADMISSION NO. 1

23      Denied.

24  RESPONSE TO REQUEST FOR ADMISSION NO. 2

25      Denied.

26  RESPONSE TO REQUEST FOR ADMISSION NO. 3

27      Denied.

28  RESPONSE TO REQUEST FOR ADMISSION NO. 4

1      Admit.

2   RESPONSE TO REQUEST FOR ADMISSION NO. 5

3      Admit.

4   RESPONSE TO REQUEST FOR ADMISSION NO. 6

5      Admit.

6   RESPONSE TO REQUEST FOR ADMISSION NO. 7

7      Admit.

8   RESPONSE TO REQUEST FOR ADMISSION NO. 8

9      Admit.

10  RESPONSE TO REQUEST FOR ADMISSION NO. 9

11      Admit.

12  RESPONSE TO REQUEST FOR ADMISSION NO. 10

13      Admit.

14  RESPONSE TO REQUEST FOR ADMISSION NO. 11

15      Plaintiff lacks sufficient knowledge to admit or deny and on that basis

16  denies the request.

17  RESPONSE TO REQUEST FOR ADMISSION NO. 12

18      Plaintiff lacks sufficient knowledge to admit or deny and on that basis

19  denies the request.

20  RESPONSE TO REQUEST FOR ADMISSION NO. 13

21      Admit.

22  RESPONSE TO REQUEST FOR ADMISSION NO. 14

23      Plaintiff lacks sufficient knowledge to admit or deny and on that basis

24  denies the request.

25

26

27

28

**091**

1  Dated: April 10, 2008                    LAMBERTO & KREGER

2

3

4

5                                          By: _____

6                                          BRIAN S. KREGER

7                                          Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE

I, the undersigned, declare:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, California, in which county the within-mentioned mailing occurred, and not a party to the subject cause. My business address is 160 West Santa Clara, Suite 1050, San Jose, California 95113. On April 10, 2008, I caused to be served the attached RESPONSE TO REQUEST FOR ADMISSIONS on the parties in said cause as follows:

Steven Kroll
Ford & Harrison
350 South Grand Ave., Suite 2300
Los Angeles, CA 90071


Jeffrey D. Mokotoff
Ford & Harrison
1275 Peachtree St., NE, Suite 600
Atlanta, GA 30309


[ X ]   (BY MAIL) I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States mail at San Jose, California.

[   ]   (BY PERSONAL SERVICE) I caused such envelope(s) to be delivered by hand this date to the offices of the addressee(s).

[   ]   (BY OVERNIGHT DELIVERY) I caused such envelopes to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

[   ]   (BY FACSIMILE) I served the parties listed on the attached service list by facsimile on the fax numbers listed below each of the parties.


[ X ]   (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 10, 2008, at San Jose, California.

_____
BRIAN S. KREGER

**093**

Kekad Deposition

CERTIFIED
COPY

```
 1              UNITED STATES DISTRICT COURT

 2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

 3                        --o--

 4

 5   JASBIR GILL, MAHMOUD KEDKAD,   )
                                    )
 6              Plaintiffs,         )
                                    )
 7   vs.                           )    No. C 07-04112 PVT
                                    )
 8   KNOWLEDGESTORM, INC., a        )
     Corporation, DOES 1 through 50,)
 9                                  )
                Defendants.         )
10   -------------------------------

11

12

13

14            DEPOSITION OF MAHMOUD KEDKAD

15

16

17   DATE:           Tuesday, January 15, 2008

18

19   TIME:           10:15 a.m.

20

21   LOCATION:       Bell & Myers
                     2055 Junction Avenue, Suite 200
22                   San Jose, CA 95131

23

24   REPORTED BY:    Anna S. Allen
                     Certified Shorthand Reporter
25                   License Number 9954
```

```
 1                    A P P E A R A N C E S

 2

 3

 4     For the Plaintiffs:

 5     LAMBERTO & KREGER
       By:   BRIAN S. KREGER, ESQ.
 6     160 W. Santa Clara Street, #1050
       San Jose, CA 95113
 7     408-999-0300

 8

 9

10

11     For the Defendants:

12     FORD & HARRISON
       By:   JEFF D. MOKOTOFF, ESQ.
13     1275 Peachtree Street, N.E., Suite 600
       Atlanta, Georgia, 30309
14     404-888-3800

15

16

17

18     Also Present:

19     CHRIS GLEASON, Corporate Representative for
       KnowledgeStorm
20

21

22

23

24

25
```

2

```
 1                    E X H I B I T S

 2

 3     Exhibit              Description              Page

 4

 5     1            Application for employment        17

 6     2            Interview schedule for Kedkad     41

 7     3            10-30-06 offer letter             52

 8     4            2-14-07 e-mail from Brown         71

 9     5            "Something fun for dinner"        80

10                  e-mail from Brown

11     6            4-3-07 e-mail from Brown          83

12     7            4-13-07 e-mail from Gay to        91

13                  Kedkad

14     8            4-6-07 e-mail from Hoback re      94

15                  April revenue

16     9            Six-page e-mail                  127

17     10           4-26-07 three-page document      132

18     11           4-27-07 four-page memorandum     151

19     12           4-26-07 e-mail from Brown to     160

20                  4-Sales West

21     13           5-9-07 memorandum from Gleason   161

22                  to Kedkad

23     14           6-7-07 e-mail from Gleason to    165

24                  Kedkad

25     15           7-26-07 e-mail from Gay to       171
```

3

| 1  | EXHIBIT |                                              | PAGE |
|----|---------|----------------------------------------------|------|
| 2  |         | Kedkad                                       |      |
| 3  | 16      | 8-2-07 e-mail from Kedkad to                 | 180  |
| 4  |         | Gay                                          |      |
| 5  | 17      | 9-17-07 memorandum from Gay to               | 181  |
| 6  |         | Kedkad                                       |      |
| 7  | 18      | 9-17-07 memorandum from Gay to               | 183  |
| 8  |         | Kedkad                                       |      |
| 9  | 19      | 5-4-07 Complaint of                          | 184  |
| 10 |         | Discrimination                               |      |
| 11 | 20      | 5-5-07 e-mail from Niederberger              | 188  |
| 12 |         | to Kedkad                                    |      |

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    San Jose, California                    January 15, 2008

2                              --0--

3                        MAHMOUD KEDKAD

4              having been first duly sworn,

5          was examined and testified as follows:

6                          EXAMINATION

7    BY MR. MOKOTOFF:

8        Q.    Mr. Kedkad, good morning.

9        A.    Good morning.

10       Q.    This will be your deposition taken pursuant to

11   notice by agreement for the purposes of discovery,

12   cross-examination and all other purposes allowed and

13   consistent with the Federal Rules of Civil Procedure.

14             Could you state your full name for the record,

15   please.

16       A.    Mahmoud Kedkad.

17       Q.    Do you also go by Mike?

18       A.    Yes.

19       Q.    For the record, my name is Jeff Mokotoff.  I

20   know you sat in on Ms. Gill's deposition yesterday, so

21   you had a little bit of a sense of how a deposition

22   goes.  As you know, I represent the defendant,

23   KnowledgeStorm, in this lawsuit that you and Ms. Gill

24   have brought against it.

25             Mr. Kedkad, have you ever had your deposition

MERRILL  LEGAL  SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1    another address?

2        A.    8 Avocet, A-v-o-c-e-t, Drive, Unit Number 203.

3    And that is Redwood City, California, 94065.

4        Q.    Is that an apartment?

5        A.    That's an apartment.

6        Q.    And did you also own that?

7        A.    No, I was renting there.

8        Q.    But the Meridian Drive home, have you owned it

9    for the past ten months or you've owned it longer?

10        A.    I owned it for the past seven years.

11        Q.    But you've lived there over the past ten

12    months?

13        A.    Yes.

14        Q.    Did you live there prior to the last ten

15    months?

16        A.    Yes.

17        Q.    Why were you living at 8 Avocet Drive?

18        A.    I was renting my townhouse.

19        Q.    And the townhouse is at Meridian Drive?

20        A.    Yes.

21        Q.    What is your date of birth?

22        A.    September 4th, 1955.

23        Q.    Mr. Kedkad, where did you grow up?

24        A.    Tripoli, Libya.

25        Q.    Tripoli?

1    A.    Yes.    T-r-i-p-o-l-i.

2    Q.    Is that where you were born?

3    A.    Yes.

4    Q.    And you have citizenship in Libya; is that

5    correct?

6    A.    I have dual citizenship.

7    Q.    And in the states as well?

8    A.    Yes.

9    Q.    Any other?

10   A.    No.

11   Q.    Are you currently married?

12   A.    Yes.

13   Q.    What is your wife's name?

14   A.    Laila, L-a-i-l-a, Azzuz, A-z-z-u-z.

15   Q.    What is her profession?

16   A.    Pediatrician.

17   Q.    Do you have any children?

18   A.    Two.

19   Q.    What are their names?

20   A.    Ziad, Z-i-a-d, and Eiad, E-i-a-d.

21   Q.    What is Ziad's age?

22   A.    He's six.

23   Q.    And Eiad?

24   A.    Eiad, 11 months.

25   Q.    Congratulations.

9

1       A.    Could you repeat that?

2       Q.    Sure.  What was the next step of your process

3    of your employment with KnowledgeStorm?

4       A.    It was to fly me out to meet with the executive

5    team in Atlanta.

6             (Defendants' Exhibit 2, Interview schedule for

7    Kedkad, marked for identification.)

8             BY MR. MOKOTOFF:  (Q)  Mike, I've just handed

9    you what we have identified as Exhibit 2 to your

10    deposition.  My first question is, would this be an

11    accurate reflection of the individuals with whom you

12    interviewed when you were flown out to Atlanta?

