1   Steven M. Kroll, Bar No. 216196
    FORD & HARRISON LLP
2   350 South Grand Avenue, Suite 2300
    Los Angeles, California 90071
3   Telephone:  (213) 237-2400
    Facsimile:  (213) 237-2401
4   skroll@fordharrison.com

5   Jeffrey D. Mokotoff, GA Bar No. 515472
    FORD & HARRISON LLP
6   *Admitted Pro Hac Vice*
    1275 Peachtree Street, NE, Suite 600
7   Atlanta, Georgia 30309
    Telephone:  (404) 888-3800
8   Facsimile:  (404) 888-3863
    jmokotoff@fordharrison.com
9
    Attorneys for Defendant
10  KNOWLEDGESTORM, INC.

11                 UNITED STATES DISTRICT COURT

12        NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

13

14  JASBIR GILL, MAHMOUD              Case No. C 07-04112 PVT
    KEDKAD,
15                                    **EVIDENCE SUBMITTED IN
                   Plaintiffs,        SUPPORT OF DEFENDANT
16                                    KNOWLEDGESTORM, INC.'S
         v.                           MOTION FOR SUMMARY
17                                    JUDGMENT, OR IN THE
    KNOWLEDGESTORM, INC., a           ALTERNATIVE, PARTIAL
18  corporation, DOES 1through 50,    SUMMARY JUDGMENT AGAINST
                                      PLAINTIFF JASBIR GILL**
19                 Defendants.
                                      **(Pages 1 through 63)**
20
                                      Date:    June 3, 2008
21                                    Time     10:00 a.m.
                                      Crtrm:   5, 4th floor
22

23                                    Action filed:  July 13, 2007
                                      Trial date:  August 4, 2008
24

25          Defendant KnowledgeStorm, Inc. respectfully submits the following

26  evidence in support of its Motion for Summary Judgment or, in the alternative,

27  Partial Summary Judgment against Plaintiff Jasbir Gill.

28  / / /

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES          LA:66272.1          - 1 -          EVIDENCE SUBMITTED IN SUPPORT OF
                                                        DEFENDANT'S MOTION FOR SUMMARY
                                                        JUDGMENT AGAINST PLAINTIFF GILL

## INDEX OF EVIDENCE

**DECLARATIONS**                                                          **PAGE(S)**

Declaration of Kelly Gay                                              3-6

Declaration of Michael Ewers                                          7-9

Declaration of Joseph Brown                                           10-18

Declaration of Lisa McGuire                                           19-25

Declaration of Steven Kroll                                           26-27

**EXHIBITS**

Exhibit 3:    October 12, 2006 Offer Letter to Plaintiff             28-29

Exhibit 4:    KnowledgeStorm's Employee Handbook                     30-56

Exhibit 5:    Plaintiff's Acknowledgement RE: Employee               57-58
              Handbook and No-Harassment Policy

Exhibit 7:    December 29, 2006 Email                                59

Exhibit 11:   January 24, 2007 Email                                 60-61

Exhibit 13:   April 4, 2007 Email                                    62

Exhibit 14:   December 12, 2006 Email                                63

Exhibit 15:   April 25, 2007 Email                                   64-66

**DEPOSITION TRANSCRIPTS**

Deposition of Plaintiff Gill: Excerpts from                          67-127
Transcript dated January 14, 2008

Deposition of Plaintiff Kedkad: Excerpts from                        128-138
Transcript dated January 15, 2008

Dated: April 29, 2008                    FORD & HARRISON LLP


                                         By: /s/ Steven M. Kroll
                                             Jeffrey D. Mokotoff
                                             Steven M. Kroll
                                             Attorneys for Defendant
                                             KNOWLEDGESTORM, INC.

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66272.1                      - 2 -

EVIDENCE SUBMITTED IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF GILL

**DECLARATION OF KELLY GAY**

Steven M. Kroll, Bar No. 216196
FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone:  (213) 237-2400
Facsimile:  (213) 237-2401
skroll@fordharrison.com

Jeffrey D. Mokotoff, GA Bar No. 515472
FORD & HARRISON LLP
*Admitted Pro Hac Vice*
1275 Peachtree Street, NE, Suite 600
Atlanta, Georgia 30309
Telephone:  (404) 888-3800
Facsimile:  (404) 888-3863
jmokotoff@fordharrison.com

Attorneys for Defendant
KNOWLEDGESTORM, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **JASBIR GILL, MAHMOUD KEDKAD,** | **Case No. C 07-04112 PVT** |
| **Plaintiffs,** | |
| **v.** | **DECLARATION OF KELLY GAY** |
| **KNOWLEDGESTORM, INC., a corporation, DOES 1 through 50,** | |
| **Defendants.** | |

The following declaration is made pursuant to 28 U.S.C. § 1746:

1.    I, Kelly Gay, was employed by KnowledgeStorm, Inc. from approximately February 2000 until December 2007.  I held the positions of Executive Vice President, and then President and Chief Executive Officer (CEO), based out of KnowledgeStorm's headquarter office in Alpharetta, Georgia.  I have personal knowledge of the matters described in this declaration, knowledge that I acquired in the course of my duties.  This declaration is made for use in the above-entitled lawsuit.

2.    In November 2007, KnowledgeStorm was sold to a competitor.  Effective December 2007, the competitor terminated my employment, along with the majority of KnowledgeStorm's employees, including Mr. Kedkad.

3.    KnowledgeStorm was a company that provided search resources for technology solutions and information.  It gave technology vendors opportunities to reach business and technology professionals as they conducted research online and gave contact information that converted them into web leads.

4.    During my tenure as President and CEO of KnowledgeStorm, I was very involved with KnowledgeStorm's employees.   I am unaware that KnowledgeStorm ever continued to employ (i.e., elected not to terminate) an employee who it believed used company time and equipment to print out his or her resume.  Had I known that any employee, without my permission or the permission of upper management, used company time and equipment to print out his or her

resume, KnowledgeStorm would have terminated that employee.

5.    On or about April 25, 2007, I interviewed Elysse Miller concerning a complaint of harassment she lodged against Mr. Kedkad. As part of KnowledgeStorm's investigation of Ms. Miller's complaint, I, along with Chris Gleason, interviewed Mr. Kedkad the following day, April 26, 2007. During the interview, Mr. Kedkad stated, for the very first time, that he believed there was discrimination ongoing in the South San Francisco office.

6.    Immediately after completing our interview of Mr. Kedkad regarding Ms. Miller's complaint, we commenced an investigation into Mr. Kedkad's complaint. During the evening of April 26, 2007, we spoke with Mr. Kedkad regarding his complaint. As part of our investigation, KnowledgeStorm also interviewed Joe Brown, Jason Hoback, Kevin Cummings, Rachel Gordon, Rick Neigher, Tracy Mikolajewski, Matt Hart, and Emily Crume. KnowledgeStorm concluded that Mr. Brown did not engage in any discriminatory behavior. To minimize any further interaction between Mr. Brown and Mr. Kedkad, KnowledgeStorm began having Mr. Kedkad report to Mr. Jim Canfield, VP of Sales.

7.    Since this litigation commenced, I have become aware that Ms. Gill and Mr. Kedkad created a company called Content Maximizers using Company time and Company equipment. If I had become aware of these actions while either

Ms. Gill or Mr. Kedkad was employed, KnowledgeStorm would have terminated immediately their employment.

I declare under penalty of perjury that the foregoing declaration is true and correct. Executed in Atlanta, Georgia, on April 29, 2008.

KELLY GAY

Atlanta:449379.1

**DECLARASTION OF MICHAEL EWERS**

Steven M. Kroll, Bar No. 216196
FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone:  (213) 237-2400
Facsimile:  (213) 237-2401
skroll@fordharrison.com

Jeffrey D. Mokotoff, GA Bar No. 515472
FORD & HARRISON LLP
*Admitted Pro Hac Vice*
1275 Peachtree Street, NE, Suite 600
Atlanta, Georgia 30309
Telephone:  (404) 888-3800
Facsimile:  (404) 888-3863
jmokotoff@fordharrison.com

Attorneys for Defendant
KNOWLEDGESTORM, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **JASBIR GILL, MAHMOUD KEDKAD,**<br><br>          **Plaintiffs,**<br><br>     **v.**<br><br>**KNOWLEDGESTORM, INC., a corporation, DOES 1through 50,**<br><br>          **Defendants.** | **Case No. C 07-04112 PVT**<br><br><br>**DECLARATION OF MICHAEL EWERS** |

The following declaration is made pursuant to 28 U.S.C. § 1746:

1.    I, Michael Ewers, was employed by KnowledgeStorm, Inc. from approximately January 2000 until February 2008, based out of KnowledgeStorm's headquarters office in Alpharetta, Georgia.  I have personal knowledge of the matters described in this declaration, knowledge that I acquired in the course of my duties.  This declaration is made for use in the above-entitled lawsuit.

2.    My last position with KnowledgeStorm was as V.P. of Finance and Human Resources.  In that capacity, I oversaw the training of KnowledgeStorm's employees, including its sales executives.  At the beginning of their employment, both Mr. Kedkad and Ms. Gill attended a week-long training session in KnowledgeStorm's Alpharetta, Georgia office.  (Kedkad Depo., p. 56:25-57:16.)  During the training, KnowledgeStorm held a presentation on its employment policies and procedures, including its No-Harassment policy.  At the training, both Mr. Kedkad and Ms. Gill received a copy of KnowledgeStorm's employee handbook ("Handbook"). The Handbook included a No-Harassment policy that required an employee who "is being harassed . . . or believes his/her employment is being adversely affected by such conduct" to "immediately report their concerns to" either "Mike Ewers, Vice-President" or "Kelly Gay, CEO."  A copy of the policy contained in the Handbook is attached hereto as Exhibit "D".

**008**

I declare under penalty of perjury that the foregoing declaration is true and correct.  Executed in Atlanta, Georgia, on April 29, 2008.

_____

MICHAEL EWERS

LA:66307.1

**009**

# DECLARATION OF JOSEPH BROWN

Steven M. Kroll, Bar No. 216196
FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone:  (213) 237-2400
Facsimile:  (213) 237-2401
skroll@fordharrison.com

Jeffrey D. Mokotoff, GA Bar No. 515472
FORD & HARRISON LLP
*Admitted Pro Hac Vice*
1275 Peachtree Street, NE, Suite 600
Atlanta, Georgia 30309
Telephone:  (404) 888-3800
Facsimile:  (404) 888-3863
jmokotoff@fordharrison.com

Attorneys for Defendant
KNOWLEDGESTORM, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **JASBIR GILL, MAHMOUD KEDKAD,** | **Case No. C 07-04112 PVT** |
| **Plaintiffs,** | |
| **v.** | **DECLARATION OF JOSEPH WELLS BROWN** |
| **KNOWLEDGESTORM, INC., a corporation, DOES 1 through 50,** | |
| **Defendants.** | |

The following declaration is made pursuant to 28 U.S.C. § 1746:

1.    I, Joseph Wells Brown, was employed by KnowledgeStorm, Inc. from approximately August 2003 until December 2007, based out of KnowledgeStorm's headquarter office in Alpharetta, Georgia. I have personal knowledge of the matters described in this declaration, knowledge that I acquired in the course of my duties. This declaration is made for use in the above-entitled lawsuit.

2.    From approximately October 2006 until the summer of 2007, I held the position of Western Region Sales Manager. In that capacity, I supervised Mr. Kekdad and Ms. Gill. I was involved in the decision to hire both Mr. Kedkad and Ms. Gill. I recommended that they be hired.

3.    In or about April 2007, I discovered three (3) printed copies of Ms. Gill's resume on KnowledgeStorm's printer located in Alpharetta, Georgia. I took these resumes to my supervisor, Jason Hoback. At that point, I discussed with Mr. Hoback the fact that this was a violation of company policy. In late March 2007, I had a face-to-face conversation with Ms. Gill wherein, as a follow-up to a discussion about honesty, Ms. Gill asked me if we would still be friends if we ever left KnowledgeStorm (at that point we understood that KnowledgeStorm was going to be acquired). I responded that we would as long as she was honest with me. Ms. Gill responded that she wanted me to know that she felt like she worked for me, i.e., she was expressing her loyalty to me.

