1  Steven M. Kroll, Bar No. 216196
   FORD & HARRISON LLP
2  350 South Grand Avenue, Suite 2300
   Los Angeles, California 90071
3  Telephone:  (213) 237-2400
   Facsimile:   (213) 237-2401
4  skroll@fordharrison.com

5  Jeffrey D. Mokotoff, GA Bar No. 515472
   FORD & HARRISON LLP
6  *Admitted Pro Hac Vice*
   1275 Peachtree Street, NE, Suite 600
7  Atlanta, Georgia 30309
   Telephone:  (404) 888-3800
8  Facsimile:   (404) 888-3863
   jmokotoff@fordharrison.com
9
   Attorneys for Defendant
10 KNOWLEDGESTORM, INC.

11              UNITED STATES DISTRICT COURT

12   NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

13

14 JASBIR GILL, MAHMOUD            Case No. C 07-04112 PVT
   KEDKAD,
15                                 **EVIDENCE SUBMITTED IN
                                   SUPPORT OF DEFENDANT**
16          Plaintiffs,            **KNOWLEDGESTORM, INC.'S
                                   MOTION FOR SUMMARY**
17     v.                          **JUDGMENT, OR IN THE
                                   ALTERNATIVE, PARTIAL**
18 KNOWLEDGESTORM, INC., a         **SUMMARY JUDGMENT AGAINST**
   corporation, DOES 1through 50,  **PLAINTIFF JASBIR GILL**

19          Defendants.            **(Pages 64 through 138)**

20                                 Date:    June 3, 2008
21                                 Time    10:00 a.m.
                                   Crtrm:  5, 4th floor
22

23                                 Action filed:  July 13, 2007
                                   Trial date:  August 4, 2008
24

25      Defendant KnowledgeStorm, Inc. respectfully submits the following

26 evidence in support of its Motion for Summary Judgment or, in the alternative,

27 Partial Summary Judgment against Plaintiff Jasbir Gill.

28 / / /

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

LA:66272.1              - 1 -

EVIDENCE SUBMITTED IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF GILL

**EXHIBIT 15**

## Hoback, Jason

**From:** Ramminger, John
**Sent:** Wednesday, April 25, 2007 3:36 PM
**To:** Hoback, Jason
**Subject:** Jasper Gill's Print Log









**GILL DEPOSITION**

CERTIFIED
COPY

1              UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3                        --0--

4

5    JASBIR GILL, MAHMOUD KEDKAD,     )
                                      )
6              Plaintiffs,            )
                                      )
7    vs.                              )    No. C 07-04112 PVT
                                      )
8    KNOWLEDGESTORM, INC., a          )
     Corporation, DOES 1 through 50,)
9                                     )
               Defendants.            )
10   ------------------------------

11

12

13

14              DEPOSITION OF JASBIR KAUR GILL

15

16

17   DATE:            Monday, January 14, 2008

18

19   TIME:            10:07 a.m.

20

21   LOCATION:        Bell & Myers
                      2055 Junction Avenue, Suite 200
22                    San Jose, CA 95131

23

24   REPORTED BY:     Anna S. Allen
                      Certified Shorthand Reporter
25                    License Number 9954

**067**

1                    A P P E A R A N C E S

2

3

4    For the Plaintiffs:

5    LAMBERTO & KREGER
     By:   BRIAN S. KREGER, ESQ.
6    160 W. Santa Clara Street, #1050
     San Jose, CA 95113
7    408-999-0300

8

9

10

11   For the Defendants:

12   FORD & HARRISON
     By:   JEFF D. MOKOTOFF, ESQ.
13   1275 Peachtree Street, N.E., Suite 600
     Atlanta, Georgia, 30309
14   404-888-3800

15

16

17

18   Also Present:

19   CHRIS GLEASON, Corporate Representative for
     KnowledgeStorm
20

21

22

23

24

25

**068**

2

1                              I N D E X

2

3

4                                              PAGE

5

6    By Mr. Mokotoff...........................7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                        **069**

                                                          3

```
 1                         E X H I B I T S

 2

 3      Exhibit              Description              Page

 4

 5      1            Application for Employment        11

 6      2            Gill resume                       36

 7      3            Offer letter                      38

 8      4            Employee handbook                 49

 9      5            Acknowledgment form               49

10      6            11-21-06 email from Gill to       71

11                   Brown and response

12      7            12-29-06 email from Brown to      76

13                   Gill

14      8            1-22-07 email from Gill to        93

15                   Brown

16      9            1-25-07 email from Gill           94

17      10           11-8-06 email from Hoback to      98

18                   4-Sales team

19      11           1-23-07 email from Brown to      100

20                   Gill

21      12           Five-page email                  107

22      13           4-4-07 email from Brown to Gill  115

23      14           12-12-06 email from Hoback       128

24      15           Three-page document              137

25      16           5-11-07 Complaint of             157
```

**070**

4

MERRILL    LEGAL    SOLUTIONS
800-826-0277    818-593-2300    Fax 818-593-2301    www.merrillcorp.com

1           Discrimination

2    17      Three-page email                    183

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**071**

5

1    San Jose, California                    January 14, 2008

2                         --0--

3                    JASBIR KAUR GILL

4              having been first duly sworn,

5          was examined and testified as follows:

6          MR. MOKOTOFF:  This will be the deposition of

7    Jasbir Gill taken pursuant to notice and by agreement

8    for the purposes of discovery, cross-examination, and

9    all other purposes allowed and consistent with the

10   Federal Rules of Civil Procedure.  All objections except

11   those as to the form of the question and the

12   responsiveness of the answer will be reserved until such

13   time of trial or until such other time as some

14   evidentiary use is sought to be made of the transcript.

15             Is that an agreeable stipulation?

16         MR. KREGER:  I'm not stipulating to anything.

17   Whatever federal rules apply, apply.

18         MR. MOKOTOFF:  Do you understand what the

19   federal rules are in terms of --

20         MR. KREGER:  I do, sir, but I don't need to

21   stipulate to them.  They're already in place.

22         MR. MOKOTOFF:  Would you like to reserve or

23   waive signature?  Do you know?

24         MR. KREGER:  Why?

25         MR. MOKOTOFF:  Why what?

**072**

6

1           MR. KREGER:  Why do you want to do that?

2           MR. MOKOTOFF:  No.  I'm asking, would you like

3    to reserve or waive signature?

4           MR. KREGER:  Oh, no, no.

5           MR. MOKOTOFF:  No what?

6           MR. KREGER:  I'm not waiving any signature.

7           MR. MOKOTOFF:  Okay.  I'm not arguing.  I just

8    want to know whether you'd like to reserve or waive

9    signature.

10          MR. KREGER:  Whatever the rules are apply.

11          MR. MOKOTOFF:  But you have the choice under

12   the rules.

13          MR. KREGER:  I don't need to choose anything.

14          MR. MOKOTOFF:  Okay.

15                         EXAMINATION

16   BY MR. MOKOTOFF:

17     Q.   For the record, please, Ms. Gill, could you

18   state your full name.

19     A.   Jasbir Kaur Gill.

20     Q.   For the record, my name is Jeff Mokotoff.  I

21   represent the defendant, KnowledgeStorm, in this lawsuit

22   you've brought against them.

23          Ms. Gill, have you had your deposition taken

24   before?

25     A.   No.

                                             **073**

                                                          7

1      Q.    And have you had any other education or further

2   education?

3      A.    That was the last.

4      Q.    Okay.  Have you ever been convicted of any

5   crime?

6      A.    No.

7      Q.    Or pled guilty to any crime?

8      A.    No.

9      Q.    And for the record, what is your national

10   origin?

11      A.    You mean my nationality?

12      Q.    Yes, your nationality.

13      A.    I'm a Canadian.

14      Q.    Were you born in Canada?

15      A.    I was born in Canada.

16      Q.    And then grew up in India?

17      A.    Yes.

18      Q.    How long did you spend in Canada?

19      A..    I was three years old when my parents moved

20   back to India.

21      Q.    Do you have dual citizenship both in Canada and

22   in India?

23      A.    India does not allow dual citizenship, so I do

24   not.

25      Q.    What is your status here in the states?

**074**

13

1     some questions about what his thoughts on the job were.

2          Q.    Anything more specific in terms of what you

3     recall Joe Brown telling you about the position?

4          A.    Nothing more in addition to what Jason Hoback

5     had already told me.

6          Q.    So there wasn't any discussion at that point as

7     to how you might get leads, for example?

8          A.    There was no discussion as to how I would get

9     leads, no.

10         Q.    Approximately, how long would you estimate that

11    conversation lasted?

12         A.    I would, to my best recollection, say about 45

13    minutes, 35 to 45 minutes.

14         Q.    Did you understand through that conversation

15    that you'd be reporting to Joe Brown?

16         A.    Yes.

17         Q.    What did he tell you in terms of what his

18    position was?

19         A.    That he would be the manager for this position

20    that has opened up in South San Francisco.

21         Q.    Did he discuss the needs of KnowledgeStorm in

22    terms of how many employees KnowledgeStorm was seeking

23    to have in place to perform the sales executive

24    position?

25         A.    I do not recall him in that conversation

**075**

28

1   telling me what the job -- what they did at the company

2   and asked me what I was currently doing.

