1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BRIAN S. KREGER, State Bar No. 106707
LAMBERTO & KREGER
160 W. Santa Clara St., Suite 1050
San Jose, CA 95113
Telephone: (408) 999-0300
Facsimile: (408) 999-0301

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA-SAN JOSE DIVISION

JASBIR GILL, MAHMOUD KEDKAD,

                    Plaintiffs,

vs.

KNOWLEDGESTORM, INC. a corporation,
DOES 1 THROUGH 50,

                    Defendants.

_____/

**Case No. C 07-04112PVT**

**PLAINTIFF GILL'S
MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION FOR
SUMMARY JUDGEMENT OR
PARTIAL SUMMARY JUDGMENT**

Date: June 3, 2008
Time: 10:00 a.m.
Courtroom: 5

1
2

# TABLE OF CONTENTS

3
4

5   A.  INTRODUCTION …………………………………………………………5

6

7   B.  SUMMARY JUDGEMENT MAY NOT BE GRANTED UNLESS
8       DEFENDANT  MEETS ITS BURDEN OF SHOWING THAT PLAINTIFF
        CAN NOT PREVAIL  AS A MATTER OF LAW, ON ANY THEORY OF
9       RECOVERY…………………………………………………………………6

10  C.  THE LEGAL STANDARD FOR RACIAL HARASSMENT…………………………7

11
12  D.  NO SUMMARY JUDGEMENT IS AVAILABLE ON THE BASIS OF
        "AVOIDABLE CONSEQUENCES"………………………………………………11

13

14  E.  THE EVIDENCE OF RACIAL HARASSMENT SHOWS IT WAS SEVERE
15      OR PERVASIVE………………………………………………………………11

16  F.  THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER PLAINTIFF
17      WAS TERMINATED IN RETALIATION FOR PROTECTED ACTIVITIES……16

18  G.  WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY…………17

19

20  H.  CONCLUSION………………………………………………………………17

21
22
23
24
25
26
27
28

1

2

**TABLE OF AUTHORITIES**

3

4

**FEDERAL CASES**

5

*Baskerville v. Culligan Int'l Co.* (7th Cir. 1995) 50 F.3d 428..........................8

6

*Brooks v. City of San Mateo* (9th Cir. 2000) 229 F3d 917.........................7,9

7

*Cruz v. Coach Store Inc.* (2nd Cir. 2000) 202 Fed 560...............................10

8

*Ellison v. Brady* (9th Cir. 1991) 924 F2d 872...............................................8

9

*Harris v. Forklift Systems, Inc.* (1993) 510 US 17.......................................7

10

*Hostetler v. Quality Dining, Inc* (7th Cir. 2000) 218 F3d 798........................7

11

*Jordan v. Clark* (9th Cir. 1988) 847 F2d 1368...........................................16

12

*Passantino v. Johnson and Johnson Consumer Products Inc.*
(9th Cir. 2000) 212 F3d 493.....................................................................16

13

*Quantock v. Shared Marketing Services, Inc.,*
(7th Cir. 2002) 312 F.3d 1408..................................................................9

14

15

*Rodgers v. Western-Southern Life Insurance*
( 7th Cir. 1993) 12 F3d  668....................................................................7,9

16

*Strother v. Southern California Permanente Med. Group*
(9th Cir. 1996) 79 F3d 859.......................................................................16

17

*Taylor v. Metzger* (1998) 152 N.J. 490......................................................9

18

*Thomas v. City of Beaverton* (9th Cir. 2004) 379 F3d 802..........................16

19

20

**STATE CASES**

21

*Dee v. Vintage Petroleum* (2003) 106 CA4th 30..........................................9

22

*Evan F. v. Hughson United Methodist Church* (1992) 8 CA 4th 828.............6

23

*Fisher v. San Pedro Peninsula Hosp.* (1989) 214 CA3d 590.........................8

24

*Kulesa v. Castleberry* (1996) 47 CA4th 103..............................................6

25

*Lyle v. Warner Bros. Television Prods.* (2006) 38 C4th 264 .......................8

26

*McManis v. San Diego Postal Credit Union* (1998) 61 CA 4th 547................6

27

*Myers v. Trendwest Resorts Inc.* (2007) 148 CA4th 1403..........................11

