1  BRIAN S. KREGER, State Bar No. 106707
   LAMBERTO & KREGER
2  160 W. Santa Clara St., Suite 1050
   San Jose, CA 95113
3  Telephone: (408) 999-0300
   Facsimile: (408) 999-0301
4
   Attorneys for Plaintiffs
5

6

7

8              UNITED STATES DISTRICT COURT

9      NORTHERN DISTRICT OF CALIFORNIA-SAN JOSE DIVISION

10

11  JASBIR GILL, MAHMOUD KEDKAD,          Case No. C 07-04112PVT

12                                        EVIDENCE SUBMITTED BY
                    Plaintiffs,           PLAINTIFF IN OPPOSITION TO
13                                        DEFENDANT'S MOTION FOR
    vs.                                   SUMMARY JUDGMENT OR IN
14                                        THE ALTERNATIVE PARTIAL
    KNOWLEDGESTORM, INC. a corporation,   SUMMARY JUDGMENT
15  DOES 1 THROUGH 50,
                                          DATE: June 3, 2008
16                  Defendants.           TIME: 10:00 a.m.
                                        / COURTROOM: 5
17

18      Plaintiff submits the following evidence in opposition to defendant's Motion

19  for Summary Judgment or in the Alternative, Partial Summary Judgment:

20  DECLARATION OF BRIAN S. KREGER

21  EXHIBIT A: Excerpts of the deposition of Jasbir Gill

22  EXHIBIT B: Excerpts of the deposition of Mahmoud Kedkad

23  EXHIBIT C: Excerpts of the deposition of Joe Niederberger.

24

25  Dated: May 12, 2008              LAMBERTO & KREGER

26

27                                   By: /s/ Brian S. Kreger
                                         Brian S. Kreger, Attorney for plaintiff
28

1   BRIAN S. KREGER, State Bar No. 106707
    LAMBERTO & KREGER
2   160 W. Santa Clara St., Suite 1050
    San Jose, CA 95113
3   Telephone: (408) 999-0300
    Facsimile: (408) 999-0301
4
    Attorneys for Plaintiffs
5

6

7

8                   UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA-SAN JOSE DIVISION

10

11   JASBIR GILL, MAHMOUD KEDKAD,          **Case No. C 07-04112PVT**

12
                    Plaintiffs,
13
     vs.                                   **DECLARATION OF BRIAN S.**
14                                         **KREGER IN OPPOSITION TO**
     KNOWLEDGESTORM, INC. a corporation,   **MOTION FOR SUMMARY**
15   DOES 1 THROUGH 50,                    **JUDGMENT**

16                  Defendants.            DATE: June 3, 2008
                                        /  TIME: 10:00 a.m.
17                                         COURTROOM: 5

18

19

20       I, Brian S. Kreger, declare:

21   1. I am an attorney at law licensed to practice in the State of California and the

22   United States District Court, Northern District of California.

23   2. I am the attorney of record for plaintiffs herein.

24   3. I have person knowledge of the matters set forth herein and if called as

25   witness could competently testify thereto.

26   4. Attached hereto and marked as exhibit "A" are true and correct copies of

27   excerpts of the deposition of Jasbir Gill.

28   4. Attached hereto and marked as exhibit "B" are true and correct copies of

     Declaration of Brian S. Kreger in opposition
     to Motion for Summary Judgment

1  excerpts of the deposition of Mahmoud Kedkad.

2  4.  Attached hereto and marked as exhibit "C" are true and correct copies of

3  excerpts of the deposition of Joe Niederberger.

4

5      I declare under penalty of perjury under the laws of the State of California

6  and the United States of America that the foregoing is true and correct.

7      Executed this 12th day of May, 2008 in San Jose, California.

8

9

10                              /s/ Brian S. Kreger
                                Brian S. Kreger, Attorney for plaintiff
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFIED
COPY

1              UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3                          --0--

4

5    JASBIR GILL, MAHMOUD KEDKAD,    )
                                     )
6              Plaintiffs,           )
                                     )
7    vs.                            )    No. C 07-04112 PVT
                                     )
8    KNOWLEDGESTORM, INC., a         )
     Corporation, DOES 1 through 50,)
9                                    )
               Defendants.           )
10   ------------------------------

11

12

13

14            DEPOSITION OF JASBIR KAUR GILL

15

16

17   DATE:           Monday, January 14, 2008

18

19   TIME:           10:07 a.m.

20

21   LOCATION:       Bell & Myers
                     2055 Junction Avenue, Suite 200
22                   San Jose, CA 95131

23

24   REPORTED BY:    Anna S. Allen
                     Certified Shorthand Reporter
25                   License Number 9954

EXHIBIT A

1    with Katie or Lisa your belief that there was a

2    systematic harassment by Joe Brown of you?

3        A.   I think I said, yes, I did discuss the facts

4    that Joe is not cooperating, Joe is not answering my

5    calls, Joe does not want to help me out.  So I think

6    that when there's a pattern that's being established and

7    you're discussing it with your colleagues, that does

8    smell of some sort of -- it does smell of harassment.

9        Q.   Do you believe that Joe was helping others to a

10   greater extent than you?

11       A.   I did not hear anybody else complain.

12       Q.   Okay.  My question is, do you believe that Joe

13   Brown was helping others more favorably than he was

14   helping you?

15       A.   Yes, I do believe so.

16       Q.   Which individuals do you believe he was helping

17   to a greater extent than he was helping you?

18       A.   Katie Kimball, Lisa McGuire, Joe Niederberger,

19   Joe Kaniewski, Tracy Mikolajewski, who were all getting

20   his help.

21       Q.   Anyone else?

22       A.   Those are the only people in the office.

23       Q.   Well, what point in time?  I thought there was

24   Mike Kedkad.

25       A.   Mike Kedkad was almost in the same boat I was.

61

1    Q.   How do you know that?

2    A.   Because we discussed.

3    Q.   So in terms of individuals that you believed

4    Joe Brown was not being as responsive or helpful, the

5    two individuals that you identified so far is yourself

6    and Mike Kedkad.   Anybody else?

7    A.   No, nobody else.

8    Q.   So he would have been more responsive and

9    helpful to someone like Kevin Cummings as well?

10    A.   Absolutely.

11    Q.   But you did not discuss with Katie or Lisa any

12    of the racial slurs that you say Joe Brown made; is that

13    right?

14    A.   No, I did not.

15    Q.   Did you discuss with anyone --

16    A.   Yes.

17    Q.   -- excuse me -- anyone at the South San

18    Francisco office these racial slurs that Joe Brown made?

19    A.   Anyone at the South San Francisco office?

20    Q.   Yes.

21    A.   Yes.

22    Q.   Who?

23    A.   Mike Kedkad.

24    Q.   Anyone else?

25    A.   No.

62

1        A.    Yes.

2        Q.    Was that the reason why you were printing it

3    up?

4        A.    Yes.  So this print -- so at that time, you had

5    asked me why I had made my resume.  So this was to leave

6    a copy of my resume at my lawyer.

7        Q.    But this was something that you were doing at

8    work; is that right?

9        A.    I was on my way out from work.  I had done my

10    full day's work.  I was on my way out and I'm printing a

11    copy.  This is work-related because my H-1B is sponsored

12    by my work.  So my understanding is this is work

13    related.  And so I'm using not company time but company

14    resource to print a resume, yes.

15        Q.    Okay.  And this was at a period of time not too

16    far after you had had conversations with Joe and Jason

17    where they were trying to understand whether or not you

18    were going to be staying with KnowledgeStorm; is that

19    correct?

20        A.    Probably, yes.

21        Q.    Are you saying that Jason Hoback never told you

22    that it was a violation of company policy to use company

23    time and equipment to print out your resume?

24        A.    Rephrase that question.

25        Q.    Sure.  Are you saying that Jason Hoback never

135

1    told you that it was a violation of company policy to

2    use company time and equipment to print out your resume?

3        A.    I don't think I still understand your question.

4    Jason never told me that?  Where does that come in this

5    context?

6        Q.    My question is:  Are you saying that Jason

7    Hoback never told you that it was company policy to --

8    that it was a violation of company policy to use company

9    time and equipment to print out your resume?