13       A.    Yes.

14       Q.    Okay.  And do you recall approximately when --

15    well, let me strike that.

16             Do you recall whether the date identified at

17    the top of Exhibit 2 is an accurate reflection of when

18    you met with folks in Atlanta?

19       A.    My memory and calendar cannot pinpoint exactly,

20    but if it's there, then it is.

21       Q.    In other words, you don't have any reason to

22    disbelieve that you were flown out to Atlanta sometime

23    in the middle to latter part of October, 2006?

24       A.    That's correct.

25       Q.    And do you recall meeting with Mike Ewers?

41

1    A.    That's correct.

2    Q.    Did you know at the time what Mike's position

3  was?

4    A.    Yes.

5    Q.    What was his position?

6    A.    CFO.

7    Q.    And do you recall any of the substance of your

8  conversation with Mike?

9    A.    Not very much.

10   Q.    Okay.  Do you recall any?

11   A.    Yes, I do.

12   Q.    What do you recall?

13   A.    He was very inquisitive.

14   Q.    Okay.  Do you recall anything else?

15   A.    It was not a warm one.

16   Q.    Okay.  How did you come to that opinion?

17   A.    There's certain characteristics about people

18  who's open and shake hands and make things convenient

19  for you.  But in his situation, that did not happen.  So

20  that's how I characterize it.

21   Q.    Okay.  Do you recall anything else?

22   A.    That's it.

23   Q.    Do you recall whether your meeting with Mike

24  was approximately the time identified on Exhibit 2?

25   A.    My times got turned around a little bit because

42

1    Kelly Gay could not make it on that time.  And they
2    somehow filled up the slot by me talking to another
3    salesperson.
4        Q.    Okay.
5        A.    Let me put it this way:  Mike, yes.  With Mike,
6    I think the time was correct, then when it came to Kelly
7    Gay, she was not there.
8        Q.    Okay.  So do you recall who you met with after
9    Mike?
10        A.    Two people.  I have always confused both.
11    Either Jason Putnam or Jason Koufman or Joe Koufman, one
12    of those guys.  The newer guy.
13        Q.    Or was new at the time, you're saying?
14        A.    Yeah.  He's been in the position for one year.
15        Q.    Do you recall any of the substance of your
16    conversation with either Jason or Joe?
17        A.    It was a very good one.  He was -- either one
18    of the Joes that I talked to was in the position for one
19    year, and he was doing very well in terms of the sales
20    and the quota.  And the company was very proud of him.
21    So I believe he was the person that the company would
22    use to entice any sales executive that they wanted to
23    join the company to feel good about the company, hear it
24    from another salesperson.
25        Q.    Okay.  Do you recall who you met with after

43

1    either Jason or Joe?

2        A.    Kelly Gay.

3        Q.    Okay.  Did you understand what Kelly Gay's

4    position was at the time you met with her?

5        A.    CEO.

6        Q.    Do you recall any of the substance of the

7    conversation with Kelly?

8        A.    Yes.

9        Q.    Can you tell me what you recall?

10       A.    Kelly did all the talking.  And something that

11   stuck out the most, she asked me to look at her screen

12   and look at the proposals, and I recall, mentioning that

13   with KnowledgeStorm reaching -- making sales is not as

14   important as having a huge pipeline.

15       Q.    Okay.

16       A.    She mentioned one particular employee, a female

17   employee that's been with the company for close to a

18   year, and she's not getting terminated -- she has not

19   made a sale, and she's not getting terminated because

20   she got the biggest proposal value, slash, pipeline.

21       Q.    Did you recall whether she mentioned that

22   employee by name?

23       A.    The only person I can think of is Lisa Lewis

24   but just because I don't know anyone else from the other

25   offices, and Lisa Lewis is a name that stuck in my head.

44

1  So I might not be correct.

2      Q.   Anything else that you recall about your

3  conversation with Kelly?

4      A.   That's it.

5      Q.   And who did you meet with next?

6      A.   Went to lunch with Joe Brown and Jim Canfield

7  for a lunch meeting.

8      Q.   Do you recall anything about the substance of

9  your conversation with either Jim or Joe during that

10  lunch meeting?

11      A.   All my conversation was with Jim Canfield,

12  nothing with Joe.

13      Q.   What do you recall of your conversation with

14  Jim, if anything?

15      A.   Jim didn't seem comfortable with the large

16  deals that I was selling when I was with SunGard, and

17  realized that in how the questions were set.

18      Q.   I'm sorry.  The last part, I missed that, I

19  apologize.  He didn't seem comfortable with the large

20  deals and what was that?

21      A.    The way that he went over to tell me what

22  KnowledgeStorm deal is like.  For example, he asked me,

23  what is your largest deal?  And I said $300,000.  And he

24  says, in KnowledgeStorm, it will be smaller.

25      Q.   Got you.  Just to go back to your interaction

45

1    two ways, either to call Jason Hoback or call his boss,

2    or she can talk to her lady, Kathy.  I would assume,

3    let's say, Kathy, who would talk to them.

4        Q.    Do you know which route she took?

5        A.    I took the route and I said I will -- she asked

6    me -- she suggested that it's best if I call his boss

7    directly.

8        Q.    Okay.  And then did you?

9        A.    Yes, I did.

10        Q.    So who did you call?

11        A.    I called Jason Hoback.

12        Q.    And what did you say to Jason?

13        A.    I said that I'm not expecting less than 80,000,

14    and I said that the recruiter have told me that salary

15    would be -- base salary would be anywhere between 80 to

16    100.

17        Q.    Okay.

18        A.    And he told me, "75 is the most we would pay."

19              And I said, "What I have is not even 75."

20        Q.    Anything else in that conversation?

21        A.    He told me he was surprised that came out as

22    that and he'll contact Joe Brown to fix it and send me

23    another offer letter.

24        Q.    And then you received the subsequent offer

25    letter?

54

1       A.    That's correct.

2       Q.    The one identified as Exhibit 3?

3       A.    That's correct.

4       Q.    Reflecting a base salary of $75,000?

5       A.    That's correct.

6       Q.    And then you accepted the offer as identified

7  on page 2 of Exhibit 3?

8       A.    That's correct.

9       Q.    And you would have accepted it on or about

10  October 30th, 2006?

11       A.    It could be back-dated.

12       Q.    Okay.  The dates on the second page of Exhibit

13  3, are those dates that you wrote in or someone else

14  wrote in?

15       A.    Those are the dates that I wrote in.

16       Q.    Okay.  So, in other words, you could have --

17  you said you would have back-dated the acceptance dates

18  or could have back-dated the acceptance dates?

19       A.    The acceptance dates -- I recall trying to

20  renegotiate this.  So if I received this on the 30th,

21  and I was negotiating it.  Just trying to look at the

22  time frame, if I spent at least a day or two doing it --

23  so I would say on or about.

24       Q.    October 30th?

25       A.    Yes.

55

1      Q.    When you say you were trying to renegotiate

2    this, being Exhibit 3?

3      A.    Yes.

4      Q.    So after you received the second offer letter,

5    that is Exhibit 3, you sought to renegotiate the amount

6    put in this letter, as well?

7      A.    Thought about it.

8      Q.    Did you renegotiate Exhibit 3?

9      A.    No.

10     Q.    And then did you put in the start date on page

11   2 of Exhibit 3?

12     A.    Yes.

13     Q.    Is that the date that you can recall starting

14   for KnowledgeStorm?

15     A.    Yes.

16     Q.    Why did you pick November 20th?

17     A.    It was mutually agreed.

18     Q.    Between you and who?

19     A.    Between me and the recruiter, going back and

20   forth.

21     Q.    Do you recall, did you fax this offer letter

22   back to the number identified on page 2 of Exhibit 3?

23     A.    I don't recall the number, but if it's in

24   there, then that must be the number that I faxed it to.

25     Q.    Subsequent to your accepting the job offer, did

56

1    you commence any training with KnowledgeStorm?

2        A.    Yes.

3        Q.    Okay.  When did you have any training with

4    KnowledgeStorm?

5        A.    To the best of my knowledge, it was

6    December 4th through the 8th, maybe the 9th.

7        Q.    Where was the training?

8        A.    Atlanta, Georgia.

9        Q.    When you had attended the training at Atlanta,

10   Georgia, you had already started working out of the

11   South San Francisco office?

12       A.    Could you repeat the question?

13       Q.    Sure.  At the time that you attended training

14   in Atlanta, Georgia, had you previously already started

15   working out of the South San Francisco office?

16       A.    That's correct.

17       Q.    And the position that you accepted was as a

18   sales executive; is that correct?

19       A.    That's correct.

20       Q.    Do you recall the other sales executives that

21   were working out of the South San Francisco office at

22   the time that you began working for KnowledgeStorm?

23       A.    Could you repeat the question?

24       Q.    Sure.  Do you recall the other sales executives

25   that were working out of the South San Francisco office

1    at the time you began working for KnowledgeStorm?

2         A.   Yes.

3         Q.   Can you give me their names.

4         A.   Jasbir Gill, Lisa McGuire, Kevin Cummings,

5    although he was not physically there at that time.

6         Q.   Do you know where he was at that time?

7         A.   I heard he was working out of Boston.

8         Q.   Okay.

9         A.   Katie Kimball, Rachael Gordon.  That's when I

10   started.

11        Q.   Okay.  So you and approximately five other

12   employees?

13        A.   That's correct.

14        Q.   I'm going to hand you what was marked as

15   Exhibit 4 to Ms. Gill's deposition yesterday.  And my

16   question relates to your training that we were just

17   previously discussing.