4.    Later in the same day that I found the resumes, Jason Hoback and I

called Ms. Gill on her cell phone. Mr. Hoback informed her that he had found

three (3) of her resumes on our printer and asked her whether she wanted to

explain that. She responded that she was printing the resumes to share them with a

friend. I informed Ms. Gill that it was a violation of Company policy to use

Company equipment for personal use and on Company time. Mr. Hoback

informed her that she was terminated.

4.    I am unaware that KnowledgeStorm ever continued to employ (i.e.,

elected not to terminate) an employee who it believed used company time and

equipment to print out his or her resume.

5.    KnowledgeStorm interviewed me on two (2) separate occasions

concerning allegations that had been brought to their attention. Attached as

Exhibits "A" and "B" to my declaration are the transcriptions of these interviews

that I signed and dated.

6.    I have never in my life used the term "sand nigger" or "camel jockey"

and I have never in my life ever made any of the statements attributed to me by

Mr. Kedkad and Ms. Gill. In short, they are lying through their teeth.

I declare under penalty of perjury that the foregoing declaration is true and

correct. Executed in Atlanta, Georgia, on April 29, 2008.

JOSEPH WELLS BROWN

## MEMORANDUM

TO:     Joe Brown

FROM:   Chris Gleason

DATE:    Discussed with Joe on May 17th

A current employee, Mike Kedkad, recently alleged that you engaged in discriminatory behavior by excluding him from a company dinner and a sales promotion. Upon learning of these allegations, the Company immediately conducted a thorough investigation into the matter.

As you are aware, the Company has a No-Harassment Policy prohibiting all forms of illegal harassment and discrimination in the workplace. The No-Harassment Policy also prohibits any adverse treatment of an employee because they report inappropriate activity. A copy of the No-Harassment Policy is attached, to ensure, once again, that you read and understand the Company's policy. We expect and demand that all employees comply with this Policy and that they conduct themselves professionally at all times. We take all reports concerning this Policy very seriously and whenever an employee alleges that the Policy has been violated, we thoroughly investigate those concerns.

We have completed our investigation of the two instances of alleged discrimination. The facts do not support discriminatory behavior. Those facts are: The dinner was not company-sponsored or company-planned. It was an informal meeting initiated by a sales rep that evening (Matt Hart) who called Joe Brown to invite him to come have dinner. Matt was in town for business and Joe was not aware that many other local employees were there and only realized it when he arrived. Several weeks later, there was a company-sponsored dinner and Joe invited all West coast employees. With respect to the sales promotion, it was one of many promotions routinely implemented to drive specific business goals. In this case, in order to participate, only reps that were on a full quota were considered. At the time, Mike Kedkad was not eligible as he was not yet at full quota.

KnowledgeStorm is taking the following actions to ensure communications are clear and company events and sales promotions are not perceived as discriminating against anyone.

1) Continue to communicate all company-sponsored events to all team members. Communication must include an email to all team members.
2) Ensure that all sales reps are aware that sales promotions are routinely implemented to drive specific business objectives, and as such, they may not include all employees in the sales organization. At times sales reps will be specifically included to participate based upon criteria such as; status of being on a full quota, attainment to quota, experience, geography, types of accounts handled, knowledge of certain services, etc. At no time is the exclusion of a sales rep ever based upon discrimination of a protected class and if a sales rep ever has questions about being excluded, they will be directed to an email to their manager and copy the VP of Sales to get clarification on the sales promotion criteria.

KSI 0137

In addition, before implementation, a written description of the sales promotion goals and criteria must be approved by both the VP of Sales and the VP of Human Resources. To ensure sales reps understand that this is the operating norm, a written policy will be communicated to the sales team and will be included in sales training.

Please be advised that the No-Harassment Policy prohibits any retaliation against Mr. Kedkad. If we learn of any retaliatory actions on your part, you will be subject to disciplinary action, up to and including the immediate termination of your employment

KnowledgeStorm is committed to providing an amicable and professional working environment for all of its employees. Accordingly, pursuant to the No-Harassment Policy, please promptly report to Kelly Gay or to Mike Ewers any incidents of inappropriate conduct or behavior of which you are aware.

If you have any questions, please discuss them with me or Mike Ewers. Please also keep in mind that this matter is confidential and you should not discuss this matter with anyone at the Company. Please acknowledge your receipt of this memorandum and the No-Harassment Policy by signing below.

_____     June 4, 2007
Joe Brown                                                          Date

_____     6/4/07
Chris Gleason                                                    Date

- 2 -

KSI 0138

**014**

Interview with Joe Brown
June 5, 2007

Present in Chris' office: Chris Gleason and Mike Ewers
On the phone: Joe Brown
Meeting time: approximately 10 am – 11 am

Chris prefaced the call by saying that as she and Joe had previously discussed, this call was to conduct an investigation of the most recent claims alleged by Mike Kedkad and Jasbir Gill in a letter from their attorney. Chris said that we would be asking specific questions about those allegations and that she would be taking notes. Mike reiterated that only Kelly, Chris, and he knew the specifics of these allegations and Joe was not to share them with anyone.

Mike said that we would specifically be referencing allegations stated in the recent letter from Mike's and Jasbir's attorney.

**Mike:** "Have you ever said that *All Muslims are terrorists?*"
**Joe:** "Never in my life."
**Mike:** Have you ever used anything like that in a joke?"
**Joe:** "No"
**Mike:** "Have you ever called or referred to Jasbir Gill or Mike Kedkad as a *sand nigger?*"
**Joe:** "Never"
**Chris:** "Have you ever used those words or words like that in the workplace?"
**Joe:** "No, never."
**Mike:** "Have you ever used the term *camel jockey?*"
**Joe:** "No, never."
**Mike:** "Have you ever heard that term or a similar term used in a joking way?"
**Joe:** "No"
**Mike:** "Have you ever said that *you hated Indians because they were taking all of the jobs.*"
**Joe:** "My God, no".
**Joe:** "The only time where there was any reference to Indians in any comments was a conversation that Jasbir Gill and I entered into. The conversation was about the different classes of Indians between the Southern Indians and the Northern Indians. Jasbir was explaining to me the interclass warfare between the North and the South. She was explaining that the persecution of one group was as magnified as anything in history, but did not get the coverage. She was talking about where she was from. I don't remember which, the North or the South. I was interested in learning history that I knew nothing about. I was speaking to her about her perceptions and she was explaining it to me. I found it fascinating that she was sharing all of this and it was fascinating as a historical conversation."
**Mike:** "How did the conversation start?"

**Joe:** "It was in the office. The door was open, but no one else was involved.  Jasbir was the only one. I don't remember who else was in the office."

**Mike:** "Was it argumentative?"

**Joe:** "Not at all, no, no. It was interesting the fact that she was telling me all about this. It was a casual conversation about Indian culture."

**Chris:** "Was there any other conversation about Indian culture?"

**Joe:** "The only other thing I remember talking to Jasbir about was when she was going to visit her mother, who she was going to see in 3 weeks."

**Mike:** "When was that conversation?"

**Joe:** "I don't remember the exact dates. It was probably in January, early on after she started. I can look to see when I was in San Francisco. She hadn't seen her mother in 3 years and she was really excited about it."

**Mike:** "Can you go into details about any events where Jasbir Gill or Mike Kedkad were not included or invited to events?"

**Joe:** "I have no idea what they might be referring to. There is only one instance that I am aware of where Mike perceived that. It was a casual dinner that was organized by sales reps. It was a non-company function that I was invited to long after the event started. I was completely unaware that Mike thought that it was a company function that he was not invited to attend until my conversation with Chris.

**Mike:** "When was that dinner?"

**Joe:** "It was around the end of February. I think Jasbir was on vacation."

**Mike:** "Who was there" (at the dinner)?

**Joe:** "Matt, Rachel, Rick Neigher, Emily Crume, Lisa, Katie. I don't remember if Kevin Cummings was there. I was working late, after 6; I got a call from Matt Hart. When I got there, I found out the most of the team was there."

**Mike:** "Who wasn't there?"

**Joe:** "Joe Kaniewski, Joe Niederberger, Mike Kedkad, David Boyd, Jonathan Brown, Tracy Mikolajewski"

Joe said his recollection was that Mike Kedkad had been back to work for about a month after his 2nd child was born. He didn't remember what patterns Mike had, i.e., if he was working at home, going home early.

**Chris:** Did you hear anyone talking about getting together earlier that day?         *unusual* JB

**Joe:** "I think I heard Matt and Rachel talking about going out to eat. That was not usual. Most of time when someone is in town, they will buddy up and go out to dinner. I didn't think anything of it. When there are company events, everyone is always included. There was a dinner after that and I sent an outlook invite, which I still have. There was 100% participation. The only decliner was Joe Niederberger-he said he had a prior commitment.

**Chris:** "Did you ever hear anything from any employee about anyone being treated unfairly or discriminated against….about themselves or anyone else?"

**Joe:** Mike Kedkad had continually asked me to have accounts transitioned to him when reps left. It was never based upon discrimination. Mike was always eager to have accounts. I explained that the policy, practice, was when a rep makes a 1st sale on their own merit, then they were entitled to have accounts transitioned to them. That has been

our 4 year history, up to that point, both from my experience as a sales rep myself and as a manager. No one referenced or ever brought any concerns about discrimination against anyone. Jasbir Gill did say, and the details are fuzzy, something like "I hope you don't associate me with Mike Kedkad. He's a complainer and I hope you don't group us together. They had the same start date, so in that sense they were in the same group."

**Mike:** "Did you ever refuse to include anyone, including Jasbir Gill and Mike Kedkad, because they were scouting for terrorist targets?"

**Joe:** "No, never."

**Mike:** "Did you ever treat Jasbir Gill or Mike Kedkad differently than Caucasian employees or not provide them the tools and information necessary to be successful in their work?"

**Joe:** "No, I never treated either of them differently than anyone else."

**Chris:** "Were there any issues of any kind brought to you by Jasbir Gill or Mike Kedkad?"

**Joe:** "Jasbir raised the issue that while she was on vacation, she needed an email with pricing. She submitted it to Brian Stewart and Dan O'Shaughnessy. She sent an email and asked me to follow up. Then she asked for the status again. I finally got the proposal and pricing to her. I don't recall anything other than that. We had a 2 and ¼ hour conversation on 3/27 right before the team dinner. In her words, "we cleared the air about that situation." She said she had chosen to wait to talk face to face. She said she was upset that it took more than 1 request to get what she needed. We talked about what she liked in terms of how to manage her. It was a very productive discussion.

The only other thing that she brought up was that Jason and I were always behind closed doors and mentioned that the last time we were in CA we spent the whole time interviewing.

It was a good relationship building discussion. Joe said Jasbir said it meant a lot to her that he was there and said something like, "I really feel like I am working for you, not KnowledgeStorm." Joe said that that was "meaningful to hear."

**Chris:** "Have you every yelled or raised your voice at Mike Kedkad or Jasbir Gill or at anyone in the office?"

**Joe:** "No I have not. I have not ever heard screaming or yelling while I was in the office."

**Mike:** "Do you have anything to add to what was covered or anything related to this?"

**Joe:** "I am shocked, disappointed, surprised. Shocked at what is here. I have nothing to add. I volunteered everything that I felt was appropriate about what discussions took place. I felt like I have a bond with people. I felt like Jasbir Gill felt like I was a genuine person when she was talking about the history."

**Chris:** "Rachel mentioned that Katie yelled in the office. Did you hear any complaints about that or anything else from anyone?"

**Joe:** "Both Lisa and Rachel mentioned Katie's childish behavior. I specifically talked to Katie about it. I didn't know until afterwards, but people in general didn't like Joe Niederberger. I do recall hearing from Jason that he and David Boyd had a heated discussion one time."