3       Q.   Okay.  Do you believe you obtained a better

4   understanding of the position through your conversations

5   with Katie and Rachel?

6       A.   It did not change much from what I had already

7   learned.

8       Q.   Okay.  After you had your meetings with Katie

9   and Rachel, what was your next conversation or

10  connection with KnowledgeStorm?

11      A.   The next conversation, I would have to -- I'm

12  not sure if it was the recruiting agency that emailed me

13  to tell me that I had to go and meet people back in

14  Atlanta or if it was Joe Brown who was the first point

15  of contact telling me.  But the next point of contact

16  was to be going to Atlanta and meeting with some folks

17  down there.

18      Q.   So KnowledgeStorm then flew you up to Atlanta?

19      A.   Yes.

20      Q.   And approximately, how much in advance of your

21  starting with KnowledgeStorm was that flight out?

22      A.   I want to say about three weeks.

23      Q.   And do you recall with whom you met in Atlanta?

24      A.   Yes.  I met with Mike Ewers.

25      Q.   Do you know Mike's position?

**076**

31

1      A.   He's the VP of finance.

2      Q.   All right.

3      A.   I met with another salesperson, Joe -- I can't

4    remember his name.  Jason Putnam was another salesperson

5    I met with.  And another Joe person.  I'm sorry.  I

6    cannot remember his last name.

7      Q.   But, to your knowledge, a salesperson?

8      A.   Both of these people were salespeople.

9      Q.   Okay.  Anyone else?

10     A.   And then I went for lunch with Jason Hoback and

11   Jim Canfield.

12     Q.   What was Jason's position?

13     A.   Jason is the director, sales director.

14     Q.   How about Jim?

15     A.   VP of sales.

16     Q.   Okay.

17     A.   Lastly, I met with Kelly Gay.

18     Q.   And who is Kelly?  What was Kelly's position?

19     A.   CEO.

20     Q.   And to the best of your recollection, was this

21   an all-day interview?

22     A.   Pretty much.

23     Q.   Okay.  Was it in one day?

24     A.   It was in one day.

25     Q.   Okay.  Do you recall -- well, what do you

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1    KnowledgeStorm?

2        A.    I'm not sure if she asked me for a resume,

3    because she had already pulled the resume from the job

4    boards.  So I do not recollect if she asked me to send

5    her a resume or if she used that copy.

6        Q.    Would the work experience section under your

7    employment at KnowledgeStorm be an accurate depiction of

8    your job duties while at KnowledgeStorm?

9        A.    Under KnowledgeStorm?

10       Q.    Yes.

11       A.    Yes.

12       Q.    Was your next contact after the conversation

13   that you had with Joe Brown over the telephone where he

14   had said you'd be receiving an offer actually receiving

15   an offer from KnowledgeStorm?

16       A.    Yes.

17            (Defendants' Exhibit 3, offer letter, marked

18   for identification.)

19            BY MR. MOKOTOFF:   (Q)  I'm going to hand you

20   what I've marked as Exhibit 3 to your deposition.  And

21   my first question is after you've had a chance to look

22   at it:  Is that the offer letter that you received from

23   Joe Brown?

24       A.    Yes.

25       Q.    And if you look at the second page of Exhibit

**078**

38

1    3, is that your signature?

2        A.    Yes.

3        Q.    And is that an accurate reflection of when you

4    accepted the offer of October 13th, 2006?

5        A.    Yes.

6        Q.    And you understood that your start date was

7    going to be on or about October 23rd, 2006; is that

8    correct?

9        A.    That is the start date that Joe Brown put

10   there, but my understanding was that that was not going

11   to be viable, reason being, I'm an H-1B employee and

12   they needed to transfer my H-1B.  So right off the back,

13   I knew that that start date was not going to be correct.

14       Q.    In other words, you knew that it was going to

15   take more time than --

16       A.    Yes.

17       Q.    -- October 23rd, 2006 in order to get your H-1B

18   transferred over?

19       A.    Yes.

20       Q.    And KnowledgeStorm was paying for that transfer

21   of the H-1B visa; is that correct?

22       A.    Which is a normal accepted policy, which an

23   employer pays for the H-1B transfer.

24       Q.    In other words, to your understanding, there

25   wasn't any reimbursement agreement into which you

**079**

39

1    entered, in other words, for the cost of any H-1B

2    transfer costs?

3         A.    INS rules do not allow for any reimbursement.

4         Q.    So my question is, actually, did KnowledgeStorm

5    ever ask or provide you with any documentation seeking

6    reimbursement of the H-1B transfer costs?

7         A.    No.

8         Q.    Do you have a sense of how much that cost

9    KnowledgeStorm?

10        A.    It's about $2200 for INS fees and about $1000

11   to $1500 for the lawyer fees.

12        Q.    So between 3- and $4000?

13        A.    Sounds correct.

14        Q.    And how did you know those fees?

15        A.    Because I have been doing this for a while, so

16   I'm fairly fluent with the fees.

17        Q.    And these were fees that were identified by

18   Litwin?

19        A.    The INS fees are determined by INS.  The lawyer

20   fees are determined by Litwin.

21        Q.    And in terms of the approximate amount

22   inclusive of INS fees and lawyer's fees, were these

23   fees, to your understanding, paid by KnowledgeStorm on

24   your behalf?

25        A.    Yes.

**080**

40

1    a training program, but if you could explain to me the

2    training that you received while at KnowledgeStorm.

3        A.    The training that I received while at

4    KnowledgeStorm was going through KnowledgeStorm

5    programs, going through some of their CRM component,

6    which is the customer relationship management, as to how

7    to access that, how to get phone numbers, how to be able

8    to make contact with the client.  So that's what the

9    training entailed.

10       Q.    Who provided that training?

11       A.    Different people from KnowledgeStorm's group.

12       Q.    Were these different people out of the South

13   San Francisco office?

14       A.    The training was held in Atlanta, Georgia, so

15   these people were out of the Atlanta office.

16       Q.    So you receive an offer, which you accept, and

17   you ultimately begin working for KnowledgeStorm as a

18   sales executive; is that correct?

19       A.    Correct.

20       Q.    And to your recollection, when did you begin

21   working for KnowledgeStorm?

22       A.    I was asked by Joe Brown if I could come in for

23   training while I was not even employed for

24   KnowledgeStorm because that's when the training was

25   happening.  And me being very considerate -- I knew I

**081**

47

1    was not going to be paid for that -- I took time off

2    from work, because I was still waiting for my H-1B to be

3    transferred.  I went to Atlanta for training.

4        Q.    Approximately when was that?

5        A.    It was approximately the last week -- I

6    remember the 2nd of November was the last day, and it

7    was a four-day training.  So it started somewhere --

8        Q.    I'm sorry.  The last week of which month?

9        A.    Last week of October into the first week of

10   November.

11       Q.    And was it a full week, you said?

12       A.    It was four days.  It was a four-day training.

13       Q.    Do you recall any other sales executives in

14   your training class?

15       A.    Yes.  There were -- I think there was about 10

16   or 11 people in that sales training class.

17       Q.    Do you recall any of the names?

18       A.    Michael Torcellini, Michael Beasley, Joe

19   Niederberger, Michael Barnes.  Those are some names that

20   I recall.

21       Q.    And after your training which was, to your

22   recollection, the last week of October, was there any

23   other activity that you performed on behalf of

24   KnowledgeStorm before beginning work for KnowledgeStorm?

25       A.    No.

**082**

48

1           (Defendants' Exhibit 4, employee handbook,

2    marked for identification.)

3           (Defendants' Exhibit 5, acknowledgment form,

4    marked for identification.)

5           MR. MOKOTOFF:  Off the record.

6           MR. KREGER:  Can we take a short break?

7           MR. MOKOTOFF:  Sure.

8           (Break taken.)

9           MR. MOKOTOFF:  Back on the record after a short

10   break.

11          BY MR. MOKOTOFF:  (Q)  Jasbir, right before the

12   break, I handed you Exhibits 4 and 5.  And my first

13   question related to Exhibit 4 is, do you recall

14   receiving a copy of KnowledgeStorm's handbook?

15       A.   Yes.

16       Q.   Do you recall when you would have received a

17   copy of that handbook?

18       A.   I don't recall if this was Fed Ex'd to me

19   before my training or if I got it during my training.

20   So it was one of these things:  It could have been Fed

21   Ex'd to me so I could bring it along for my training or

22   it could have been handed over to me when I was at the

23   training.

24       Q.   So during the training that you received in the

25   last week of October, do you recall someone going over

                                            **083**

                                                      49

1    the handbook with you?

2        A.    I don't recall anybody going over page by page

3    over this.  Some parts were gone over and the other

4    parts were just, here, you guys need to take it, read

5    it, and sign it and give it back to us.

6        Q.    In fact, that's what you did; is that correct?

7        A.    Yes.

8        Q.    You took it, you read it, and then you signed

9    an acknowledgment, which is Exhibit 5?

10       A.    Yes.

11       Q.    And that acknowledgment, is that your signature

12   at the bottom of the page?

13       A.    Yes.

14       Q.    And that's dated November 8th --

15       A.    Correct.

16       Q.    -- 2006.  Would that have been when you would

17   have signed this?