28

*Podolsky v. First Healthcare Corp.* (1996) 50 CA 4th 632...........................6

*State Dept. Of Health Services v. Superior Court* (2003) 31 C4th 1026....7,11

*Stevenson v. Superior Court* (1997) 16 C4th 880....................................17

*Stimson v. Carlson* (1992) 11 CA 4th 1201................................................6

*Tameny v. Atlantic Richfield* (1980) 27 C3d 167......................................17

*Wattenberger v. Cincinnati Reds, Inc.* (1994) 28 CA 4th 746......................6

*Yanowitz v. L'Oreal USA Inc.* (2005) 36 C4th 1028................................16

**STATUTES**

California Business and Professions Code 17200......................................17

California Government Code 12940(j)(1)...................................................7

California Government Code 12926(m)................................................7,13

California Government Code 12940(h) ...................................................16

1

2

3        **A. INTRODUCTION**

4            This action arises out of claims that plaintiffs were subjected to

5    demeaning and humiliating racial epithets by their <u>supervisor</u> and that plaintiff

6    Gill was terminated ten days after she and her co-worker, plaintiff Kedkad,

7    reported racial harassment to their supervisor's boss, Jason Hoback, for the

8    third time without any action being taken.

9            Plaintiff opposes each and every basis for Summary Judgment or Partial

10   Summary Judgment.  Defendant's Motion for Summary Judgement or Partial

11   Summary Judgment is without merit as there is sufficient disputed evidence of

12   severe or pervasive racial harassment. Defendant's characterization of

13   comments such as "I hate Indians, I wish they would go back to India," and "I

14   hate Muslims, they are all terrorists" as being "social commentary" rather than

15   harassment is contrary to any reasonable interpretation of such comments.

16           Additionally, defendant's claim that it was unreasonable for plaintiff to

17   report the racial harassment to Jason Hoback, the Director of Sales and the

18   supervisor of the harasser, rather than the CEO, at the very least merely

19   constitutes a question of fact for the jury which goes to the issue of damages,

20   not liability.

21           Finally given the proximity in time between plaintiff reporting the racial

22   harassment and her firing ( just ten days after her third complaint) there is a

23   triable issue of fact as to whether her complaints were a motivating factor in

24   terminating her.

25   //

26   //

27   //

28

1

2      **B.  SUMMARY JUDGEMENT MAY NOT BE GRANTED UNLESS**

3      **DEFENDANT  MEETS ITS BURDEN OF SHOWING THAT PLAINTIFF**

4      **CAN NOT PREVAIL  AS A MATTER OF LAW, ON ANY THEORY OF**

5      **RECOVERY**

6

7          In defendant's motion for summary judgment, defendant must negate an

8  essential element of each of plaintiff's causes of action. *Wattenberger v.*

9  *Cincinnati Reds, Inc.* (1994) 28 CA 4th 746.

10          A defendant moving for summary judgment must disprove at least one

11  essential element of each cause of action, or show that an element of each

12  cause of action cannot be established.  *McManis v. San Diego Postal Credit*

13  *Union* (1998) 61 CA 4th 547, 555.  A moving party defendant must show that,

14  under no possible hypothesis within reasonable purview of the allegations of

15  complaint, is there a material question of fact which requires examination by

16  trial. *Id.*  All doubts as to whether any material, triable issue of fact exists are

17  to be  resolved in favor of party opposing summary judgment.  *Podolsky v. First*

18  *Healthcare Corp.* (1996) 50 CA 4th 632, 642.

19          The court should strictly construe the moving parties' papers and liberally

20  construe those of opposing party to determine if there is a triable issue of

21  material fact.  *Stimson v. Carlson* (1992) 11 CA 4th 1201, 1205.  All doubts

22  as to the propriety of granting a motion should be resolved in the favor of the

23  party opposing the motion.  *Evan F. v. Hughson United Methodist Church*

24  (1992) 8 CA 4th 828, 842.