10       A.    No.

11       Q.    So he didn't tell you, at least according to

12   what you're stating here, the reason why you were being

13   terminated?

14       A.    Other than the fact that I had violated company

15   policy.

16       Q.    He didn't say what policy you had violated?

17       A.    No.

18       Q.    Did he ever tell you the company's trust had

19   been broken due to your behavior?

20       A.    No.

21       Q.    But he did tell you that the company was

22   terminating your employment effective that day; is that

23   correct?

24       A.    I think that day was April 12th.  He said

25   April 13th.

136

1    A.    I have every reason to disbelieve that.  My

2  belief is that I was terminated based on my race.  I was

3  terminated because I had complained about racial

4  discrimination, of harassment.  I think that was the

5  main reason why I was terminated.

6    Q.    Do you know of anyone else who printed out his

7  or her resume while on company time who the company

8  understood was printing out his or her resume and was

9  not terminated?

10    A.    I think I recollect Lisa McGuire printing out

11  her job offer letter from another company, which my

12  understanding is, it even fell into the management's

13  hand but yet, I think she was required -- she was

14  requested to stay on.

15    Q.    Okay.  Do you have any proof of that?

16    A.    Her own word.

17    Q.    Anyone else?

18    A.    Not that I know of.

19    Q.    When do you contend was the first time Joe

20  Brown made statements about your national origin or race

21  that you found offensive?

22    A.    To the best of my recollection, I think it was

23  the first week of January when I had asked him to come

24  and take a look at an email that I was writing to a

25  client, to see if he needed to add something or if he

139

1     felt that was the right way of describing some of the

2     programs that we offer.

3                And he came, and he looked at it, and he said,

4     "Well, that's what they teach you in India?  You need to

5     learn the right way, which is the white man's way," and

6     he just shrugged his shoulders and left.

7          Q.    Do you recall the client to whom you were

8     writing this email?

9          A.    Unfortunately, I do not.

10         Q.    But he was in the office in San Francisco?

11         A.    Yes.

12         Q.    And you were at your cubicle?

13         A.    Yes.

14         Q.    And did you ask Joe Brown to come over?

15         A.    Yes.  I went over to his office and his office

16    door was opened.  He had just walked in.  And I said --

17    it was very early in the morning.  I said:  Do you have

18    a minute to come and look over -- I've typed up

19    something I can show you, because I was fairly new in

20    describing some of the programs.

21                And he came over and he looked at it and he

22    just said:  Is that what they teach you in India?  And

23    he said:  You need to learn the right way, which is the

24    white man's way.  And he left.  And I didn't know what

25    to make of it.

1     Q.    So that was in the early morning?

2     A.    Yes.

3     Q.    Are you aware of anyone else that would have

4     heard that comment?

5     A.    I am not aware of anybody else.

6     Q.    Was there anyone else at that time in the

7     morning that was at the office?

8     A.    Could be.  I'm not sure.  I don't know.

9     Q.    When you say early in the morning, would it

10    have been before -- it's hard to say what working hours

11    are -- before 9 o'clock in the morning?

12    A.    Yes, it was probably around 8:30-ish, I think.

13    Q.    And did you have any response to him at all?

14    A.    Did I respond?

15    Q.    To Joe Brown after he made that comment.

16    A.    He just left.  He just walked away from it.  He

17    said what he said and he walked away from my cube.

18    Q.    Did you let anyone know about that statement?

19    A.    Jason Hoback.

20    Q.    When did you let him know?

21    A.    It was, I think, the week of March -- I'm

22    sorry -- the week of January, the last week, I think, on

23    January 31st.  Jason Hoback had come to the office, and

24    I asked him if I could talk to him.  I told him -- I

25    said:  You know, I just want to let you know, I'm

141

1    shocked that Joe Brown said something like that.

2              And so that's when I let him know that.

3         Q.    So Jason Hoback was in the office around, you

4    said, January 30th or 31st?

5         A.    I think it was the 30th or 31st, one of those

6    dates, yes.

7         Q.    And so this would have been something that you

8    would have told Jason face to face?

9         A.    Yes.

10        Q.    Was anyone else there when you told Jason?

11        A.    It was in his office and we closed the door.

12        Q.    So in one of the two closed door offices?

13        A.    Yes.

14        Q.    Why didn't you tell Jason Hoback about that

15    comment before the 31st?

16        A.    I think I wanted to but I found out he was

17    going to be coming to the San Francisco office, so I

18    figured I'll just wait until he comes and I'll tell him

19    in person.

20        Q.    In other words, there wasn't a need to tell him

21    before the 31st?

22        A.    I don't think I would say there wasn't a need.

23    I think it was a comfort level.  I felt I'd be more

24    comfortable telling him something like this in person

25    rather than over the phone.

                                                           142

1    giving you some inbound leads.

2              And so that's what Jason Hoback said.

3        Q.   Do you know others that were getting inbound --

4    what do you call them?

5        A.   Inbound leads.

6        Q.   Inbound leads?

7        A.   Yes.

8        Q.   Who?

9        A.   Joe Niederberger was getting inbound leads, I

10   know Lisa McGuire was getting those inbound leads, I

11   know Rick Neigher was getting those inbound leads, I

12   know Katie Kimball had strategic accounts that she was

13   working on.  I never heard any one of them make any cold

14   calls other than myself.

15       Q.   Okay.  And did you ever get any inbound leads?

16       A.   None.

17       Q.   What was the next statement that Joe Brown made

18   to you based on your race or national origin that you

19   found offensive?

20       A.   That concerned me?  I was told of the fact that

21   while I was in India, he had asked a colleague when I

22   was coming back, and that maybe I won't come back;

23   anyways, he didn't like Indians because they were taking

24   all the jobs in the bay area so it's good, maybe I'll

25   stay out back there.

144

1    Q.    Who told you about that?

2    A.    He made that comment to Mike Kedkad.

3    Q.    And when did Mike tell you about this comment?

4    A.    A few days after I came back.

5    Q.    Where were you?

6    A.    As far as I can recollect, we were in my

7    office.  We were in our office.

8    Q.    Again, just so I understand, the cubicle?

9    A.    It is a cubicle.

10    Q.    Was anyone else there when Mike told you this?

11    A.    Not that I know of.  There could have been

12    other people around.  I don't know if anybody heard him

13    tell me that.

14    Q.    I know that you gave me fairly specific

15    information that Mike told you, but I'm trying to get

16    more specific.  Do you recall everything that Mike told

17    you about the comment that Joe Brown allegedly made

18    while you were in India?

19    A.    My understanding is that he asked Mike if he

20    had heard back from me, if he knew where I was.

21          And Mike said:  Well, I think she must be busy

22    with her family, that she had to go see a few clients as

23    well.

24          I think in respect to that, Joe Brown made that

25    comment, that maybe I won't come back, there's too many

1    Indians and he hated them.

2        Q.    Did you ask Mike if he said anything in

3    response?

4        A.    I asked Mike:  Did you say anything?

5              He said:  What could I say?  I was shocked.  I

6    didn't know what to say at that point.

7        Q.    I'm sorry.  Was this in the morning or in the

8    afternoon?

9        A.    That I don't know, because I was not present at

10    that time.

11        Q.    I'm sorry.  When Mike told you this comment.

12        A.    I don't recollect the time.

13        Q.    Okay.  But you do recollect that it was in your

14    cubicle?

15        A.    Yes.

16        Q.    That Mike came to your cubicle?

17        A.    Either I went to his cubicle or he came to my

18    cubicle.  It was of the two.

19        Q.    And you don't recollect or you do recollect

20    that no one else was there when this comment was made?

21        A.    I said that I do not know if there were other

22    people around.

23        Q.    Okay.

24        A.    There could have been other people around.  I

25    don't know if anybody heard him say that to me.

146

1        Q.   Did Mike tell you whether anyone else was

2    around Mike when Joe made that comment?

3        A.   I don't think I even asked Mike that question.

4        Q.   Do you know whether someone else was around?

5        A.   I don't know.

6        Q.   Did you report this comment to anyone that Mike

7    Kedkad had told you?

8        A.   Yes, that was reported to Jason Hoback.

9        Q.   When did you make that report to Jason Hoback?

10       A.   It was some time the last week of March when I

11   had a phone conversation with Jason.