18             The training that took place from approximately

19   December 4 through December 9th in Atlanta, Georgia, do

20   you recall during that training receiving a copy of the

21   handbook that has been identified as Exhibit 4 of Jasbir

22   Gill's deposition?

23        A.   I received a copy.  I'm not sure if it's during

24   the training.

25        Q.   Do you recall when you would have received a

58

1    copy of the handbook?

2        A.    I don't exactly recall when.

3        Q.    Would you know whether it was in 2006?

4        A.    Yes, must have.

5        Q.    So you're just not sure whether it occurred

6    during training or at some point in time when you were

7    in San Francisco?

8        A.    Yes.

9        Q.    Okay.

10       A.    I take that back.  I know it's not in San

11   Francisco.

12       Q.    So you would have received it some time in 2006

13   in Atlanta, Georgia?

14       A.    When I was in the training, I was handed the

15   package to fill out with all the information, signing a

16   lot of documents.  Maybe that's the time where I got it.

17       Q.    And including those documents, I think you

18   stated that Exhibit 1, which is your application, that

19   was something else you would have received.  And that

20   was dated December 6, which is the time that you were in

21   Atlanta, Georgia?

22       A.    That's correct.

23       Q.    So at that time, you believed that you would

24   have also received a copy of the handbook?

25       A.    If I have received it, I would have signed

1    having ever received a copy of the handbook?

2        A.    I do not.

3        Q.    Do you recall ever receiving a copy of the

4    company's no-harassment policy?

5        A.    At some point in time, yes.

6        Q.    While you were employed at KnowledgeStorm?

7        A.    Correct.

8        Q.    Okay.  Do you recall when you would have

9    received a copy of the company's no-harassment policy?

10        A.    After some accusations to me in some meetings,

11    probably May --

12        Q.    Okay.

13        A.    -- of 2006.

14        Q.    Of 2007?

15        A.    2007.

16        Q.    Do you recall reading that no-harassment policy

17    when you would have received it in or about May of 2007?

18        A.    Yes, I looked it over.

19        Q.    Okay.  When you started working for

20    KnowledgeStorm in 2006, did you understand the reporting

21    structure at KnowledgeStorm in terms of who you would be

22    reporting to?

23        A.    I have already answered that.

24        Q.    Did you understand -- so let me clarify that.

25    Did you understand that you'd be reporting to Joe Brown?

62

1      A.    Yes.

2      Q.    Okay.  And did you understand who Joe Brown's

3   boss was?

4      A.    Yes.

5      Q.    And who was that?

6      A.    Jason Hoback.

7      Q.    And did you understand who Jason Hoback's boss

8   was?

9      A.    Yes.

10     Q.    And who was that?

11     A.    Jim Canfield.

12     Q.    Were any of those three gentlemen physically

13  located out of the South San Francisco office?

14     A.    Could you rephrase it?

15     Q.    Sure.  Was either Joe Brown, Jason Hoback or

16  Jim Canfield physically located out of the South San

17  Francisco office?

18     A.    All three of them are.

19     Q.    They were physically located out of the South

20  San Francisco office?

21           MR. KREGER:  Do you mean to ask it that way?

22           MR. MOKOTOFF:  I will try to rephrase that.

23           MR. KREGER:  "Out of" sounds like not in San

24  Francisco.

25           MR. MOKOTOFF:  Thank you for that

63

1    clarification.

2         BY MR. MOKOTOFF:    (Q)  Let me rephrase my

3    question, Mike.  Do you know, was Joe Brown employed out

4    of the Atlanta, Georgia office?

5         A.   I think you're asking me a question that I

6    don't know, because that's an arrangement that's been

7    made.

8         Q.   And so --

9         A.   I can tell you what I --

10        Q.   What you believe?

11        A.   What I believe.

12        Q.   That's all I'm asking.

13        A.   They're commuting managers, so they could have

14    the arrangement made with them to be between both.

15        Q.   Your understanding is they were commuting

16    managers?

17        A.   Commuting managers, yes.

18        Q.   We have previously been discussing your

19    coworkers out of the South San Francisco office when you

20    started working for KnowledgeStorm, and you named

21    Jasbir, Lisa, Kevin, Katie and Rachel.

22             As you evolved in your employment at

23    KnowledgeStorm, would you identify any of those

24    coworkers as coworkers with whom you had a better

25    professional relationship than others?

64

1      A.    Initially, they were all about exact same

2   level.

3      Q.    Subsequently, did that change?

4      A.    Change, yes.

5      Q.    Who did you have a better professional

6   relationship as time went on?

7      A.    Started with Lisa McGuire, Katie Kimball,

8   Rachel Gordon, and Jasbir Gill.

9      Q.    As individuals with whom you had a better

10  professional relationship than others?

11     A.    Yes.

12     Q.    Let's move to, say, January of 2007.  As of

13  January 2007, were there any other coworkers that you

14  had out of the South San Francisco office?

15     A.    I'm sorry.

16     Q.    As of January 2007, were there any other

17  coworkers other than the ones you've identified that

18  were working out of the South San Francisco office?

19     A.    That I had?

20     Q.    That were working out of the South San

21  Francisco office.  So you identified five individuals

22  that were working out of the South San Francisco office

23  when you began working for KnowledgeStorm, and I'm

24  fast-forwarding to January 2007.

25            At that point in time, were there any other

65

1    A.    Nothing social, other than very seldom

2    occasional lunches.

3    Q.    How often do you recall Joe Brown being in the

4    South San Francisco office?

5    A.    Every two to three weeks.

6    Q.    And how about Jason Hoback?

7    A.    Three to four weeks.

8    Q.    How about Jim Canfield?

9    A.    Few times I'd see him very -- maybe two times I

10   ever seen him.

11   Q.    In the South San Francisco office?

12   A.    Yes.

13   Q.    As a sales executive, did you have the need to

14   communicate with Joe Brown on a daily basis?

15   A.    There is a need, yes.

16   Q.    Did you have the need to communicate with Joe

17   Brown on a daily basis?

18   A.    Yes.

19   Q.    How would you communicate with Joe Brown?  In

20   other words, via e-mail, telephone, face to face?

21   A.    Phone, face to face or e-mail.

22   Q.    All three of those?

23   A.    All three of those.

24   Q.    Would there be one method that you'd use more

25   than others?

68

1          A.    About the same.

2          Q.    And when you were communicating with Joe Brown

3    using e-mail, did you always use your KnowledgeStorm

4    e-mail account?

5          A.    Yes.

6          Q.    Did you ever use your personal account or Yahoo

7    account to perform KnowledgeStorm work?

8          A.    No.

9          Q.    At the beginning of your employment with Joe

10   Brown, how would you describe your relationship with

11   him?

12         A.    Didn't think much of it.

13         Q.    What do you mean by that?

14         A.    It was very limited to start.

15         Q.    Did that change over time?  In other words, I

16   think you just stated that the beginning of your

17   employment, your interaction with Joe Brown was very

18   limited.  Would that be accurate?

19         A.    I would say what I meant by limited is in terms

20   of management.  So instead of talking on a daily basis,

21   we'd be talking in two or three days.

22         Q.    Okay.  And then over time, did it increase in

23   frequency?

24         A.    Increased in frequency because of the increase

25   in my activities.

69

1     Q.   Did Joe Brown go with you on sales calls?

2     A.   Yes.

3     Q.   Do you recall how many?

4     A.   I can only recall two.

5     Q.   Which ones can you recall?

6     A.   Company called All Covered and another company

7 called Eccenture, spelled E-c -- maybe two "c"'s,

8 e-n-t-u-r-e.

9     Q.   Is that different than Accenture?  It started

10 with an "E"?  There's a company I know that's named

11 Accenture.  You don't know whether it's Accenture or

12 Eccenture?

13     A.   No, I'm not sure.

14     Q.   Did you ask him to attend those sales calls

15 with you?

16     A.   Yes.

17     Q.   You described it as you evolved at

18 KnowledgeStorm, your interaction with Joe Brown was more

19 frequent.  And I think you said that that was because

20 your activity was more frequent.

21     A.   Right.

22     Q.   By that, did you mean that you were obtaining

23 more sales opportunities?

24     A.   Yes.  Yes.

25     Q.   Okay.

70

1    A.    I don't see her name in here.

2    Q.    Your recollection was she was in attendance at

3    this gathering?

4    A.    I will take that back.

5    Q.    Do you recall another social gathering where

6    Lisa McGuire was in attendance that you attended?

7    A.    No.

8          (Defendants' Exhibit 6, 4-3-07 e-mail from

9    Brown, marked for identification.)

10          MR. MOKOTOFF:  It's an exhibit or document that

11   you guys produced.

12          BY MR. MOKOTOFF:  (Q)  Mike, if you can take a

13   little bit of time and look at this document.

14          For the record, it's a one-page document with a

15   Bates stamp 00-004 produced by Mr. Kedkad's counsel.

16   A.    (Complying.)  Okay.

17   Q.    Do you believe that this document supports any

18   of your claims against KnowledgeStorm?

19   A.    Yes.

20   Q.    How?

21   A.    I was a good salesman.

22   Q.    And Joe Brown was letting all of the -- Joe

23   Brown was letting others know that KnowledgeStorm

24   congratulated certain reps for their marked performance

25   at above quota, and you were one of those persons?

83

1        A.    I would not be able to state a fact.

2        Q.    But you do know that you were at your --

3        A.    I know I was, yes.

4        Q.    And then Joe Brown goes on to say in this

5    e-mail that:

6           "Your hard work and effort paid off, resulting in your

7           great performance through the first quarter.  Thank you

8           again for the results."

9           Do you believe that you were working hard to

10   get these results?

11       A.    Extremely hard.

12       Q.    And do you believe that your efforts had paid

13   off, your hard work and effort?