**Chris:** "Did you hear about that from anyone else?"

Joe: "I just heard it from Jason and then I think David mentioned it. No one else said anything about it. "

Joe: "I'd also heard Mike Kedkad suggested to Jason Hoback that Joe Kaniewski was trying to play KnowledgeStorm by saying he had another offer and asked for a salary increase."

Mike: "Regarding the employment guarantees for Mike Kedkad and Jasbir Gill, were you involved in those discussions with either of them?"

Joe: "No, that was mainly Jason.

Mike: "Did you ever say anything or communicate anything about falsifying start dates or inflating proposals?"

Joe: "No, in fact, my comments to sales reps, emails, and phone conversations, too, that whenever there is a promotion to close business or something else we are being asked to do, I always clearly state as long as there is no negative impact to the customer and won't damage the relationship, then go ahead. I have always coached to be respectful of the customer first. It is my personal belief and I manage people to do so."

**Concluding Comments**

Chris and Mike reiterated that this was not to be discussed with anyone and that Joe should focus on business. In addition, we discussed that there could be no retaliation. We discussed that there should be very limited need to talk to Mike Kedkad, since he was now reporting to Jim Canfield. Joe asked if he should continue to keep Mike on his team emails. Chris said that he should just so that Mike didn't miss anything, but that we would ask Mike to direct any related questions to Jim. Joe asked if he should approve a deal. Mike said yes if Jim wasn't around, to go ahead and do that.

Chris and Mike told Joe if he had any questions or needed to talk further about this situation, that he should call either of us.

_[signature]_    06/11/07

**DECLARATION OF LISA MCGUIRE**

Steven M. Kroll, Bar No. 216196
FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone:   (213) 237-2400
Facsimile:   (213) 237-2401
skroll@fordharrison.com

Jeffrey D. Mokotoff, GA Bar No. 515472
FORD & HARRISON LLP
*Admitted Pro Hac Vice*
1275 Peachtree Street, NE, Suite 600
Atlanta, Georgia 30309
Telephone:   (404) 888-3800
Facsimile:   (404) 888-3863
jmokotoff@fordharrison.com

Attorneys for Defendant
KNOWLEDGESTORM, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **JASBIR GILL, MAHMOUD KEDKAD,**<br><br>      **Plaintiffs,**<br><br>   v.<br><br>**KNOWLEDGESTORM, INC., a corporation, DOES 1through 50,**<br><br>      **Defendants.** | **Case No. C 07-04112 PVT**<br><br>**DECLARATION OF LISA McGUIRE** |

The following declaration is made pursuant to 28 U.S.C. § 1746:

1.    I, Lisa McGuire, was employed as a sales executive for KnowledgeStorm, Inc., from approximately April 2006 until I resigned in March 2007. I have personal knowledge of the matters described in this declaration, knowledge that I acquired in the course of my duties. This declaration is made for use in the above-entitled lawsuit.

2.    As a sales executive, I worked directly and closely with Plaintiffs Mahmoud "Mike" Kedkad and Jasbir Gill, who were also sales executives, out of KnowledgeStorm's South San Francisco office. The office was a very small office, with approximately 9 employees working out of the office in early 2007. We had no manager on-site at that time. Rather, Joe Brown was manager of our sales force, and he was located out of KnowledgeStorm's headquarters office in Atlanta, Georgia.

3.    Of all of the sales executives, I believe that I had the closest working and social relationship with both Mr. Kedkad and Ms. Gill. I probably spoke more with Mr. Kedkad and Ms. Gill than any of the other sales executives. All of the sales executives, with the exception of a sales executive by the name of Joe Niederberger, got along very well. I considered our South San Francisco sales force as a close-knit family.

4.    Beginning in or about January 2007 through approximately March 2007, Mr. Kedkad and Ms. Gill began working, while on company time, on

- 2 -

creating their own business. The name of the business was Content Maximizers (www.contentmaximizers.com). Both Mr. Kedkad and Ms. Gill approached me to ask whether I would like to help them with their new business. In fact, while working at KnowledgeStorm, I went on an appointment with Mike Kedkad to a potential client of Content Maximizers. Ms. Gill and Mr. Kedkad worked often on this new company and spent time during and after work on developing this company.

5.     At no time did I witness or hear Joe Brown make any statements as alleged by Mr. Kedkad or Ms. Gill in their lawsuit. In fact, at no time did I hear Joe Brown make *any* racist, discriminatory or derogatory comments toward or about *anyone*, including Mr. Kedkad and Ms. Gill. Mr. Kedkad's and Ms. Gill's allegations are unbelievable. Joe Brown always tried to do the right thing by everyone. Joe Brown came out to the office approximately one time per month and he approached everybody in the same manner. More specifically, he always asked, "Is there anything I can do for you?" and "Is there anything you need to speak about?" I would go so far as to say that he never, to my knowledge, said one bad thing about anybody. I would describe Joe Brown as kind, sensitive, and always trying to do right by everyone.

6.     If Joe Brown had made any one of the statements attributed to him by Mr. Kedkad or Ms. Gill, I simply cannot believe that they, or anyone else in the

- 3 -

021

office, would not have told me about the alleged comments. Indeed, because of my close relationship with Mr. Kedkad and Ms. Gill, I find their allegations to be incredible and unbelievable.

7.    I am unaware whether Mr. Kedkad or Ms. Gill ever reported to Jason Hoback any of the allegations as identified in their Complaint. However, I knew Jason Hoback very well. This is because, before I was a sales executive for KnowledgeStorm, I was a KnowledgeStorm client for approximately three years. In that capacity, I knew both Jason and Kelly Gay, KnoweldgeStorm's CEO, well. If Jason or Kelly Gay ever discovered that any of their employees had made statements like those alleged in Mr. Kedkad and Ms. Gill's lawsuit, they would have taken immediate action against the employee making those statements and indeed, I believe they would have fired that person.

8.    As I mentioned above, I believe that the South San Francisco office got along very well, except for Joe Niederberger. Both Ms. Gill and Mr. Kedkad expressed to me their dislike for Joe Niederberger. I would describe Mr. Niederberger as someone who was less than forthright. For example, approximately two days after Mr. Niederberger began working for KnowledgeStorm (he began working at approximately the same time Jasbir Gill began working for KnowledgeStorm), I learned that Mr. Niederberger was contacting one of my accounts with which I was in the middle of contract

- 4 -

negotiations. I then explained the "45-day rule" to Joe Niederberger. A short

while after, I discovered that he had literally removed my name from

approximately fifteen (15) strategic accounts and put his name in my place. This

would have occurred in or about December 2006. Beginning sometime in early

2007, Joe Niederberger worked almost exclusively from home and rarely, if at all,

was at the office. I recall Joe Niederberger telling me: "All you have to do is raise

your voice to Joe Brown or any of the other execs, and they will back down.

That's what I do and that's why I get what I want."

  9.  I am unaware of any fraudulent acts in which KnowledgeStorm

allegedly engaged, as asserted by Mr. Kedkad and/or Ms. Gill in their lawsuit. I

specifically am unaware that KnowledgeStorm, through any of its management,

directed or suggested that any of the sales representatives falsify start dates or

inflate proposals in an effort to defraud potential buyers of KnowledgeStorm.

  10.  I am unaware that KnowledgeStorm or Joe Brown discriminated

against Mr. Kedkad or Ms. Gill on the basis of race, national origin or any other

criteria, or retaliated against them, including by allegedly supporting other sales

executives in a more favorable fashion. Just before I left my employment at

KnowledgeStorm, I gave exclusively to Mr. Kedkad and Ms. Gill my list of

hundreds of prospects. Accordingly, if anything, Ms. Gill and Mr. Kedkad had

greater opportunities for sales than their co-workers. More specifically, every sales

executive had to cold call and no sales executive was given leads. All sales representatives were trained extensively on calling.

11.    Jasbir Gill told me she was terminated from KnowledgeStorm because they caught her printing out her resumes at work. She never told me, during or after she was terminated, that Joe Brown discriminated against her or harassed her because of her race, national origin, religion, or any other criteria, and she never told me that he made any derogatory remarks to or about her or Mr. Kedkad.

12.    Mr. Kedkad's and/or Ms. Gill's assertion, that Joe Brown did not invite them to a "business dinner" on February 21, 2007, is untrue. On or about February 21, 2007, after work, I, along with Katie Sefton, initiated an informal get together. We went to Xebec for drinks. I recall that, that morning, Mr. Kedkad was not in the office when we discussed going out for drinks. I also recall that, later that day, he and Joe Brown spoke for several hours in Joe Brown's office about business issues. I do not believe that Jasbir Gill was in the office that day because she was in India. I recall that Emily Crume was in the office that day as was Matt Hart, and that Rick Neighor was in from Los Angeles. We all had drinks at Xebec and then Joe Brown showed up later that afternoon/early evening at Xebec. I recall that the next day, Mr. Kedkad came into the office and was angry that he had not been invited. I told him that we had invited everyone and assumed he knew about it. This was not a "business dinner" initiated by Joe Brown and/or a

dinner for which Joe Brown would have invited attendees. I have just learned that

Mr. Kedkad stated that I told him after this get-together that Joe Brown told me or

made some reference to Mr. Kedkad or Ms. Gill not being invited to this gathering

because they would "scope out terrorist targets." Mr. Brown never made any such

comment, or any remark even vaguely like that, and I never told Mr. Kedkad that

Mr. Brown made any such comment, or any remark even vaguely like that. In

short, Mr. Kedkad is lying. As stated above, at no time did Mr. Brown make any

racist or derogatory remark to or about Mr. Kedkad or Ms. Gill.

I declare under penalty of perjury that the foregoing declaration is true and

correct. Executed in *San Francisco* California on January *22*, 2008.

Lisa McGuire

**DECLARATION OF STEVEN KROLL**

1    Steven M. Kroll, Bar No. 216196
     FORD & HARRISON LLP
2    350 South Grand Avenue, Suite 2300
     Los Angeles, California 90071
3    Telephone:   (213) 237-2400
     Facsimile:   (213) 237-2401
4    skroll@fordharrison.com

5    Jeffrey D. Mokotoff, GA Bar No. 515472
     FORD & HARRISON LLP
6    *Admitted Pro Hac Vice*
     1275 Peachtree Street, NE, Suite 600
7    Atlanta, Georgia 30309
     Telephone:   (404) 888-3800
8    Facsimile:   (404) 888-3863
     jmokotoff@fordharrison.com
9
     Attorneys for Defendant
10   KNOWLEDGESTORM, INC.

11              UNITED STATES DISTRICT COURT

12      NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

13

14   JASBIR GILL, MAHMOUD              Case No. C 07-04112 PVT
     KEDKAD,
15                                     **DECLARATION OF STEVEN
                  Plaintiffs,          KROLL IN SUPPORT OF
16                                     DEFENDANT'S MOTION FOR
            v.                         SUMMARY JUDGMENT, OR IN
17                                     THE ALTERNATIVE, PARTIAL
     KNOWLEDGESTORM, INC., a           SUMMARY JUDGMENT**
18   corporation, DOES 1through 50,

19                Defendants.

20

21

22

23

24

25

26

27                                                    **026**

28

FORD & HARRISON
      LLP
ATTORNEYS AT LAW
  LOS ANGELES

LA:66336.1                    - 1 -         DECLARATION OF STEVEN KROLL

## <u>DECLARATION OF STEVEN KROLL</u>

I, Steven M. Kroll, declare as follows:

1.    I am an attorney at law licensed to practice in the State of California and the United States District Court, Northern District of California.

2.    I am an associate with the law firm of Ford & Harrison LLP, attorneys of record for defendant KnowledgeStorm, Inc. ("Defendant") in this action.

3.    I have personal knowledge of each of the matters set forth below and, if called as a witness, could and would testify competently to each of them under oath.