18       A.    Yes.

19       Q.    Okay.  So when you were asked to take the

20   handbook, read it, and then return the acknowledgment

21   form to them, did you actually read the handbook after

22   the training?

23       A.    Yes.

24       Q.    Okay.  Did you read it at the time you signed

25   this on November 8th, 2006?

**084**

50

1    A.    Close to that.

2    Q.    Okay.  And did you read and understand the

3    policies contained in the handbook?

4    A.    Yes.

5    Q.    And did you have any issues with any of the

6    policies contained in the handbook?

7    A.    None that I can recall.

8    Q.    And if you don't mind, we can look at page 3 of

9    the handbook on Exhibit -- it's, actually, the page

10   physically numbered 3 on the handbook.  That's the

11   company's no harassment policy.  Do you see that?

12   A.    Yes, I do.

13   Q.    By that time, you had met both Mike Ewers and

14   Kelly Gay; is that correct?

15   A.    Yes.

16   Q.    And based on your reading of this handbook, you

17   understood that if you believed that someone had

18   violated the company's no harassment policy, that you

19   were to report your concerns to either Mike or Kelly; is

20   that correct?

21   A.    Yes.

22   Q.    Okay.  And it's accurate that you never

23   reported to Mike Ewers or Kelly Gay any of your concerns

24   that you've identify in your lawsuit; is that correct?

25   A.    That's correct.

**085**

51

1      Q.    And I think you identified Jason as being the

2    director of sales; is that correct?

3      A.    Yes.

4      Q.    And the person above Jason would have been

5    whom?

6      A.    Jim Canfield.

7      Q.    He would have been vice president of sales?

8      A.    Yes.

9      Q.    When you first started working out of the South

10   San Francisco office -- strike that.

11         When you first began working for

12   KnowledgeStorm, did you work primarily out of the South

13   San Francisco office?

14     A.    Yes.

15     Q.    Did there come a time during your employment

16   where you started working from home?

17     A.    Maybe once a week I might have worked from home

18   but, primarily, I preferred going to the office and

19   working from the office.  So I had not reached that

20   stage where I had started working from home.

21     Q.    When you say "reached that stage," was there

22   ever a stage where you, while you were employed by

23   KnowledgeStorm, worked more often than once a week from

24   home?

25     A.    No.

**086**

53

1    Q.    So to your recollection or the best of your

2    recollection, on average you would maybe work one day a

3    week outside the office but the remainder of the days

4    would be inside the office?

5    A.    Actually, I worked almost every day at the

6    office.  So if I had an appointment in the south bay and

7    I had a couple of appointments, instead of me going back

8    and forth, I would work from home a few hours and then

9    go make my appointment and come back and work.  So

10    that's my way of saying that I, maybe once a week, might

11    have worked at home.  But otherwise, primarily, I was

12    working from the office.

13    Q.    When you first started working out of the South

14    San Francisco office, do you recall or can you identify

15    for me the employees working for KnowledgeStorm that

16    also worked out of that office?

17    A.    Yes.  There was Katie Kimball, there was Rachel

18    Gordon, there was Lisa McGuire, there was Joe

19    Niederberger, there was Kevin Cummings.

20    Q.    And then yourself?

21    A.    And then myself.

22    Q.    So approximately six?

23    A.    Yes.

24    Q.    And let's go to, say, January 2007, beginning

25    of last year.  Do you recall whether there was a change

**087**

54

1    in the number of employees that were working out of the

2    South San Francisco office?

3        A.    Yes, the aforementioned were still there.

4    There was Mike Kedkad, there was Joseph Kaniewski, there

5    was another person by the name of Tracy Mikolajewski who

6    only came in once or twice a month.  She worked from her

7    home office.  And a couple of others who worked from

8    their home office whose names I do not recall.

9        Q.    If we look at the group identified as of

10   January 2007 -- so approximately nine to ten in total --

11   were there some sales execs with which you were more

12   friendly than others?

13       A.    Actually, before I answer that question, Kevin

14   Cummings had started working from the Massachusetts

15   office, so he was not working from the South San

16   Francisco office anymore for at least a month or so.

17       Q.    So for about a one month time period, Kevin

18   Cummings was working out of the Massachusetts office?

19       A.    Yes.

20       Q.    Do you recall whether that was 2006 or 2007?

21       A.    He started working out of the Massachusetts

22   office because his father was not well and then I

23   believe his father passed away.  So it was more than a

24   month he was working out of the Massachusetts office.

25       Q.    Okay.  And then going back to my question --

**088**

1    thank you for that -- of the eight or nine or, actually,

2    approximately eight other folks working out of the South

3    San Francisco office, were there those that you were

4    more friendly with than others?

5        A.    I would not use the word "friendly."  I would

6    say professionalism.  Was I more professionally attached

7    to them?  Yes, I was more professionally attached to

8    Katie Kimball because she was a salesperson and I needed

9    her guidance in performing my daily duties.  There was

10   Lisa McGuire, who was helping me out as well.  So these

11   two were definitely more close because of their

12   professional acumen which helped me.

13       Q.    And did you ever do anything socially with

14   either Katie or Lisa?

15       A.    Other than going on an occasional lunch, no.

16       Q.    When you began working for KnowledgeStorm,

17   approximately how often would Joe Brown be in the South

18   San Francisco office?

19       A.    To the best of my recollection, it would be

20   every two weeks.  He would come in for a couple of days,

21   come in on Tuesday, leave on Thursday or early Friday.

22       Q.    How about Jason Hoback?  How often, to your

23   recollection, would he be in the South San Francisco

24   office?

25       A.    Probably about once a month.

**089**

56

1    with Katie or Lisa your belief that there was a

2    systematic harassment by Joe Brown of you?

3        A.   I think I said, yes, I did discuss the facts

4    that Joe is not cooperating, Joe is not answering my

5    calls, Joe does not want to help me out.  So I think

6    that when there's a pattern that's being established and

7    you're discussing it with your colleagues, that does

8    smell of some sort of -- it does smell of harassment.

9        Q.   Do you believe that Joe was helping others to a

10   greater extent than you?

11       A.   I did not hear anybody else complain.

12       Q.   Okay.  My question is, do you believe that Joe

13   Brown was helping others more favorably than he was

14   helping you?

15       A.   Yes, I do believe so.

16       Q.   Which individuals do you believe he was helping

17   to a greater extent than he was helping you?

18       A.   Katie Kimball, Lisa McGuire, Joe Niederberger,

19   Joe Kaniewski, Tracy Mikolajewski, who were all getting

20   his help.

21       Q.   Anyone else?

22       A.   Those are the only people in the office.

23       Q.   Well, what point in time?  I thought there was

24   Mike Kedkad.

25       A.   Mike Kedkad was almost in the same boat I was.

**090**

61

1        Q.    How do you know that?

2        A.    Because we discussed.

3        Q.    So in terms of individuals that you believed

4   Joe Brown was not being as responsive or helpful, the

5   two individuals that you identified so far is yourself

6   and Mike Kedkad.   Anybody else?

7        A.    No, nobody else.

8        Q.    So he would have been more responsive and

9   helpful to someone like Kevin Cummings as well?

10       A.    Absolutely.

11       Q.    But you did not discuss with Katie or Lisa any

12  of the racial slurs that you say Joe Brown made; is that

13  right?

14       A.    No, I did not.

15       Q.    Did you discuss with anyone --

16       A.    Yes.

17       Q.    -- excuse me -- anyone at the South San

18  Francisco office these racial slurs that Joe Brown made?

19       A.    Anyone at the South San Francisco office?

20       Q.    Yes.

21       A.    Yes.

22       Q.    Who?

23       A.    Mike Kedkad.

24       Q.    Anyone else?

25       A.    No.

**091**

62

1      Q.    Why Mike Kedkad?

2      A.    Why Mike Kedkad?  Because I saw what Mike

3   Kedkad was facing.  There were some racial slurs, there

4   were some harassment.  I saw he was having to go through

5   the same thing.  And we were basically two professional

6   colleagues empathizing and sympathizing with each other.

7      Q.    Why not Katie or Lisa, the two people you

8   identified as having the greatest professional

9   relationship?

10     A.    Because I did not feel comfortable.

11     Q.    Comfortable speaking to Katie and Lisa?

12     A.    Yes.

13     Q.    Why?

14     A.    It's something that I think when you're a

15   foreigner, you understand that, that as a foreigner, you

16   try to find out what your next foreigner is going

17   through.  This is something as a Caucasian, most people

18   will not understand.  And that's kind of what prohibits

19   you from talking this over to another white person.

20     Q.    So you didn't feel comfortable speaking to any

21   white person?

22     A.    No.

23     Q.    How would you describe your relationship with

24   Mike Kedkad?

25     A.    Rephrase that question, please.

**092**

1    Q.    Okay.  Right before the break, I provided to

2    you what we have marked as Defendants' Exhibit 7, which

3    you had an opportunity to review; is that correct?

4    A.    Correct.

5    Q.    And Defendants' Exhibit 7 reflects an email

6    exchange between Joe Brown in the 4-Sales group; is that

7    correct?

8    A.    Correct.

9    Q.    What is the 4-Sales group?

10    A.    The sales group, the sales team.

11    Q.    Is it the entire sales team across

12    KnowledgeStorm or just the western region?

13    A.    My understanding is, it's the entire.

14    Q.    And this is an email that appears to have been

15    sent on December 29th, 2006; is that correct?