25          The moving party has the burden of establishing the absence of a genuine

26  issue of fact on each issue material to its case. *Kulesa v. Castleberry* (1996) 47

27  CA4th 103

28

1

2          **C.  THE LEGAL STANDARD FOR RACIAL HARASSMENT**

3          California Government Code 12940(j)(1) prohibits harassment based upon

4  any of the protected characteristics, including race.  The protection against

5  discrimination and harassment because of race includes the perception (even if

6  wrong) that the person may have any of the protected characteristics or that

7  she is associated with any of the perceived characteristics.  California

8  Government Code 12926(m).

9          A prima facie case of racial harassment is met by evidence that: 1)

10  plaintiff belongs to a protected group, 2) that plaintiff was subjected to

11  unwelcome racial harassment, 3) the harassment was based on race, 4) the

12  harassment was sufficiently pervasive or severe so as to alter the conditions of

13  employment. *Rodgers v. Western-Southern Life Insurance* ( 7th Cir. 1993) 12

14  F3d  668, 675.

15          Furthermore, defendant is strictly liable where the harassment is

16  perpetrated by plaintiff's supervisor.  *State Dept. Of Health Services v. Superior*

17  *Court* (2003) 31 C4th 1026, 1041.

18          The level of severity or pervasiveness is generally a question of fact and

19  is dependant, on, among other things who is doing the harassing**.**  *Brooks v.*

20  *City of San Mateo* (9th Cir. 2000) 229 F3d 917, 926.  Whether the conduct is

21  sufficiently abusive is to be determined by looking at all of the circumstances,

22  including: the frequency of the conduct, its severity, whether it involves

23  physical conduct, and whether it unreasonably interferes with an employees

24  work.  No single factor is required.  The courts must consider "all of the

25  circumstances."  *Harris v. Forklift Systems, Inc.* (1993) 510 US 17;  *Hostetler*

26  *v. Quality Dining, Inc* (7th Cir. 2000) 218 F3d 798, 806.

27          Both a subjective and objective standard are used to determine whether the

28

1   conduct was abusive.  For purposes of summary judgment, the objective

2   standard is met if  a reasonable person <u>with the same characteristics</u> would

3   consider the conduct in question sufficiently severe or pervasive to create an

4   abusive work environment.  *Ellison v. Brady* (9th Cir. 1991) 924 F2d 872*, Fisher*

5   *v. San Pedro Peninsula Hosp.* (1989) 214 CA3d 590.

6       The required showing of severity of the harassing conduct varies inversely

7   with the frequency of the conduct; i.e. the more incidents the less severe they

8   need to be to establish a hostile environment.  *Elison, supra* at 878.

9   It has been noted that determining whether there was a hostile environment "is

10   not, and by its nature cannot be, a mathematically precise test."  *Harris v.*

11   *Forklift Systems, Inc.* (1993) 510 US 17, 22.  The courts have also noted that

12   drawing the line between actionable and non-actionable harassment is not

13   always easy.

14       "On one side lie sexual assaults; other physical contact, whether amorous
        or hostile, for which there is no consent express or implied; uninvited

15       sexual solicitations; intimidating words or acts; obscene language or
        gestures; pornographic.  On the other side lies the occasional vulgar

16       banter, tinged with sexual innuendo, of coarse or boorish workers...."
        *Baskerville v. Culligan Int'l Co.* (7th Cir. 1995) 50 F.3d 428, 430.

17

18       In the instant case it is clear that the conduct complained of is not simply

  occasional boorish banter.  Rather it is on the "other side."  Furthermore, unlike

19   the cases relied upon by defendant, the harassing party in this case occupied a

20   position of authority.  Defendant's reference to *Lyle v. Warner Bros. Television*

21   *Prods.* (2006) 38 C4th 264 does not support their argument.  *Lyle,* supra

22   involved a claim for sexual harassment based upon the discussion of writers in

23   preparing scripts for the television show *Friends*.  The work at Knowledgstorm

24   can hardly be described as such an environment, nor comments about hating

25   particular ethnic groups "discussion" of race as "social commentary," or

26   "offhand comments."  Rather the comments were hateful, and so clearly hostile

27   and demeaning as to alter the recipients work environment in a very substantial

28

1   way, given the fact that it was coming from plaintiff's supervisor.

2          The specific circumstances of the working environment and the
3   relationship between the harassing party and the harassed can bear on whether
4   that line is crossed.  Thus in *Quantock v. Shared Marketing Services, Inc.,* (7th
5   Cir. 2002) 312 F.3d 1408 the court reversed a summary judgment in the
6   defendant's favor, noting the importance of the defendant's "significant
7   position of authority" and the close working quarters.  *Quantock,* supra at
8   1414.