12       Q.   So this would have been approximately -- well,

13   let me ask you this:  Was Jason physically present at

14   the time?

15       A.   No.  This was a phone conversation and I think

16   you even have it as an exhibit.

17       Q.   It was the email where it said, "Please call me

18   privately"?

19       A.   Yes.

20       Q.   And were you the only person on that telephone

21   with --

22       A.   Yes.

23       Q.   And I'm sorry.  You said you got back from

24   India approximately when?

25       A.   Fifth of March.

147

1      Q.   Why did you wait until the last week in March

2    to call Jason about this comment?

3      A.   I found out about two weeks after I came back.

4    And then that was the next time I was going to be

5    talking to Jason Hoback.  I had been -- we had been

6    playing phone tags.  He would call me, I would call him.

7    And then that just happened to be the date I was talking

8    to him.

9      Q.   And if I recall about that conversation, there

10   were other topics you guys were discussing?

11     A.   Yes.

12     Q.   So when Mike came to you or you were at Mike's

13   cubicle, one or the other, that was a couple of weeks

14   after you returned from India?

15     A.   Yes.

16     Q.   Do you recall what date Mike Kedkad came to

17   you?

18     A.   I don't recall that date exactly, no.  I don't

19   recall that date.

20     Q.   What was the next statement, if there was one,

21   that Joe Brown made to you about you concerning your

22   national origin or race that you found to be offensive?

23     A.   Somewhere around the last week of March, I

24   recollect Joe Brown being in the office.  And we were

25   talking of my account Infosys.  And we start -- we

148

1    started discussing the economy and his question came up

2    as to what my thoughts on the war in Iraq were.

3        And my answer to him was that this is not a

4    time and place for us to discuss my idea or my views on

5    the war in Iraq.

6        And Joe Brown's comment was:  Oh, well, I don't

7    care, I hate Muslims, I think all Muslims are terrorists

8    anyway.

9    Q.    And are you Muslim?

10   A.    I am not.

11   Q.    What is your religion?

12   A.    Sikh.

13   Q.    But you found -- I'm sorry.  My question was,

14   what was the next statement that Joe Brown made about

15   your race or national origin?

16   A.    Even if I am not a Muslim, that is a very

17   offensive statement.

18   Q.    So you found it offensive, but it wasn't about

19   your race or --

20   A.    Maybe Joe Brown thinks I'm Muslim.  I don't

21   know.

22   Q.    You don't know whether he thinks that.

23   A.    I don't know.  Maybe he thinks that and that's

24   why he made that comment.  I don't know.  But you asked

25   me what was the next offensive comment.  That was the

149

1    offensive comment, that even if I am not Muslim, I find

2    that very offensive.

3        Q.    My question was, what was the next comment that

4    Joe Brown made about your race or your national origin

5    that you found offensive?  And I think you just

6    identified the next statement that you found offensive

7    that came from Joe Brown.

8            Was there any other statement made by Joe Brown

9    about your race or your national origin that you found

10   offensive?

11       A.    I know there was another occasion -- I don't

12   remember the exact date and timing of this -- Joe Brown

13   made a comment in which he said:  Non-whites have a very

14   difficult time in sales and that they should just pack

15   up their bags and leave.

16       Q.    And you're saying you don't recall when that

17   was?

18       A.    I know that this was made in one of his visits

19   which was early on, I think, some time in the second

20   week of January when he was around.

21       Q.    So non-whites have a difficult time in sales

22   and that they should just pack up and leave.  This was

23   something -- was it a comment he made to you?

24       A.    It was a comment that I think we were talking

25   of certain sales aspects of how Indians and what kind of

                                                          150

```
 1      A.   No.

 2      Q.   And all of the comments that we have just

 3   identified, other than to Jason Hoback, did you let

 4   anyone else at KnowledgeStorm know about these comments?

 5      A.   Mike Kedkad would be one and that's it.

 6           MR. KREGER:  Can we take a quick break?

 7           MR. MOKOTOFF:  Sure.

 8           (Break taken.)

 9           (Defendants' Exhibit 16, 5-11-07 Complaint of

10   Discrimination, marked for identification.)

11           MR. MOKOTOFF:  Back on the record after a

12   break.

13           BY MR. MOKOTOFF:  (Q)  Ms. Gill, I'm going to

14   refer your attention to what's been marked as Exhibit 16

15   to your deposition, and I believe it's your charge of

16   discrimination.

17           Is that your signature at the bottom of Exhibit

18   16?

19      A.   Yes.

20      Q.   And it's dated May 4th, 2007; is that correct?

21      A.   Correct.

22      Q.   And did you file this with Mike Kedkad?

23      A.   I'm sorry.  Say that again?

24      Q.   Let me back up because I think that's assuming

25   facts we haven't gotten to yet.
```

157

1    down my questions to you.  It says:

2            "Joe Brown stated to another employee regarding

3            Mr. Kedkad, 'What do you think of the camel

4            jockey working for KnowledgeStorm?  Why don't

5            you take the SWAT out on him so he will start

6            making some calls.'"

7            My question to you is:  Had you heard of that

8    comment while you were employed by KnowledgeStorm?

9        A.    Had I heard of that while I was employed?  I

10    think I was -- no.  That comment I had not heard while I

11    was working.

12        Q.    In paragraph 7, there is a statement that

13    focuses on Mr. Kedkad made by Joe Brown, essentially, a

14    statement to the effect of:  Why are you dressed like

15    this?  This is not the middle east.

16            Were you aware of that statement while you were

17    employed by KnowledgeStorm?

18        A.    Yes, I was.

19        Q.    How did you become aware of that statement?

20        A.    I was, in fact, right there when that comment

21    was made.

22        Q.    But that's not the comment you and I had

23    discussed previously; is that correct?

24        A.    No.

25        Q.    And you said you were right there when that

                                                    163

1    comment was made.  Again, let's sort of paint the

2    context.  Where were you when this comment was made?

3        A.    I was -- if I fairly very correctly remember, I

4    was walking towards Joe Brown's office.  And I saw Mike

5    Kedkad come in to work.  And he said good morning to Joe

6    Brown.  And I stood there, just because I was saying

7    good morning as well.

8            And the first comment Joe Brown made is:  Why

9    are you dressed like that?  It's not the middle east.

10       Q.    Do you recall what Mike was wearing?

11       A.    He was wearing normal pant and shirt.

12       Q.    And was anyone else there at the time?

13       A.    I am not aware.

14       Q.    Do you recall approximately when this comment

15   was made?

16       A.    Some time in the morning.

17       Q.    And was it January, February, March, April,

18   December?

19       A.    Best of my recollection, it was probably

20   January.

21       Q.    Okay.  And was this at or around the same time

22   that he made the comment to you about the white man's

23   way is the right way?

24       A.    To the best of my recollection, I would say

25   somewhat around the same time.

164

1    the Complaint that talks about not being invited to a

2    business dinner.  I want to make sure that paragraph

3    does or does not relate to any allegations that you're

4    bringing.

5        A.  It does not relate to me.

6        Q.  Paragraph 12 of the Complaint, there is a

7    statement that's attributed to Joe Brown commenting to

8    Mr. Kedkad that he hated Indians and they were taking

9    all the jobs.  Is that the same comment that you and I

10   spoke about earlier today?

11       A.  Yes.

12       Q.  Okay.  In paragraph 13 of the Complaint, there

13   is a statement made that Joe Brown called you on --

14   well, it says:

15            "Joe Brown called plaintiff Gill and shouted at

16            her in a very threatening voice, asking her if

17            she was leaving or staying.  He said that she'd

18            better tell him or he would make it very

19            difficult for her to do her job."

20            I don't believe that's something that we have

21   talked about yet, but if we have, I apologize.  Can you

22   tell me about the context of that conversation that

23   occurred the week of March 19th, 2007.

24       A.  Yes.  I unexpectedly receive a call.  It's

25   about, to the best of my recollection, towards the end

167

1    of the afternoon.  And I get a call from Joe Brown in a

2    very threatening, very demanding, demeaning,

3    intimidating voice.