14       A.    That's his opinion.

15       Q.    I'm asking your opinion.

16       A.    That's not something I wrote.

17       Q.    I understand that.  But I'm asking you whether

18   you believe that your hard work and effort had paid off.

19       A.    No.  I'll put it in different terminology than

20   what Joe Brown would.

21       Q.    How would you put it?

22       A.    That I'm a hard-working person and I'm very

23   successful, and this is my first quarter and I'm at

24   154 percent quota.

25       Q.    Do you believe that Joe Brown was supporting

85

1    you in your sales efforts at that point in time?

2        A.    Absolutely not.

3        Q.    Why do you believe he was not supporting you in

4    your sales efforts?

5        A.    Not only he's being nonsupportive, he also was

6    betting at the management level that I'd never close a

7    deal.

8        Q.    You said betting at the management level?

9        A.    Yes.

10       Q.    Could you explain that statement.

11       A.    He had told me a few times that I would never

12   close a deal.

13       Q.    Okay.  He being Joe Brown?

14       A.    Joe Brown.

15       Q.    When you said he had told you a few times that

16   you would never close a deal, can you recall those

17   instances when he said that?

18       A.    The one that stands the most is a call I had

19   with KSR --

20       Q.    KSR?

21       A.    Yeah, a company called KSR, around January.

22   Previous to that, I had a call with a company called

23   Sindera.  And those two times, I heard loud and clear

24   that I would not close those deals.

25       Q.    In other words, he told you, "I'll bet you that

86

1    you're not going to close these deals"?

2        A.    Yes.

3        Q.    Do you recall what you would have said in

4    response?

5        A.    No.  I was shocked.

6        Q.    So you don't recall saying anything in

7    response?

8        A.    Yeah, I did not say anything.

9        Q.    Was he physically on the call with you to those

10   two clients or client prospects?

11       A.    I asked him to be on one call for KSR, he was

12   on a call.  And the other one, I was discussing it with

13   him.

14       Q.    Can you recall any other times when Joe Brown

15   bet you that you wouldn't close a deal?

16       A.    No.

17       Q.    Is it your opinion that your good performance

18   through the first quarter was in spite of Joe Brown?

19       A.    I don't live my life based on what other people

20   think.  It's who I am, so your answer is no.

21       Q.    Do you recall having discussions with either

22   Joe Brown or Jason Hoback concerning the potential

23   acquisition of KnowledgeStorm?

24       A.    With Jason Hoback.

25       Q.    Okay.  Do you recall whether those discussions

87

```
 1      Q.   You don't remember whether you did or didn't?

 2      A.   I don't know whether I did or didn't.

 3      Q.   Do you believe KnowledgeStorm took adverse

 4 action against you because you did not send Objectivity

 5 an addendum?

 6      A.   No.

 7           MR. KREGER:  Can we take a break?

 8           MR. MOKOTOFF:  Good time.

 9           (Lunch break taken.)

10           MR. MOKOTOFF:  We're back on the record after

11 lunch.

12           BY MR. MOKOTOFF:  (Q)  This morning, early on

13 in your testimony, we were discussing some of your prior

14 employers before working for KnowledgeStorm.  And one of

15 those employers was SunGard Systems.

16           I forgot to ask:  Do you recall what your

17 compensation was when you were working for SunGard?

18      A.   Eighty thousand base.

19      Q.   How about Xtiva?  Do you recall what your

20 salary was?

21      A.   I believe it's 85,000 base.

22      Q.   Mike, when do you contend was the first time

23 that Joe Brown made statements about your national

24 origin or race that you found offensive?

25      A.   The first time was probably few weeks after I
```

98

1  started, second or third week of December.

2      Q.    Okay.  And what did he say during the second or

3  third week of December?

4      A.    I overheard him say to another employee:  What

5  do you think of the camel jockey we've hired?  Why don't

6  you take the swat on him so he can start making some

7  calls?

8      Q.    This communication that he made to this other

9  employee, who is the other employee?

10     A.    Joe Niederberger.

11     Q.    And was this a conversation or communication

12  that you overheard in the South San Francisco office?

13     A.    That's correct.

14     Q.    Do you know the context of that conversation?

15  In other words, were you a part of the conversation with

16  Joe Niederberger?

17     A.    No.

18     Q.    Were you walking by?

19     A.    Yes.

20     Q.    Where, to your recollection, did this

21  conversation take place?

22     A.    In Niederberger's booth.

23     Q.    And Joe Niederberger's booth or cubicle, was

24  that nearby your cubicle?

25     A.    Couple of cubicles down from me, yes.

99

1    Q.    So when you overheard Joe Brown make this

2    statement during the 2nd or 3rd [sic] of December, were

3    you walking to your cubicle?

4    A.    I was just coming in to work in the morning.

5        MR. KREGER:  I don't think he said the 2nd or

6    3rd of December.

7        MR. MOKOTOFF:  I'm sorry.  Second or third week

8    of December.

9        BY MR. MOKOTOFF:  (Q)  I'm sorry.  You were

10    walking --

11    A.    I was coming in to work and walking into the

12    office.

13    Q.    So in order to get to your cubicle, you would

14    necessarily have to pass by Joe Niederberger's cubicle?

15    A.    That's correct.

16    Q.    Do you know to whom Joe Brown was referring to

17    when he was making the statement?

18    A.    To me.

19    Q.    How do you know that?

20    A.    I know that because I was self-conscious about

21    making phone calls.  I've heard the statement few times.

22    Q.    What statement?  I'm sorry.  What statement did

23    you hear a few times?

24    A.    To make phone calls.

25    Q.    From Joe Brown?

100

1     first time I've been called a camel jockey.

2          Q.   You're saying you have been called camel jockey

3     previous to that time?

4          A.   I'm not saying that.  I say that I hear that

5     all the time from outside.

6          Q.   Okay.  So you're saying outside of

7     KnowledgeStorm you've heard that comment?

8          A.   Yes.

9          Q.   In relation to you or just you've heard that

10    comment before?

11         A.   In relation to me.

12         Q.   Okay.  And you're saying that statement had

13    been made in relation to you previously by people other

14    than those working for KnowledgeStorm?

15         A.   I don't know how to answer that.

16         Q.   Okay.  See if I can go about it another way.

17    You have just identified a conversation that Joe Brown

18    had with Joe Niederberger where he made a camel jockey

19    comment, and I think you further said that in the past,

20    you had been referred to as camel jockey.

21              And what I'm trying -- if I understood your

22    testimony correctly, what I'm trying to find out is

23    whether the term "camel jockey" was made by anyone else

24    at KnowledgeStorm in reference to you?

25         A.   In KnowledgeStorm?

102

1    Q.    At KnowledgeStorm.

2    A.    Joe Brown.

3    Q.    Okay.  Other than the comment that we have just

4    discussed that he made, did he refer to you as a camel

5    jockey subsequent to that occasion?

6    A.    No.

7          MR. KREGER:  You mean that he heard?

8          MR. MOKOTOFF:  Well, I didn't ask him

9    whether --

10          BY MR. MOKOTOFF:  (Q)  That you heard, that

11    you're aware of.

12    A.    Yes.

13    Q.    Have you had an opportunity to discuss with Joe

14    Niederberger this comment, since you first overheard it?

15    A.    No.

16    Q.    Did you report this comment to anyone?

17    A.    Jason Hoback.

18    Q.    When did you report that to Jason?

19    A.    I reported this to Jason when we went to visit

20    a client in person, after the visit to the client.

21    Q.    Do you recall when that was?

22    A.    End of January.

23    Q.    Do you recall the client that you were

24    visiting?

25    A.    PostPath.

103

1      Q.    PostPath?

2      A.    Um-hum.

3      Q.    And you said you told Jason of this comment

4   after you visited the client?

5      A.    That's correct.

6      Q.    Were you guys driving in the car together when

7   you told him?

8      A.    Actually, I asked -- when we finished the

9   visit, I asked if I can speak to him privately.

10     Q.    And where did you speak to him privately?

11     A.    We spoke in his car.

12     Q.    And in his car is when you told him about this

13   comment?

14     A.    Yes.

15     Q.    Did you tell him about any -- were there any

16   other comments at that time you told him about?

17     A.    Yes.

18     Q.    What else did you tell him about?

19     A.    I told him about Joe Brown making fun of my --

20   the way I dress.  I told him about the nonsupportive

21   attitude and nonresponsiveness of Joe Brown that is

22   creating an unfriendly and hostile environment for me to

23   do my job.  I also reminded him of his words to me that

24   I would be handling accounts and I'd be handling leads

25   and when would that happen.

1    in other words, date-wise, did this occur?

2        A.    Probably middle of January.

3        Q.    And you were coming into work and you said you

4    passed by Joe Brown's office?

5        A.    Yes.

6        Q.    And what did he say?

7        A.    He got up and we greeted each other.    And then

8    he looked at me and he made that derogatory comment.

9        Q.    What did he say?

10       A.    He said:    Why are you dressed like this?    You

11   think you're in the Middle East?

12       Q.    Do you recall what you were wearing?

13       A.    Probably a long shirt and pants, a heavy shirt.

14   I didn't have a jacket on that day.

15       Q.    Was there anything that you were wearing that

16   would have been distinctive to the Middle East?

17       A.    No.

18       Q.    Okay.

19       A.    Well, the second occasion might be.

20       Q.    So the first occasion was the middle of

21   January, you're coming into work, passing by his office,

22   and you were wearing a long shirt and pants.    And he

23   said, Why are you dressed like this?    You think you're

24   in the Middle East; is that correct?

25       A.    Yes.

106

1    Q.    Did you say anything in response to that?

2    A.    No.

3    Q.    What was the second time?

4    A.    Second time, probably a day or two after that.

5    Q.    Okay.  What did he say then?

6    A.    I was wearing a jacket, a light jacket that's

7    long, maybe comes down to here (indicating).