4.    I am making this declaration in support of Defendant's motion for summary judgment or, in the alternative, partial summary judgment against plaintiff Jasbir Gill ("Plaintiff") and its separate statement of uncontroverted material facts.

5.    Attached hereto under a tab are true and correct copies of excerpts from the deposition transcript of Plaintiff dated January 14, 2007.

6.    Attached hereto under a tab are true and correct copies of excerpts from the deposition transcript of plaintiff Mahmoud Kedkad dated January 15, 2007.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 29th day of April 2008, at Los Angeles, California.

_____
Steven M. Kroll

**027**

**EXHIBIT 3**

 KNOWLEDGESTORM

October 12, 2006

Jasbir K. Gill
4309 Watson Circle
Santa Clara, CA 95054

Dear Jasbir

On behalf of the entire KnowledgeStorm team, we are pleased to offer you the position of Sales Executive for the West Coast region. It is personally gratifying to know that a person of your caliber is ready to join our team. We certainly look forward to working with you!

| | |
|---|---|
| Reports to: | Joseph Brown |
| Base Salary: | $75,000.00, paid in semi-monthly installments. |
| Variable Comp: | Commissions (plan to be disseminated separately). |
| Benefits: | Position qualifies for all employee benefit programs including: health and dental (after 30 day wait period), life insurance, disability, 401(k) plan, flexible spending plan, vacation, sick pay, and holidays. Visit our benefits website at www.benefitspassport.com, for more information. The log in information is: User ID: knowledgestorm, Password: benefits; |

We believe that every member of our team should contribute toward and participate in its financial success. To that end, after thirty (30) days of consecutive, active employment you will be granted Incentive Stock Options to purchase 2,000 shares of KnowledgeStorm, Inc. common stock, subject to terms and conditions of the KnowledgeStorm, Inc. Stock Incentive Plan. The stock options will be delivered thirty (30) days thereafter. The options will vest at a rate of no less than 25% per year over a four (4) year period.

This offer is contingent upon your successful completion of a background investigation and reference checks. If the background investigation reveals any felony and/or misdemeanor crimes involving moral turpitude, such as embezzlement, theft, assault or a pattern of violating federal or state laws, or reveals any falsehoods, false statements or misrepresentations, this offer will be immediately rescinded. In addition, it is also contingent upon submitting to us the required documentation of your eligibility to work in the United States, such as a valid driver's license, social security card, military identification, passport or other acceptable documentation as determined by the US Department of Immigration and Naturalization.

*The above offer is a summary of our mutual understanding surrounding the terms of employment offered to you, and does not constitute an employment contract. Your employment with KnowledgeStorm is on an "at will" basis.*



DEFENDANT'S
EXHIBIT
3
1-14-08

028

October 11, 2006
Page 2 of 2

We are excited about your future with KnowledgeStorm. Please confirm your acceptance of this offer by signing below and returning to me within twenty-four hours. Should you have any questions, concerns, find this offer unacceptable or not as it was verbally communicated to you, please contact me directly at 770-290-8837.

Please do not make any changes to this letter. Should it be altered in any way, this offer will be considered null and void.

Again, we look forward to working with you and receiving your acceptance of this letter.

Regards,

Joseph Brown
West Coast Sales Manager

I, Jasbir K. Gill, accept the position and conditions as described above:

_____        10|13|06                October 23, 2006
Signature                         Acceptance Date          Start Date

**Please fax back to 770-290-8841**

**EXHIBIT 4**



DEFENDANT'S
EXHIBIT
H
I-14-08

# KNOWLEDGESTORM EMPLOYEE HANDBOOK
## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................1

    A. COMPANY HISTORY ....................................................2

    B. EMPLOYEE HANDBOOK ...............................................2

II.  GENERAL COMPANY POLICIES ...................................2

    A. EQUAL EMPLOYMENT OPPORTUNITY POLICY .......................2

    B. NO-HARASSMENT POLICY .............................................3

III. HIRING ...................................................................4

    A. EMPLOYMENT SCREENING ...........................................4

    B. HIRE DATE .............................................................4

    C. INTRODUCTORY PERIOD .............................................4

    D. PROMOTIONS AND TRANSFERS ....................................5

    E. EMPLOYEE CLASSIFICATIONS ......................................6

IV.  CONDITIONS OF EMPLOYMENT ...............................6

    A. EMPLOYEE HONESTY ................................................6

    B. CONFIDENTIALITY....................................................6

    C. TELEPHONE...........................................................7

    D. EMAIL .................................................................7

    E. INTERNET .............................................................8

    F. WORKPLACE SEARCHES.............................................8

    G. CONTRACT/TEMPORARY WORKERS ...............................9

    H. DRESS CODE/APPEARANCE .........................................9

    I. HOURS OF WORK AND FLEXTIME...................................9

    J. OVERTIME ...........................................................10

    K. PERFORMANCE APPRAISALS.......................................10

    L. SMOKING POLICY....................................................11

    M. ACCESS CARDS .....................................................11

N. SECOND JOBS ...........................................................................11

O. RECORDING DEVICES ................................................................11

P. ACCURATE HOME ADDRESSES AND PHONE NUMBERS ...........12

V.  COMPENSATION AND BENEFITS ................................................12

A. PAY PERIOD ..............................................................................12

B. PAYROLL DEDUCTIONS ............................................................12

C. GARNISHMENTS ........................................................................12

D. VACATION .................................................................................13

E. EMPLOYEE BENEFITS ...............................................................13

F. WORKERS' COMPENSATION ......................................................14

G. INSURANCE CONTINUATION .....................................................14

VI.  ATTENDANCE, HOLIDAYS, AND LEAVES ...................................15

A. ATTENDANCE ............................................................................15

B. TARDINESS AND LEAVING EARLY ............................................15

C. HOLIDAYS .................................................................................15

D. FAMILY AND MEDICAL LEAVE ACT ("FMLA") .........................16

E. PERSONAL LEAVE .....................................................................18

F. MILITARY LEAVE ......................................................................19

G. BEREAVEMENT LEAVE ..............................................................19

H. JURY DUTY ...............................................................................19

I. SCHOOL VISITATION LEAVE ......................................................19

J. SICK LEAVE ..............................................................................20

K. VOTING LEAVE .........................................................................20

VII.  DISCIPLINE, DRUGS AND GRIEVANCES ....................................21

A. DISCLAIMER .............................................................................21

B. DISCIPLINARY PROCEDURE ......................................................21

C. ILLEGAL DRUGS .......................................................................21

D. QUESTIONS, SUGGESTIONS, AND COMPLAINTS .......................22

VIII. TERMINATION ..........................................................................22

A. RESIGNATION ........................................................22

B. DISMISSAL FOR CAUSE..............................................22

IX.    ACKNOWLEDGMENT.............................................25

X.   ACKNOWLEDGMENT ...............................................26

# I.    INTRODUCTION

Dear KnowledgeStorm Colleague,

I remember the day I joined KnowledgeStorm—brimming with ideas and enthusiasm about how I could make a difference and contribute to the company's success. Mine is just one of the many "KnowledgeStorm stories" shared among friends and co-workers. I was employee #21, and as I looked to my co-workers, I knew it was "up to us" to make KnowledgeStorm succeed. Each of us had to make the commitment that our individual effort would lead to the team's achievement. Whether KnowledgeStorm is 21 or 2100 employees, that commitment still holds true.

Based on the efforts of the original team and all the talent that have since joined, KnowledgeStorm has taken the lead as an indispensable resource for IT buyers and IT providers.

There are three fundamental values that have served as the foundation for KnowledgeStorm's success:

- Respect—KnowledgeStorm promotes a professional environment of cooperation and integrity.
- Contribution—KnowledgeStorm recognizes individual effort, which contributes to the team's overall success.
- Work Ethic—KnowledgeStorm achieves its greatest success when each colleague is laser focused and working in an environment of optimized performance.

KnowledgeStorm has established this Employee Handbook to clearly detail the expectations and privileges common to KnowledgeStorm. I encourage you to read this document carefully and to incorporate these practices into your daily professional routine.

KnowledgeStorm is an ambitious organization and doesn't rest easy on its laurels. The achievements are great and many more lay ahead. In our environment where expectations and values are clear, each one of us can walk in every morning with that same sense of enthusiasm and purpose we had on day one.

Welcome to the KnowledgeStorm team!

Sincerely,

*Kelly*

Kelly H. Gay
Chairman, President & CEO

-1-

033

## A. COMPANY HISTORY

KnowledgeStorm, Inc. was conceived during the summer of 1998. The concept grew out of recognition that both prospective buyers and potential providers of software and high-tech products were using inefficient means to find each other. This realization, combined with new ideas on how to use the web to harvest, normalize, search and distribute information led to the KnowledgeStorm, Inc. business model and service.

## B. EMPLOYEE HANDBOOK

The strength of KnowledgeStorm is based in the quality of the KnowledgeStorm team. This handbook is designed to provide you with a full range of general information that will assist you during your career with KnowledgeStorm, help you grow as a part of our team, and improve your working relationships with your co-workers.

This handbook is not an employment contract, either express or implied. Your employment relationship is at-will, meaning that either you or KnowledgeStorm may terminate the employment relationship at any time, for any reason or no reason. These policies and procedures, may, and likely will be, changed from time to time with or without notice, as KnowledgeStorm, in its sole discretion, deems appropriate. Please refer to the Acknowledgment on the last page of the handbook, read it carefully, sign and return to the Human Resources Department.

After reading the handbook, please keep it to review for general information about our Company. Please do not hesitate to ask your manager or contact Human Resources if you have any questions about this handbook.

## II.     GENERAL COMPANY POLICIES

## A. EQUAL EMPLOYMENT OPPORTUNITY POLICY

KnowledgeStorm will recruit, hire, promote, transfer, train, and make all other employment decisions without regard to race, color, religion, sex, age, national origin, ancestry, pregnancy, disability, veteran status, sexual orientation, marital status, medical condition, childbirth, or related medical condition, or any other protected status.

In compliance with all applicable state and federal civil rights laws, every effort will be made to employ the most qualified individuals without regard to the above factors. Additionally, it is, and will continue to be, our policy to provide information and advancement opportunities in a non-discriminatory fashion.

## B. NO-HARASSMENT POLICY

It is also KnowledgeStorm policy that employees and their work environment should be free from all forms of prohibited harassment and intimidation. KnowledgeStorm does not, and will not, permit employees to engage in prohibited sexual harassment (with or without sexual conduct) or harassment based on race, color, religion, sex, age, national origin, ancestry, pregnancy, disability, veteran status, sexual orientation, marital status, medical condition, childbirth or related medical condition, protected status (i.e., opposition to prohibited discrimination or participation in the statutory complaint process), or other status protected by state or federal law. Prohibited harassment by any employee, manager, and any person doing business with KnowledgeStorm is strictly prohibited.

Prohibited harassment includes verbal or physical conduct that denigrates or shows hostility toward an individual because of his/her race, color, religion, sex, age, national origin, ancestry, pregnancy, disability, veteran status, sexual orientation, marital status, medical condition, childbirth or related medical condition, or other status protected by federal or state law and that creates an intimidating, hostile, or offensive working environment. Prohibited harassment may include, but is not limited to, epithets, slurs, jokes, or other verbal or physical conduct relating to an individual's race, color, religion, sex, age, national origin, ancestry, pregnancy, disability, veteran status, sexual orientation, marital status, medical condition, childbirth or related medical condition, or other protected status. Prohibited sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal, graphic, or physical conduct of a sexual nature that creates an offensive or hostile work atmosphere. This policy also prohibits same-sex harassment.