16    A.    Yes.

17    Q.    And it's an announcement from Joe Brown to the

18    entire sales team concerning your first sale?

19    A.    Yes.

20    Q.    Is it accurate that that was your first sale?

21    A.    Yes.

22    Q.    And then you responded at the top thanking Joe

23    Brown for his patience and support.

24    My question to you is:  Did you believe that

25    Joe Brown was patient and did support you in this first

**093**

85

1      Q.    When you were working for KnowledgeStorm, you

2   visited India for a short period of time; is that

3   correct?

4      A.    Correct.

5      Q.    Do you recall when that was?

6      A.    My recollection is, I left on the 9th of

7   February and I came back on the 5th of March.

8      Q.    And when you came back, did you bring Joe Brown

9   a gift?

10      A.    I did not bring him a gift.

11      Q.    Did you bring him anything?

12      A.    I did not bring him anything.

13      Q.    Okay.  Did you bring anyone else a gift?

14      A.    No.  Sorry.  I take that back.  I brought him

15   something, yes.  And I brought a few others along

16   something as well.

17      Q.    What did you bring back for Joe Brown?

18      A.    What did I bring?  I had asked him if he wanted

19   something from India, and he had asked for -- what are

20   those things -- wind chimes.  He asked for a wind chime,

21   and I brought him a wind chime.  And another colleague

22   had asked for a scarf.  I brought her a scarf.  A few

23   small things that people had asked for and I brought

24   them things.

25      Q.    Who did you bring a scarf back for?

**094**

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1      A.    I brought a scarf back for Lisa McGuire.   I

2   brought little samples of soap, sandal soap for Rachel

3   Gordon, sandal soap for Katie Kimball.  And I think

4   that's it.

5      Q.    Why did you bring Joe Brown a gift?

6      A.    He's my manager and I like to -- I brought

7   things for everybody back.  That's just me.

8      Q.    I'm sorry.  The time that you were in India,

9   which you identified as approximately February 9th

10  through March 5th, Joe Brown, at least according to what

11  we have discussed so far, had already begun a systematic

12  racial harassment against you; is that correct?

13     A.    Right.

14     Q.    Given that, why would you bring him back a

15  gift?

16     A.    At this time, I did not classify it as racial

17  discrimination.  I did not start compartmentalizing

18  these things.  I took it as somebody's personality,

19  somebody's brushing me off, somebody's nonsupportive.

20  What am I going to do?  Quit and leave and go?  No.  I'm

21  going to continue my job.  I'm going to try to maintain

22  a professional and somewhat of a decent relationship

23  with this person.

24        So to the best of my ability, I tried to move

25  on.  And that's what I did.

**095**

91

1        Q.    And you shared pictures of your India trip

2   with --

3        A.    I shared those pictures with everybody.

4        Q.    With everybody being who?

5        A.    Lisa McGuire, Mike Kedkad, Joe Brown, Jason

6   Hoback, I think had a quick peek at the pictures, Rick

7   Neigher.  Everybody who was in the office.

8        Q.    When you say "quick peek at the pictures," you

9   actually physically sent Joe Brown pictures, didn't you?

10       A.    I physically sent those pictures to pretty much

11  everybody that asked for it.

12       Q.    And Joe Brown asked for those pictures?

13       A.    I don't remember if Joe Brown asked for them.

14  I asked him, do you want -- because everybody was

15  looking at those pictures.  And I asked him, did you

16  want to take a look at the pictures?  And he must have

17  said, yes, and I sent them over.

18       Q.    Do you recall sending Joe Brown jokes via

19  email?

20       A.    I don't recall sending jokes.

21       Q.    Could it have happened and you just don't

22  recall it?

23       A.    I don't think I'm the kind of person -- going

24  back on my personality, I don't think I'm the kind of

25  person who would exchange jokes.  Maybe on one occasion

**096**

92

1    basically telling Jason Hoback as to what kind of racial

2    slurs were being passed on by Joe Brown and also

3    apprising -- and Jason Hoback was concerned that a lot

4    of people from the office were leaving as to what was

5    going on, and just basically telling him that I'm

6    still -- I'm not going anywhere.

7        Q.    Why didn't you put anything in writing about

8    your concerns about the racial remarks that Joe Brown

9    was making?

10       A.    I don't think it was planned in any sort of

11   way, that I did not on purpose didn't put anything in

12   writing.  I just had two phone calls -- one time I met

13   Jason Hoback in person and I explained it to him, and

14   the second time was over the phone.  So my understanding

15   was that Jason Hoback will do something about it.

16       Q.    Okay.  And the context of the conversation that

17   you were talking about, now was that in person or over

18   the phone?

19       A.    This particular -- after this email, this

20   particular conversation was over the phone.

21       Q.    Okay.  You said "after this email," so the

22   context is --

23       A.    Because if you read it, it says, "Call me from

24   a private spot."  So I called him.  This happened over

25   the phone.

**097**

108

1    my honest opinion, that I felt people were leaving

2    because they felt shaky about the acquisition and a

3    couple of people left because they found better

4    opportunities and I thought that, hopefully, we should

5    be able to be contained, ourselves, as to the number

6    that we had.

7        Q.    He goes on to say in the next paragraph that:

8              "I will continue to treat you with respect as a

9              person and expect the same of you toward me.

10             Even in disagreement, I think that respect is

11             more important than anything else.  If you ever

12             feel that I've been disrespectful to you, I

13             know you will tell me.  Therefore, I will tell

14             you that your sarcastic comments and tone was

15             very disappointing to me and more surprising

16             than anything."

17             Do you know of what he was referring?

18       A.    I honestly do not recall me ever being

19    sarcastic to him, maybe to the point where I might have

20    said that, well, you picked a good date to travel, being

21    March 31st, which is the last date of the quarter.  That

22    is as far a sarcastic comment that I must have made.

23       Q.    When he says, "If you ever feel that I have

24    been disrespectful to you, I know you will tell me," in

25    terms of the racial remarks that you said Joe Brown made

**098**

118

1   to you, did you ever discuss with Joe Brown those

2   remarks?

3       A.   No, I did not.

4       Q.   Okay.  Then he goes on to say:

5            "I realize the tension of the discussion but

6            like our call with Lori, expect that discretion

7            truly is the better part of valor."

8            Do you know what call with Lori he was

9            identifying in that?

10      A.   Yes.  It's the same call that you have marked

11  here as exhibit -- actually, you lumped it all into

12  one -- Abrige, Lori Evans.  So we finally had to talk to

13  the client, and she was very angry.  So that's what he's

14  referring it to.

15      Q.   And when he's referring, he says, "Expect that

16  discretion truly is the better part of valor," do you

17  know what he was talking about?

18      A.   I have no clue, I'm sorry.  I have no clue what

19  he's meaning with that.

20      Q.   In the next paragraph, he says, "You are

21  someone I admire greatly and want to help be successful

22  here."

23           Was that the first time that you had ever heard

24  Joe Brown make that statement to you?

25      A.   That's the first time that I ever read that

**099**

119

1  prospects were identified?

2      A.   SalesLogics is a CRM system, which is customer

3  relationship system, which all accounts are put in and

4  all prospects are put in.  And that's basically your

5  working base.

6      Q.   And would you actually physically get leads

7  from the SalesLogics?  In other words, would you get

8  leads from SalesLogics or is that where you'd actually

9  put your account prospects in?

10     A.   It could work both ways.  You could find new

11 accounts and then put them in SalesLogics.  You could

12 mind SalesLogics and see which accounts had not been

13 worked for the last 40 days.  And if they were in your

14 territory, you can put it in your name.

15     Q.   Did you, while you were employed at

16 KnowledgeStorm, ever inherit any accounts?

17     A.   No.

18     Q.   What does the acronym ISV stand for?

19     A.   I think that was an IBM program, if I'm not

20 mistaken, ISV partner program.

21     Q.   Tell me what your involvement was with the IBM

22 program or the ISV program.

23     A.   The ISV program was a list of accounts that IBM

24 had provided to us.  And these were people that had --

25 these were accounts that had purchased a certain number

**100**

127

1    of IBM -- they were like IBM resellers, so they

2    qualified for a free listing with KnowledgeStorm or a

3    $600 listing with KnowledgeStorm for six months.  So

4    this was a list that was provided to me to call these

5    people and tell them that they qualified for a free

6    listing.

7        Q.   And that was something that was provided

8    exclusively to you?

9        A.   No.  There were other people working on that as

10   well.

11            (Defendants' Exhibit 14, 12-12-06 email from

12   Hoback, marked for identification.)

13            BY MR. MOKOTOFF:  (Q)  Jasbir, I'm handing you

14   what's been marked as Exhibit 14.  And I believe this is

15   a little bit about or a lot of what we were just

16   discussing.  The email at -- the top of the email says:

17            "Jasbir Gill represents the West for the ISVs.

18            Joe plans on being on some of these calls with

19            her as she ramps up."

20            Does this help refresh your recollection at all

21   as to whether you were the exclusive rep for the ISV

22   program, at least in the west coast?

23        A.   I don't think so, because I think there was

24   some BDRs that were calling on the west account as well.