9          As noted in *Brooks*, supra, which found one incident of physical
10  harassment insufficient, one incident could very well be sufficient if it was
11  perpetrated by a supervisor, rather than a coworker, as is the case in this
12  matter.  *Brooks*, supra at 927, footnote 9.

13         In *Dee v. Vintage Petroleum* (2003) 106 CA4th 30, the court held that a
14  single racial slur by a supervisor is sufficient to constitute severe racial
15  harassment.  The Court  held that the comment "it is your Filipino
16  understanding versus mine" was sufficient to create a triable issue of fact as to
17  racial harassment.  The court noted the importance of the fact that the
18  comment was by her supervisor, and that those factors, along with his abusive
19  conduct toward her were sufficient to constitute racial harassment.

20         As noted with approval in *Dee*, supra and stated in *Rodgers v. Western-*
21  *Southern Life Insurance* ( 7th Cir. 1993) 12 F3d  668, 675 "no single act can
22  more quickly 'alter the conditions of employment and create a hostile an
23  *abusive environment'… than the use of an [unambiguous] racial epithet."*  In
24  *Taylor v. Metzger* (1998) 152 N.J. 490, 508, the New Jersey Supreme Court
25  reversed a summary judgement in which it concluded that where a supervisor
26  makes a single racial slur, that exacerbates the severity of the remark sufficient
27  to establish a triable issue of fact.

28

1    This case, unlike *Dee*, supra does not involve just a single incident, but

2    rather several incidents to plaintiff Gill, as well as to plaintiff Kedkad and to

3    another employee, Joe Niederberger, clearly establishing at a minimum a triable

4    issue of fact as to whether their was a hostile work environment created by the

5    supervisor.

6    Furthermore, in *Cruz v. Coach Store Inc*. (2nd Cir. 2000) 202 Fed 560,

7    570, the court held that evidence of similar slurs directed at other minorities

8    may contribute to the overall hostility. In that respect the numerous other racial

9    slurs that were directed at Kedkad and told to a co-worker about plaintiff's such

10   as "sand nigger" and "camel jockey" and discussed with Gill and together

11   reported to Hoback are further evidence of a hostile working environment

12   created by a supervisor and of Brown's racial animus.

13   Thus we are not faced with the isolated, stray or teasing comment.

14   These comments were, with due respect to defendants characterization as just

15   "social commentary," about as hate filled and abusive as they could get.

16   Coupled with the fact that they were made by the plaintiff's supervisor, and

17   were reported to his supervisor and yet nothing was done, clearly creates a

18   triable issue of fact as to whether they were severe enough to alter the

19   conditions of employment.

20   Finally, the same actor principle does not apply were there is direct

21   evidence of racial animus, such as this case.  That would mean that regardless

22   of the direct evidence of racial hostility and harassment, one could racially

23   harass and terminate an employee with impunity merely because he had hired

24   that person.  Furthermore, Brown's deposition testimony, which was not

25   available at the time of filing the opposition was that he could not remember

26   being the one to make the decision to hire plaintiff.  Plaintiff requests that she

27   be permitted to submit this evidence if the court finds that this issue is

28

1  dispositive.

2

3    **D.  NO SUMMARY JUDGEMENT IS AVAILABLE ON THE BASIS OF**

4        **"AVOIDABLE CONSEQUENCES"**

5        Defendant's assertion that the "avoidable consequences" defense is a bar

6  to the action is incorrect.  First, the defense applies only to damages, not to

7  liability.  *State Dept. of Health Services v. Superior Court* (2003) 31 C4th

8  1026, 1045.  Also, the issue of whether plaintiff's reporting to Jason Hoback

9  on three occasions was reasonable is, at the very least, a question of fact since

10 it may be found to have been reasonable conduct in light of all of the

11 circumstances, and that Hoback's failure to report it on three occasions is

12 evidence that defendant does not have an adequate system for training,

13 reporting and dealing with such claims.  No summary judgement is available on

14 this ground.  *Myers v. Trendwest Resorts Inc*. (2007) 148 CA4th 1403, 1418.