4            He says:  I just want to ask -- I want to find

5    out from you, are you leaving or are you staying?

6            So my response to him was:  Joe, what kind of

7    question is that?

8            He said to me:  If you don't tell me, I will

9    make it very difficult for you to do your job here.

10           And my response to him again was:  I don't know

11   what kind of question that is.

12       Q.   Anything more to that conversation?

13       A.   That's it.

14       Q.   Do you know why he was calling you and

15   questioning whether you were leaving or staying?

16       A.   I do not know.

17       Q.   You made the statement that he was calling you

18   in a very threatening voice.  Was he screaming or was

19   he -- how would you describe -- you used the word "very

20   threatening."

21       A.   He was using foul language.  He was very rude,

22   very loud, very angry.

23       Q.   Do you recall what foul language he was using?

24       A.   To the best of my recollection, he used the

25   "damn" word, he used the "F" word.

168

1        Q.    Was Joe Brown someone, to your recollection,
2    who shouted?
3        A.    Yes.
4        Q.    Okay.  Was Joe Brown someone, to your
5    recollection, who had a temper?
6        A.    Yes.
7        Q.    And was it based on incidents other than this
8    telephone conversation?
9        A.    Repeat that question.
10       Q.    Sure.  Was it your understanding and belief
11   that Joe Brown was someone who was -- I can't recall
12   whether I said screaming but someone who had a hot
13   temper based on this conversation alone or on other
14   actions as well?
15       A.    I do not know his contact with other Caucasian
16   employees, but I know that most of his conversations
17   with me, he used some sort of foul language, he raised
18   his voice in some sort of fashion.  Or if I tried to
19   show him -- if I try to tell him that I think, Joe, in
20   this call, we should have done this, he would get angry
21   as to why I was saying that, you'd better listen to me,
22   or it was very threatening and demeaning, his tenor and
23   tone was very threatening and demeaning.  I don't know
24   if it was consistent with other employees, but to me
25   that was his contact.

169

1    mention anything about Mike Kedkad; is that correct?

2        A.    No, other than the fact that I heard from Mike

3    Kedkad that Joe Brown said he hated Indians.

4        Q.    Right.  And then my second question is:  It

5    says that Mr. Hoback said you should hang in there and

6    be supportive of management.  Is that an accurate

7    statement of what Jason's response was?

8        A.    Yes.  His response was that at this time, when

9    everybody is leaving, I should be more supportive of the

10   management, I should hang in there.

11       Q.    And in paragraph 16, there's a statement that

12   says on the week of March 26, 2007, Joe Brown said in

13   front of you:  All Muslims are terrorists.

14             Is that the statement that you and I have

15   discussed earlier?

16       A.    Yes.

17       Q.    There is a statement in paragraph 17 that says

18   that Joe Brown said to Mike Kedkad:  You should go back

19   to school so you can learn to read, write and talk

20   normal like us.

21             Were you aware of that statement while you were

22   employed at KnowledgeStorm?

23       A.    No.

24       Q.    Paragraph 18 references a telephone

25   conversation that says that plaintiffs had on April 3rd,

172

1    2007 with Jason.  And I believe that's the telephone

2    conversation you and I had discussed earlier that you

3    and Mike and Jason had together; is that correct?

4         A.   Yes.

5         Q.   And the paragraph goes on to say:

6              "Plaintiffs asked him about the contract that

7              he had promised them and asked him about the

8              contracts and raises given to other employees

9              and even the ones that were leaving."

10             So let me try to break up that second sentence

11   with some questions.  It says, "Plaintiffs asked him

12   about the contract that Jason had promised them."

13             Is the contract the one that we have discussed

14   where if there was a company that was going to be

15   acquiring KnowledgeStorm, that you would have some

16   secure employment insured by KnowledgeStorm?

17        A.   Yes.

18        Q.   And then it goes on to say that you guys asked

19   him about the contracts and raise he's given to other

20   employees and even the ones that were leaving.

21             What contracts and raises were given to other

22   employees including the ones that were leaving?

23        A.   My understanding was that there was Joe

24   Kaniewski, who was leaving, he was being given a

25   contract that we were talking about, where for six

1    months they wouldn't be let go.  He told us that he was

2    being given a raise.  I know that Rick Neigher was

3    leaving, who worked out of the Los Angeles home office,

4    where he was also being given a raise because he was

5    leaving.  So they were trying to keep these two.

6        Q.    So those two folks told you that they were both

7    given raises in order to try to have them stay on.  And

8    as it relates to Joe Kaniewski, that he was offered this

9    contract as well?

10       A.    Correct.

11       Q.    And then the paragraph goes on to state that

12   you guys told him about the recent racial slurs and

13   discrimination from Joe Brown.

14             And so my question is:  What were the racial

15   slurs and discrimination from Joe Brown that you

16   reference in this April 3rd conversation?

17             MR. KREGER:  I'm going to object; asked and

18   answered.

19             MR. MOKOTOFF:  I'm actually being a little bit

20   more global than my previous question, because it talks

21   about racial slurs and discrimination from Joe Brown.

22             BY MR. MOKOTOFF:  (Q)  So do you understand my

23   question?

24       A.    In all honesty, I don't.

25       Q.    Let me back up.  That sentence says, "They also

1      told him about the recent racial slurs and

2      discrimination from Joe Brown."

3              And my question is:  Can you identify for me

4      what were the recent racial slurs and discrimination

5      from Joe Brown that you identified or that was

6      identified in this April 3rd conversation?

7          A.    I think I have already answered the racial slur

8      part.  And for the discrimination part, I think we

9      reiterated everything that had started from start to

10     that point, to where Joe was uncooperative, would not

11     answer his phone calls.

12             And I think in my case, the more specific

13     incident that happened was on March 29th, where I really

14     needed someone's help to get my contract processed, and

15     Joe did not tell me where he was going to be that day.

16     And so I think those are some of the things that I

17     brought to Jason's attention.

18         Q.    The next sentence says after that says that:

19                 "Jason Hoback became very angry with them and

20                 threatened plaintiffs and said that he would

21                 fire them for creating trouble."

22             Can you tell me what you recall about anything

23     about that sentence.

24         A.    Sure.  Towards the end of the conversation,

25     we -- I'm going to use the word "we" because there were

175

1    both of us at that time.

2          We asked him:  Jason, when can we expect to see

3    something from you in terms of those contracts?

4          And at that point, Jason became very angry,

5    very loud, very agitated, rude, and said:  Damn you

6    guys.  I'm surprised that you guys are behaving in such

7    a noncooperative fashion.  You guys -- I can fire you

8    both if I want to.  And you are not supporting the

9    management.  And he started using the cuss words.  And

10   the next thing I know, the phone went dead.

11        Q.   He hung up on you?

12        A.   Yeah.  My understanding is he hung up on us.

13   And it was a lot of cussing and getting angry.  And then

14   Mike and I were just looking at each other, what

15   happened?

16        Q.   The Complaint said that he would fire you guys

17   for creating trouble.  You just said something to the

18   effect he said:  I can fire you both.  Is that one in

19   the same, in your mind?

20        A.   I think it's one in the same, I can fire you

21   both or I can fire you.

22        Q.   For creating trouble.  What trouble did you

23   understand that you were creating?

24        A.   I don't know what trouble we were creating.

25   Honestly, I don't know what trouble he was referencing.

176

1    Q.    Did he reference his frustration or concerns

2    about you bringing in what other people were promised in

3    terms of raises or contracts?

4    A.    I think -- to my recollection or to the best of

5    my knowledge, I think he was referring to the fact that

6    we kept on bringing the part that Joe Brown was

7    harassing us, we kept on bringing the part that Joe

8    Brown was uttering these racial comments against us.  I

9    think Jason did not like the fact we were bringing it to

10    his attention.

11    Q.    The next sentence in that paragraph 18 says,

12    plaintiff -- I'm not sure if it should be plural or

13    singular -- that they were referred to as "sand

14    niggers."

15        Explain to me -- first of all, were you aware

16    of that comment, the "sand niggers" comment while you

17    were employed at KnowledgeStorm?

18    A.    No.

19    Q.    And have you since become aware of that

20    comment?