8    Q.    Okay.

9    A.    And then, actually, he was touching it like

10   this (indicating), saying, What is this funny weird

11   clothes you're wearing?

12   Q.    Was there anything distinctive about that

13   jacket, to your opinion, that was distinctive in terms

14   of it being Middle Eastern?

15   A.    No.

16   Q.    Did you say anything in response to Joe's

17   comment?

18   A.    Yes, I did.

19   Q.    What did you say?

20   A.    I told him that this is a style here.

21   Q.    This is the style here, you said?

22   A.    Um-hum.

23   Q.    Did he have any response to that?

24   A.    No.

25   Q.    Do you recall whether anyone would have heard

107

1    the first comment, the one that took place in the middle

2    of January?

3        A.    Yes.

4        Q.    Who would have overheard that?

5        A.    Jasbir Gill.

6        Q.    And how did you come to understand that Jasbir

7    Gill overheard that comment?

8        A.    She was in the same vicinity.

9        Q.    Did she tell you she heard the comment?

10       A.    Yes.

11       Q.    And how about the comment a few days after that

12   about your funny, weird clothes?  Did anyone overhear

13   that comment, to your knowledge?

14       A.    To my knowledge, I don't know.  I don't know.

15       Q.    Were these all comments that you reported to

16   Joe [sic] toward the end of January?

17       A.    Joe?

18       Q.    Jason.

19       A.    Yes.

20       Q.    When do you contend was the next time that Joe

21   Brown made statements about your national origin or race

22   that you found offensive?

23       A.    Probably third week of February.

24       Q.    What statement did he make?

25       A.    He made a statement about Indian people.

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1 Q. Okay.  What was the statement that he made?

2 A. In a conversation, he was talking about how

3 many foreigners live in our area and how many Indians

4 and how they are taking all the jobs to the point where

5 he hates them.

6 Q. When you heard this statement made, where were

7 you?

8 A. We were sitting on a round table, discussing

9 our phone call that we had together.

10 Q. A round table in the South San Francisco

11 office?

12 A. In his office.

13 Q. In his office.  You were discussing a phone

14 call that you and Joe had just made together?

15 A. Yes.

16 Q. Okay.  Do you recall who the phone call was to?

17 A. KSR.

18 Q. One of your clients?

19 A. Yes.

20 Q. And after your conversation with KSR was

21 finished, is that when he was talking about the number

22 of Indians in the area?

23 A. Yes.

24 Q. Okay.  Do you remember how that topic came up

25 or was it just brought up by Joe?

109

1       A.    It was -- we were having a conversation

2   together --

3       Q.    Okay.

4       A.    -- on different topics.

5       Q.    And he just started talking about the number of

6   Indians in the area?

7       A.    Um-hum.

8       Q.    In other words, there wasn't anything that

9   triggered his discussion concerning the number of

10  Indians that you can recall?

11      A.    I'm not sure if it triggered, but the

12  subsequent question was about Jasbir's whereabouts.

13      Q.    When you say subsequent, so after he made that

14  statement, he subsequently asked you where Jasbir was?

15      A.    Within the context of that conversation.  I'm

16  not sure which one --

17      Q.    -- came first?

18      A.    Yeah.

19      Q.    To your understanding, did he know where Jasbir

20  was at that time?  Did he know that Jasbir was in India?

21      A.    Yeah, he knows.

22      Q.    But there was a discussion concerning her

23  whereabouts?

24      A.    Yes.

25      Q.    In other words, where she was in India?

110

1       A.   Can you say that again?

2       Q.   I'm trying to figure out, you said there was a

3    discussion concerning Jasbir's whereabouts, but you also

4    testified that he knew where she was.

5       A.   Um-hum.

6       Q.   So what was the discussion concerning her

7    whereabouts?

8       A.   He asked me if I know when Jasbir is coming

9    back --

10      Q.   Okay.  Got you.

11      A.   -- from India.

12      Q.   Did you know when she was coming back?

13      A.   I had no idea.

14      Q.   And what did he say, if anything, in response

15   to your statement that you didn't know when she was

16   coming back?

17      A.   He said, Good, maybe she's not coming back.

18   That will be one less Indian.

19      Q.   Did you say anything in response?

20      A.   No.

21      Q.   By that time, by the third week in February,

22   had you and Jasbir started working on the company that I

23   discussed with Jasbir yesterday in the deposition?  The

24   company's name is escaping me now.  Do you know what I'm

25   referring to?

1   to mischaracterize your testimony.  You were waiting for

2   an appropriate time to tell him this.

3            Why did you tell him these comments when you

4   were working from home at the end of March?  Why did you

5   tell him at that time?

6        A.    Because we had a call together.

7        Q.    What was --

8        A.    We were calling on a company called

9   Objectivity.

10       Q.    That's one of the clients that was in the list?

11       A.    Um-hum.

12       Q.    And did you tell Jason about these comments

13   before or after you had your call with Objectivity?

14       A.    After.

15       Q.    Okay.  And what do you recall telling him about

16   these comments?

17       A.    I mentioned to him that -- I told him about

18   what is going on between me and Joe Brown in terms of

19   the racial slurs he uses, referring to telling me that

20   he hates Indians while talking about Jasbir.  I also

21   brought up a couple of other Joe Brown's thereafter

22   slurs that he used.

23       Q.    Okay.  Do you recall the other slurs that Joe

24   Brown used that you told Jason about during the end of

25   March?

                                                          116

1      A.    I told him that I was not -- that I was really

2    hurt and I was not invited to a party.  And I told him

3    about the comment that he made, that I might be scoping

4    for terrorist targets.

5      Q.    Any others at that time that you would have

6    told Jason?

7      A.    I discussed a whole bunch of other issues.  I'm

8    not sure exactly what issues you want me to --

9      Q.    No.  I'm sorry.  I was specifically referring

10   to slurs or other comments about your race or national

11   origin or other people's races or national origin.

12     A.    Yes, there's other ones.

13     Q.    Before I get into those, the February 21st

14   party and the scoping for terrorist target comments,

15   when you were telling Jason this on the telephone, do

16   you recall what his response was to your letting him

17   know about these comments?

18     A.    Not very positive.  He was very angry.

19     Q.    Do you recall what he said?

20     A.    He started talking about how terrible that San

21   Francisco office is getting out of hand and start

22   diverting the issue into an office problem than my own

23   personal complaint.

24     Q.    Did you have any response to Jason's response?

25     A.    It was just going back conversations where I

117

1    A.    Do I know if anyone else received this?  I know

2    I did not.

3    Q.    I think you answered my question.  I just want

4    to make sure.  Do you know whether, as it relates to

5    this February 21st party, whether anyone received a

6    written invitation?

7    A.    I don't know that.

8    Q.    Do you know whether Joe Brown was the organizer

9    of this gathering?

10    A.    I know that.

11    Q.    How do you know that?

12    A.    I was told the next day.

13    Q.    Who told you that?

14    A.    The group who was out there.

15    Q.    And who told you specifically -- when you say

16    "the group," who told you specifically that Joe Brown

17    was the organizer of this party?

18    A.    Three people that I can recall prominently is

19    Lisa McGuire, Katie Kimball, and Rachel Gordon.

20    Q.    Okay.  And do you know why they were telling

21    you that?  In other words, were you asking them why you

22    weren't invited?

23    A.    No.

24    Q.    How did it come about, to your recollection,

25    that Lisa, Katie and Rachel told you that Joe organized

119

1    this party?

2        A.    That's what they told me.

3        Q.    Were you asking them questions about the party

4    and they told you who organized it?

5        A.    I did not ask any questions.

6        Q.    They just solicited that information to you?

7    They gave you that information?

8        A.    They told me that.

9        Q.    I'm trying to understand contextually why they

10    would have told you that.

11        A.    You're not asking the proper question.

12        Q.    When you're saying I'm not asking the proper

13    questions, I'll try and get a question that you perhaps

14    understand a little more clearly.

15            Did Lisa McGuire come up to you and just say

16    unsolicited, Joe Brown organized a party yesterday?

17        A.    Not Lisa McGuire.  But when I was -- I was in

18    the next day early in the morning.  And when the girls

19    somehow were walking around the office and I got up and

20    I said, good morning, they asked me how come I didn't

21    come to the party, how come I was not invited to the

22    party.

23        Q.    And that's when you found out?

24        A.    Yes.

25        Q.    Okay.  Were you in the office the morning of

                                                           120

1  February 21st?

2      A.    Yes.

3      Q.    What time?

4      A.    I don't exactly remember.  I'm usually -- I

5  have different times.  Sometimes I come in very early.

6  And if I have things to do, sometimes I come in not

7  later than 9 o'clock.

8      Q.    Do you recall whether you were in not later

9  than 9 o'clock on February 21st?

10     A.    Yes.

11     Q.    Yes, you were?

12     A.    Yes I were -- I was.

13     Q.    The scoping for terrorist targets comments, how

14  did you learn about this comment?

15     A.    In the same context of the conversation that

16  when they told me why I was not invited to the party.

17     Q.    Okay.  Specifically, who told you -- well, let

18  me ask you:  Did someone tell you that Joe Brown said

19  that you were not invited because you'd be scoping out

20  terrorist targets?

21     A.    Yes.

22     Q.    Who said that?

23     A.    Lisa McGuire.

24     Q.    Okay.  And was it in the context of her

25  discussion with you concerning why you weren't at the

                                                      121

1    party the previous day?

2        A.    It was a comment after I said I was not

3    invited.

4        Q.    Do you recall exactly what she told you in

5    response to that?

6        A.    Yes.  She looked at the girls and said, oh,

7    that's why Joe didn't invite you, because he thought

8    you'd be scoping for terrorist targets.