Any employee who believes that he/she is being harassed by a co-worker, manager, or other individual, whether employed at KnowledgeStorm or not, or believes his/her employment is being adversely affected by such conduct, whether directed at that employee or another employee, should immediately report their concerns to:

Mike Ewers
Vice-President
2520 Northwinds Parkway
Suite 600
Alpharetta, GA 30004

or

Kelly Gay
CEO
2520 Northwinds Parkway
Suite 600
Alpharetta, GA 30004

-3-

**035**

A prompt and thorough investigation will occur and, if it is determined that prohibited harassment has occurred, KnowledgeStorm will take appropriate disciplinary action calculated to see that the harassment ends, up to and including discharge of the offending employee. KnowledgeStorm will protect the confidentiality of harassment allegations to the extent possible, and although KnowledgeStorm cannot guarantee complete confidentiality, information about the allegations of harassment will be shared only with those who need to know about it. KnowledgeStorm will not take action against the employee who makes a good faith report of inappropriate conduct. KnowledgeStorm will not tolerate adverse treatment of an employee because they report harassment or provide information related to such complaints.

All employees, including managers, have an obligation to stop discrimination and all forms of harassment from occurring and must report conduct which they observe that violates this policy to the most senior member of management at their facility or corporate headquarters.

## III.    HIRING

### A.  EMPLOYMENT SCREENING

We desire honest, law-abiding employees with the highest level of integrity. In furtherance of that goal, we reserve the right to conduct criminal background checks and Social Security Number verifications on all of the Company's applicants. A record of criminal conviction will not necessarily be a bar to employment, since we will consider factors such as the age of the offense, time of the offense, the nature, and seriousness of the violation, and evidence of rehabilitation in making any employment decision. We also reserve the right to conduct criminal checks on our current employees at twelve (12) to eighteen (18) month intervals.

### B.  HIRE DATE

An employee's initial hire date is to be used in establishing length of service. An employee needs to be on the company payroll as a regular employee before a hire date is established.

### C.  INTRODUCTORY PERIOD

We allow you to get to know fellow employees, managers and the tasks involved in your position through a 90 day Introductory Period. During this time, your performance will be evaluated for continuing employment. At any time during these first 90 days, you may resign, for any reason or no reason. Likewise, KnowledgeStorm may terminate your employment for any reason or no reason. Vacation and sick time are accrued during this period but are not available for use until the completion of the introductory period; however, personal floating holidays may be used.

036

Please understand that completion of the Introductory Period does not guarantee continued employment for any specified period of time, nor does it require than an employee be discharged only for "cause."

After the Introductory Period, your employment will continue to be at-will, meaning you may resign at any time, for any reason or no reason. Likewise, KnowledgeStorm may terminate your employment at any time, for any reason or no reason.

### D. PROMOTIONS AND TRANSFERS

Transfers and promotions represent one of the most important elements of employee development and growth.

We are firmly committed to a policy of promotion from within on the basis of merit. This is possible because we hire people who are capable of handling increased or new responsibilities and because we offer opportunities for improvement and growth. Of course, internal promotion is in our interest as well, as it is a desirable and necessary means of attracting, retaining, motivating, and developing high-caliber personnel.

*Employee Initiative:* Each employee must take the initiative in deciding what his or her career goals are and in seeking counsel from his or her manager to develop career plans. In the final analysis, advancement at KnowledgeStorm depends on individual job performance, management's evaluation of capability to accept more responsibility, the availability of openings, and the relative qualifications of other candidates for advancement.

*Promotion from Within:* Whenever possible, new and vacant positions will be filled from within KnowledgeStorm by promoting a qualified internal candidate. Merit factors considered include performance in present and previous positions, other related experience skills, technical qualifications, aptitude, motivation, knowledge, education, and career interests. Generally, priority is given to candidates within the same work group or department where the opening exists. Length of continuous service will be considered only in the unusual event that two or more candidates are equally qualified.

*Transfers:* Among the reasons for company-initiated transfers are meeting work load needs, whether short-term or long-term; better matching of individual abilities to positions; staffing new functions; providing needed on-the-job training; opening channels for promotion of others; alleviating personality conflicts, etc.

In order to qualify as a candidate for promotion or transfer, an employee must generally have been in his or her current position for a minimum period of 6 months and have a performance rating of average or better. Should the manager declare the candidate unavailable due to urgent business needs, management will work together to assist in a

037

resolution which is in the best interest of, first, KnowledgeStorm and second, the employee.

## E. EMPLOYEE CLASSIFICATIONS

*Regular Full-Time Employees:* A regular full-time employee is regularly scheduled to work at least forty (40) hours per week.

*Regular Part-Time Employees:* A regular part-time employee is regularly scheduled to work less than forty (40) hours per week.

*Temporary Employees:* A temporary employee is one who works full-time or part-time and who is employed for no definite term in a position that has a limited duration.

*Exempt and Non-Exempt Employees:* Non-exempt employees are paid on an hourly basis and are entitled to overtime pay at the rate of one and one-half times the regular rate of pay for all hours worked in excess of forty (40) in a workweek. Exempt employees are paid on a salary basis and are not eligible for overtime pay.

## IV.    CONDITIONS OF EMPLOYMENT

### A. EMPLOYEE HONESTY

We expect that our employees will always act with the utmost honesty and integrity. The following approach makes good business sense, but more importantly, it is the right thing to do. Failure to act honestly and with integrity towards our clients and co-workers could result in your immediate termination. The following are examples of conduct that will not be tolerated under any circumstances. This list below is a sample of activities that will not be tolerated. This list is not meant to be exclusive or complete:

1.    Taking leads from another sales representative.
2.    Lying to managers.
3.    Falsifying time-off records.

### B. CONFIDENTIALITY

At the time of hiring, all employees are required to sign an employee agreement. This agreement requires employees to keep confidential any company-related information they may acquire or become aware of through working at KnowledgeStorm. Confidential information includes, but is not limited to, trade secrets, processes, data, procedures, discoveries, developments, designs, improvements, techniques, marketing plans, strategies, forecasts, new products, unpublished financial statements, budgets, projects, licenses, prices, costs, customer and suppliers' lists, and customer information regarding sales. Such confidential information has been created, discovered, or

-6-

038

developed by, or has otherwise become known to KnowledgeStorm, or is information in which property rights have been assigned or otherwise conveyed to KnowledgeStorm.

We value our reputation in the business community. The Company and our employees have worked hard to gain that reputation and believe that the KnowledgeStorm name itself is a business asset, or in other words, goodwill. This goodwill can be damaged or destroyed by negative comments regarding KnowledgeStorm by people currently or previously employed by the Company. Such comments have the potential to harm KnowledgeStorm financially and are therefore prohibited. Violation of this policy could result in KnowledgeStorm seeking to recover damages against you that it suffered as a result of such comments.

## C. TELEPHONE

We may employ electronic or mechanical devices to monitor employees' phone calls so that we may assess the productivity and performance of our employees.

We realize that personal calls are sometimes necessary. However, such calls must be kept to an absolute minimum. Long distance calls that do not pertain to Company business are discouraged and should be charged to your home telephone or personal charge card. Where this is not possible, you must reimburse the Company for the cost of the call.

You are prohibited from using the phone in a manner that is harassing, intimidating, offensive, or discriminatory. Such conduct may result in your immediate dismissal or other disciplinary measures.

## D. EMAIL

Each employee will be given a password to access e-mail. Your password is confidential and should not be shared with anyone else. You are prohibited from the unauthorized access of someone else's e-mail. However, we retain a copy of all passwords and have a right to access e-mail at any time for any reason without notice.

We realize that personal e-mails, like personal calls, are sometimes necessary. However, such e-mails should be kept to an absolute minimum.

You are prohibited from sending e-mails that are harassing, intimidating, offensive, discriminatory, or obscene. Similarly, you may not forward, arrange to receive or view such e-mails. Such conduct may result in your immediate dismissal or other disciplinary measures. We reserve the right to forward any evidence of illegal activity to the proper authorities.

-7-

**039**

### E. INTERNET

Internet equipment, connections, and transmissions are the property of KnowledgeStorm. By using the Internet, you are acting as a representative of KnowledgeStorm and should conduct yourself accordingly. Use of the Internet to view, create or forward material that is harassing, intimidating, offensive, discriminatory or obscene, including pornographic, sexist or racist material, is strictly prohibited. Failure to comply with this policy will result in disciplinary action, up to and including possible termination. The company reserves the right to monitor all information transmitted over the Internet to ensure compliance with this policy.

Compliance with the following policies is expected:

1.  Internet access is provided for business use only. During non-business hours it is acceptable to access the Internet for personal reasons as long as is does not violate any of the rules set forth within this section. The duration of such personal use should be reasonable as defined by management.

2.  Electronic communications generally are confidential, however, users should not expect confidentiality with the Internet. Therefore, Internet users must act in accordance with established security procedures when sending confidential or non-confidential information across the Internet.

3.  The malicious tampering, or intentional introduction of viruses with any computer system is prohibited. Any such activity will result in your immediate dismissal or other disciplinary measures.

4.  Unless otherwise noted, all software on the Internet should be considered copyrighted work. Therefore, employees are prohibited from downloading software and/or modifying work without permission.

5.  Misuse of the Internet can result in your immediate dismissal or other disciplinary measures.

If you are unsure if your use of the Internet will violate the KnowledgeStorm policy, please consult your manager.

### F. WORKPLACE SEARCHES

All company property, including, but not limited to, desks, file cabinets, computers, computer disks and electronically stored data, is subject to being searched and the contents held by the KnowledgeStorm personnel at any time.

If you store personal information on company computers, you do so at your own risk. Such information becomes the property of KnowledgeStorm and may be subject to

-8-

040

review, copying or deletion. All information stored on company computers, as well as all software provided by the company, is the company's property. Transferring or copying information relating to company business or company software for non-company use is forbidden.

Introduction of personal property onto company premises is deemed consent to all searches. The company may, from time-to-time, search and/or require employees to allow searches of parcels, bags (including handbags and briefcases) and or/other personal items, and/or personal vehicles brought onto company property. In conducting searches, special care will be taken to preserve individual dignity to the fullest extent possible.

If you interfere with or refuse to cooperate in an investigation, including a search or a request to submit to a test for drugs, you are subject to discipline including immediate termination.

### G. CONTRACT/TEMPORARY WORKERS

Individuals may be hired from time-to-time on a temporary or contract basis. Such hires when utilizing KnowledgeStorm's facilities are expected to abide by company policies and work practices as a courtesy to others in the workplace. These individuals are not entitled to benefits, including vacation, sick, holiday pay, medical, or other benefits.

### H. DRESS CODE/APPEARANCE

We do not have a formal dress code or appearance code. However, your appearance should always reflect a standard of professionalism. You should always be well groomed and your attire should be appropriate and conducive to a good working environment. Let common sense and good taste be your guide. If you are unsure of what is acceptable, consult with your manager. A department manager can establish a department dress code if needed.

### I. HOURS OF WORK AND FLEXTIME

*Work Hours/Workweek:* Your manager will tell you your scheduled workdays and the hours you are expected to work each day. Generally, the regular workweek is Monday through Friday and averages forty (40) hours for nonexempt employees. Your workweek may vary from time-to-time as projects dictate. We reserve the right to assign duties and to change starting and stopping times according to need.

Customer service is essential to our success, so you are expected to be in attendance and on the job ready to work at your starting time. Likewise, you are expected to work until your regularly scheduled departure time unless your manager gives you permission to leave early.

041

If you are unable to work or will report late, you must telephone your manager personally and no later than your regular starting time. It will not be acceptable to have another party call for you unless it is impossible for you to call personally.

*Flextime:* Flexible work arrangements are dependent on company requirements. A universal flexible work policy does not apply to every department or situation. Managers are encouraged to explore flexible work arrangements with their employees. A work plan that is beneficial to both employee and KnowledgeStorm can be developed jointly by you and your manager in cases where a flexible work arrangement is feasible. All flexible scheduling arrangements are subject to management approval and must not impair company operations.

A flextime work schedule allows you latitude in scheduling working hours within specified limits as long as your full complement of work hours is met. Individual departments may use a flexible work schedule provided there is adequate staff coverage to meet the operational requirements of the department.

## J. OVERTIME

From time-to-time, overtime may be required. In the event that overtime is necessary, non-exempt employees must receive prior approval from their manager. This permission must be renewed on a daily basis. Overtime will be computed on the basis of time-and-one-half for all time worked in excess of forty (40) hours per week for all nonexempt employees. Exempt employees are not eligible to receive overtime pay.