25        Q.   So you would have been the only sales rep,

**101**

128

1    say, hey, what do I do with these?

2           Don't call on them.

3           So I have to go through a list first, figure

4    out who I am not supposed to call.  Finally, I'm left

5    with a small number of people that I'm calling.  And on

6    those, it's basically, sorry, we qualify for a free

7    listing.  So that was kind of what this list entails.

8        Q.    Who told you that you were being terminated?

9        A.    Jason Hoback and Joe Brown.

10       Q.    And where were you when you were informed that

11   you were being terminated?

12       A.    At home.

13       Q.    And did you receive a call to you or did you

14   actually make a call to Jason or Joe Brown?

15       A.    I received a call from them.

16       Q.    Were you at home understanding that they were

17   going to call you?  In other words, did they send you an

18   email saying, we want to talk to you now?

19       A.    No.  I was at home, getting ready to leave for

20   a call.

21       Q.    Okay.  And this conversation that was over the

22   telephone, did both Jason and Joe talk?

23       A.    Yes.

24       Q.    Okay.  Who told you why you were being

25   terminated?

**102**

1      A.    I was never told why I was being terminated.

2   All I was told was that -- to the best of my

3   recollection, the tone was very threatening, very

4   demeaning.  All I was told was I had violated company

5   policy, I'm being terminated as of tomorrow, I need to

6   return my equipment, my keys.  That's it.

7      Q.    Did you have any understanding as to why?

8      A.    I have no understanding as to why this

9   transpired, what happened.  I was shocked.

10     Q.    Did you ever tell Lisa McGuire why you were

11  being terminated?

12     A.    After I found out, yes, I did tell.  I found

13  out from other people that were still employed at

14  KnowledgeStorm that there was a rumor that I was fired

15  because I printed a resume.  And Lisa and I were

16  talking, because Lisa was at ON24 at that time.  She

17  asked me if I wanted to apply for the position.  And at

18  that time, I might have told her that this is what

19  happened.

20     Q.    So who told you about the rumor as to why you

21  were being terminated?

22     A.    Mike Kedkad.

23     Q.    Anyone else?

24     A.    I think he was the only one.

25     Q.    Okay.  Would it be accurate to say that you

**103**

131

1      A.    We shared this idea with Lisa McGuire, and we

2    asked her how viable she thought this idea was.

3      Q.    But it's your testimony that never at work or

4    using any company resources were you in the process of

5    creating Content Maximizers?

6      A.    To the best of my knowledge, we never used any

7    company resources or any company time.

8      Q.    During the period of time that you were

9    employed by KnowledgeStorm, did you ever visit a client

10   prospect on behalf of Content Maximizers?

11     A.    We did not even have any prospect to visit on

12   behalf of Content Maximizer.

13     Q.    Do you recall printing out your resume at work?

14     A.    Yes.

15     Q.    And do you recall hearing or understanding that

16   when you printed out this resume, it actually showed up

17   at the Atlanta, Georgia office?

18     A.    I was actually -- I don't think I even paid

19   attention to that.  I was in a hurry.  I was on the way

20   out.  I needed to print a copy of my resume.  I printed

21   it.  It didn't print.  I didn't see it print.  I printed

22   another copy and I left.

23     Q.    And I think you've already testified earlier

24   today of at least one reason why you were printing out a

25   resume.

**104**

134

1    Q.   So the following day?

2    A.   Yes.

3    Q.   Did you have any questions of him at that time?

4    A.   I was not given a chance to even ask a

5  question.

6    Q.   And nothing concerning your resume ever

7  occurred or transpired during that conversation; is that

8  correct?

9    A.   No.

10          (Defendants' Exhibit 15, three-page document,

11  marked for identification.)

12          BY MR. MOKOTOFF:  (Q)  Exhibit 15 consists of

13  three pages.  My first question simply is:  Have you

14  ever seen these documents before today?

15    A.   This particular one?

16    Q.   Yeah, these three pages.

17    A.   Yes.

18    Q.   What are, to your understanding, these

19  documents reflecting?

20    A.   My understanding -- I'm not very back-end

21  computer literate but my understanding is, this is

22  probably a screen shot of the queue up of me trying to

23  print something.

24    Q.   And it shows, actually, three separate

25  occasions where you were trying to print something; is

**105**

137

1    that accurate?  Specifically, if you look at the --

2         A.    I'm only seeing page 1.

3         Q.    You should have -- I only gave you page 1?

4    Those are pages 2 and 3.  If you look at the upper

5    left-hand portion of all of those, all three of those

6    pages, you'll see a time entry.  Do you see those?

7    7:35:36 p.m, 7:35:41, and then 7:35:53.

8              Do you recall whether on this day, you would

9    have printed out your resume three separate times?

10        A.    I must have tried printing it the first time.

11   It probably didn't print.  Tried printing it the second

12   time.  That's all I can recollect of this.

13        Q.    Do you know where that resume printed to?

14        A.    I know now.

15        Q.    Where did that resume print to?

16        A.    Probably the head office, Atlanta.

17        Q.    Do you have any reason to disbelieve the reason

18   why you were terminated was because you were using

19   company equipment to print out your resume?

20             MR. KREGER:  You mean does she believe

21   that's the real reason she was terminated?

22             BY MR. MOKOTOFF:  (Q)  More specifically, do

23   you have any reason to disbelieve that the reason why

24   you were terminated is because you were using company

25   equipment to print out your resume?

**106**

138

1      A.    I have every reason to disbelieve that.  My

2  belief is that I was terminated based on my race.  I was

3  terminated because I had complained about racial

4  discrimination, of harassment.  I think that was the

5  main reason why I was terminated.

6      Q.    Do you know of anyone else who printed out his

7  or her resume while on company time who the company

8  understood was printing out his or her resume and was

9  not terminated?

10     A.    I think I recollect Lisa McGuire printing out

11 her job offer letter from another company, which my

12 understanding is, it even fell into the management's

13 hand but yet, I think she was required -- she was

14 requested to stay on.

15     Q.    Okay.  Do you have any proof of that?

16     A.    Her own word.

17     Q.    Anyone else?

18     A.    Not that I know of.

19     Q.    When do you contend was the first time Joe

20 Brown made statements about your national origin or race

21 that you found offensive?

22     A.    To the best of my recollection, I think it was

23 the first week of January when I had asked him to come

24 and take a look at an email that I was writing to a

25 client, to see if he needed to add something or if he

**107**

139

1    felt that was the right way of describing some of the

2    programs that we offer.

3         And he came, and he looked at it, and he said,

4    "Well, that's what they teach you in India?  You need to

5    learn the right way, which is the white man's way," and

6    he just shrugged his shoulders and left.

7         Q.   Do you recall the client to whom you were

8    writing this email?

9         A.   Unfortunately, I do not.

10        Q.   But he was in the office in San Francisco?

11        A.   Yes.

12        Q.   And you were at your cubicle?

13        A.   Yes.

14        Q.   And did you ask Joe Brown to come over?

15        A.   Yes.  I went over to his office and his office

16    door was opened.  He had just walked in.  And I said --

17    it was very early in the morning.  I said:  Do you have

18    a minute to come and look over -- I've typed up

19    something I can show you, because I was fairly new in

20    describing some of the programs.

21        And he came over and he looked at it and he

22    just said:  Is that what they teach you in India?  And

23    he said:  You need to learn the right way, which is the

24    white man's way.  And he left.  And I didn't know what

25    to make of it.

**108**

140

1       Q.    So that was in the early morning?

2       A.    Yes.

3       Q.    Are you aware of anyone else that would have

4    heard that comment?

5       A.    I am not aware of anybody else.

6       Q.    Was there anyone else at that time in the

7    morning that was at the office?

8       A.    Could be.  I'm not sure.  I don't know.

9       Q.    When you say early in the morning, would it

10   have been before -- it's hard to say what working hours

11   are -- before 9 o'clock in the morning?

12      A.    Yes, it was probably around 8:30-ish, I think.

13      Q.    And did you have any response to him at all?

14      A.    Did I respond?

15      Q.    To Joe Brown after he made that comment.

16      A.    He just left.  He just walked away from it.  He

17   said what he said and he walked away from my cube.

18      Q.    Did you let anyone know about that statement?

19      A.    Jason Hoback.

20      Q.    When did you let him know?

21      A.    It was, I think, the week of March -- I'm

22   sorry -- the week of January, the last week, I think, on

23   January 31st.  Jason Hoback had come to the office, and

24   I asked him if I could talk to him.  I told him -- I

25   said:  You know, I just want to let you know, I'm

**109**

141

1    shocked that Joe Brown said something like that.

2          And so that's when I let him know that.

3    Q.    So Jason Hoback was in the office around, you

4    said, January 30th or 31st?

5    A.    I think it was the 30th or 31st, one of those

6    dates, yes.

7    Q.    And so this would have been something that you

8    would have told Jason face to face?

9    A.    Yes.

10   Q.    Was anyone else there when you told Jason?

11   A.    It was in his office and we closed the door.

12   Q.    So in one of the two closed door offices?

13   A.    Yes.

14   Q.    Why didn't you tell Jason Hoback about that

15   comment before the 31st?

16   A.    I think I wanted to but I found out he was

17   going to be coming to the San Francisco office, so I

18   figured I'll just wait until he comes and I'll tell him

19   in person.