15

16   **E.  THE EVIDENCE OF RACIAL HARASSMENT SHOWS IT WAS SEVERE**

17       **OR PERVASIVE**

18       Joe Brown, Knowledgestorm's West Coast Regional manager, was both

19 Gill and Kedkad's supervisor.  Gill and Kedkad were sales people stationed in

20 defendant's South San Francisco office.  Jason Hoback was Brown's

21 supervisor.  Brown and Hoback were commuting managers working out of the

22 Atlanta and South San Francisco offices.  (Kedkad depo. 62: 24-25; 63:1-6;

23 64:2-17).  Joe Brown was the Regional Sales Manager and Jason Hoback was

24 his boss, the Director of Sales.  (Niederberger depo. 23:12-25; 24:1-4).

25       During the week of January 15, 2007, Joe Brown said to plaintiff Gill, "Is

26 that what they teach in India, you need to learn the right way, which is the

27 white man's way." (Gill depo. 139:19-25; 140: 1-6).

28

1      The week of January 15, 2007, Gill heard Joe Brown ridicule her co-
2  worker, plaintiff Kedkad, by saying "Why are you dressed like this, this is not
3  the Middle East." (Gill depo. 163:12-18; 164:3-20).

4      On January 31, 2007, plaintiff Gill spoke to Jason Hoback and
5  complained about the racial slurs, discrimination and harassment but Hoback
6  did nothing. He said that she was just over reacting. (Gill depo.141:18-25;
7  142:1-9; 166:10-15).  This is clear evidence that Knowledgestorm does not
8  properly train its managers or take such complaints seriously.

9      On February 21, 2007 Joe Brown commented to plaintiff Kedkad that he
10  did not like Indians as they were taking all the jobs. Joe Brown asked him if he
11  had heard from plaintiff Gill who was on vacation in India. Joe Brown said that
12  maybe she won't come back and anyways, there are too many Indians here
13  who are taking away the jobs, and that he hated these Indians.  Kedkad told
14  Gill about the comment. (Gill depo. 144:17-25; 145:1-4; 145:14-25; 146:1-6).

15      On another occasion during the second week in February 2007, Brown
16  stated to plaintiff that "Non-whites have a very difficult time in sales and they
17  should just pack up their bags and leave."  (Gill depo.150:3-15).  This comment
18  alone could lead plaintiff to conclude that because of her race she could never
19  succeed at Knowledgestorm.

20      During the last week of March, Gill complained about these comments to
21  Jason Hoback.  (Gill depo. 147: 6-22).

22      The week of March 19, 2007, Joe Brown called plaintiff Gill and shouted
23  at her and in a very threatening voice asked her if she was leaving or staying at
24  knowledgestorm. Gill depo. 167: 12-25; 168:1-25.  Brown treated Gill
25  disrespectfully.  (Gill depo. 169:1-25).

26      The week of March 26, 2007, Joe Brown asked Gill her views on the Iraq
27  war.  When plaintiff stated that it was not the time and place for such a

28

1   discussion, Brown stated I don't care, I hate Muslims and I think all Muslims are

2   terrorists anyway. (Gill depo. 148: 20-25; 149:1-8). It does not matter if Gill

3   actually was Muslim, only Brown's perception. California Government Code

4   12926(m).

5       On April 3, 2007 plaintiffs had a telephone conversation with Jason

6   Hoback. Plaintiffs Gill and Kedkad told him about the recent racial slurs and

7   discrimination from Joe Brown. Jason Hoback became very angry with them

8   and threatened plaintiffs and said that he could fire them for creating trouble.

9   (Gill depo. 172: 24-25; 173: 1-4; 174:25; 175:1-25; 176:1-15; 177:1-10).

10      Ten days later, on April 13, 2007, Hoback made good on his threat and

11  fired plaintiff Gill. At the time of the termination, Hoback did not tell Gill

12  specifically why she was being terminated, only that she had allegedly violated

13  company policy. Defendant now claims that the reason was that plaintiff had

14  printed out her resume using company paper. However, Hoback did not even

15  ask plaintiff why she had printed her resume. Plaintiff testified that the reason

16  for printing the resume was that her attorneys for her H-1B visa had requested

17  copies of the resume. (Gill depo.135:2-25; 136:1-25; 137: 1-9).

18      Furthermore, other employees who had printed out resumes or even

19  accepted work with another company were not fired. (Gill depo: 139:6-14).

20      Gill observed that Brown treated other employees differently and

21  discussed the racial harassment with another employee, Mahmoud Kedkad who

22  was having a similar experience with Brown. (Gill depo. 61:9-25; 62:1-23).