21    A.    Yes.

22    Q.    From whom did you learn that?  Well, let me ask

23    you:  Do you know, was this a comment that was made by

24    Joe Brown?

25    A.    My assumption is, yes.

177

1   what I was being referred to as, I just didn't want to

2   go further into it.

3        Q.   Did Joe Niederberger at that time mention any

4   other statements or comments that were attributed to Joe

5   Brown as it related to you or Mr. Kedkad?

6        A.   No.   To me, that was the only comment that he

7   made.

8        Q.   The next paragraph of the Complaint, which is

9   paragraph 19, states that:

10           "Defendants further demanded and plaintiffs

11           refused" -- I'm not sure whether that is

12           singular or plural -- "to commit fraudulent

13           acts, including falsifying start dates and

14           inflating proposals in an effort to defraud

15           potential buyers."

16       My question to you first simply is:   Does

17  paragraph 19 refer or relate to anything done toward

18  you?

19       A.   I think I was a party to it, because I did

20  receive an email where I was asked to pull the contract

21  date for Infosys in, even though they were technically

22  not starting until mid April.   And I remember getting an

23  email from Joe Brown asking salespeople to inflate the

24  proposal by adding advertising even though you know your

25  client will not be buying advertising, and we can adjust

                                                        181

1    I got, which I'm sure the rest of the people got as

2    well, said basically the verbiage that's here without

3    copying of this other email.

4        Q.   Got you.  And so -- I'm sorry.  What do you

5    think is inappropriate about this email?

6        A.   I think the very fact that you're asking people

7    to pull in your contract dates when you know that the

8    client is not going to be starting until April -- so

9    you're basically short charging the client their full

10   six months or three months or whatever that is.

11       Q.   So if you look at the first page of Exhibit 17,

12   can you show me where KnowledgeStorm is short charging

13   the customer?

14       A.   I think that's inherent in the email, if you

15   read it.

16       Q.   And I'm having a difficult time understanding

17   it.  Where is it inherent in the email that you're

18   charging a customer for something that they're not

19   receiving?

20       A.   I personally feel that this is -- my personal

21   belief on this is that this is not fair, because when

22   you know that you are -- the client is technically not

23   starting until, let's say, the middle of April, then why

24   are you pulling them -- why are you asking them to sign

25   a contract saying that, yes, they're starting on a

185

1    certain day when they're really not starting on the

2    certain date?

3              That's the problem I have with it.  Why should

4    I ask my clients to sign a document saying that I'm

5    starting on April 1st when they're -- and I'm just

6    making up that date.  I'm not going by these dates.  I'm

7    just saying -- sign a document saying you're starting

8    April 1st when you're really not starting until

9    April 15?  So even if you're not short changing the

10   client, why should the client sign that?

11        Q.   And you're saying you never did go to your

12   clients to ask them to do this?

13        A.   No, I did not.

14        Q.   And you believe that you were terminated

15   because you didn't?

16        A.   I think I was terminated because I brought the

17   racial comments.  I think I was terminated because --

18   also because I did not want to participate in this.  But

19   maybe that played a smaller part.  The major part was I

20   was racially targeted.

21        Q.   And let's see.  And inflating proposals.  I

22   think you had mentioned there was an email related or

23   discussed marketing advertising to potential customers;

24   is that correct?

25        A.   Correct.

186

1    Q.    Okay.    Explain to me what you understood

2    KnowledgeStorm to be doing inappropriately.

3    A.    I think when you are fully aware that your

4    client is not going to be buying advertising, and you're

5    putting in a line item of advertising and showing

6    $10,000, I feel that, in my personal belief, that's

7    inflating a proposal; because, though, you know a

8    hundred percent that the client is not going to be

9    buying advertising, why should I put a line item of

10    advertising when I know they're not going to be buying

11    advertising?

12        So the email specifically said we should put

13    that in there because then we'll look good in terms of

14    how many proposals -- the value of the proposals that

15    we're generating in front of our prospect buyers.

16    Q.    And do you believe that that was a reason why

17    you were terminated?    Because you didn't provide this

18    item offer to your client prospects?

19    A.    I think I'm going to repeat myself.    I think I

20    was terminated because I was racially targeted.    I was

21    terminated because I brought the racial comments up

22    front.    And I think these two items maybe played a

23    little part in it, I think, because I was noncooperating

24    in doing these things, but I think the major part of it

25    was my race.

187

CERTIFIED
COPY

1          UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3                        --0--

4

5     JASBIR GILL, MAHMOUD KEDKAD,      )
                                        )
6               Plaintiffs,             )
                                        )
7     vs.                               )    No. C 07-04112 PVT
                                        )
8     KNOWLEDGESTORM, INC., a           )
      Corporation, DOES 1 through 50,)
9                                       )
                Defendants.             )
10    ------------------------------

11

12

13

14               DEPOSITION OF MAHMOUD KEDKAD

15

16

17    DATE:           Tuesday, January 15, 2008

18

19    TIME:           10:15 a.m.

20

21    LOCATION:       Bell & Myers
                      2055 Junction Avenue, Suite 200
22                    San Jose, CA 95131

23

24    REPORTED BY:    Anna S. Allen
                      Certified Shorthand Reporter
25                    License Number 9954

EXHIBIT B

1    having ever received a copy of the handbook?

2        A.    I do not.

3        Q.    Do you recall ever receiving a copy of the

4    company's no-harassment policy?

5        A.    At some point in time, yes.

6        Q.    While you were employed at KnowledgeStorm?

7        A.    Correct.

8        Q.    Okay.  Do you recall when you would have

9    received a copy of the company's no-harassment policy?

10       A.    After some accusations to me in some meetings,

11   probably May --

12       Q.    Okay.

13       A.    -- of 2006.

14       Q.    Of 2007?

15       A.    2007.

16       Q.    Do you recall reading that no-harassment policy

17   when you would have received it in or about May of 2007?

18       A.    Yes, I looked it over.

19       Q.    Okay.  When you started working for

20   KnowledgeStorm in 2006, did you understand the reporting

21   structure at KnowledgeStorm in terms of who you would be

22   reporting to?

23       A.    I have already answered that.

24       Q.    Did you understand -- so let me clarify that.

25   Did you understand that you'd be reporting to Joe Brown?

62

1      A.   Yes.

2      Q.   Okay.  And did you understand who Joe Brown's

3   boss was?

4      A.   Yes.

5      Q.   And who was that?

6      A.   Jason Hoback.

7      Q.   And did you understand who Jason Hoback's boss

8   was?

9      A.   Yes.

10      Q.   And who was that?

11      A.   Jim Canfield.

12      Q.   Were any of those three gentlemen physically

13   located out of the South San Francisco office?

14      A.   Could you rephrase it?

15      Q.   Sure.  Was either Joe Brown, Jason Hoback or

16   Jim Canfield physically located out of the South San

17   Francisco office?

18      A.   All three of them are.

19      Q.   They were physically located out of the South

20   San Francisco office?

21           MR. KREGER:  Do you mean to ask it that way?

22           MR. MOKOTOFF:  I will try to rephrase that.

23           MR. KREGER:  "Out of" sounds like not in San

24   Francisco.

25           MR. MOKOTOFF:  Thank you for that

63

1    clarification.

2          BY MR. MOKOTOFF:    (Q)   Let me rephrase my

3    question, Mike.   Do you know, was Joe Brown employed out

4    of the Atlanta, Georgia office?

5          A.   I think you're asking me a question that I

6    don't know, because that's an arrangement that's been

7    made.

8          Q.   And so --

9          A.   I can tell you what I --

10         Q.   What you believe?

11         A.   What I believe.

12         Q.   That's all I'm asking.

13         A.   They're commuting managers, so they could have

14    the arrangement made with them to be between both.

15         Q.   Your understanding is they were commuting

16    managers?

17         A.   Commuting managers, yes.

18         Q.   We have previously been discussing your

19    coworkers out of the South San Francisco office when you

20    started working for KnowledgeStorm, and you named

21    Jasbir, Lisa, Kevin, Katie and Rachel.

22          As you evolved in your employment at

23    KnowledgeStorm, would you identify any of those

24    coworkers as coworkers with whom you had a better

25    professional relationship than others?