9        Q.    She looked at the girls, being Katie and

10   Rachel?

11       A.    Yes.

12       Q.    Did either Katie or Rachel make any comments

13   when Lisa said that?

14       A.    No.

15       Q.    Do you know whether or not Katie or Rachel

16   would have heard that comment?

17       A.    They were in the vicinity, but I cannot confirm

18   if they heard it or not.  But they were right there,

19   standing next to each other.

20       Q.    And when Lisa told you or made this comment,

21   was this the morning after the party, so the morning of

22   February 22nd?

23       A.    Yes.

24       Q.    And when she told you about this comment, where

25   were you?

MERRILL  LEGAL  SOLUTIONS
800-826-0277  818-593-2300  Fax 818-593-2301  www.merrillcorp.com

1        A.    I was by my cube.

2        Q.    Okay.  And she was also by your cube, Lisa was

3    also by your cube?

4        A.    No.

5        Q.    Where was she?

6        A.    She was by her own cube.

7        Q.    In terms of distance, her cube versus your

8    cube, what are we talking about in terms of distance?

9        A.    Ten, 15 feet.

10        Q.    Okay.  So when she's making this comment, she's

11    approximately 10 to 15 feet away from you?

12        A.    Um-hum.

13        Q.    And then Katie and Rachel, where, to your

14    recollection, would they have been when this comment was

15    made?

16        A.    Katie's cube is probably two to three cubes

17    down.  The position is that everybody was kind of

18    peeking out from their cubes.  So was I, peeking out.

19        Q.    Did you ever discuss this comment -- when I say

20    this comment, the terrorist target comment -- with Joe

21    Brown?

22        A.    No.

23        Q.    Did you ever discuss or confront Joe Brown

24    concerning your belief that Joe Brown had not invited

25    you to the party on the 21st of February?

123

1     A.    No.

2     Q.    When was the next time that you can recall, if

3    there was a next time, that Joe Brown made any comment

4    to or about you that you found offensive that was based

5    on your race or national origin?

6     A.    During a client visit or prospect visit that we

7    did together.

8     Q.    You and Joe Brown?

9     A.    Yes.

10    Q.    Do you recall approximately when that was?

11    A.    Sometime in March, probably end of March

12    someplace.

13    Q.    Do you recall the client prospect you guys were

14    visiting?

15    A.    All Covered.

16    Q.    All Covered?

17    A.    Um-hum.

18    Q.    And was the comment that you're about to tell

19    me, was it before or after you visited them?

20    A.    After.

21    Q.    Where were you and where was Joe when he made a

22    comment?

23    A.    We were just walking out of the building.

24    Q.    Of All Covered?

25    A.    For All Covered, yes.

                                                        124

1          Q.    And what statement did he make?

2          A.    Well, we walked outside and I looked at him and

3    I asked the question of, What do you think of the call?

4                And he hesitated for a little bit, and he

5    looked at me and said, You know, I think you should go

6    back to school, learn some English, read and write so

7    you can speak normal like us.  You'll really be

8    successful.  You need it.

9          Q.    I'm sorry.  You said, So that you can be speak

10   like us?

11         A.    Yes, you can speak normal like us.

12         Q.    And did you make any -- or provide any response

13   to that?

14         A.    Yes, I did.

15         Q.    What did you say?

16         A.    I said, Why do you think that?

17         Q.    And what did he say?

18         A.    He said Jason told him that I make too many

19   mistakes in my proposals.

20         Q.    Did you say anything in response to that?

21         A.    Yes.

22         Q.    Do you recall what that was?

23         A.    Yes.  I told him I made one mistake in a

24   company's name, one line in a company's name, and Jason

25   pointed it out to me and it was corrected.

125

1    Q.    Did you make any response to that?

2    A.    No.

3    Q.    Did you report this comment to anyone?

4    A.    Yes.

5    Q.    Who did you report that comment to?

6    A.    To Jason Hoback.

7    Q.    Do you recall when you would have reported that

8    comment to Jason?

9    A.    Beginning of February.

10    Q.    Where did you report it to Jason?

11    A.    Could you --

12    Q.    Sure.  I'll make it a clearer question to you.

13          Where were you when you reported this to Jason?

14    A.    I was in the South San Francisco office.

15    Q.    And was Jason there as well?

16    A.    No.  It was on the phone.

17    Q.    Was there anyone else on the phone call with

18    you?

19    A.    Jasbir Gill.

20    Q.    And on that telephone conversation, what did

21    you report to Jason other than this comment in terms of

22    comments that Joe Brown made concerning your national

23    origin or race?

24    A.    That I did?

25    Q.    Yes.

126

1        A.   This is the only one I talked about.

2        Q.   After the speak-normal-like-us comment, was

3   there any further comment that Joe Brown made to you

4   concerning your national origin or race?

5        A.   Nothing that I can recall.

6        Q.   Okay.

7             (Defendants' Exhibit 9, Six-page e-mail, marked

8   for identification.)

9             BY MR. MOKOTOFF:   (Q)  Mike, I'm handing you

10  what's been marked as Exhibit 9.  Just for the record,

11  Exhibit 9 consists of six pages with Bates numbers

12  00-005 through 00-011.  If you can take your time and

13  look through Exhibit 9.

14       A.   (Complying.)  Okay.

15       Q.   This was a document or some documents that your

16  attorney produced to us.  And my question is:  Do you

17  believe that Exhibit 9 supports your claim of

18  discrimination or retaliation?

19       A.   Retaliation.

20       Q.   And how so?

21       A.   I was accused of using -- being in misconduct

22  in dealing with Ms. Miller.

23       Q.   Who is, to your knowledge, Elysse Miller?

24       A.   She's a telemarketer or BDR.

25       Q.   And it's accurate to state that she was -- that

127

1    she was at some point assigned to you as a BDR; is that

2    correct?

3        A.    Yes.

4        Q.    And, in fact, she was assigned to you after you

5    had previously worked with two other BDRs in a short

6    time period; is that correct?

7        A.    Three.

8        Q.    So she would have been the fourth?

9        A.    Right now, all I can remember is two.

10        Q.    The BDRs previous to Elysse were whom?

11        A.    Michael Barnes and Bryan Bachler.

12        Q.    And do you recall when you first began working

13    with BDRs?

14        A.    Late February, March.

15        Q.    And who is the first BDR with whom you worked?

16        A.    Michael Barnes.

17        Q.    And approximately, how long did you work with

18    Michael?

19        A.    A week or two.

20        Q.    Do you know why you only worked a week or two

21    with Michael?  Is it Michael Barnes?

22        A.    Michael Barnes.  He either -- they either took

23    him away or he left the company.

24        Q.    Okay.

25        A.    I'm not sure.  Something happened.

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1      A.    Yes.

2      Q.    In that voice mail, was she trying to set up a

3   time to be in contact with you?

4      A.    Yes.

5      Q.    Did you next -- after receiving that voice

6   mail, did you next speak to Kelly Gay?

7      A.    No.    I responded by an e-mail.

8      Q.    What do you recall the content of your

9   response?

10      A.    Give her my availability.

11      Q.    Okay.    And what was the next contact with Kelly

12   Gay or anyone else at KnowledgeStorm?

13      A.    The next day we had a conference call, my

14   afternoon time.

15      Q.    And that was in the afternoon of April 26th?

16      A.    That's correct.

17      Q.    Okay.    And who attended that conference call?

18      A.    Nobody from my side.

19      Q.    You attended?

20      A.    Yes, I attended and Kelly Gay and Chris

21   Gleason.

22      Q.    And was that a telephone call made to you or

23   did you call them?

24      A.    I believe they called me on the conference

25   call.    I could not conference from my phone.

134

1    confirm that.

2        Q.   Do you recall letting Kelly and Chris know that

3    your issue was that Elysse was not getting on the phone

4    and getting her job done for which she was accountable?

5        A.   Could you rephrase that, please?

6        Q.   Sure.  I'm actually reading from Exhibit 10, so

7    I will just try and restate it.

8            Do you recall telling either Kelly or Chris

9    that your issue was that Elysse was not really getting

10   on the phone and getting her job done that she was

11   accountable for?

12       A.   No.

13       Q.   Did you recall telling Chris or Kelly that you

14   had a total of three phone calls with Elysse?

15       A.   Maybe.

16       Q.   Okay.  Do you recall telling them about an

17   e-mail that she sent, which was interfering with your

18   accounts?

19       A.   Yes.

20       Q.   And do you recall commenting to them at that

21   time that you'd be more concerned with discrimination in

22   the San Francisco office and what was going on with you

23   in particular?

24       A.   My conversation with Chris and Kelly was, I'm

25   very surprised because I was -- I had expected that this

138

1    call to be either trying to investigate another employee

2    or they've heard of my constant complaints to Jason

3    Hoback about the discriminations and the racial slurs

4    and what's going on in the San Francisco office, and

5    this is the time that, finally, it got to them and

6    they're trying to help me out.

7        Q.    Do you recall telling either Kelly or Chris:

8        "If you're calling me to tell me complaints that

9        someone with three weeks' of employment has made, I

10       don't understand how you'd take her word over mine.    I

11       don't know what you're referring to"?

12       A.    I don't recall.

13       Q.    You're not saying you didn't say that, you're

14   not saying you did, you just don't recall that

15   statement?

16       A.    Right.

17       Q.    Do you recall telling them you were totally

18   disappointed?

19       A.    Yes.

20       Q.    Do you recall telling them, how could they take

21   the time to have a serious conversation when you had

22   issues with the South San Francisco office?

23       A.    Yes.

24       Q.    Do you recall them telling you specifically the

25   allegations that Elysse was making, that you called

139

1     that you were Middle Eastern and of all people, you

2     understand what not to say to other people?