## K. PERFORMANCE APPRAISALS

The purpose of a performance appraisal is to give your manager a means of rating your work and to give you an accurate understanding of your performance as your manager evaluates it. The appraisal also gives you the opportunity to discuss your thoughts about your work, your manager and KnowledgeStorm. Employees who are not performing satisfactorily may be placed on a formal "performance improvement plan" at the time of the appraisal or at any time their performance needs improvement.

You will be asked to sign your appraisal to indicate you have reviewed it. A signature on the form does not necessarily indicate agreement with the appraisal. If you disagree with your appraisal, you may document the areas of disagreement either on the form or in a separate note, which will be attached to the appraisal before it is sent to the file.

Around each year's anniversary of employment with KnowledgeStorm, a formal performance appraisal will take place. In addition to a formal performance appraisal once a year, informal performance appraisals may take place from time to time at KnowledgeStorm's discretion. These performance appraisals will be carried out in an objective manner. These appraisal meetings may or may not be used for determination of salary increases and/or bonuses.

042

We reserve the right to conduct interim reviews as deemed necessary by management.

### L.  SMOKING POLICY

Smoking is not permitted in any KnowledgeStorm owned or leased buildings. Employees who smoke must do so outside the building.  It is your responsibility to ensure that smoking does not in any way interfere with or detracts from your job performance or punctuality.  Employees who abuse smoking breaks will be subject to disciplinary action.

### M. ACCESS CARDS

Access cards may be issued to employees on their first day of employment. These cards are not only provided to allow entrance to the building, but to provide a safer working environment and prevent unauthorized people from wandering into the building. Since we are trying to provide for employees safety, allowing any outside person to use your card may result in disciplinary action.

If an access card is misplaced or lost, please notify management immediately.  A replacement card will be issued.  If an access card is misplaced a second time, a replacement fee may be required.

### N.  SECOND JOBS

There may be times when you want to work a second job in addition to the one you have here at KnowledgeStorm.  We will allow you to work a second job so long as you are not working for a company that competes with us either in whole or in part. Furthermore, we cannot allow your work at another company to impact your work at KnowledgeStorm.  If your performance and productivity falter, you could be asked to resign from your other position or face disciplinary action including discharge.  In addition, you are prohibited from engaging in work for another company while you are on KnowledgeStorm's time or premises.  Failure to comply with this rule could result in disciplinary action including discharge.

### O.  RECORDING DEVICES

Voice and video recording devices in the workplace are strictly prohibited, other than those used by KnowledgeStorm managers or managers in the usual and ordinary course of their jobs, or by employees at the direction of management.  No employee may bring a voice recorder or video recording device into the workplace without the express written approval of the Chief Executive Officer.  Violation of this policy will result in disciplinary action up to and including termination.

### P. ACCURATE HOME ADDRESSES AND PHONE NUMBERS

There will be times when we may need to contact you at home, either by phone or mail. You should update your address and phone number within fourteen (14) days of a change in such information. Willful failure to provide this information could result in discipline up to and including discharge.

## V.    COMPENSATION AND BENEFITS

### A. PAY PERIOD

You are paid on the basis of semimonthly pay periods. Paychecks will be distributed on the working day on or before the 1st and 15th of each month. Payday on the 1st and 15th of the month is for the previous pay period, not the current one.

### B. PAYROLL DEDUCTIONS

We are required to make certain deductions from your salary. These include federal withholding tax, state withholding tax, Social Security tax, etc. Each employee is required to sign a "withholding certificate" (Form W-4). This indicates the number of exemptions that you have for income tax purposes. If the number of exemptions that you are entitled to changes, your manager should be notified immediately. A new W-4 must be signed to reflect the change.

All deductions are itemized on your payroll check. In accordance with the provisions of the law, after the end of the year, you will receive a statement (Form W-2), in duplicate, showing your earnings and the amount withheld for federal, state, and local taxes.

### C. GARNISHMENTS

Your creditors may garnish your pay for an unpaid debt. We are required by law to honor legal garnishments. Responding to garnishments is time-consuming and costly to the Company because it involves preparing additional payroll records and submitting documents to court officials, and thus reduces the overall efficiency of the payroll department. As such, we do not wish to become involved in the personal finances of its employees. We expect employees to handle their personal financial affairs with a sense of responsibility that does not require Company involvement. We do not favor garnishment of your wages and strongly encourage you to resolve debts and financial disputes in order to avoid unnecessary garnishment proceedings.

044

### D. VACATION

We believe that vacations from work are a healthy and desirable part of everyone's life; therefore, we provide paid vacations to both regular full-time and regular part-time employees. All full-time employees are eligible to receive vacation at the regular rate of pay and based on eight (8) hour days. Part-time employees are eligible to receive vacation with pay, prorated on the average number of hours worked per week at the regular rate of pay. Vacation time must be used in accordance with the terms of this policy.

Standard vacation time is as follows:

| Years employed | Yearly vacation accrual rate |
|----------------|------------------------------|
| Less than 5 | 10 days |
| 5 to 10 | 15 days |
| 10 and over | 20 days |

You will begin accruing vacation at that rate from your first day on the job. Any fractions of a day will be rounded up to the next whole day. For example, if you are hired on March 1, you would be eligible to accrue 10/12 of 10 days vacation, or 8.3 days of vacation which would be rounded up to 9 days of vacation for the calendar year in which you were hired.

The company will allow for up to five (5) days to be rolled over into the following calendar year if approved by management in writing. These days must be used within the first quarter of the following year.

Vacation requests should be put in writing to your manager as soon as possible to allow for adequate scheduling. If there is a conflict surrounding the scheduling of vacation time, preference will be given to the employee with the greatest length of service, provided that adequate notice has been given.

No accrued vacation will be paid to employees at the termination of their employment relationship except as state law requires.

### E. EMPLOYEE BENEFITS

We provide a broad range of benefits for regular full-time employees who have been employed for at least thirty (30) days. Specific eligibility requirements and detailed information appear in the booklets we provide for each benefit plan. Each employee is provided this information upon hire. We reserve the right to adjust and modify the benefits package at any time.

045

Company benefits currently available to all employees are:

1.    Comprehensive Health and Dental Insurance for employees and/or family (spouse and/or children)

2.    Long-Term Disability

3.    Short-Term Disability

4.    Life Insurance/Accidental Death and Dismemberment

### F.  WORKERS' COMPENSATION

We provide Workers' Compensation insurance on all employees while working. Although you should use caution in your work and follow all safety requirements and procedures as set forth by your manager, should you receive any kind of injury while on the job, immediately bring it to the attention of your manager. A First Report of Injury must be filed within three days of injury even if you consider the injury or illness minor and do not seek medical attention. This report is to be signed by you and your manager and forwarded to:

> Michael Ewers
> Vice-President
> 2520 Northwinds Pkwy #600
> Alpharetta, GA 30004

### G.  INSURANCE CONTINUATION

Termination of your employment may entitle you and any covered dependents to continued group medical insurance benefits for a period of eighteen (18) months from the date of your termination. Entitlement to continued group medical insurance benefits would not continue beyond:

1.    The date KnowledgeStorm ceases to provide a group health plan to any employee.

2.    Thirty (30) days after premiums for continuation of coverage are not paid.

3.    The date you become entitled to Medicare.

4.    The date you become covered under any other group health plan.

Your election of coverage must be made within sixty (60) days of either the date of your termination or the date you are first notified by the insurance carrier of your right to elect continuation coverage. If this election is made after either of these dates, you are

-14-

responsible for payment of the premiums for coverage during the period before this election and must pay this premium within forty-five (45) days from the date of this election.

You or your beneficiaries must notify the insurance carrier of any change in marital status and/or change in number of dependents within sixty (60) days from the date this change occurs. You must notify KnowledgeStorm and the insurance carrier promptly of any address change or coverage by a new Company for you and/or your dependents.

## VI.    ATTENDANCE, HOLIDAYS, AND LEAVES

### A. ATTENDANCE

Regular and prompt attendance is essential to your success and the success of KnowledgeStorm. Each employee has a critical role to play in our operation. Absences disrupt business and put an added burden on co-workers. As a result, regular attendance by each employee is mandatory. In addition, on days where you will be absent, you must call in to your manager by 9am (or start of business that day) to report your absence.

An employee absent from work for two consecutively scheduled workdays without notifying his/her manager or manager will be considered to have quit without notice.

### B. TARDINESS AND LEAVING EARLY

Tardiness and leaving early are defined as time lost during the actual workday due to late arrival or departure before the normally scheduled end of the workday. Tardiness and leaving early, like absences, disrupt our business and put an added burden on co-workers. We request that you do everything possible to limit the number of times you are tardy or leave early.

### C. HOLIDAYS

We observe the following eleven (11) holidays:

1.    New Year's Day
2.    Memorial Day
3.    Independence Day
4.    Labor Day
5.    Thanksgiving Day
6.    Day After Thanksgiving
7.    Christmas Day
8.    Two (2) Company-Chosen Floating Holidays

-15-

**047**

9.     Two (2) Employee-Chosen Floating Holidays

When a holiday falls on a Saturday, the preceding Friday is observed as the holiday. If the holiday falls on a Sunday, the following Monday is observed as the holiday. Employees must work the day before and the day immediately following any regularly scheduled holiday in order to be eligible to receive holiday pay. This provision will be strictly enforced. If a holiday falls within an employee's vacation period, it will not be charged to the vacation. An employee who wishes to observe a religious holiday may charge such holiday against his or her personal or vacation time with prior managerial approval.

Only regular full-time and regular part-time employees are entitled to holiday pay at the regular rate of pay. Part-time employees who work less than a forty (40) hour workweek will be paid on a prorated basis as follows:

1.     35 hours a week will be paid 7 hours of holiday pay
2.     30 hours a week will be paid 6 hours of holiday pay
3.     25 hours a week will be paid 5 hours of holiday pay
4.     20 hours a week will be paid 4 hours of holiday pay, etc.

Each year the company will choose two floating holidays. Every effort will be made to place these floating holidays near another company observed holiday. Each year employees will be able to use two additional floating holidays of their choice with appropriate approval.

New employees, for the first year, will receive their floating holidays in the following manner:

1.     If hired between January 1st and June 30th, you will be given two floating holidays for that year.
2.     If hired between July 1st and December 31st, you will be given one floating holiday for that year.

Floating holidays cannot be rolled over into the following year with the exception of new employees hired during the last quarter of the year. In these cases, the one day can be rolled over and must be used within the first quarter of the following year.

## D. FAMILY AND MEDICAL LEAVE ACT ("FMLA")

Eligible employees are permitted to take up to twelve (12) weeks of unpaid leave during any "rolling" twelve (12) month period (measured backward from the date the FMLA leave sought by the employee would begin) for the following reasons: (1) the birth of a child or placement of a child with the employee for adoption or foster care; (2) the care of a spouse, child or parent with a serious health condition; or (3) a serious health condition of the employee that renders the employee unable to perform the functions of

-16-

**048**

his or her job. Leave taken under this policy will be counted against the employee's annual Family and Medical Leave Act entitlement.

Eligibility - In order to be eligible for leave under this policy, employees must have been employed by the Company for at least one (1) year of cumulative service, must have worked at least 1,250 hours during the twelve (12) months immediately preceding the leave and must be employed at a worksite where fifty (50) or more employees are employed by the Company within seventy-five (75) miles of that worksite.

An employee desiring leave under this policy for foreseeable events (such as an expected birth or adoption of a child or for planned medical treatments) must provide us with at least thirty (30) days advance written notice explaining the reasons for such leave, the anticipated duration of the leave and the expected start of the leave. In cases where the need for leave cannot be anticipated thirty (30) days in advance, the employees must give notice of the need for leave as soon as practicable (ordinarily one or two business days) after the employee learns of the need for the leave. The employee must also make reasonable efforts to schedule the leave in a manner that does not unduly disrupt Company operations. Failure to comply with the notice requirements for foreseeable leave under this policy may result in denial of leave until thirty (30) days after the employee provides proper notice to the Company.