20   Q.    In other words, there wasn't a need to tell him

21   before the 31st?

22   A.    I don't think I would say there wasn't a need.

23   I think it was a comfort level.  I felt I'd be more

24   comfortable telling him something like this in person

25   rather than over the phone.

**110**

142

1    giving you some inbound leads.

2         And so that's what Jason Hoback said.

3    Q.   Do you know others that were getting inbound --

4    what do you call them?

5    A.   Inbound leads.

6    Q.   Inbound leads?

7    A.   Yes.

8    Q.   Who?

9    A.   Joe Niederberger was getting inbound leads, I

10   know Lisa McGuire was getting those inbound leads, I

11   know Rick Neigher was getting those inbound leads, I

12   know Katie Kimball had strategic accounts that she was

13   working on.  I never heard any one of them make any cold

14   calls other than myself.

15   Q.   Okay.  And did you ever get any inbound leads?

16   A.   None.

17   Q.   What was the next statement that Joe Brown made

18   to you based on your race or national origin that you

19   found offensive?

20   A.   That concerned me?  I was told of the fact that

21   while I was in India, he had asked a colleague when I

22   was coming back, and that maybe I won't come back;

23   anyways, he didn't like Indians because they were taking

24   all the jobs in the bay area so it's good, maybe I'll

25   stay out back there.

**111**

144

1    Q.    Why did you wait until the last week in March

2    to call Jason about this comment?

3    A.    I found out about two weeks after I came back.

4    And then that was the next time I was going to be

5    talking to Jason Hoback.  I had been -- we had been

6    playing phone tags.  He would call me, I would call him.

7    And then that just happened to be the date I was talking

8    to him.

9    Q.    And if I recall about that conversation, there

10    were other topics you guys were discussing?

11    A.    Yes.

12    Q.    So when Mike came to you or you were at Mike's

13    cubicle, one or the other, that was a couple of weeks

14    after you returned from India?

15    A.    Yes.

16    Q.    Do you recall what date Mike Kedkad came to

17    you?

18    A.    I don't recall that date exactly, no.  I don't

19    recall that date.

20    Q.    What was the next statement, if there was one,

21    that Joe Brown made to you about you concerning your

22    national origin or race that you found to be offensive?

23    A.    Somewhere around the last week of March, I

24    recollect Joe Brown being in the office.  And we were

25    talking of my account Infosys.  And we start -- we

**112**

148

1    started discussing the economy and his question came up

2    as to what my thoughts on the war in Iraq were.

3         And my answer to him was that this is not a

4    time and place for us to discuss my idea or my views on

5    the war in Iraq.

6         And Joe Brown's comment was:  Oh, well, I don't

7    care, I hate Muslims, I think all Muslims are terrorists

8    anyway.

9    Q.    And are you Muslim?

10   A.    I am not.

11   Q.    What is your religion?

12   A.    Sikh.

13   Q.    But you found -- I'm sorry.  My question was,

14   what was the next statement that Joe Brown made about

15   your race or national origin?

16   A.    Even if I am not a Muslim, that is a very

17   offensive statement.

18   Q.    So you found it offensive, but it wasn't about

19   your race or --

20   A.    Maybe Joe Brown thinks I'm Muslim.  I don't

21   know.

22   Q.    You don't know whether he thinks that.

23   A.    I don't know.  Maybe he thinks that and that's

24   why he made that comment.  I don't know.  But you asked

25   me what was the next offensive comment.  That was the

**113**

149

1    offensive comment, that even if I am not Muslim, I find

2    that very offensive.

3        Q.    My question was, what was the next comment that

4    Joe Brown made about your race or your national origin

5    that you found offensive?  And I think you just

6    identified the next statement that you found offensive

7    that came from Joe Brown.

8            Was there any other statement made by Joe Brown

9    about your race or your national origin that you found

10   offensive?

11       A.    I know there was another occasion -- I don't

12   remember the exact date and timing of this -- Joe Brown

13   made a comment in which he said:  Non-whites have a very

14   difficult time in sales and that they should just pack

15   up their bags and leave.

16       Q.    And you're saying you don't recall when that

17   was?

18       A.    I know that this was made in one of his visits

19   which was early on, I think, some time in the second

20   week of January when he was around.

21       Q.    So non-whites have a difficult time in sales

22   and that they should just pack up and leave.  This was

23   something -- was it a comment he made to you?

24       A.    It was a comment that I think we were talking

25   of certain sales aspects of how Indians and what kind of

**114**

150

1    jobs Indians are doing here, and it was made in that

2    context.

3        Q.    Okay.  But it was a conversation between you

4    and Joe?

5        A.    Yes.

6        Q.    Was anyone else part of that conversation?

7        A.    I don't think anybody else was part of that

8    conversation.

9        Q.    So, actually, this newest comment was actually

10   preceding the all Muslims are terrorists comment?

11       A.    Yes.

12       Q.    And, actually, it sounds like it was about the

13   same time --

14       A.    As --

15       Q.    -- as the right way is the white man's way.

16       A.    Yes.

17       Q.    Was it the same conversation?

18       A.    No.  It was in a different conversation.

19       Q.    Was it in a conversation that you guys were

20   having face to face?

21       A.    Yes.

22       Q.    Where were you?

23       A.    I was in his office.

24       Q.    Okay.  And was it morning, afternoon?

25       A.    I think this was in afternoon time because we

**115**

 1    had a call that we had to make and we were not able to

 2    get through to a client.  And right after that, this was

 3    the conversation.

 4        Q.   Did you report this comment to anyone?

 5        A.   I reported it to Jason Hoback.

 6        Q.   When did you report this one to Jason Hoback?

 7        A.   Right when I reported the first one.

 8        Q.   Okay.  So that would have been about

 9    January 30th or 31st?

10        A.   Correct.

11        Q.   Did you report anything else to Jason Hoback on

12    the 31st?  This is another one, the non-whites have a

13    difficult time in sales and they should pack up and

14    leave?

15        A.   Right.

16        Q.   And then you had the right way is the white

17    man's way.  Any other comments you reported to Jason

18    Hoback on the 31st?

19        A.   No.  Those were the two.

20        Q.   And then we have a report that you made to

21    Jason Hoback the last week in March about the comment

22    that Joe Brown made to Mike Kedkad about Indians.  And

23    you reported that to Jason the last week of March.

24             Did you report anything else to Jason the last

25    week of March?

**116**

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1      A.    No, that was the only comment that I made to

2  Jason Hoback.

3      Q.    When Mike made -- excuse me.  When Joe Brown

4  made the comment, non-whites have a difficult time in

5  sales and they should just pack up and leave, did you

6  say anything in response?

7      A.    No.

8      Q.    Did you tell anyone else at that time about

9  that comment?

10      A.    I don't think I mentioned that to anybody.

11      Q.    To anybody?

12      A.    To anybody.  I don't think I even made that

13  mention to Mike Kedkad other than Jason Hoback.  I did

14  report it to Jason Hoback.

15      Q.    And going forward to the all Muslims are

16  terrorists comment that you attribute to Joe Brown --

17  I'm sorry.

18          Approximately, when did that occur?

19      A.    I think the last week of March.  That's when

20  Joe was in the office.

21      Q.    Was that before or after you reported it to

22  Jason Hoback in the last week of March?

23      A.    This was after.

24      Q.    Okay.  And any other comments that Joe Brown

25  made to you concerning your race or national origin?

**117**

153

1    A.    I think around about the same week that he made

2    the comment that all Muslims are terrorists, one of his

3    comment was that most Indians here are here to do menial

4    jobs, we don't let them take any of the high paying

5    leveled jobs.

6    Q.    I'm sorry.  Around the same time the Muslims

7    are terrorists comment?

8    A.    Yes.  I think a day before or -- I think maybe

9    a day before.  He was here for two or three days.  And

10   one of the days, he said -- he made a comment about

11   Indians doing all menial jobs, and we don't -- Americans

12   don't let them take any of the high-paying jobs.

13         And I think I commented back to him, I said:  I

14   don't know which world you are living in.  Lots of

15   Indians here are VPs and CEOs.

16   Q.    I'm sorry.  What was the context of that

17   comment?

18   A.    I think the -- if I fairly recollect, the

19   content of that conversation, we were talking about

20   Google as to how many -- if you go to the Google campus,

21   all you see is lots and lots of Indians.  And I think

22   that's where his comment came, that, oh, they're all

23   just developers sitting there doing menial jobs and

24   developing codes.

25   Q.    Did you report this comment to Jason Hoback?

**118**

154

1      A.    Yes.

2      Q.    What did he say when you reported -- I'm sorry.

3            Did you report it around the last week of

4   March?

5      A.    No.    These two, the all Muslims are terrorists

6   and that comment was reported on April 3rd when Mike and

7   I had a joint call with Jason Hoback.

8      Q.    And at least one other purpose of that joint

9   call was some further assurances about keeping you guys

10  on board during any acquisition; is that correct?

11     A.    Correct.

12     Q.    And so you made a comment to Jason Hoback about

13  the all Muslims are terrorists, that most Indians take

14  menial jobs comment on the April 3rd telephone

15  conversation?

16     A.    Correct.

17     Q.    And Mike Kedkad was a part of that

18  conversation?