23      Plaintiff Kedkad also testified that he was racially harassed by the same

24  supervisor and that the harassment was known to Gill.

25      In December 2006, he heard his supervisor, Joe Brown, say to another

26  employee, Joe Niederberger, "What do you think of the camel jockey we've

27  hired. Why don't you take the swat out on him so he will start making some

28

1  calls." (Kedkad depo. 98:22-25; 99:1-7).  Kedkad reported these racial

2  comments to Brown's boss, Jason Hoback at the end of January 3007.

3  (Kedkad depo. 103:16-22).

4     The week of January 15, 2007, and on other occasions as well Joe

5  Brown ridiculed plaintiff Kedkad and said "Why are you dressed like this, this is

6  not the Middle East." (Kedkad depo. 105:17-25; 106:1-25; 107:1-11; 108:1-

7  14).

8     On January 31, 2007, after a face to face meeting with a business

9  prospect, when Kedkad spoke to Brown's boss, Jason Hoback about the racial

10  slurs Hoback responded: "Joe Brown is inexperienced in management and

11  might have said things that he did not mean. Please bear with us for the next

12  few months. We will give you big accounts and you will make a lot of money."

13  (Kedkad depo. 103:16-22; 104: 15-25).

14     On February 21, 2007, plaintiff was not invited to a business dinner by

15  Joe Brown in which the entire Western region was invited. A joke was made by

16  Brown that plaintiffs would not be invited to meetings in San Francisco as they

17  would scope out terrorist targets.  (Kedkad depo. 121:13-25; 122:1-8

18     In February 2007, Joe Brown asked him if he had heard from plaintiff Gill

19  who was on vacation in India. Joe Brown said that maybe she won't come

20  back and anyways there are too many Indians and expressed the hope that she

21  would not return and then there would be "one less Indian."  (Kedkad depo.

22  111:2-18).

23     On March 21, 2007, plaintiff Kedkad spoke to supervisor Jason Hoback

24  on the phone and reiterated the racial slurs and discrimination meted out to him

25  and Ms. Gill from Joe Brown. Hoback became angry when he reported the

26  problems.  (Kedkad depo. 115:5-8; 117: 13-23).

27     In late March 2007, after a joint meeting with a business prospect, Joe

28

1    Brown said to plaintiff Kedkad, "You should go back to school so you can learn
2    to read, write and talk normal, like us." (Kedkad depo. 125:1-11).

3          In the latter part of April or beginning of May 2007, Kedkad was also told
4    by Gill that Brown had been using the term "sand nigger." (Kedkad depo. 4-22).

5          A former employee, Joe Niederberger, also testified that Joe Brown,
6    plaintiffs' supervisor, and an employee of defendant, had on numerous
7    occasions used the term "sand niggers" and "camel jockeys" referring to
8    plaintiffs and that he had reported it to Hoback. ( Niederberger depo. 30: 9-21;
9    33:7-22; 36:6-20; 40: 22-25; 41:1-25; 42:22-25; 43 1-25; 45:3-8; 45:18-25;
10   46:1-17

11         On April 24, 2007, Niederberger wrote an email to Kelly Gay advising her
12   that there was racial discrimination and harassment in the South San Francisco
13   office, and that it was coming from Joe Brown.  Gay testified that this email
14   and information from Joe Niederberger was not enough to cause her to conduct
15   any investigation.

16         While these comments were being made, plaintiffs discussed the
17   comments amongst themselves and were aware of the comments being made
18   by Brown about each other and together complained about the comments to
19   Hoback, who took no action. (Gill depo. 157:2-5).

20         Defendant's reference to any of these comments being "hearsay" is a
21   misunderstanding of the hearsay rule.  "Hearsay" is an out of court statement
22   introduced for the truth of the matter stated. Obviously, these statements are
23   asserted not for their truth, but as evidence that they were made. In any event
24   they would be considered admissions against interest as an exception to the
25   hearsay rule as well as the state of mind exception.