64

1      Q.   You don't remember whether you did or didn't?

2      A.   I don't know whether I did or didn't.

3      Q.   Do you believe KnowledgeStorm took adverse

4   action against you because you did not send Objectivity

5   an addendum?

6      A.   No.

7           MR. KREGER:  Can we take a break?

8           MR. MOKOTOFF:  Good time.

9           (Lunch break taken.)

10          MR. MOKOTOFF:  We're back on the record after

11  lunch.

12          BY MR. MOKOTOFF:  (Q)  This morning, early on

13  in your testimony, we were discussing some of your prior

14  employers before working for KnowledgeStorm.  And one of

15  those employers was SunGard Systems.

16          I forgot to ask:  Do you recall what your

17  compensation was when you were working for SunGard?

18     A.   Eighty thousand base.

19     Q.   How about Xtiva?  Do you recall what your

20  salary was?

21     A.   I believe it's 85,000 base.

22     Q.   Mike, when do you contend was the first time

23  that Joe Brown made statements about your national

24  origin or race that you found offensive?

25     A.   The first time was probably few weeks after I

98

1        Q.    At KnowledgeStorm.

2        A.    Joe Brown.

3        Q.    Okay.  Other than the comment that we have just

4    discussed that he made, did he refer to you as a camel

5    jockey subsequent to that occasion?

6        A.    No.

7              MR. KREGER:  You mean that he heard?

8              MR. MOKOTOFF:  Well, I didn't ask him

9    whether --

10             BY MR. MOKOTOFF:   (Q)   That you heard, that

11   you're aware of.

12       A.    Yes.

13       Q.    Have you had an opportunity to discuss with Joe

14   Niederberger this comment, since you first overheard it?

15       A.    No.

16       Q.    Did you report this comment to anyone?

17       A.    Jason Hoback.

18       Q.    When did you report that to Jason?

19       A.    I reported this to Jason when we went to visit

20   a client in person, after the visit to the client.

21       Q.    Do you recall when that was?

22       A.    End of January.

23       Q.    Do you recall the client that you were

24   visiting?

25       A.    PostPath.

103

1        Q.    PostPath?

2        A.    Um-hum.

3        Q.    And you said you told Jason of this comment

4    after you visited the client?

5        A.    That's correct.

6        Q.    Were you guys driving in the car together when

7    you told him?

8        A.    Actually, I asked -- when we finished the

9    visit, I asked if I can speak to him privately.

10       Q.    And where did you speak to him privately?

11       A.    We spoke in his car.

12       Q.    And in his car is when you told him about this

13   comment?

14       A.    Yes.

15       Q.    Did you tell him about any -- were there any

16   other comments at that time you told him about?

17       A.    Yes.

18       Q.    What else did you tell him about?

19       A.    I told him about Joe Brown making fun of my --

20   the way I dress.  I told him about the nonsupportive

21   attitude and nonresponsiveness of Joe Brown that is

22   creating an unfriendly and hostile environment for me to

23   do my job.  I also reminded him of his words to me that

24   I would be handling accounts and I'd be handling leads

25   and when would that happen.

1      Q.    When you told Jason about the camel jockey

2    comment and the making fun of the way that you dress, do

3    you recall what Jason's response was?

4      A.    He played it down.

5      Q.    Specifically, what do you recall?  How did he

6    play it down?

7      A.    Don't exactly remember the words, but something

8    like, really, or oh, no.

9      Q.    Okay.  When you reminded Jason of his promise

10   concerning handing you accounts and providing leads, do

11   you recall what his response was?

12     A.    His response is, bear with us, we'll be giving

13   you accounts.  Joe is an inexperienced manager and we're

14   looking -- actively looking for a new manager and things

15   will change.  A few other things I can't recall from my

16   conversation.

17     Q.    The making fun of the way you dress comment

18   that Joe Brown made, when did that occur?

19     A.    That occurred on at least a couple of

20   occasions.

21     Q.    Okay.  Can you tell me the first time that that

22   occurred.

23     A.    The first time, I was coming into work and he

24   was at his office.

25     Q.    And approximately when during your employment,

105

1    in other words, date-wise, did this occur?

2        A.    Probably middle of January.

3        Q.    And you were coming into work and you said you

4    passed by Joe Brown's office?

5        A.    Yes.

6        Q.    And what did he say?

7        A.    He got up and we greeted each other.  And then

8    he looked at me and he made that derogatory comment.

9        Q.    What did he say?

10       A.    He said:  Why are you dressed like this?  You

11   think you're in the Middle East?

12       Q.    Do you recall what you were wearing?

13       A.    Probably a long shirt and pants, a heavy shirt.

14   I didn't have a jacket on that day.

15       Q.    Was there anything that you were wearing that

16   would have been distinctive to the Middle East?

17       A.    No.

18       Q.    Okay.

19       A.    Well, the second occasion might be.

20       Q.    So the first occasion was the middle of

21   January, you're coming into work, passing by his office,

22   and you were wearing a long shirt and pants.  And he

23   said, Why are you dressed like this?  You think you're

24   in the Middle East; is that correct?

25       A.    Yes.

106

1      Q.    Did you say anything in response to that?

2      A.    No.

3      Q.    What was the second time?

4      A.    Second time, probably a day or two after that.

5      Q.    Okay.  What did he say then?

6      A.    I was wearing a jacket, a light jacket that's

7    long, maybe comes down to here (indicating).

8      Q.    Okay.

9      A.    And then, actually, he was touching it like

10   this (indicating), saying, What is this funny weird

11   clothes you're wearing?

12     Q.    Was there anything distinctive about that

13   jacket, to your opinion, that was distinctive in terms

14   of it being Middle Eastern?

15     A.    No.

16     Q.    Did you say anything in response to Joe's

17   comment?

18     A.    Yes, I did.

19     Q.    What did you say?

20     A.    I told him that this is a style here.

21     Q.    This is the style here, you said?

22     A.    Um-hum.

23     Q.    Did he have any response to that?

24     A.    No.

25     Q.    Do you recall whether anyone would have heard

1    the first comment, the one that took place in the middle

2    of January?

3        A.    Yes.

4        Q.    Who would have overheard that?

5        A.    Jasbir Gill.

6        Q.    And how did you come to understand that Jasbir

7    Gill overheard that comment?

8        A.    She was in the same vicinity.

9        Q.    Did she tell you she heard the comment?

10       A.    Yes.

11       Q.    And how about the comment a few days after that

12   about your funny, weird clothes?  Did anyone overhear

13   that comment, to your knowledge?

14       A.    To my knowledge, I don't know.  I don't know.

15       Q.    Were these all comments that you reported to

16   Joe [sic] toward the end of January?

17       A.    Joe?

18       Q.    Jason.

19       A.    Yes.

20       Q.    When do you contend was the next time that Joe

21   Brown made statements about your national origin or race

22   that you found offensive?

23       A.    Probably third week of February.

24       Q.    What statement did he make?

25       A.    He made a statement about Indian people.

108

1      A.    Can you say that again?

2      Q.    I'm trying to figure out, you said there was a

3   discussion concerning Jasbir's whereabouts, but you also

4   testified that he knew where she was.

5      A.    Um-hum.

6      Q.    So what was the discussion concerning her

7   whereabouts?

8      A.    He asked me if I know when Jasbir is coming

9   back --

10      Q.    Okay.  Got you.

11      A.    -- from India.

12      Q.    Did you know when she was coming back?

13      A.    I had no idea.

14      Q.    And what did he say, if anything, in response

15   to your statement that you didn't know when she was

16   coming back?

17      A.    He said, Good, maybe she's not coming back.

18   That will be one less Indian.

19      Q.    Did you say anything in response?

20      A.    No.

21      Q.    By that time, by the third week in February,

22   had you and Jasbir started working on the company that I

23   discussed with Jasbir yesterday in the deposition?  The

24   company's name is escaping me now.  Do you know what I'm

25   referring to?

111

1    Q.    And you wouldn't have reported these comments

2    to him at that time because they occurred the third week

3    of February; correct?

4    A.    Correct, yes.

5    Q.    So I was specifically asking you when you would

6    have reported the third week of February comments to

7    Jason Hoback.

8    A.    That would be sometime in March.

9    Q.    Okay.  Do you recall whether it was in the

10    early part of March?