3          A.     Yes.

4          Q.     And do you recall telling them that your wife

5     is a doctor and that you'd never utter words like that

6     about women?

7          A.     Yes.

8          Q.     Do you recall telling Kelly or Chris that you

9     told Elysse that her job is to send the e-mails and get

10    him appointments, and that if a representative says that

11    an account should be theirs, don't take any sides?

12         A.     Yes.

13         Q.     And do you recall telling them that was the

14    extent of the conversation that you had with her?

15         A.     Yes.

16         Q.     And do you recall advising them that the call

17    did not go on for more than a few minutes?

18         A.     For a short time, yes.

19         Q.     Do you recall telling them that you believed

20    that what Elysse was saying was a lie, because you had

21    not said anything about Elysse being incompetent or

22    anything about not wanting to work with her because she

23    was a woman?

24         A.     Yes.

25         Q.     Do you recall telling them that from day one,

141

1    you believe to be discrimination by Joe Brown?

2        A.    That is part of the Elysse Miller conversation.

3        Q.    Okay.  What do you recall as part of the Elysse

4    Miller conversation concerning your concerns of

5    discrimination by Joe Brown?

6        A.    Can you say that again?

7        Q.    Sure.  What do you recall as part of the Elysse

8    Miller conversation your concerns of discrimination by

9    Joe Brown?

10        MR. KREGER:  I'm going to object to the form of

11    the question as ambiguous.

12        BY MR. MOKOTOFF:  (Q)  Do you understand my

13    question?

14        A.    Not really.

15        Q.    Okay.  Did you discuss with either Chris

16    Gleason or Kelly Gay anything concerning your beliefs

17    that Joe Brown was discriminating against you?

18        A.    Did not discuss.

19        Q.    You said "did not"?

20        A.    No.  But I mentioned it.

21        Q.    What did you mention?

22        A.    That Joe Brown was discriminating against me

23    personally.

24        Q.    Did you give any examples?

25        A.    I gave examples.

162

1       Q.    What examples did you give?

2       A.    I gave examples of the language, the profanity,

3    the discrimination.

4       Q.    What examples of language did you give to them?

5       A.    I did not go into the details because they told

6    me this is a conversation to be discussed after the

7    Elysse Miller conversation.  So I was shoved off.  But

8    they knew exactly there was discrimination, and it was

9    profanity and language that is going on and I wanted to

10   discuss it.

11      Q.    Are you saying that you didn't have any

12   subsequent conversation with either Chris or Kelly

13   concerning the discrimination you believed -- that Joe

14   Brown was discriminating against you?

15      A.    They had no interest in having a conversation

16   with me afterwards.

17      Q.    Are you saying that you did not have any

18   conversation with them?

19      A.    No.

20      Q.    Do you recall during the Elysse Miller

21   conversation your identifying any profanity that Joe

22   Brown used?

23      A.    I used the word "profanity" but did not mention

24   any of the profanity words.

25      Q.    Did you discuss with either Kelly Gay or Chris

163

1    about the allegations set forth in your counsel's

2    letter, period?  Or question mark at the end of that.

3         MR. KREGER:  What letter?

4         BY MR. MOKOTOFF:  (Q)  Let me be more specific.

5    Were you willing to speak to KnowledgeStorm about the

6    allegations contained in the letter dated May 18th sent

7    by your counsel to counsel for KnowledgeStorm?

8         A.   I did not.

9         Q.   My question was:  Were you willing to speak to

10   KnowledgeStorm about it?

11        A.   Initially, I was.

12        Q.   What changed your mind?

13        A.   I have already talked to them about the

14   allegations.  They did not do anything about it.

15        Q.   When you said that you had talked to

16   KnowledgeStorm about the allegations, are you referring

17   to your conversations with Jason Hoback?

18        A.   Jason Hoback, Kelly Gay, Chris Gleason.

19        Q.   What had you communicated to Chris Gleason or

20   Kelly Gay concerning your allegations of discrimination

21   as it relates to Joe Brown?

22        A.   I already told you.

23        Q.   Maybe I didn't understand your previous

24   responses.  What specifically have you told Chris

25   Gleason or Kelly Gay about discrimination at the hands

168

1    and I was asked to be talking about this in a different

2    time.

3            MR. MOKOTOFF:  That's nonresponsive.

4            MR. KREGER:  No, it's not.  It's not proper for

5    you to argue with the witness and tell him if it's

6    responsive or not.

7            MR. MOKOTOFF:  Ms. Court Reporter, can you read

8    back my last question?

9            (Record read.)

10           MR. KREGER:  That's asked and answered.

11           MR. MOKOTOFF:  Did you understand my question?

12           MR. KREGER:  He answered it already.

13           MR. MOKOTOFF:  It's a "yes" or "no."

14           MR. KREGER:  No, it isn't, because if you make

15   misstatements in it, he can correct it.

16           MR. MOKOTOFF:  What misstatements did I make?

17           THE WITNESS:  I was not given the opportunity

18   to continue on about the discussion of the

19   discrimination and the harassment and the hostile

20   environment, and I was asked this will be taken in a

21   different time.

22           BY MR. MOKOTOFF:  (Q)  Okay.  And I think you

23   have also testified that subsequent to that, there was

24   no other conversation; is that correct?

25       A.    Yes.

1      A.    He was very upset.

2      Q.    Do you recall what he was upset about?

3      A.    He was upset about me not attending a function,

4    slash, meeting or function, one of those.

5      Q.    By that time, and by that time I mean by

6    July 23rd, were you reporting to someone else other than

7    Joe Brown?

8      A.    I was reporting to Jim Canfield.

9      Q.    Do you recall approximately when you began

10    reporting to Jim Canfield?

11      A.    I don't recall.  Some time in May.

12      Q.    Do you recall why you began reporting to Jim

13    Canfield instead of Joe Brown?

14      A.    I would assume because of the case against Joe

15    Brown or the case that I have.

16      Q.    When you say "the case," you mean the actual

17    lawsuit?

18      A.    Yeah.

19      Q.    The lawsuit, I believe, but your counsel will

20    correct me if I am wrong, was filed sometime in July of

21    2007.  And your beginning to report to Jim Canfield, by

22    your testimony, was some time in May; is that correct?

23      A.    Yes.

24      Q.    Okay.  So are you saying that you began

25    reporting to Joe Brown [sic], your assumption is,

173

1     that in reference to Gill, maybe she won't come back;

2     anyway, there are too many Indians who are taking away

3     the jobs and he hated these Indians.

4          Are these the same statements that we discussed

5     earlier today?

6     A.    Yes.

7     Q.    Paragraph 16 of the complaint asserts a

8     statement made by Joe Brown on March 26th, 2007 to Ms.

9     Gill, and that statement says that all Muslims are

10    terrorists.

11         My question to you is:  When did you first

12    learn of this statement that Joe Brown made to Ms. Gill

13    that all Muslims are terrorists?

14    A.    Could you please repeat?

15    Q.    Paragraph 16 of the complaint states that the

16    week of March 26, 2007, Joe Brown said in front of

17    plaintiff Gill, quote, all Muslims are terrorists."

18         My question to you is:  When did you first

19    learn of that comment?

20    A.    Probably a few days after that, I'd say, maybe.

21         MR. KREGER:  Mike, don't speculate.  I mean, if

22    you know when --

23         THE WITNESS:  I don't exactly remember when she

24    told me.

25         BY MR. MOKOTOFF:  (Q)  Was it Ms. Gill that

198

1    told you that?

2        A.    Yes.

3        Q.    Do you recall where you were when she told you

4    that comment?

5        A.    In the office.

6        Q.    And do you recall whether it was morning or the

7    afternoon?

8        A.    No.

9        Q.    Do you recall whether anyone else was there

10   when she told you of this comment?

11       A.    No.

12       Q.    Did you ever report this comment to Jason

13   Hoback?

14       A.    I believe in the April 3rd conversation.

15       Q.    Okay.  Did you ever report this comment to

16   anyone else at KnowledgeStorm?

17       A.    No -- sorry.  Take that back.  I did.

18       Q.    To who?

19       A.    To Jason Hoback.

20       Q.    No one else other than Jason?

21       A.    Yes.  I tried to remember.  Jason Hoback.

22       Q.    Paragraph 17 of the complaint references a

23   statement made on March 28th, 2007 where Joe Brown said

24   to you, You should go back to school so you can learn to

25   read, write and talk normal like us.

1          Was that the same comment that we spoke about

2   earlier today?

3          A.   Yes.

4          Q.   In paragraph 18 of the complaint, there is a

5   statement that says:  "Plaintiff heard that they were

6   referred to as 'sand niggers.'"  And I know you were

7   here during Jasbir's deposition yesterday.

8          My question to you is:  When did you first --

9   well, do you know whether the "sand nigger" comment was

10  made about you?

11         A.   Yes.

12         Q.   When did you first learn of the "sand nigger"

13  comment?

14         A.   Some time toward the end of April, beginning of

15  May.

16         Q.   Okay.  And that was after Joe Niederberger no

17  longer was employed by KnowledgeStorm; is that correct?

18         A.   I didn't mention who I heard it from.

19         Q.   Thank you.  You're keeping us all honest.

20         Who did you hear this from, the "sand nigger"

21  comment?

22         A.   Jasbir.

23         Q.   So you did not hear this from Joe Niederberger?

24         A.   No.

25         Q.   Have you ever heard this comment from Joe

                                                        200

1    Niederberger?

2        A.    No.

3        Q.    Where were you when you learned of the "sand

4    nigger" comment?

5        A.    Don't recall the exact location.

6        Q.    Could you recall whether you were at home or

7    the South San Francisco office?