In cases where both a husband and wife work for the company, they will each be eligible for a total of twelve (12) weeks of unpaid leave during a twelve (12) month period for the birth, placement for adoption or foster care of a child, the care of a child after birth, placement for adoption or foster care, or the care of a parent with a serious health condition.

Benefits - During a leave under this policy, an employee's health insurance coverage will be continued at the same level of benefits and under the same terms and conditions as the coverage currently being provided by the company. If an employee is currently paying a portion of the health insurance premium, the employee must continue to make such payments to the company, at the time such payments would be due if made by payroll deduction, for the duration of the leave. Such payments should be made by check or money order in person or through the mail. Any questions concerning benefits should be directed to the Company Human Resource representative. Other employment benefits, such as vacation days, sick time, etc., shall not be accrued during the leave.

Reinstatement - Employees returning from leave under this policy (other than "key employees' as defined below) will be reinstated to their former position or an equivalent position with equivalent benefits, pay and other terms and conditions of employment. "Key employees" are those salaried Family and Medical Leave Act-eligible employees within the highest ten percent pay bracket of all employees employed by the company within seventy-five (75) miles of the employee's worksite. Reinstatement may be denied to key employees under this policy if it is necessary to prevent substantial and grievous economic injury to the company, the company notifies

-17-

the employee of its intent to deny reinstatement, and the employee elects not to return to work within a reasonable period of time after receipt of such notice.

Pay During Leave - Employees who take leave because of personal medical illness must first exhaust any earned paid sick leave days. Employees who take leave for any reason under this policy must use earned but untaken vacation time. In all other circumstances, time spent on leave under this policy will be unpaid.

Verification Requirements - Employees who request leave under this policy for a period of time equal to or greater than one week for the serious health condition of the employee or a family member (spouse, child or parent), must provide KnowledgeStorm with a statement of medical certification from a health care provider which explains the condition necessitating the leave, the date the condition commenced, the probable duration of the condition and the anticipated regimen of treatment to be prescribed. Employees who request leave under this policy for more than one month must provide re-certification of the medical condition on the monthly anniversary of the first day such leave was taken. The state of medical certification should be provided to the company at the time the employee requests leave under this policy, or shortly thereafter. In the case of unforeseen leave (such as for a medical emergency) the statement of medical certification should be provided to the company soon after the leave commences. Failure to comply with the medical certification provisions of this policy may result in the denial of leave until after the employee provides a statement of medical certification to the company.

If the company has reason to request the validity of a medical certification provided by the employee's health care provider, the company might require the employee to obtain a second opinion, at the company's expense, from a health care provider designated by the company. In the event the second opinion differs from the first, the company may request the employee to obtain a third and final opinion, at the company's expense, from a health care provider jointly approved by the company and the employee.

The company also requires the employee to submit a report once every seven (7) days during the duration of the leave regarding the medical status of the employee or family member and the employee's intention of returning to work. An employee returning from leave under this policy due to his or her own serious health condition which kept the employee out of work for a period of time equal to or greater than one week must provide the company with a written medical release from a health care provider before initiating work. Failure to provide a release may result in a denial of restoration of employment until the employee provides a medical release to the company.

### E. PERSONAL LEAVE

Consideration will be given to the granting of a personal leave of absence for a brief period of time under certain extraordinary circumstances at the Company's discretion.

050

### F.  MILITARY LEAVE

Members of the National Guard or any branch of the armed services will be granted military leave in accordance with applicable state and federal laws.

### G.  BEREAVEMENT LEAVE

In the event of a death in your or your spouse's immediate family (spouse, son, daughter, father, mother, brother, sister, grandfather, grandmother) you can receive time off, up to five (5) days, to attend the funeral services. You will be paid for the days taken to attend the funeral at your regular base rate of pay. Such leave must be approved by your manager.

In the event of a death in your or your spouse's extended family, you may receive one (1) day of paid bereavement leave.

If you have used the allotted number of days and additional days off are necessary, the employee may take additional time without pay or use vacation or floating holidays with your manager's approval.

### H.  JURY DUTY

Participation in our judicial system is an important civic responsibility. An employee who serves on any duly constituted jury, or who is subpoenaed as a witness or serves as a voluntary witness at the request of the company, shall be paid for hours necessarily absent from work. You must give a copy of the jury duty summons to your manager as soon as you are notified. Pay for time off for jury duty will be based on the straight-time earnings that the employee lost as a result of jury service up to a maximum of forty (40) hours(or prorated based upon employees whose normal workweek is less than forty hours). You must return to your regularly scheduled work when you are relieved from jury duty.

### I.  SCHOOL VISITATION LEAVE

We allow both full-time and part-time employees who are not eligible for paid vacation or personal time or who have exhausted their paid vacation and personal time to receive up to eight hours of unpaid time per school year to attend school activities that cannot be scheduled during non-work hours. Excess leave will be granted, as state law requires.

Full-time and part-time employees must have worked six consecutive months prior to requesting this time off. Employees must make a written request for this time off at least seven days in advance and must first exhaust all accrued vacation and paid personal time.

-19-

## J.  SICK LEAVE

It is our policy to grant the equivalent of five (5) paid sick days per twelve months employment to regular full-time employees, based upon the limitations set below.  You will begin accruing such sick days from the day you begin work.  Any fractions of a day will be rounded up to the next whole day.  For example, if you are hired on March 1, you would be eligible to accrue 10/12 of 5 days sick leave, or 4.16 days of paid sick leave which would be rounded up to 5 days of sick leave for the calendar year in which you hired.

Paid sick days are for use in connection with absences from work due to legitimate personal injuries, illnesses or pregnancy as determined by the company.  Paid sick days may also be used to take care of an ill family member.  The company may, at the company's discretion, require a doctor's statement describing the employee's condition or additional information regarding the employee's condition if the employee is absent three or more working days.

Pay for each paid sick day will be calculated on the same basis as holiday pay.

You must personally contact your manager before the scheduled start of your workday in order to receive sick pay for that day.

Employees who are ill and have exhausted their accrued sick leave will not be paid for those days absent.  However, vacation days or employee-chosen  floating holidays may be substituted for an unpaid absence due to illness.

Paid sick days cannot be carried forward into the following calendar year.  Sick time may be used in four-hour increments if desired. Sick days have no cash value upon termination of employment and will not be paid upon termination of employment except as state law requires.

## K.  VOTING LEAVE

We believe that all of our employees should exercise their right to vote.  If you do not have enough time outside of your working hours to vote, you may take enough time so that, when it is added to the time available outside working hours, you will be able to vote.  This time must be at the beginning or the end of the time you are scheduled to work unless you and your manager come to an alternate arrangement.  We will pay you for this time off, up to a maximum of two hours.  If you are aware that you need to take time off to vote, you must provide us with at least two working days notice that you will need this time off.

052

## VII.   DISCIPLINE, DRUGS AND GRIEVANCES

### A.  DISCLAIMER

This section does not alter the at-will employment relationship.  These steps may not be followed at the sole discretion of KnowledgeStorm.  The employee may still resign for any reason or no reason and KnowledgeStorm may terminate the employment relationship for any reason or no reason.

### B.  DISCIPLINARY PROCEDURE

We utilize a progressive discipline policy to correct employee problems involving misconduct, excessive absenteeism, and poor job performance.  When it becomes necessary to take corrective action, the company will make every effort to apply discipline in a fair and consistent manner.  The company reserves the right to accelerate discipline up to and including termination in any individual case considering the employee's position and the frequency and/or seriousness of the matter.

If you have received a formal, written warning for violating any company rule and for a period of one year from the date of the warning you have no other rule infractions, that warning will be voided and will not be used to support future disciplinary action.

### C.  ILLEGAL DRUGS

We make every effort to maintain a work environment that is safe and conducive to employee productivity.  The use of illegal drugs may have a serious adverse effect on the workplace.  Accordingly, this statement summarizes the company's illegal drug policy.

1.    We strongly oppose the use of illegal drugs and believe that illegal drug use, either on or off-duty, is inconsistent with the company's anti-drug commitment. For purposes of this policy, "illegal drugs" includes non-prescribed narcotics, hallucinogenic drugs, marijuana, or other non-prescribed controlled substances, including prescription drugs that have not been prescribed to the employee.  The possession, use, purchase, sale, manufacture, or distribution of illegal drugs is prohibited.  Employees are prohibited from reporting to work or being at work with any measurable quantity of illegal drugs in their blood or urine.

2.    If an employee has committed an unsafe working practice or is involved in an accident, that employee is subject to immediate drug testing.  If the test reveals the presence of illegal drugs in the employee's blood, hair or urine, that employee is subject to immediate discharge.

053

## D. QUESTIONS, SUGGESTIONS, AND COMPLAINTS

As an employee of KnowledgeStorm, you are a valued asset to the company. We encourage you to bring your questions, suggestions, and complaints to our attention. We will give them careful consideration in our continued efforts to improve our relationship and to ensure our continued success.

Differences of opinion are bound to occur in almost any company. When many people work together, situations may be viewed differently. While we cannot guarantee that we will always give you the answer that you may want, your complaints, problems, or suggestions will always be given fair consideration.

If you have a problem or a question, you should first discuss the situation with your manager. You and your manager work closely on a day-to-day basis, and our experience have shown that most problems can be settled at this level. We encourage you to speak honestly and openly with your manager.

If you still feel that your question or problem has not been resolved or if for some reason you do not wish to discuss it with your manager, you should speak directly with Mike Ewers, Vice-President. He will review your problem and will meet with you to discuss a possible resolution. In sum, we hope you understand that we will do everything to ensure that your complaints, problems, or questions are handled in a fair and confidential manner.

# VIII. TERMINATION

## A. RESIGNATION

We hope that your association with us will be a long one and that you will stay and grow with the Company. However, should circumstances require that you leave, please notify your manager in writing as soon as possible. You must give a minimum of two weeks written notice in order to be eligible for potential re-hire by KnowledgeStorm and to receive a favorable reference or recommendation from the Company.

## B. DISMISSAL FOR CAUSE

The following acts are examples of types of conduct that are prohibited while at work or on our premises. These types of conduct may be subject to discipline, including termination. This list is for illustrative purposes only and is not exclusive or complete:

1.  Theft, misappropriation or removing from the company private or company property.
2.  Falsification of personnel or other records or the employment application.
3.  Fighting on company property, except in the case of an innocent victim of an unprovoked assault.

4. Refusal to follow direction or orders of managers while performing your job or insubordination.

5. Abuse or deliberate destruction of company property, tools, equipment, or vending machines.

6. Use, sale, possession, distribution, purchase, transfer, offer to sell or buy, transportation, presence in the body of, or bringing onto company property illegal drugs or controlled substances, or hallucinogens; or possessing equipment related to illegal drugs or controlled substances.

7. Unauthorized consumption of illegal drugs, controlled substances, or hallucinogens on company property or reporting for work while impaired by illegal drugs, alcohol or controlled substances, or hallucinogens.

8. Use or possession of weapons or firearms on company property.

9. Using obscene language, engaging in obscene conduct or displaying indecent literature or pictures on Company property.

10. Defacing company property or posting unauthorized materials on company property.

11. Failure to report an on-the-job injury or failure to report for scheduled medical treatment relating to an on-the-job injury.

12. Conviction of a felony or other crime involving moral turpitude or crimes which can be construed to indicate that the continued presence of the employee would constitute a hazard to fellow employees, the company or its property.

13. Unauthorized work elsewhere while off work or failure to return to work at the end of an unauthorized leave of absence.

14. Excessive absenteeism, tardiness or irregular attendance.

15. Improper use or removal from the premises without proper authorization of company property, company records or confidential information.