19     A.    Yes.

20     Q.    And what do you recall, if anything, Jason

21  Hoback saying in response to those two statements?

22     A.    He did not say much.    His comment back -- he

23  tried to ignore that I was telling him this.    He tried

24  to stay on the issue of the contracts.    And so he did

25  not -- he didn't want to comment much on what comments I

**119**

1    had made.  He skirted the issue.

2        Q.    In other words, he didn't make any comments

3    that you can recall?

4        A.    No, he did not.

5        Q.    Going back to the report that you said you made

6    to Jason Hoback -- well, let me see.  We talked about a

7    time on or about January 31st that you made a report to

8    Jason?

9        A.    Yes.

10        Q.    We talked about a time on or about -- I don't

11    want to -- in the last week of March?

12        A.    Correct.

13        Q.    And in the last week of March, what do you

14    report to him?

15        A.    The last week of March, I reported to him that

16    he had said that he hated all Indians.

17        Q.    Right.  And that was the comment that Mike --

18        A.    That Mike had told me.

19        Q.    And on April 3rd, you report two new comments

20    to him, the all Muslims are terrorists comment and then

21    the most Indians take the menial jobs comment?

22        A.    Correct.

23        Q.    Any other statements made by Joe Brown

24    concerning your race or national origin that you're

25    aware of?

**120**

156

1    it later on so that we can look good in front of our

2    potential buyers.

3         Q.    Okay.  So were there two separate emails --

4         A.    Yes, these were two separate emails.

5         Q.    -- that you believe you received?

6         A.    Yes.

7         Q.    And did you have any response to those emails?

8         A.    I don't recollect responding to any of those

9    emails.

10        Q.    So Joe Brown and KnowledgeStorm wouldn't have

11   known one way or the other whether you would have

12   accommodated those emails; is that correct?

13        A.    No, they would know that I would or would not.

14   Because if I did not pull in the contract date for

15   Infosys, then I'm sure they're aware of the fact that I

16   have not accommodated that email.

17             And for the other one, if I am putting in

18   proposals -- and I was putting in a few proposals at

19   that time -- and I am not adding advertising into that,

20   then I think they're aware of the fact that I am not

21   accommodating that email.

22        Q.    And you didn't add advertising to your

23   proposals?

24        A.    No, I did not.

25        Q.    And you didn't, with respect to Infosys, reach

**121**

182

1    out to Infosys to ask them to have a start date that was

2    earlier than April?

3         A.    No, I did not.

4         Q.    Do you know whether any of the other sales

5    executives received these emails?

6         A.    I think -- I know that others did, because a

7    lot of people were copied on those emails.  People who

8    had just sold in the last week of March did get that

9    email.

10         Q.    Do you know whether any of those sales

11    executives accommodated the request of KnowledgeStorm in

12    those regards?

13         A.    I am not privy to that knowledge.

14              (Defendants' Exhibit 17, three-page email,

15    marked for identification.)

16              BY MR. MOKOTOFF:  (Q)  If you can take a look

17    at this, Jasbir.  Have you ever seen this document

18    before?

19         A.    Yes, I have.

20         Q.    How did you come about to see this?

21         A.    Because there was another one that came in, in

22    which I was included.

23         Q.    So you're saying there was another email where

24    you were on the "to" line?

25         A.    Yes.

**122**

183

1    certain day when they're really not starting on the

2    certain date?

3          That's the problem I have with it.  Why should

4    I ask my clients to sign a document saying that I'm

5    starting on April 1st when they're -- and I'm just

6    making up that date.  I'm not going by these dates.  I'm

7    just saying -- sign a document saying you're starting

8    April 1st when you're really not starting until

9    April 15?  So even if you're not short changing the

10   client, why should the client sign that?

11        Q.   And you're saying you never did go to your

12   clients to ask them to do this?

13        A.   No, I did not.

14        Q.   And you believe that you were terminated

15   because you didn't?

16        A.   I think I was terminated because I brought the

17   racial comments.  I think I was terminated because --

18   also because I did not want to participate in this.  But

19   maybe that played a smaller part.  The major part was I

20   was racially targeted.

21        Q.   And let's see.  And inflating proposals.  I

22   think you had mentioned there was an email related or

23   discussed marketing advertising to potential customers;

24   is that correct?

25        A.   Correct.

**123**

1      Q.    Okay.  Explain to me what you understood

2    KnowledgeStorm to be doing inappropriately.

3      A.    I think when you are fully aware that your

4    client is not going to be buying advertising, and you're

5    putting in a line item of advertising and showing

6    $10,000, I feel that, in my personal belief, that's

7    inflating a proposal; because, though, you know a

8    hundred percent that the client is not going to be

9    buying advertising, why should I put a line item of

10    advertising when I know they're not going to be buying

11    advertising?

12         So the email specifically said we should put

13    that in there because then we'll look good in terms of

14    how many proposals -- the value of the proposals that

15    we're generating in front of our prospect buyers.

16      Q.    And do you believe that that was a reason why

17    you were terminated?  Because you didn't provide this

18    item offer to your client prospects?

19      A.    I think I'm going to repeat myself.  I think I

20    was terminated because I was racially targeted.  I was

21    terminated because I brought the racial comments up

22    front.  And I think these two items maybe played a

23    little part in it, I think, because I was noncooperating

24    in doing these things, but I think the major part of it

25    was my race.

**124**

187

1           MR. MOKOTOFF:  Back on the record after a short

2      break.

3           BY MR. MOKOTOFF:  (Q)  Let me ask you some

4      brief questions about your trip to India.  You've

5      already identified it's your recollection that it

6      occurred from February 9th through approximately March

7      5th; is that correct?

8           A.    Correct.

9           Q.    And was that a trip to see your mother?

10          A.    Primarily.

11          Q.    And did you or do you know what

12     KnowledgeStorm's vacation policy was at that time for

13     someone with your tenure at the company?

14          A.    I don't recollect.

15          Q.    Do you recall how many weeks of vacation you

16     were to have received?

17          A.    I think it was about two weeks.

18          Q.    And this trip would have been more than two

19     weeks?

20          A.    This trip was three weeks.  But you have to

21     remember, one week was going and seeing clients.  I met

22     with three different clients.  That included traveling

23     to see those clients.  And those clients, the meetings

24     were three different days.  So I actually traveled

25     almost from L.A. to New York, all the way there.  It was

**125**

190

1    that much distance that I traveled.

2         Q.    Within India?

3         A.    Within India, yes.  So one week of that was

4    work time.

5         Q.    And in order to go on that trip, did you have

6    to get the approval of Joe Brown?

7         A.    Yes.

8         Q.    And Joe Brown allowed you to go?

9         A.    Yes, because I was also going to be seeing

10   clients.

11        Q.    So he was supportive of your trip?

12        A.    Because the way I presented it.  Because I had

13   these client meetings that were coming up, I asked him

14   if I could take two more weeks and maybe use my vacation

15   time to go see my mother and meet with these clients as

16   well.

17        Q.    Paragraph 27 of the Complaint states that:

18              "Plaintiffs were not given accounts to work on,

19              even though everyone else was and it had been

20              promised to them during their interview."

21              My questions are, obviously, going to relate to

22   what you know about what you were promised and what you

23   weren't given.  And I think you and I have talked about

24   and exhausted the inbound leads, if I am saying that

25   correctly?

**126**

191

REPORTER'S CERTIFICATE

1

2

3

4      I, ANNA ALLEN, CSR 9954, Certified Shorthand

5  Reporter, certify;

6      That the foregoing proceedings were taken before me

7  at the time and place therein set forth, at which time

8  the witness was put under oath by me;

9      That the testimony of the witness, the questions

10  propounded, and all objections and statements made at

11  the time of the examination were recorded

12  stenographically by me and were thereafter transcribed;

13      That the foregoing is a true and correct transcript

14  of my shorthand notes so taken.

15      I further certify that I am not a relative or

16  employee of any attorney of the parties, nor financially

17  interested in the action.

18      I declare under penalty of perjury under the laws

19  of California that the foregoing is true and correct.