26
27
28

1     **F.  THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER PLAINTIFF**
2          **WAS TERMINATED IN RETALIATION FOR PROTECTED ACTIVITIES**
3          Plaintiff alleges that she was fired in retaliation for complaining about her
4     supervisor's racial comments on three occasions, the last being April 3, 2007
5     just ten days before she was fired in a telephone conversation with Hoback and
6     Brown.  She further testified that during the April 3, 2007 discussion with
7     Hoback in which she and Kedkad complained about Brown, Hoback became
8     angry and threatened to fire them.
9          A prima facie case of retaliation is established by showing: 1) she was
10    engaged in protected activity; 2) she suffered adverse employment action, and
11    3) there was a causal connection.  *Yanowitz v. L'Oreal USA Inc.* (2005) 36
12    C4th 1028.
13         California Government Code 12940(h) retaliation against an employee for
14    complaining about any of the rights generated under that statute, which would
15    include, obviously, racial harassment.
16         Furthermore, the employer's knowledge of those complaints together with
17    proximity in time are sufficient to create a triable issue of fact that there was a
18    causal connection between the protected activity and the firing.  *Jordan v. Clark*
19    (9th Cir. 1988) 847 F2d 1368, 1376.  *Passantino v. Johnson and Johnson*
20    *Consumer Products Inc.* (9th Cir. 2000) 212 F3d 493, 507.  Very little evidence
21    of discriminatory motive is required where there is close proximity in time.
22    *Strother v. Southern California Permanente Med. Group* (9th Cir. 1996) 79 F3d
23    859.  A seven week interval creates an inference of nexus.  *Thomas v. City of*
24    *Beaverton* (9th Cir. 2004) 379 F3d 802.
25         In the instant case. A ten day interval certainly raises that inference and,
26    together with the direct evidence of racial animus by Brown and the fact that
27    Brown and Hoback were the ones to fire plaintiff, it is sufficient to create a
28

1    triable issue of fact as to retaliation.

2

3        **G.  WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

4        Plaintiff also alleges that she was targeted by defendant because she

5    opposed illegal practices of her employer and played a part in her termination.

6    Specifically, she testified that she was asked to inflate proposals by adding

7    advertising even when it was known that there would be no advertising in the

8    contract.  (Gill depo. 181: 8-25; 182: 1-3).  She also testified that she was told

9    to alter start dates thereby short changing customers.  (Gill depo. 185: 4-25;

10   186:1-20).  She believed that this was done to mislead potential buyers of the

11   company.  (Gill depo. 187:1-25).

12       A cause of action for termination in violation of public policy exists where

13   an employee is terminated for refusing to participate in what they believe to be

14   illegal activities.  *Tameny v. Atlantic Richfield* (1980) 27 C3d 167.

15       Plaintiff's opposition to these practice are protected under California

16   Business and Professions Code 17200 which prohibits unfair business practices.

17   Accordingly, there is a triable issue of fact as to whether her termination was in

18   violation of public policy.

19       Furthermore, her termination as a result of engaging in the protected

20   activity of complaining of racial harassment is also a violation of public policy.

21   *Stevenson v. Superior Court* (1997) 16 C4th 880, 885.

22

23

24       **H.  CONCLUSION**

25       Contrary to defendant's assertion, this case is not about isolated

26   "discussions" of race amounting to "social commentary."  If statements such as

27   "I hate Indians," "Where do you think you are, India? Learn to do it the white

28

1  way," "I hate Muslims, they are all terrorists," hoping plaintiff would leave the

2  country so that there would be "one less Indian," as well as comments regarding

3  "sand niggers," and "camel jockeys," are just social commentary, one may as

4  well throw out any application of the law on racial harassment.

5      Given the fact that these comments were made by plaintiff's supervisor,

6  the law is clear that a triable issue of fact exists as to whether this amounts to

7  severe or pervasive harassment.  In our view, it does.

8      Furthermore, there is a triable issue of fact whether plaintiff's termination

9  coming just days after she last reported racial harassment and was greeted with

10 a threat of termination.  Particularly since the termination was by the two

11 individual involved in her harassment; the person to whom she had reported the

12 harassment and the person about whom she had complained.

13     Plaintiff respectfully requests that defendant's Motion for Summary

14 Judgement, or in the alternative, Partial Summary Judgement be denied.

15

16

17 Dated: May 12, 2008                LAMBERTO & KREGER

18

19                                By: /s/ Brian S. Kreger

20                                    BRIAN S. KREGER
                                      Attorneys for Plaintiffs

21

22

23

24

25

26

27

28