11    A.    Later part of March.

12    Q.    Why did you wait approximately one month before

13    reporting this to Jason?

14    A.    I do not feel comfortable then.  I kind of wait

15    myself out and hesitate, but also wait for the right

16    opportunity to do it.

17    Q.    When you reported these comments to Jason

18    toward the end of March, where were you when you

19    reported them?

20    A.    I was working from home.

21    Q.    And so this report would have been over the

22    telephone?

23    A.    Yes.

24    Q.    And you had previously said you were waiting

25    for -- I don't know.  I'm not going to -- I'm trying not

115

1     February 21st?

2         A.   Yes.

3         Q.   What time?

4         A.   I don't exactly remember.  I'm usually -- I

5     have different times.  Sometimes I come in very early.

6     And if I have things to do, sometimes I come in not

7     later than 9 o'clock.

8         Q.   Do you recall whether you were in not later

9     than 9 o'clock on February 21st?

10        A.   Yes.

11        Q.   Yes, you were?

12        A.   Yes I were -- I was.

13        Q.   The scoping for terrorist targets comments, how

14    did you learn about this comment?

15        A.   In the same context of the conversation that

16    when they told me why I was not invited to the party.

17        Q.   Okay.  Specifically, who told you -- well, let

18    me ask you:  Did someone tell you that Joe Brown said

19    that you were not invited because you'd be scoping out

20    terrorist targets?

21        A.   Yes.

22        Q.   Who said that?

23        A.   Lisa McGuire.

24        Q.   Okay.  And was it in the context of her

25    discussion with you concerning why you weren't at the

121

1    party the previous day?

2        A.    It was a comment after I said I was not

3    invited.

4        Q.    Do you recall exactly what she told you in

5    response to that?

6        A.    Yes.  She looked at the girls and said, oh,

7    that's why Joe didn't invite you, because he thought

8    you'd be scoping for terrorist targets.

9        Q.    She looked at the girls, being Katie and

10    Rachel?

11        A.    Yes.

12        Q.    Did either Katie or Rachel make any comments

13    when Lisa said that?

14        A.    No.

15        Q.    Do you know whether or not Katie or Rachel

16    would have heard that comment?

17        A.    They were in the vicinity, but I cannot confirm

18    if they heard it or not.  But they were right there,

19    standing next to each other.

20        Q.    And when Lisa told you or made this comment,

21    was this the morning after the party, so the morning of

22    February 22nd?

23        A.    Yes.

24        Q.    And when she told you about this comment, where

25    were you?

122

```
 1          Q.   And what statement did he make?

 2          A.   Well, we walked outside and I looked at him and

 3      I asked the question of, What do you think of the call?

 4               And he hesitated for a little bit, and he

 5      looked at me and said, You know, I think you should go

 6      back to school, learn some English, read and write so

 7      you can speak normal like us.  You'll really be

 8      successful.  You need it.

 9          Q.   I'm sorry.  You said, So that you can be speak

10      like us?

11          A.   Yes, you can speak normal like us.

12          Q.   And did you make any -- or provide any response

13      to that?

14          A.   Yes, I did.

15          Q.   What did you say?

16          A.   I said, Why do you think that?

17          Q.   And what did he say?

18          A.   He said Jason told him that I make too many

19      mistakes in my proposals.

20          Q.   Did you say anything in response to that?

21          A.   Yes.

22          Q.   Do you recall what that was?

23          A.   Yes.  I told him I made one mistake in a

24      company's name, one line in a company's name, and Jason

25      pointed it out to me and it was corrected.
```

125

CERTIFIED
COPY

1

2                    UNITED STATES DISTRICT COURT

3            IN THE NORTHERN DISTRICT OF CALIFORNIA

4                            --oOo--

5      JASBIR GILL, MAHMOUD KEDKAD,           )
                                              )
6                  Plaintiffs,                )
                                              )
7            vs.                              )  No. C 07-04112 PVT
                                              )
8      KNOWLEDGESTORM, INC., a corporation,)
       DOES 1 through 50,                     )
9                                             )
                   Defendants.                )
10                                            )
       _____)
11

12

13                       DEPOSITION OF

14                  JOSEPH C. NIEDERBERGER

15            _____

16                    January 18, 2008

17

18

19

20

21     REPORTED BY:  KAREN A. FRIEDMAN, CSR 5425    JOB # 404738

22

23

24

25

EXHIBIT C

M E R R I L L   L E G A L   S O L U T I O N S

www.merrillcorp.com/law     20750 Ventura Blvd, Suite 205     818.593.2300 Tel
                            Woodland Hills, CA 91364

1      Q.    Do you know what his title or position was with

2   the company?

3      A.    I do not.

4      Q.    Did he, to your knowledge, did Mr. Brown, was

5   he in this same capacity, this interim capacity that

6   you've described, during the entire time that you were

7   employed by Knowledgestorm?

8      A.    That is my understanding.

9      Q.    Meaning, for example, did Mr. Brown change in

10  any other capacity during your employment there?

11     A.    No.

12     Q.    While you were employed by Knowledgestorm, are

13  you aware at all what Mr. Brown's title that he had as

14  an employee?

15     A.    I believe it might have been a regional sales

16  manager or district sales manager.

17     Q.    Does western region sales manager ring a bell?

18     A.    It could well have been that.

19     Q.    Was Mr. Brown your direct report?

20     A.    That is correct.  I reported to him.

21     Q.    Was there anyone else who you reported to

22  directly during your employment at Knowledgestorm?

23     A.    No.  There were other people I interacted with

24  senior to him, but he was my direct supervisor.

25     Q.    Who were the other people that you interacted

23

1    with?

2        A.    Jason Hoback, Jim Canfield.  Jason Hoback was a

3    director of sales for the company.  Jim Canfield was a

4    vice president of sales.

5        Q.    Was Mr. Hoback and Mr. Canfield also located

6    out of Alpharetta, Georgia?

7        A.    That's correct.

8        Q.    Going back to, one of the responsibilities that

9    you say that you had as a sales executive in the South

10   San Francisco office was office management.  Is that

11   accurate?

12       A.    Yes, that's accurate.

13       Q.    Is that -- who, I guess, empowered you with

14   those duties?

15       A.    Probably Joseph Brown.

16       Q.    What do you recall Mr. Brown saying to you with

17   regard to implementing those duties?

18       A.    Because he wouldn't be in the office.  He would

19   be traveling from Alpharetta periodically to the office.

20   That he needed someone to manage pretty much any local

21   issues that needed to be handled on a local basis;

22   whether it was ordering supplies, whether it was making

23   sure there was enough coffee.

24             Whether it was a space issue, a

25   telecommunications issue; there was a letdown in the

24

1    Q.    I understand that.  But my question is --

2    A.    It's pure speculation on my part.  I have no

3    basis in fact for coming to any conclusion.  They

4    rendered their reasons for terminating me.  They're

5    their reasons.

6    Q.    And you would only be speculating if there were

7    alternate reasons?

8    A.    I would be speculating, that's correct.

9    Q.    Now, are you aware of what the general

10   allegations are in this lawsuit?

11   A.    I believe I do, because I actually initiated

12   communication to the company relative to it.

13   Q.    Relative to these allegations?

14   A.    To these allegations, yes.

15   Q.    How did you initiate the information?

16   A.    Direct conversation with my superior.

17   Q.    And --

18   A.    Or actually, not my superior.  My supervisor's

19   superior.  I apologize.  That would be Jason Hoback.

20   Q.    So you spoke with Jason Hoback?

21   A.    That's correct.

22   Q.    And your understanding, that's the first point

23   in time in which Knowledgestorm learned of these general

24   allegations in this complaint?

25   A.    That's correct.

30

1     with it.

2         Q.    What else did you tell him?

3         A.    I couldn't give you a verbatim quote, but that

4     was the genesis that I told him.  I told him there were

5     issues I didn't know how to proceed on; I needed some

6     guidance.

7         Q.    Did you tell Mr. Hoback what the issues were?

8         A.    I told him they were related to racial issues

9     so he understood the severity of it.

10        Q.    What else do you recall telling Mr. Hoback in

11    this conversation?