8        A.    Not in an office.  It's maybe in a cell phone

9    conversation driving someplace.

10        Q.    Okay.  The next paragraph talks about -- I will

11    read it and ask you to comment on it:

12        "Defendants KnowledgeStorm further demanded, and

13        plaintiffs refused" -- and it looks like it's

14        singular -- "the plaintiffs refused to commit

15        fraudulent acts, including falsifying start dates and

16        inflate proposals in an effort to defraud potential

17        buyers."

18        My question is:  Have we discussed the ways in

19    which you contend KnowledgeStorm engaged in fraudulent

20    acts?

21        A.    Some.

22        Q.    Are there others?

23        A.    There was an e-mail that came out that, as you

24    see from the e-mail, I was looking for it and we cannot

25    locate it, that I recalled very clearly stating to

201

1    STATE OF CALIFORNIA     )
                             )    SS.
2    COUNTY OF SANTA CLARA   )

3

4

5

6

7         I, the undersigned, declare under penalty of

8    perjury that I have read the foregoing transcript, and I

9    have made any corrections, additions or deletions that I

10   was desirous of making; that the foregoing is a true and

11   correct transcript of my testimony contained therein.

12        EXECUTED this _____ day of _____,

13   2007, at _____, California.

14             (City)

15

16

17

18

19

20

21        _____

22             MAHMOUD KEDKAD

23

24

25

224

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

## REPORTER'S CERTIFICATE

1

2

3

4      I, ANNA ALLEN, CSR 9954, Certified Shorthand

5   Reporter, certify;

6      That the foregoing proceedings were taken before me

7   at the time and place therein set forth, at which time

8   the witness was put under oath by me;

9      That the testimony of the witness, the questions

10  propounded, and all objections and statements made at

11  the time of the examination were recorded

12  stenographically by me and were thereafter transcribed;

13     That the foregoing is a true and correct transcript

14  of my shorthand notes so taken.

15     I further certify that I am not a relative or

16  employee of any attorney of the parties, nor financially

17  interested in the action.

18     I declare under penalty of perjury under the laws

19  of California that the foregoing is true and correct.

20

21

22

23

24  _____

25  Anna Allen, CSR No. 9954

**161**

Gill Deposition

CERTIFIED
COPY

1                  UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3                              --o--

4

5    JASBIR GILL, MAHMOUD KEDKAD,      )
                                       )
6                  Plaintiffs,         )
                                       )
7    vs.                               )    No. C 07-04112 PVT
                                       )
8    KNOWLEDGESTORM, INC., a           )
     Corporation, DOES 1 through 50,)
9                                      )
                   Defendants.         )
10   -------------------------------

11

12

13

14              DEPOSITION OF JASBIR KAUR GILL

15

16

17   DATE:           Monday, January 14, 2008

18

19   TIME:           10:07 a.m.

20

21   LOCATION:       Bell & Myers
                     2055 Junction Avenue, Suite 200
22                   San Jose, CA 95131

23

24   REPORTED BY:    Anna S. Allen
                     Certified Shorthand Reporter
25                   License Number 9954

```
1                    A P P E A R A N C E S

2

3

4      For the Plaintiffs:

5      LAMBERTO & KREGER
       By:   BRIAN S. KREGER, ESQ.
6      160 W. Santa Clara Street, #1050
       San Jose, CA 95113
7      408-999-0300

8

9

10

11     For the Defendants:

12     FORD & HARRISON
       By:   JEFF D. MOKOTOFF, ESQ.
13     1275 Peachtree Street, N.E., Suite 600
       Atlanta, Georgia, 30309
14     404-888-3800

15

16

17

18     Also Present:

19     CHRIS GLEASON, Corporate Representative for
       KnowledgeStorm
20

21

22

23

24

25
```

2

1                          I N D E X

2

3

4                                              PAGE

5

6    By Mr. Mokotoff...........................7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
1                           E X H I B I T S

2

3      Exhibit              Description                Page

4

5      1           Application for Employment          11

6      2           Gill resume                         36

7      3           Offer letter                        38

8      4           Employee handbook                   49

9      5           Acknowledgment form                 49

10     6           11-21-06 email from Gill to         71

11                 Brown and response

12     7           12-29-06 email from Brown to        76

13                 Gill

14     8           1-22-07 email from Gill to          93

15                 Brown

16     9           1-25-07 email from Gill             94

17     10          11-8-06 email from Hoback to        98

18                 4-Sales team

19     11          1-23-07 email from Brown to         100

20                 Gill

21     12          Five-page email                     107

22     13          4-4-07 email from Brown to Gill     115

23     14          12-12-06 email from Hoback          128

24     15          Three-page document                 137

25     16          5-11-07 Complaint of                157
```

4

```
 1                      Discrimination

 2    17               Three-page email                    183

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

1    San Jose, California                    January 14, 2008

2                          --0--

3                     JASBIR KAUR GILL

4              having been first duly sworn,

5           was examined and testified as follows:

6           MR. MOKOTOFF:  This will be the deposition of

7    Jasbir Gill taken pursuant to notice and by agreement

8    for the purposes of discovery, cross-examination, and

9    all other purposes allowed and consistent with the

10   Federal Rules of Civil Procedure.  All objections except

11   those as to the form of the question and the

12   responsiveness of the answer will be reserved until such

13   time of trial or until such other time as some

14   evidentiary use is sought to be made of the transcript.

15           Is that an agreeable stipulation?

16           MR. KREGER:  I'm not stipulating to anything.

17   Whatever federal rules apply, apply.

18           MR. MOKOTOFF:  Do you understand what the

19   federal rules are in terms of --

20           MR. KREGER:  I do, sir, but I don't need to

21   stipulate to them.  They're already in place.

22           MR. MOKOTOFF:  Would you like to reserve or

23   waive signature?  Do you know?

24           MR. KREGER:  Why?

25           MR. MOKOTOFF:  Why what?

6

1      Q.   Did he reference his frustration or concerns

2  about you bringing in what other people were promised in

3  terms of raises or contracts?

4      A.   I think -- to my recollection or to the best of

5  my knowledge, I think he was referring to the fact that

6  we kept on bringing the part that Joe Brown was

7  harassing us, we kept on bringing the part that Joe

8  Brown was uttering these racial comments against us.  I

9  think Jason did not like the fact we were bringing it to

10 his attention.

11     Q.   The next sentence in that paragraph 18 says,

12 plaintiff -- I'm not sure if it should be plural or

13 singular -- that they were referred to as "sand

14 niggers."

15          Explain to me -- first of all, were you aware

16 of that comment, the "sand niggers" comment while you

17 were employed at KnowledgeStorm?

18     A.   No.

19     Q.   And have you since become aware of that

20 comment?

21     A.   Yes.

22     Q.   From whom did you learn that?  Well, let me ask

23 you:  Do you know, was this a comment that was made by

24 Joe Brown?

25     A.   My assumption is, yes.

177

1     Q.    And what do you base your assumption?

2     A.    From the source that told me that.

3     Q.    And who is the source?

4     A.    Joe Niederberger.

5     Q.    What did Joe Niederberger tell you?

6     A.    He told me if -- he asked me if I knew that

7  Mike and I were being referred to as "sand niggers."

8     Q.    Did he go into any further detail?

9     A.    No, I did not ask him to elaborate on that any

10  further.

11     Q.    So you don't know whether or not that was

12  something that Joe Brown was saying?

13     A.    No, he did say that:  Did you know that Joe

14  Brown referred to you and Mike as "sand niggers?"

15     Q.    So it wasn't a general statement?

16     A.    No, no.  It was very specific.

17     Q.    It was that Joe Brown had referred to you and

18  Mike Kedkad as "sand niggers?"

19     A.    As "sand niggers."

20     Q.    When did Joe Niederberger tell you this

21  comment?

22     A.    It was about two or three weeks after I was

23  terminated.

24     Q.    So sometime in the latter part of April --

25     A.    Yes.

178

1    STATE OF CALIFORNIA      )
                             )   SS.
2    COUNTY OF SANTA CLARA    )

3

4

5

6

7        I, the undersigned, declare under penalty of

8    perjury that I have read the foregoing transcript, and I

9    have made any corrections, additions or deletions that I

10   was desirous of making; that the foregoing is a true and

11   correct transcript of my testimony contained therein.

12              EXECUTED this _____ day of _____,

13   2007, at _____, California.

14              (City)

15

16

17

18

19

20

21                           _____

22                           JASBIR KAUR GILL

23

24

25

217

REPORTER'S CERTIFICATE

I, ANNA ALLEN, CSR 9954, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 22 day of January, 2008.


_Anna Allen_
Anna Allen, CSR No. 9954

171

# PROOF OF SERVICE

I, Yolanda H. Dennison, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 350 South Grand Avenue, Suite 2300, Los Angeles, California 90071. On April 29, 2008, I served a copy of the within document(s):

**EVIDENCE SUBMITTED IN SUPPORT OF DEFENDANT KNOWLEDGESTORM, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIE, PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF MAHMOUD KEDKAD**

☒ (E-Mail/Electronic Transmission) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed on the attached service list. I did not receive, within a reasonable time after the submission, any electronic message or other indication that the transmission was unsuccessful pursuant to the CM/ECF system of the United States District Court for the Northern District of California.

☐ by placing the document(s) listed above in a sealed Overnite Express envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Overnite Express agent for delivery.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

**VIA E-MAIL**

Brian S. Kreger, Esq.
Lamberto & Kreger
160 W. Santa Clara St., Suite 1050
San Jose, CA 95113

Attorneys for Plaintiffs
Tel: 408-999-0300
Fax: 408-999-0301
briank@lambertokreger.com

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 29th day of April, 2008, at Los Angeles, California.

Yolanda H. Dennison