16. Threatening, intimidating, coercing or interfering with employees or supervision at any time.

17. Smoking or use of tobacco products on company premises except in designated area.

18. Using threatening, profane, obscene or abusive language to managers or employees.

19. Engaging in disorderly conduct while on company property.

20. Receiving or making excessive personal phone calls during working hours except in case of an emergency due to an injury, illness, or a life-or-death situation.

21. Failure to perform any job as requested by the manager unless such work will endanger the health or safety of the employee(s).

22. For unexcused absences, failing to call in to the employee's manager for two consecutive workdays.

23. Excessive unavailability for work.

24. Revealing or disclosing confidential information about or concerning employees, or company business, without prior permission.

25. Failure to maintain positive working relationships with co-workers.

26. Falsification or unauthorized altering of records, employment applications, time sheets, time cards, client records, etc.

27. Deliberate or willful violation of KnowledgeStorm's equal employment opportunity policies.

28. Failure to act with professional integrity and honesty towards coworkers.

056

**EXHIBIT 5**

## IX.    ACKNOWLEDGMENT

### ACKNOWLEDGMENT FORM

This will acknowledge that I have received a copy of the KnowledgeStorm employee handbook. I recognize my responsibility to abide by the policies contained in the handbook, as well as those included in updates or additions to the handbook.

**I UNDERSTAND THAT MY EMPLOYMENT IS AT-WILL AND THAT THIS HANDBOOK DOES NOT CREATE AN EMPLOYMENT CONTRACT, OR ANY OTHER CONTRACT, EXPRESS OR IMPLIED. THAT MEANS THAT I MAY RESIGN AT ANY TIME, FOR ANY REASON OR NO REASON, AND THAT KNOWLEDGESTORM MAY TERMINATE MY EMPLOYMENT RELATIONSHIP AT ANY TIME, FOR ANY REASON OR NO REASON.**

I understand the rules, policies, and benefits contained in the handbook may be changed, modified or deleted at any time. No manager may vary the terms of these policies either orally or in writing without the written authorization of the Company's HR representative. I recognize that all members of management are dedicated to ensuring that discipline, including dismissal, is administered fairly and uniformly.

I further acknowledge that KnowledgeStorm has a right to monitor my use of the computer, e-mail, and phone. I understand that if I violate the company's policies regarding the use of the Internet, e-mail, and phone as explained by this handbook that I am subject to discipline including termination.

I understand that this handbook is mine to keep, and I will be responsible for replacing or adding pages when they are provided to me. I understand this version of the handbook supersedes all previous copies of the KnowledgeStorm employee handbook I may have in my possession.

JASBIR K GILL _____    Employee's Name (please print)

_Jasbir Gill_ _____    Employee's Signature

11|8|06 _____    Date

_(signature)_ _____    Manager's Signature


DEFENDANT'S
EXHIBIT
5
1-14-08

## X.    ACKNOWLEDGMENT

### ACKNOWLEDGMENT FORM

I hereby acknowledge that I have received a copy of KnowledgeStorm's Equal Employment Opportunity Policy and No-Harassment Policy.  I have initialed a duplicate copy of the policy at the same time I signed this form.  I further acknowledge that I have read and understand this policy.  I agree to promptly report and conduct that I believe violates the policy to one of the individuals identified in the policy.  I acknowledge that KnowledgeStorm wants to know if there is harassment at work and will not take any action against me for reporting such inappropriate conduct.

JASBIR K GILL _____ Employee's Name (please print)

_Jaslin Gill_ _____ Employee's Signature

11|8|06 _____ Date

I hereby acknowledge that I have provided this employee with a copy of the company's Equal Opportunity Policy and No-Harassment Policy.  The employee stated to me that he or she understood the policy, the reporting procedure, the obligation to report all violations of the policy, and the KnowledgeStorm will not take any action against the employee for reporting inappropriate conduct.

_____ Manager's Signature

11/9/06 _____ Date

058

**EXHIBIT 7**

**Gay, Kelly**

| | |
|---|---|
| **From:** | Gill, Jasbir |
| **Sent:** | Friday, December 29, 2006 7:47 PM |
| **To:** | Brown, Joe; 4-Sales |
| **Subject:** | RE: There is a first for everything! |

I must thank Joe Brown for his patience and support throughout this deal and Dan O for pricing it so quick.

Also many thanks to the San Francisco team for all their support.

Happy New Year !!


Jasbir Gill
Account Executive
KnowledgeStorm, Inc.
650.491.8960 (phone)
650-248-1508 (mobile)
650.491.8959 (fax)
jgill@KnowledgeStorm.com
**KnowledgeStorm — Reach. Search. Results.**



**From:** Brown, Joe
**Sent:** Friday, December 29, 2006 3:52 PM
**To:** 4-Sales
**Subject:** There is a first for everything!
**Importance:** High

The first bike you rode...
The first time you flew on a plane...
The first job you had...

All have great anticipation and great reward, but nothing beats your first sale!!!

Jasbir Gill has pulled in a new deal for 6 months for $3,560.  Xensource is an IBM ISV who qualified for the 40% discount on one listing.  Jasbir found out that the client had anticipated spending more money than the original KS quote and when the Featured Sponsorships were taken, she determined that targeted advertising was a good fit. She got the client to spend more money than the IBM offer would have alone and therefore gives us a chance to showcase our other services.

Great job Jasbir!  Your hard work is evident by your peers and we know you will be very successful. Congratulations on getting the FIRST one; we know more will be coming soon.

Happy New Year!

Joe Brown


4/26/2007



**EXHIBIT 11**

**Brown, Joe**

| | |
|---|---|
| **From:** | Gill, Jasbir |
| **Sent:** | Wednesday, January 24, 2007 12:59 AM |
| **To:** | Brown, Joe |
| **Subject:** | RE: Today's call |

I am impressed that you remember the spellings, but the actual test is the pronunciation.

Bhurra is literal translation of your last name and they would also call you Bhurra because your skin is not dark and you do not have black hair. But it does not say anything about your wisdom. For that I would have to call you Gyani Bhurra and that is going too far into the unknown for you. And I like Yoda Brown or better yet Bhurra Yoda.

Thanks for listening to what we all had to say here in SF and implementing it.

Regards,

Jasbir Gill
Account Executive
KnowledgeStorm, Inc.
650.491.8960 (phone)
650-248-1508 (mobile)
650.491.8959 (fax)
jgill@KnowledgeStorm.com

**KnowledgeStorm — Reach. Search. Results.**

| | |
|---|---|
| **From:** | Brown, Joe |
| **Sent:** | Tuesday, January 23, 2007 5:44 PM |
| **To:** | Gill, Jasbir |
| **Subject:** | RE: Today's call |

I thought it was Bhurra or something else like that.

Best regards,

Joseph W. Brown
Western Region Sales Manager
KnowledgeStorm, Inc.
770.290.8837 Atlanta
650.491.8969 San Francisco
770.490.4630 Mobile
678.868.2556 Facsimile
joe.brown@KnowledgeStorm.com

2520 Northwinds Parkway, Suite 600
Alpharetta, GA 30004

395 Oyster Point Blvd, Suite 212
S. San Francisco, CA 94080
www.KnowledgeStorm.com

**KnowledgeStorm- Reach. Search. Results.**

1



DEFENDANT'S
EXHIBIT
11
1-14-08

**From:**      Gill, Jasbir
**Sent:**      Tuesday, January 23, 2007 6:47 PM
**To:**        Brown, Joe
**Subject:**   Today's call

Thank you so much for calling me today. It was good to go over it with Yoda Brown.

Regards,

Jasbir Gill
Account Executive
KnowledgeStorm, Inc.
650.491.8960 (phone)
650-248-1508 (mobile)
650.491.8959 (fax)
jgill@KnowledgeStorm.com

**KnowledgeStorm — Reach. Search. Results.**

2

**EXHIBIT 13**

## Gleason, Chris

| | |
|---|---|
| **From:** | Brown, Joe |
| **Sent:** | Wednesday, April 04, 2007 4:44 PM |
| **To:** | Gill, Jasbir |
| **Subject:** | Items for follow up |

- If you need help getting anyone here to help with Infosys content, let me know. I would get with Roger.
- As soon as you get the wording on Abrige, forward to me and I'll put in to SLX and we will issue a new contract.
- Make sure to get Jamie Myers to assign Rachel on Infosys, but remember that your start date might be delayed because of Rachel's vacation.

With respect to the other issues you raised, it is unfortunate that we are in the position of having some reps poach into our territory. It's not lost on me that we all lose money by not finding opportunity before the others. The Sage example is a moot one, because it would have stayed with Emily's team regardless. The answer overall is to find opportunity before anyone else. I would suggest you continue working and pushing your BDR to help so that you can manage more prospects.

I continually fight for opportunity for you, Mike, the West. It gets easier sometimes, but often times it is not a winning battle- like Sage. I support you taking that message as far as you would like, as I have not been able to prevent the poaching. June 30 is the deadline.

I am very sorry that you felt like no one was reachable on Friday. Yes, I chose to travel the last day of the month, because I had not been out there due to medical reasons. I was unable to fly until last week, so I came when I was able to. I do not know the availability of Jason or Jim, but it sounds to me like Jason had about a 40 minute gap of unavailability, in which you reached Canfield instead. Maybe there is a better solution and I would be open to those, but mostly I am sorry for your feeling of isolation (not being able to reach someone right when you needed to). Hopefully my travel or any other circumstances can be minimized so the we don't face this again in the future and this will not be an issue.

Jasbir, if you want to work from home, that option is always available to you. I happen to think that office is on the mend, at least after I left you in the parking lot Thursday night, that is what I felt. Maybe I am mistaken and the office is in worse shape than what I was told by all I visited with. Ultimately it is up to each rep to determine the best environment for their productivity.

I will continue to treat you with respect as a person and expect the same of you towards me. Even in disagreement, I think that respect is more important than anything else. If you ever feel that I have been disrespectful to you, I know you will tell me. Therefore, I will tell you that your sarcastic comments and tone was very disappointing to me and more surprising than anything. I realize the tension of the discussion, but like our call with Lori, expect that discretion truly is the better part of valor. I invite and welcome all discussion with you. I feel like our conversations are actually productive.

You are someone I admire greatly and want to help be successful here. Where you feel that I am lacking or when you feel that you need more from me or KnowledgeStorm, I want you to ask. I may not be able to accommodate specific requests, but I will always make time to listen and try.

I am going to be out of the office this afternoon on personal business, but will look for the comments to be added to the Abrige contract.

Best regards,

Joseph W. Brown
Western Region Sales Manager
KnowledgeStorm, Inc.
770.290.8837 Atlanta
650.491.8969 San Francisco
770.490.4630 Mobile
678.868.2556 Facsimile
joe.brown@KnowledgeStorm.com

2520 Northwinds Parkway, Suite 600
Alpharetta, GA 30004



1

**062**

**EXHIBIT 14**

**From:** Hoback, Jason
**Sent:** Tuesday, December 12, 2006 8:43 AM
**To:** Gleason, Chris
**Cc:** Brown, Joe
**Subject:** West Coast Rep for ISV

Jasbir Gill will represent the West for the ISV's.  Joe plans on being some of these calls with her as she ramps up.


Jason Hoback
Director of Sales
KnowledgeStorm Inc.
Direct: 770-290-8834
jhoback@knowledgestorm.com
2520 Northwinds Parkway, Suite 600
Atlanta, Georgia 30004
www.knowledgestorm.com

**KnowledgeStorm — Reach. Search. Results.**


****DISCLAIMER The information contained in this e-mail and attachments, if any, is confidential and may be subject to legal privilege. If you are not the intended recipient, you must not use, copy, distribute or disclose the e-mail and its attachment, or any part of its content or take any action in reliance of it. If you have received this e-mail in error, please e-mail the message back to the sender by replying and then deleting it. We cannot accept responsibility for loss or damage arising from the use of this e-mail or attachments, and recommend that you subject these to your virus checking procedures prior to use.


1/11/2008



DEFENDANT'S EXHIBIT
14
1-14-08