20      Dated this 22 day of January, 2008.

21

22

23

24  _____
    Anna Allen, CSR No. 9954

25

**127**

**KEDKAD DEPOSITION**

CERTIFIED
COPY

1          UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3                    --0--

4

5   JASBIR GILL, MAHMOUD KEDKAD,   )
                                   )
6            Plaintiffs,           )
                                   )
7   vs.                            )    No. C 07-04112 PVT
                                   )
8   KNOWLEDGESTORM, INC., a        )
    Corporation, DOES 1 through 50,)
9                                  )
             Defendants.           )
10  -------------------------------

11

12

13

14          DEPOSITION OF MAHMOUD KEDKAD

15

16

17   DATE:          Tuesday, January 15, 2008

18

19   TIME:          10:15 a.m.

20

21   LOCATION:      Bell & Myers
                    2055 Junction Avenue, Suite 200
22                  San Jose, CA 95131

23

24   REPORTED BY:   Anna S. Allen
                    Certified Shorthand Reporter
25                  License Number 9954

**128**



1                    A P P E A R A N C E S

2

3

4    For the Plaintiffs:

5    LAMBERTO & KREGER
     By:   BRIAN S. KREGER, ESQ.
6    160 W. Santa Clara Street, #1050
     San Jose, CA 95113
7    408-999-0300

8

9

10

11   For the Defendants:

12   FORD & HARRISON
     By:   JEFF D. MOKOTOFF, ESQ.
13   1275 Peachtree Street, N.E., Suite 600
     Atlanta, Georgia, 30309
14   404-888-3800

15

16

17

18   Also Present:

19   CHRIS GLEASON, Corporate Representative for
     KnowledgeStorm
20

21

22

23

24

25

**129**

2

```
 1                    E X H I B I T S

 2

 3    Exhibit              Description              Page

 4

 5    1        Application for employment          17

 6    2        Interview schedule for Kedkad       41

 7    3        10-30-06 offer letter               52

 8    4        2-14-07 e-mail from Brown           71

 9    5        "Something fun for dinner"          80

10             e-mail from Brown

11    6        4-3-07 e-mail from Brown            83

12    7        4-13-07 e-mail from Gay to          91

13             Kedkad

14    8        4-6-07 e-mail from Hoback re        94

15             April revenue

16    9        Six-page e-mail                     127

17    10       4-26-07 three-page document         132

18    11       4-27-07 four-page memorandum        151

19    12       4-26-07 e-mail from Brown to        160

20             4-Sales West

21    13       5-9-07 memorandum from Gleason      161

22             to Kedkad

23    14       6-7-07 e-mail from Gleason to       165

24             Kedkad

25    15       7-26-07 e-mail from Gay to          171
```

**130**

3

| | EXHIBIT | | PAGE |
|---|---|---|---|
| 1 | | Kedkad | |
| 2 | | | |
| 3 | 16 | 8-2-07 e-mail from Kedkad to | 180 |
| 4 | | Gay | |
| 5 | 17 | 9-17-07 memorandum from Gay to | 181 |
| 6 | | Kedkad | |
| 7 | 18 | 9-17-07 memorandum from Gay to | 183 |
| 8 | | Kedkad | |
| 9 | 19 | 5-4-07 Complaint of | 184 |
| 10 | | Discrimination | |
| 11 | 20 | 5-5-07 e-mail from Niederberger | 188 |
| 12 | | to Kedkad | |

13

14

15

16

17

18

19

20

21

22

23

24

25

**131**

4

```
 1   San Jose, California                    January 15, 2008
 2                           --0--
 3                    MAHMOUD KEDKAD
 4            having been first duly sworn,
 5          was examined and testified as follows:
 6                       EXAMINATION
 7   BY MR. MOKOTOFF:
 8       Q.   Mr. Kedkad, good morning.
 9       A.   Good morning.
10       Q.   This will be your deposition taken pursuant to
11   notice by agreement for the purposes of discovery,
12   cross-examination and all other purposes allowed and
13   consistent with the Federal Rules of Civil Procedure.
14            Could you state your full name for the record,
15   please.
16       A.   Mahmoud Kedkad.
17       Q.   Do you also go by Mike?
18       A.   Yes.
19       Q.   For the record, my name is Jeff Mokotoff.  I
20   know you sat in on Ms. Gill's deposition yesterday, so
21   you had a little bit of a sense of how a deposition
22   goes.  As you know, I represent the defendant,
23   KnowledgeStorm, in this lawsuit that you and Ms. Gill
24   have brought against it.
25            Mr. Kedkad, have you ever had your deposition
```

**132**

5

1    you commence any training with KnowledgeStorm?

2        A.    Yes.

3        Q.    Okay.  When did you have any training with

4    KnowledgeStorm?

5        A.    To the best of my knowledge, it was

6    December 4th through the 8th, maybe the 9th.

7        Q.    Where was the training?

8        A.    Atlanta, Georgia.

9        Q.    When you had attended the training at Atlanta,

10   Georgia, you had already started working out of the

11   South San Francisco office?

12       A.    Could you repeat the question?

13       Q.    Sure.  At the time that you attended training

14   in Atlanta, Georgia, had you previously already started

15   working out of the South San Francisco office?

16       A.    That's correct.

17       Q.    And the position that you accepted was as a

18   sales executive; is that correct?

19       A.    That's correct.

20       Q.    Do you recall the other sales executives that

21   were working out of the South San Francisco office at

22   the time that you began working for KnowledgeStorm?

23       A.    Could you repeat the question?

24       Q.    Sure.  Do you recall the other sales executives

25   that were working out of the South San Francisco office

**133**

MERRILL  LEGAL  SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1    at the time you began working for KnowledgeStorm?

2        A.   Yes.

3        Q.   Can you give me their names.

4        A.   Jasbir Gill, Lisa McGuire, Kevin Cummings,

5    although he was not physically there at that time.

6        Q.   Do you know where he was at that time?

7        A.   I heard he was working out of Boston.

8        Q.   Okay.

9        A.   Katie Kimball, Rachael Gordon.  That's when I

10   started.

11       Q.   Okay.  So you and approximately five other

12   employees?

13       A.   That's correct.

14       Q.   I'm going to hand you what was marked as

15   Exhibit 4 to Ms. Gill's deposition yesterday.  And my

16   question relates to your training that we were just

17   previously discussing.

18            The training that took place from approximately

19   December 4 through December 9th in Atlanta, Georgia, do

20   you recall during that training receiving a copy of the

21   handbook that has been identified as Exhibit 4 of Jasbir

22   Gill's deposition?

23       A.   I received a copy.  I'm not sure if it's during

24   the training.

25       Q.   Do you recall when you would have received a

**134**

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1    having ever received a copy of the handbook?

2        A.    I do not.

3        Q.    Do you recall ever receiving a copy of the

4    company's no-harassment policy?

5        A.    At some point in time, yes.

6        Q.    While you were employed at KnowledgeStorm?

7        A.    Correct.

8        Q.    Okay.  Do you recall when you would have

9    received a copy of the company's no-harassment policy?

10       A.    After some accusations to me in some meetings,

11   probably May --

12       Q.    Okay.

13       A.    -- of 2006.

14       Q.    Of 2007?

15       A.    2007.

16       Q.    Do you recall reading that no-harassment policy

17   when you would have received it in or about May of 2007?

18       A.    Yes, I looked it over.

19       Q.    Okay.  When you started working for

20   KnowledgeStorm in 2006, did you understand the reporting

21   structure at KnowledgeStorm in terms of who you would be

22   reporting to?

23       A.    I have already answered that.

24       Q.    Did you understand -- so let me clarify that.

25   Did you understand that you'd be reporting to Joe Brown?

**135**

62

```
 1      A.    Yes.

 2      Q.    Okay.  And did you understand who Joe Brown's

 3   boss was?

 4      A.    Yes.

 5      Q.    And who was that?

 6      A.    Jason Hoback.

 7      Q.    And did you understand who Jason Hoback's boss

 8   was?

 9      A.    Yes.

10      Q.    And who was that?

11      A.    Jim Canfield,

12      Q.    Were any of those three gentlemen physically

13   located out of the South San Francisco office?

14      A.    Could you rephrase it?

15      Q.    Sure.  Was either Joe Brown, Jason Hoback or

16   Jim Canfield physically located out of the South San

17   Francisco office?

18      A.    All three of them are.

19      Q.    They were physically located out of the South

20   San Francisco office?

21            MR. KREGER:  Do you mean to ask it that way?

22            MR. MOKOTOFF:  I will try to rephrase that.

23            MR. KREGER:  "Out of" sounds like not in San

24   Francisco.

25            MR. MOKOTOFF:  Thank you for that
```

**136**

63

1   A.   Nothing social, other than very seldom

2   occasional lunches.

3   Q.   How often do you recall Joe Brown being in the

4   South San Francisco office?

5   A.   Every two to three weeks.

6   Q.   And how about Jason Hoback?

7   A.   Three to four weeks.

8   Q.   How about Jim Canfield?

9   A.   Few times I'd see him very -- maybe two times I

10  ever seen him.

11  Q.   In the South San Francisco office?

12  A.   Yes.

13  Q.   As a sales executive, did you have the need to

14  communicate with Joe Brown on a daily basis?

15  A.   There is a need, yes.

16  Q.   Did you have the need to communicate with Joe

17  Brown on a daily basis?

18  A.   Yes.

19  Q.   How would you communicate with Joe Brown?  In

20  other words, via e-mail, telephone, face to face?

21  A.   Phone, face to face or e-mail.

22  Q.   All three of those?

23  A.   All three of those.

24  Q.   Would there be one method that you'd use more

25  than others?

**137**

68

1        <u>REPORTER'S CERTIFICATE</u>

2

3

4        I, ANNA ALLEN, CSR 9954, Certified Shorthand

5    Reporter, certify;

6        That the foregoing proceedings were taken before me

7    at the time and place therein set forth, at which time

8    the witness was put under oath by me;

9        That the testimony of the witness, the questions

10   propounded, and all objections and statements made at

11   the time of the examination were recorded

12   stenographically by me and were thereafter transcribed;

13       That the foregoing is a true and correct transcript

14   of my shorthand notes so taken.

15       I further certify that I am not a relative or

16   employee of any attorney of the parties, nor financially

17   interested in the action.

18       I declare under penalty of perjury under the laws

19   of California that the foregoing is true and correct.

20

21

22

23

24   ---------------------------------

25        Anna Allen, CSR No. 9954

                    **138**