12        A.    That's pretty much as good a summary as I could

13    give you.

14        Q.    What were the racial issues that you were

15    attempting to reference?

16        A.    They were phrases that I was a direct party to

17    in conversation with my direct supervisor.

18              They were extremely uncomfortable.  They were

19    racial in nature.  They were just prejudicial.  They're

20    not something you would say to somebody's face.

21        Q.    Phrases by whom?

22        A.    Joe Brown.

23        Q.    Were any racial phrases made by any other

24    employees of Knowledgestorm, that you're aware of?

25        A.    Well, I -- there were jokes made.  You know,

33

1    with anyone relative to these issues?

2        A.    Honestly, I don't believe that after that time

3    frame -- I felt I did what I was supposed to do.  I had

4    passed it on, and it wasn't my job responsibility.  I

5    did it off of my own accord and then went back to work.

6        Q.    Let me just ask my question again.  Maybe I'll

7    make it clearer this time.

8              Prior to your termination of employment, did

9    you have any other conversations with Knowledgestorm

10   management related to these racial issues?

11       A.    I believe, and I can't tell you if it was pre-

12   or immediately post, but at the time of my termination I

13   had sent a letter, an e-mail perhaps, maybe not a

14   letter, to the president of the company, stipulating

15   that issues had gotten out of control relative to both

16   racial and some inappropriate behavior from the remote

17   staff that was coming in.

18             It may have been -- it was right around my

19   termination.  I'm trying to recall whether I sent it as

20   an employee or post, but it was in that time frame.

21       Q.    Okay.  And just so we're clear, is the sending

22   of this letter or e-mail to the president of

23   Knowledgestorm, was that the second act that you

24   undertook to communicate any type of racially related

25   issues in the Knowledgestorm office in South San

                                                            36

1     Hoback about these racially related issues, as opposed

2     to any other person in management of the company?

3         A.    My recollection of my rationale at the time was

4     I liked Joe Brown as an individual.

5              Different people say different things and do

6     different things.  I didn't want to escalate it as an HR

7     issue, because I thought it could be handled internal to

8     the group.  I thought that was the appropriate course of

9     action.

10        Q.    So it's fair to say you did not report this

11    issue to -- do you know Mike Evers?

12        A.    Sure.

13        Q.    What was Mike Evers' position with the company?

14        A.    Might have been head of administration.  He was

15    a senior officer with the company.

16        Q.    So it's fair to say, during your employment

17    with Knowledgestorm, you did not communicate this issue

18    to him --

19        A.    No.

20        Q.    -- correct?

21        A.    No.

22        Q.    You mentioned that you either overheard or

23    witnessed racially related either comments or statements

24    that were made by Joe Brown.  Is that correct?

25        A.    I was a direct recipient of the conversation.

40

```
1    I didn't overhear.

2        Q.    So you witnessed the conversation?

3        A.    I was part of the conversation.

4        Q.    Okay.  When did this conversation take place?

5        A.    Probably started sometime in mid-December 2006;

6    continued on sporadically through the month of January,

7    maybe into the beginning of February.

8        Q.    Okay.  Just so we're on the same page, when I

9    think of a conversation, it's an isolated conversation.

10       A.    It's not.  May I give you an example?

11       Q.    Sure.

12       A.    Okay.  I would be in the office at 6:15 in the

13   morning.  Joe Brown would come in shortly thereafter.

14   We exchange pleasantries, and he would then make a

15   disparaging comment, with no one else in the office.

16   Basically say, and I don't even like the term, but he

17   was fond of the term -- he was fond of the term "sand

18   niggers."

19            He was fond of the term "camel jockeys."  And

20   he would say, "How are the sand niggers doing?"  "What

21   can we do to get the camel jockeys working harder?"  He

22   was very disparaging.  It wasn't a conversation, we

23   weren't having a conversation, but I was the sole

24   attendee in the office.  I was the target of the

25   comments.
```

41

1           It was uncomfortable, and my response generally

2    was, I'm just doing my thing.  People come into the

3    office.  I'm not punching clocks.  My job is sales.

4           They come into the office; everybody is

5    working, that kind of thing.  And it would move on to

6    SEC, football, or some less toxic conversation.

7    Q.   Other than the term "sand nigger" or "sand

8    niggers" or "camel jockey," did you witness Mr. Brown

9    using any other types of terms that you thought were

10   racially related?

11   A.   No, not that I can recall.  There was, the rest

12   of the office was Caucasian.  There wasn't another

13   person of different ethnicity in the company; at least

14   in the South San Francisco office.

15   Q.   Okay.  But your testimony still stands that you

16   do not recall any --

17   A.   Absolutely not.

18   Q.   -- you do not recall any other types of

19   racially related comments, other than "sand nigger" or

20   "camel jockey."  Correct?

21   A.   That's correct.

22   Q.   How many times during your employment with

23   Knowledgestorm do you recall Mr. Brown using the term

24   "sand nigger"?

25   A.   At least a half a dozen.  It was, I'm not going

42

1    to say it was part of his vocabulary, but it clearly was

2    a term he was comfortable using in my presence.

3    Thinking that, A, it didn't offend me, or that it was

4    somehow acceptable.

5        Q.    You say, "At least half a dozen."  Meaning six?

6        A.    Yes.

7        Q.    And less than how many?

8        A.    Twenty.

9        Q.    Is that your best estimate, 6 to 20?

10       A.    That is my best estimate.

11       Q.    And how many times during your employment do

12   you recall Mr. Brown use the term "camel jockey"?

13       A.    An equal number; between 6 and 20.

14       Q.    Now, during each of the times that you heard

15   Mr. Brown use the term "sand nigger," was there anybody

16   else present, other than yourself?

17       A.    No.

18       Q.    During each of the times that you overheard

19   Mr. Brown using the word "camel jockey," was there

20   anybody else present?

21       A.    No.

22       Q.    So during each of the incidences when you heard

23   Mr. Brown use the word "sand nigger," to your knowledge,

24   you were the only person who heard him use that term?

25       A.    That's correct.

43

1      Q.    Right.

2      A.    No.

3      Q.    Now, what's your understanding of who Mr. Brown

4    was referring to in using the word "sand nigger"?

5      A.    There were, the office was completely Caucasian

6    with the exception of Jasbir Gill and Mike Kedkad, who,

7    I'm not really sure what their ethnicity is, but that

8    was my inference from the comments.

9      Q.    And for the record, do you know what Ms. Gill's

10   race is?

11     A.    No.

12     Q.    Do you know what her nationality is?

13     A.    No.

14     Q.    Do you know what Mr. Kedkad's race is?

15     A.    No.

16     Q.    Do you know what Mr. Kedkad's nationality is?

17     A.    No.

18     Q.    During the times when you heard Mr. Brown use

19   the term "sand nigger," did he ever refer to Ms. Gill as

20   being a sand nigger?

21     A.    He referred to them collectively as both.  It

22   was directed at both of them.

23     Q.    My, I guess my question is, for example, did

24   Mr. Brown ever use the word "sand nigger" or "sand

25   niggers" and use the names Jasbir Gill and/or Mike

45

1    Kedkad in the same statement?

2    A.    Oh, yes.    Because it was always in alignment of

3    what are these individuals, what are these individuals

4    doing?    Are they showing up for work?    Are they coming

5    into the office?

6         So he was clearly directing his inquiry toward

7    me towards some kind of information, because I was in

8    the office early.    I would know when people showed up,

9    type of thing.    And that was his inquiry.

10        He wasn't referring to Katie Campbell or Kevin

11   Cummings or Lisa McGuire, who were all Caucasians.    He

12   was only referring to them.

13   Q.    But my specific question is, in any of these

14   incidences did Mr. Brown use the names Jasbir Gill or

15   Mike Kedkad, using these racially related terms?

16   A.    No.    He used the racial terms in place of their

17   names.

18   Q.    I believe you testified -- or I'll clarify for

19   the record.

20        When was the first time that you recall

21   Mr. Brown using the term "sand nigger" or "sand

22   niggers"?

23   A.    I believe it was prior to Christmas in 2006,

24   sometime in mid-December.

25   Q.    When was the last time you recall hearing

46